APPEAL,PROSE,TERMED

# U.S. District Court
## District of Wyoming (Cheyenne)
## CIVIL DOCKET FOR CASE #: <u>2:19–cv–00021–SWS</u>
### *Internal Use Only*

Bronnenberg v. Egger et al
Assigned to: Honorable Scott W Skavdahl
Referred to: Honorable Kelly H Rankin
 Case in other court:  USCA, 19–08026
                                      USCA, 19–08055
Cause: 42:1983 Civil Rights Act

Date Filed: 01/30/2019
Date Terminated: 08/05/2019
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Tami Mae Bronnenberg**

represented by **Tami Mae Bronnenberg**
P O Box 802
Cody, WY 82414
307/899–2150
PRO SE

V.

**Defendant**

**Beau J Egger**
*also known as*
Beau J Eggar

represented by **Adrian K Kowalski**
WYOMING ATTORNEY GENERAL
2320 Capital Avenue
Cheyenne, WY 82002
307/777–7580
Fax: 307/777/8920
Email: <u>adrian.kowalski@wyo.gov</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel E White**
WYOMING ATTORNEY GENERAL
2424 Pioneer Avenue
Cheyenne, WY 82002
307/777–7495
Fax: 307/777–8920
Email: <u>heather.hunter@wyo.gov</u>
*TERMINATED: 06/25/2019*

**Defendant**

**William K Struemke**
*attorney*
*TERMINATED: 02/25/2019*

**Defendant**

**Sara L Struemke**
*secretary*
*TERMINATED: 02/25/2019*

**Defendant**

**Servicm Legal Services LLC**
*TERMINATED: 02/25/2019*

**Defendant**

**DC Marlin D Richardson**
*TERMINATED: 02/25/2019*

**Defendant**

**Big Horn Basin Chiropractic**
*TERMINATED: 02/25/2019*

**Defendant**

**Cody WY**
*TERMINATED: 02/25/2019*

**Defendant**

**Park County Detention Center**
*TERMINATED: 02/25/2019*

**Defendant**

**Park County Board of County Commissioners**
*TERMINATED: 02/25/2019*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 01/30/2019 | 1 | 7 | COMPLAINT with Jury Demand filed by Tami Mae Bronnenberg (Attachments: # 1 Requests for Consent to Sue, # 2 Mailing Label) (Court Staff, sbh) (Entered: 01/30/2019) |
| 01/30/2019 | 2 | | MOTION to Proceed In Forma Pauperis filed by Plaintiff Tami Mae Bronnenberg (Court Staff, sbh) Modified to remove termination on 2/25/2019 (Court Staff, scat). (Entered: 01/30/2019) |
| 01/30/2019 | 3 | 23 | MOTION to Appoint Counsel filed by Plaintiff Tami Mae Bronnenberg (Attachments: # 1 Proposed Order) (Court Staff, sbh) Modified on 2/28/2019 (Court Staff, scat). (Entered: 01/30/2019) |
| 01/30/2019 | 4 | 25 | MOTION for Service of Process at Government Expense filed by Plaintiff Tami Mae Bronnenberg (Attachments: # 1 Proposed Order) (Court Staff, sbh) (Entered: 01/30/2019) |
| 02/01/2019 | 5 | 27 | ORDER Dismissing Complaint on 28 U.S.C. §1915 Screening by the Honorable Scott W Skavdahl. All pending Motions in this case are denied as moot. Copy of Order provided to Plaintiff by U.S. Mail.(Court Staff, scat) |

| | | | |
|---|---|---|---|
| | | | (Entered: 02/01/2019) |
| 02/04/2019 | 6 | | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Amend/Correct 1 Complaint filed by Plaintiff Tami Mae Bronnenberg. (Court Staff, sal) (Entered: 02/04/2019) |
| 02/05/2019 | 7 | 31 | ORDER by the Honorable Kelly H Rankin granting 6 MOTION to Amend/Correct 1 Complaint filed by Plaintiff Tami Mae Bronnenberg. IT IS ORDERED Plaintiff's Motion to Amend 1983 Civil Rights Complaint [Doc. 6] is GRANTED. IT IS FURTHER ORDERED Plaintiff may file an Amended Complaint on or before February 22, 2019. IT IS FURTHER ORDERED Plaintiff provide the Court with a complete Amended Complaint.Plaintiff sent a copy of this Order via U.S. Postal Service sent on 2/5/2019. (Court Staff, sjgc) (Entered: 02/05/2019) |
| 02/14/2019 | 8 | 34 | MOTION for Reconsideration re 5 Order dismissing case, filed by Plaintiff Tami Mae Bronnenberg. (Attachments: # 1 Envelope)(Court Staff, scat) (Entered: 02/14/2019) |
| 02/14/2019 | 9 | 39 | AMENDED COMPLAINT against Defendant Big Horn Basin Chiropractic, Cody WY, Beau J Eggar, Park County Board of County Commissioners, Park County Detention Center, Marlin D Richardson, Servicm Legal Services LLC, Sara L Struemke, William K Struemke, filed by Tami Mae Bronnenberg. (Court Staff, scat) (Additional attachment(s) added on 2/14/2019: # 1 Supplement: Certified copy of Exhibit D (page 14)) (Court Staff, sbh). (Entered: 02/14/2019) |
| 02/25/2019 | 10 | 57 | ORDER On 28 U.S.C. § 1915 Screening of Amended Complaint 9 by the Honorable Scott W Skavdahl. The amended complaint states a claim upon which relief can be granted against Defendant Beau J. Eggar. It is Further ORDERED that the Clerk of Court shall serve Defendant Beau J. Eggar in his individual/personal capacity. It is Further ORDERED that Defendant Eggar shall serve an answer within twenty−one(21) days of being served the summons and complaint. It is Further ORDERED that all other claims alleged in the amended complaint are **dismissed with prejudice**. It is Further ORDERED that 2 Motion for Leave to Proceed in forma pauperis is **granted**; and It is Finally ORDERED that 8 Motion for Reconsideration re 9 Amended Complaint is **denied as moot** because the Court has herein screened anew her amended complaint. Copy of Order mailed to Plaintiff on this date. (Court Staff, scat) Modified text on 2/25/2019 (Court Staff, scat). (Entered: 02/25/2019) |
| 02/25/2019 | 11 | | WAIVER of Service Issued for Beau J. Eggar on 2/25/2019. Waiver of Service due by 3/27/2019. (Court Staff, scat) (Entered: 02/25/2019) |
| 02/28/2019 | 12 | 69 | ORDER by the Honorable Scott W Skavdahl denying 3 Motion to Appoint Counsel. Copy of Order mailed to Plaintiff of this date. (Court Staff, scat) (Entered: 02/28/2019) |
| 03/11/2019 | 13 | 71 | WAIVER OF SERVICE Returned Executed by Beau J Eggar. Beau J Eggar 2/25/2019, answer due 4/26/2019 (Court Staff, sal) (Entered: 03/11/2019) |
| 03/12/2019 | 14 | 74 | OBJECTION to 10 Order on 28 U.S.C. § 1915 Screening of Amended Complaint filed by Plaintiff Tami Mae Bronnenberg. (Court Staff, scat) (Main Document 14 replaced on 3/12/2019 to remove duplicate page) (Court Staff, scat). (Entered: 03/12/2019) |

| 03/15/2019 | 15 | 84 | OBJECTION to 12 Order on Motion to Appoint Counsel filed by Plaintiff Tami Mae Bronnenberg. (Attachments: # 1 envelope) (Court Staff, skb) (Main Document 15 replaced on 3/20/2019 to correct pagination) (Court Staff, skb). Modified on 3/20/2019 (Court Staff, skb). (Entered: 03/15/2019) |
| --- | --- | --- | --- |
| 03/26/2019 | 16 | 91 | NOTICE of Attorney Appearance by Daniel E White on behalf of Beau J Eggar (White, Daniel) (Entered: 03/26/2019) |
| 03/26/2019 | 17 | 93 | NOTICE of Attorney Appearance by Adrian K Kowalski on behalf of Beau J Eggar (Kowalski, Adrian) (Entered: 03/26/2019) |
| 03/26/2019 | 18 | 95 | NOTICE of Unconstitutional Federal Statute, 28 U.S.C. §1915 by Plaintiff Tami Mae Bronnenberg (Court Staff, scat) (Entered: 03/26/2019) |
| 03/26/2019 | 19 | 105 | NOTICE OF INTERLOCUTORY APPEAL as to 10 Order On 28 U.S.C. § 1915 Screening of Amended Complaint by Plaintiff Tami Mae Bronnenberg. (Filing fee not paid– IFP pending) (Court Staff, stbd) (Entered: 03/26/2019) |
| 03/26/2019 | 20 | | NON–PUBLIC DOCUMENT pursuant to the Judicial Conference Policy on Privacy and Public Access MOTION to Appeal in forma pauperis filed by Plaintiff Tami Mae Bronnenberg. (Court Staff, stbd) Modified on 4/2/2019 (Court Staff, stbd). (Entered: 03/26/2019) |
| 03/26/2019 | 21 | | NON–PUBLIC DOCUMENT pursuant to the Judicial Conference Policy on Privacy and Public Access – AFFIDAVIT of Tami Mae Bronnenberg re 20 MOTION to Appeal in forma pauperis filed by Plaintiff Tami Mae Bronnenberg. (Court Staff, stbd) (Entered: 03/26/2019) |
| 03/26/2019 | 22 | | Preliminary Record of appeal sent to USCA and counsel re 19 Notice of Appeal **The procedures and appeals packet may be obtained from our website at www.wyd.uscourts.gov** (Attachments: # 1 Preliminary Record on Appeal Including Notice of Appeal) (Court Staff, stbd) (Entered: 03/26/2019) |
| 03/27/2019 | 23 | | Appeal Number **19–8026** received from USCA for 19 Notice of Appeal filed by Tami Mae Bronnenberg. (Court Staff, stbd) (Entered: 03/28/2019) |
| 04/01/2019 | 24 | 106 | ORDER by the Honorable Scott W Skavdahl granting 20 Motion for Leave to Appeal in forma pauperis (cc: defendant via US Mail)(Court Staff, stbd)Modified on 4/8/2019 (Court Staff, stbd). (Entered: 04/01/2019) |
| 04/03/2019 | 25 | | JUDICIAL NOTICE by Plaintiff Tami Mae Bronnenberg in Support of 18 Notice of Unconstitutional Federal Statute, 28 U.S.C. 1915. (Court Staff, scat) (Entered: 04/03/2019) |
| 04/04/2019 | 26 | | Misdirected Appeal Document– Plaintiff's Motion for Voluntary Dismissal of Notice of Appeal received and forwarded to USCA. (Court Staff, stbd) (Entered: 04/04/2019) |
| 04/05/2019 | 27 | 107 | MANDATE of USCA DISMISSING 19 Notice of Appeal filed by Tami Mae Bronnenberg. (Attachments: # 1 Order) (Court Staff, stbd) (Entered: 04/05/2019) |
| 04/26/2019 | 28 | 110 | Converted to MOTION for Summary Judgment per 30 ~~MOTION to Dismiss~~ filed by Defendant Beau J Eggar. (Kowalski, Adrian) Modified text and event on 4/30/2019 (Court Staff, scat). (Entered: 04/26/2019) |
| 04/26/2019 | 29 | 112 | |

| | | | |
|---|---|---|---|
| | | | MEMORANDUM in Support of 28 Motion for Summary Judgment ~~Motion to Dismiss~~ filed by Defendant Beau J Eggar. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit Unpublished Case Hammett, # 6 Exhibit Unpublished Case Calbart) (Kowalski, Adrian) Modified to remove duplicate text on 4/29/2019 (Court Staff, scat). Modified text on 4/30/2019 (Court Staff, scat). (Entered: 04/26/2019) |
| 04/30/2019 | 30 | 148 | ORDER Converting Defendants 28 MOTION to Dismiss to Motion for Summary Judgment by the Honorable Scott W Skavdahl. Defendant's Motion to Dismiss Plaintiff's Complaint 28 and accompanying memorandum 29 will be treated and considered as a motion for summary judgment under Rule 56 Plaintiff is provided the opportunity to include all materials pertinent to the motion with her response to the motion which she must file no later than 5/17/2019. Copy of Order provided to Plaintiff via US Mail(Court Staff, scat) Modified text on 4/30/2019 (Court Staff, scat). Modified text on 5/2/2019 (Court Staff, scat). (Entered: 04/30/2019) |
| 05/17/2019 | 31 | | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Order Correct Spelling in Caption filed by Plaintiff Tami Mae Bronnenberg. (Attachments: # 1 Proposed Order)(Court Staff, scat) (Additional attachment(s) added on 5/17/2019: # 2 Envelope) (Court Staff, scat). (Entered: 05/17/2019) |
| 05/17/2019 | 32 | | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Permission to File 17 Page Response filed by Plaintiff Tami Mae Bronnenberg. (Attachments: # 1 Proposed Order)(Court Staff, scat) (Entered: 05/17/2019) |
| 05/17/2019 | 33 | 150 | RESPONSE to 28 MOTION for Summary Judgment, filed by Plaintiff Tami Mae Bronnenberg. (Attachments: # 1 Affidavit of Tami Bronnenberg, # 2 Exhibit 1, # 3 Exhibit 2) (Court Staff, scat) (Entered: 05/17/2019) |
| 05/17/2019 | 34 | | ORDER by the Honorable Kelly H Rankin granting 32 Motion to File Excess Pages. Plaintiff may file a response up to seventeen pages in length in opposition to Defendant's Motion for Summary Judgment 28 . Copy of Order mailed to Plaintiff on this date. (Court Staff, sjh) (Entered: 05/17/2019) |
| 05/24/2019 | 35 | 192 | REPLY to 33 Response to Motion *for Summary Judgment* filed by Defendant Beau J Eggar. (Attachments: # 1 Exhibit Unpublished Case Taylor v Burd) (Kowalski, Adrian) (Entered: 05/24/2019) |
| 05/28/2019 | 36 | 203 | MOTION for Declaratory Judgment filed by Plaintiff Tami Mae Bronnenberg. (Attachments: # 1 Proposed Order, # 2 Envelope)(Court Staff, scat) (Entered: 05/28/2019) |
| 06/04/2019 | 37 | | (TEXT–ONLY) ORDER by the Honorable Kelly H Rankin granting 31 Motion for Order. Caption is amended as requested. Plaintiff sent a copy of the docket sheet via U.S. Postal Service sent on 6/4/2019. (Court Staff, sjgc) (Entered: 06/04/2019) |
| 06/04/2019 | 38 | 207 | MOTION for Summary Judgment, filed by Plaintiff Tami Mae Bronnenberg. (Attachments: # 1 Proposed Order, # 2 Exhibit, # 3 Exhibit, # 4 Envelope)(Court Staff, scat) (Entered: 06/04/2019) |
| 06/11/2019 | 39 | 243 | RESPONSE to 36 Motion for Judgment filed by Defendant Beau J Egger. (Attachments: # 1 Exhibit Unpublished Case Lawrence v. Kuenhold, # 2 Exhibit Unpublished Case Potomac v. Pella, # 3 Exhibit Unpublished Case |

| | | | |
|---|---|---|---|
| | | | Robinson v. Blank) (Kowalski, Adrian) (Entered: 06/11/2019) |
| 06/18/2019 | 40 | 266 | RESPONSE to 38 Motion for Summary Judgment filed by Defendant Beau J Egger. (Attachments: # 1 Exhibit Unpublished Case Bencomo v. Bd Cty Commrs, # 2 Exhibit Unpublished Case Scott v. City of Albuquerque) (Kowalski, Adrian) (Entered: 06/18/2019) |
| 06/24/2019 | 41 | 291 | BRIEF in support of 36 Motion for Judgment filed by Plaintiff Tami Mae Bronnenberg. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Envelope) (Court Staff, scat) (Entered: 06/24/2019) |
| 06/25/2019 | 42 | | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Withdraw as Attorney filed by Defendant Beau J Egger. (Attachments: # 1 Proposed Order)(White, Daniel) (Entered: 06/25/2019) |
| 06/25/2019 | 43 | | ORDER by the Honorable Kelly H Rankin granting 42 Motion to Withdraw as Attorney. Attorney Daniel E White terminated. (Court Staff, sjh) (Entered: 06/25/2019) |
| 07/01/2019 | 44 | 319 | REPLY to 40 Response filed by Plaintiff Tami Mae Bronnenberg. (Attachments: # 1 Appendix, # 2 Envelope) (Court Staff, stbd) (Entered: 07/01/2019) |
| 08/05/2019 | 45 | 334 | ORDER GRANTING 28 Defendant's Motion for Summary Judgment by the Honorable Scott W Skavdahl. Officer Egger is entitled to qualified immunity. It is Further ORDERED that Plaintiff's 36 Motion for Declaratory Judgment and 38 Motion for Summary Judgment are DENIED. Final judgment in Defendants' favor and against Plaintiff shall be entered in this matter and the case will be closed. Copy of Order provided to Plaintiff via US Mail. (Court Staff, scat) Modified text on 8/8/2019 (Court Staff, sjlg). (Entered: 08/05/2019) |
| 08/05/2019 | 46 | 343 | JUDGMENT in favor of Defendant by the Honorable Scott W Skavdahl. Copy of Judgment provided to Plaintiff via US Mail.(Court Staff, scat) (Additional attachment(s) added on 8/5/2019: # 1 Bill of Costs) (Court Staff, scat). (Entered: 08/05/2019) |
| 09/03/2019 | 47 | 346 | NOTICE OF APPEAL (Misdirected Appeal Document) as to 10 ORDER On 28 U.S.C. § 1915 Screening of Amended Complaint 45 Order on Motion for Judgment, Order on Motion for Summary Judgment & 46 Judgment, by Plaintiff Tami Mae Bronnenberg. Filing fee not paid. (Attachments: # 1 Envelope) (Court Staff, stbd) (Entered: 09/03/2019) |
| 09/03/2019 | 48 | | Preliminary Record of appeal sent to USCA and counsel re 47 Notice of Appeal, **The procedures and appeals packet may be obtained from our website at www.wyd.uscourts.gov** (Attachments: # 1 Preliminary Record on Appeal Including Notice of Appeal) (Court Staff, stbd) (Entered: 09/03/2019) |
| 09/03/2019 | 49 | | Appeal Number **19–8055** received from USCA for 47 Notice of Appeal, filed by Tami Mae Bronnenberg. Notice of appearance due on 10/03/2019 for Tami Mae Bronnenberg. Notice of appearance due on 09/17/2019 for Beau J. Eggar. (Court Staff, stbd) (Entered: 09/03/2019) |

Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150



FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 JAN 30 AM 11: 06

STEPHAN HARRIS, CLERK
CHEYENNE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI MAE BRONNENBERG )<br><br>Plaintiff, )<br><br>v. )<br><br>Beau J. Eggar, Arresting Officer; William )<br>K. Struemke, Attorney; Sara L. Struemke, )<br>Secretary; Servicm Legal Services, LLC; )<br>Marlin D. Richardson, DC; Big Horn )<br>Basin Chiropractic; City of Cody; Park County )<br>Detention Center; Board of County )<br>Commissioners of the County of Park. )<br><br>Defendants. ) | | CASE NO.<br><br>19-CV-21-S<br><br>_____<br><br>1983 CIVIL RIGHT<br>COMPLAINT PURSUANT<br>TO 42 USCS §1983 |

---

### A.  JURISDICTION.

1)  Plaintiff, Tami M. Bronnenberg, is a citizen of Wyoming and the United

States of America who presently resides at 938 19th Street, Lower Ave., Space 23, Cody,

Wyoming 82414.

2)  Defendant, Beau J. Eggar, the arresting Officer is a citizen of United States

of America who presently resides 4225 Road 2da, Cody, Wyoming 82414-9209. At the

time the claim alleged in this complaint arose this defendant was acting willful and

wanton misconduct under color of state law. Sued Individually, Personally, City and

County Officially.

1

3)    Defendant, William K. Struemke, Attorney, is a citizen of United States of America who presently resides at 2906 Marlisa Ln., Cody, Wyoming 82414-6708. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City and County Officially.

4)    Defendant, Sara L. Struemke, Secretary, is a citizen of United States of America who presently resides at 2906 Marlisa Ln., Cody, Wyoming 82414-6708. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City and County Officially.

5)    Defendant, Servicm Legal Services, LLC, is a Wyoming Law Corporation at 1302 Beck Ave., Cody, Wyoming 82414. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City and County Officially.

6)    Defendant, Marlin D. Richardson, DC, is a citizen of United States of America who presently resides 11 Beacon Dr., Cody, Wyoming 82414. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City and County Officially.

7)    Defendant, Big Horn Basin Chiropractic is a Wyoming Medical Corporation at 1620 Beck Ave., Cody, Wyoming 82414. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City and County Officially.

8) Defendant, City of Cody, P.O. Box 2200, Cody, Wyoming 82414 is a municipality in Park County. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City and County Officially.

9)    Defendant, Park County Detention Center, is a law enforcement center, 1402 River View Drive, Cody, Wyoming 82414. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City and County Officially.

10)    Defendant, Board of County Commissioners of the County of Park, 1002 Sheridan Ave., Cody, Wyoming 82414. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally and County Officially.

11)    Jurisdiction is invoked pursuant to 28 USCS §1343 (3); 42 USCS §1983; 42 USCS §1985 (2, 3); Civil Rights Act 1871; 28 USCS §2201; 28 USCS 2202; Federal Rules of Civil Procedure, Rules 38, 65; 28 USCS §1651; 42 USCS §1988; 18 U.S.C.S. §1201 (a).

## B. NATURE OF THE CASE

On January 31, 2017, at approximately 1699-1627, 16th & Bleistein Ave., Street, Cody, Wyoming, Tami M. Bronnenberg kept telling the defendant, arresting officer Beau J. Edger that the warrant he was relying on, issued January 9, 2017 in this matter, was vacated. Tami M. Bronnenberg tried to show him the court order vacating the warrant. Officer Beau J. Edger would not listen to the plaintiff or (look at the Order) Officer Beau J. Edger then arrested plaintiff, placed plaintiff in his patrol car, drove plaintiff to the

Park County Detention Center, 1402 River View Drive, booked plaintiff in at 10:19:40.

Then released plaintiff after they were informed that the next stop with the court order

would be the Park County Prosecuting Attorney's Office at 11:10:58. I, Tami M.

Bronnenberg believe William K. Struemke, Attorney; Sara L. Struemke, Secretary;

Servicm Legal Services, LLC representing Marlin D. Richardson, DC; Big Horn Basin

Chiropractic; City of Cody; Park County Detention Center; Park County Commissioners

are equally responsible for Kidnapping, False Arrest and False Imprisonment, Conspiracy

of Kidnapping and Conspiracy of Civil Rights.

## C.   CAUSE OF ACTION

1)   Plaintiff, Tami M. Bronnenberg, alleges that the following of her

constitutional rights, privileges or immunities have been violated and that the following

facts form the basis for her allegations:

a)   Count I:   Defendants denied plaintiff , Tami M. Bronnenberg,  the United

States Constitution, Amendment 4; Wyoming Constitution, Art., 1 Section 4; Federal

Rules of Criminal Procedure, Rules 4. (a); Wyoming Rules of Criminal Procedure, Rule

4; Equal Protection Clause and the Due Process Clause secured by the United States

Constitution, Amendment 14 and the Wyoming Constitution , Article 1, §§2,3, 6; Article

6, §1.

i)   Supporting facts:

Defendants are guilty of kidnapping if he unlawfully removes another from his

place of residence or business or from the vicinity where he was at the time of the

removal, or if he unlawfully confines another person, with the intent to: Hold for ransom

***. W.S. § 6-2-201 (a), (i); *** or to terrorize the victim ***. W.S. § 6-2-201 (a), (iii)

4

There is no durational requirement for the period of confinement for the purpose of this section, *** . Doud v. State, 845 P.2d 402 (Wyo. 1993); 18 U.S.C.S. §1201 (a). A person is guilty of false imprisonment if he knowingly and unlawfully restrains another so as to interfere substantially with his liberty. W.S. §6-2-203 (a).

Defendants denied plaintiff's right to the United States Constitution, Amendment 4, Security From Unwarrantable Search And Seizure. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."; This provision binds the state and its officers, including local police. See, Wolf v. Colorado, 338 U.S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949).

Wyoming Constitution, Art., 1 Section 4. Security against searches and seizure. "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized."; Federal Rules of Criminal Procedure, Rules 4. (a) Issuance. Arrest Warrant or Summons upon Complaint. "If it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense has been committed and that the defendant had committed it, a warrant for the arrest of the defendant shall issue to any officer authorized by law to execute it. *** .";

5

Wyoming Rules of Criminal Procedure, Rule 4. Warrant or Summons upon information. (a) Issuance. "If it appears from a verified information, or from an affidavit or affidavits filed with the information, that there is probable cause to believe that an offense has been committed and that the defendant had committed it, a summons shall issue requiring the defendant to appear and answer to the information. *** ."; To effect an arrest there must be actual or constructive seizure or detention of the person arrested, or his voluntary submission to custody, and the restraint must be under real or pretended legal authority. Neilson v. State, 599 P.2d 1326, 1979 Wyo. LEXIS 447 (Wyo. 1979), cert. denied, 444 U.S. 1079, 100 S. Ct. 1031, 62 L. Ed. 2d 763, 1980 U.S. LEXIS 755 (U.S. 1980).and Fed. R. Crim. Proc. Rule 41. (Searches and Seizures)The Fourth Amendment requires that warrants issue "upon probable cause, supported by Oath or affirmation." The significance of the oath requirement is "that someone must take the responsibility for the facts alleged, giving rise to the probable cause for the issuance of a warrant." United States ex rel. Pugh v. Pate, 401 F.2d 6 (7th Cir. 1968); See also Frazier v. Roberts, 441 F.2d 1224 (8th Cir. 1971); Wyo. Crim. Proc., Rule 41. Where the claim is that the police have improperly searched or seized something, the claimant must have had a legitimate expectation of privacy as to that thing. Factors to be considered in making this determination include: (1) the precautions taken in order to maintain one's privacy; (2) the likely intent of the drafters of the United States and Wyoming constitutions; (3) the property rights the claimant possessed in the invaded area; and (4) the legitimacy of the individual's possession of or presence in the property which was searched or seized. Parkhurst v. State, 628 P.2d 1369, 1981 Wyo. LEXIS 347 (Wyo.), cert. denied, 454 U.S. 899, 102 S. Ct. 402, 70 L. Ed. 2d 216, 1981 U.S. LEXIS 3986 (U.S. 1981).

U.S. Const. Amendment 5, Rights of Accused in Criminal Proceedings. "No person shall be *** compelled in any criminal case to be a witness against himself, nor deprived of life, liberty, or property, without due process of law; *** ."; Wyo. Const. Art. 1, Section 11. The state constitutional language itself protects an accused's right to silence and the existence of that right does not depend upon Miranda advice. The constitutional right to silence exists at all times: before arrest, at arrest, and after arrest; before a Miranda warning and after it. The right is self-executing. Tortolito v. State, 901 P.2d 387, 1995 Wyo. LEXIS 148 (Wyo. 1995).

U.S. Const. Amendment 9. Reservation of Rights of the People. "The enumeration in the Constitution, of certain rights, shall not be construed to deny, impair, or disparage others retained by the people"; Wyo. Const. Art. 1., Section 36. "The enumeration in this constitution, of certain rights shall not be construed to deny, impair, or disparage others retained by the people."

U.S. Const. Amendment 14. Citizenship Rights Not to Be Abridged by States. "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law."

Wyo. Const. Art.1, Section 6. Due process of law. No Person shall be deprived of life, liberty or property without due process of law. If a person cannot be deprived of life, liberty or property without due process of law, he necessarily must have the right to

7

protect it. Cross v. State, 370 P.2d 371 (Wyo. 1962). And a person is not to be deprived

of his liberty without due process of law. Holm v. State, 404 P.2d 740 (Wyo. 1965).

### D. PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF.

1)    Plaintiff has In the United States Bankruptcy Court for the District of

Wyoming., In re: Tami Mae Bronnenberg, Debtor, Randy L. Royal, Trustee of the

Bankruptcy Estate of Tami Mae Bronnenberg,  Plaintiff, v. Tami Mae Bronnenberg,

Defendant., Case No: 17-20201 Chapter 7, Adv. 17-02031., other administrative

regarding the acts complained of in Part C.

### E. REQUEST FOR RELIEF.

I believe I am entitled to the following relief::

(A)    A declaratory judgment pursuant to 28 USCS §§2201 and 2202, (Wyoming

Statutes 1977, §§1-37-101 to 1-37-115), declaring that defendant's acts, polices and

practices herein described and complained of violated plaintiff's rights under the United

states Constitution  and the Wyoming Constitution.

(B)    A preliminary and permanent injunction pursuant to the Federal Rules of

Civil Procedure, Rule 65, (W.R.C.P., Rule 65; Wyoming Statutes 1977, §§1-28-101 to

111), which:

(i)    Prohibits the Defendants, their successors in office, agents, and employees

and all other persons in action concert and participation with them from denying plaintiff

the United States Constitution, Amendment 4; Wyoming Constitution, Art., 1 Section 4;

Federal Rules of Criminal Procedure, Rules 4. (a); Wyoming Rules of Criminal

Procedure, Rule 4; Equal Protection Clause and the Due Process Clause secured by the

United States Constitution, Amendment 14 and the Wyoming Constitution , Article 1, §§2,3. 6; Article 6, §1.

    (ii)   Prohibit defendants, their successors in office, agents and employees and all other persons in active concert and participation with them from retaliating against plaintiff in any way.

    (C)   Demand for jury trial pursuant to Federal Rules of Civil Procedure, Rule 38 (a), (b).

    (D)   Compensatory damages for loss pain, suffering, humiliation irreparable injury and the consequences of deprivation or loss of rights in personal, individual, official capacity of the defendants jointly and severally in the amount as the proof may show plus taxation cost, (28 USCS §1915 (e).

    (E)   Punitive damages for bad faith and willful actions of the defendants in their personal, individual, official capacity in the amount the court may determine, plus taxation cost, (28 USCS §1915 (e).

    (F)   Award plaintiff his cost (28 USCS §1915 (e) and attorney fees, 42 USCS §1988), that attorney be appointed (28 USCS §1915 (d) and such other and further relief that the court deems to be appropriate and just (28 USCS §1615).

DECLARATION UNDER PENALTY OF PERJURY.

    The undersigned declares under penalty of perjury that he is the plaintiff in the above action, that he read the above complaint and that the information contained therein is true and correct. 28 USCS §1746, 18 USCS §1621.

Executed at _Cody wy_ on _January 28_, 2018. 2019

Tami Mae Bronnenberg, Pro-Se

9

## CERTIFICATE OF SERVICE

I hereby certify a copy of the forgoing 1983 Civil Right Complaint pursuant to 42 USCS §1983 was mailed or delivered to Beau J. Eggar, Arresting Officer, 4225 Road 2da, Cody, Wyoming 82414-9209; William K. Struemke, Attorney, 2906 Marlisa Ln., Cody, Wyoming 82414-6708; Sara L. Struemke, Secretary, 2906 Marlisa Ln., Cody, Wyoming 82414-6708; Servicm Legal Services, LLC; 1302 Beck Ave., Cody, Wyoming 82414; Marlin D. Richardson, DC; 11 Beacon Dr., Cody, Wyoming 82414; Big Horn Basin Chiropractic; 1620 Beck Ave., Cody, Wyoming 82414; City of Cody; P.O. Box 2200, Cody, Wyoming 82414; Park County Detention Center; 1402 River View Drive, Cody, Wyoming 82414; Board of County Commissioners of the County of Park, 1002 Sheridan Ave., Cody, Wyoming 82414 on January 28 2019.

Tami Mae Bronnenberg, Pro-se

10

Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI MAE BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. |
| | ) | |
| v. | ) | 19-Cv-21-S |
| | ) | |
| Beau J. Eggar, Arresting Officer; William | ) | |
| K. Struemke, Attorney; Sara L. Struemke, | ) | |
| Secretary; Servicm Legal Services, LLC; | ) | _____ |
| Marlin D. Richardson, DC; Big Horn | ) | |
| Basin Chiropractic; City of Cody; Park County | ) | |
| Detention Center; Board of County | ) | |
| Commissioners of the County of Park. | ) | 1983 CIVIL RIGHT |
| | ) | COMPLAINT PURSUANT |
| Defendants. | ) | TO 42 USCS §1983 |
| | ) | |

To:  Secretary of City of Cody
    P.O. Box 2200
    Cody, Wyoming 82414
    Ph. (307) 527-7511

    Comes now, Tami Mae Bronnenberg, Pro-se and respectfully request for consent to

sue the City of Cody, Wyoming 82414. Pursuant to Wyo. Sts. §1-35-101, Atchison v.

Nelson, 406 F. Supp. 1102.

Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

1

STATE OF WYOMING    )
                    )    ss:
COUNTY OF PARK      )

Subscribed and sworn to before me this 25th day of January ___, 2019.

Witness my hand and official seal: _____
                                        Notary Public

My commission expires: _____ July 10, 2020 _____

## CERTIFICATE OF SERVICE

I, Tami Mae Bronnenberg, Pro-se, swear and certify that I mailed this true and

correct copy of the above request for consent to sue to the Secretary of the City of Cody,

P.O. Box 2200, Wyoming 82414 on this day of January ___, 2019.

Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

2

Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI MAE BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. |
| | ) | 19-CV-21-5 |
| v. | ) | |
| | ) | |
| Beau J. Eggar, Arresting Officer; William | ) | |
| K. Struemke, Attorney; Sara L. Struemke, | ) | |
| Secretary; Servicm Legal Services, LLC; | ) | _____ |
| Marlin D. Richardson, DC; Big Horn | ) | |
| Basin Chiropractic; City of Cody; Park County | ) | |
| Detention Center; Board of County | ) | |
| Commissioners of the County of Park. | ) | 1983 CIVIL RIGHT |
| | ) | COMPLAINT PURSUANT |
| Defendants. | ) | TO 42 USCS §1983 |
| | ) | |

To:  Secretary of Park County
     1002 Sheridan Ave.
     Cody, Wyoming 82414

     Comes now, Tami Mae Bronnenberg, Pro-se and respectfully request for consent to

sue: Park County Detention Center and the Board of County Commissioners of the

County of Park, Cody, Wyo. Pursuant to Wyo. Sts. §1-35-101, Atchison v. Nelson, 406

F. Supp. 1102.

Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

19

STATE OF WYOMING       )
                       )   ss:
COUNTY OF PARK         )

Subscribed and sworn to before me this 25th day of January ___, 2019.

Witness my hand and official seal: _____
                                            Notary Public

My commission expires: _____ July 10, 2020 _____

## CERTIFICATE OF SERVICE

I, Tami Mae Bronnenberg, Pro-se, swear and certify that I mailed this true and correct copy of the above request for consent to sue Park County Detention Center and the Board of County Commissioners of the County of Park, Cody, Wyo., to the Secretary of the County of Park, 1002 Sheridan Ave., Cody, Wyoming 82414 on this day of January ___, 2019.

Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

Tami: Mask
P.O. Box 802
Cody, Wyo. 82414



Tami M. Bronnenberg
P.O. Box 802
Cody, Wyo. 82414





Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 JAN 30  AM 11: 06

STEPHAN HARRIS, CLERK
CHEYENNE

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| TAMI MAE BRONNENBERG )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Beau J. Eggar, Arresting Officer; William )<br>K. Struemke, Attorney; Sara L. Struemke, )<br>Secretary; Servicm Legal Services, LLC; )<br>Marlin D. Richardson, DC; Big Horn )<br>Basin Chiropractic; City of Cody; Park County )<br>Detention Center; Board of County )<br>Commissioners of the County of Park. )<br>)<br>Defendants. )<br>) | CASE NO.<br>19-CV-21-S<br><br><br><br>_____<br><br>1983 CIVIL RIGHT<br>COMPLAINT PURSUANT<br>TO 42 USCS §1983 |

## MOTION FOR APPOINTMENT OF COUNSEL.

The plaintiff in the above-entitled matter hereby moves the Court for an

order appointing legal counsel to act on her behalf. I sought assistance from some

civil rights attorneys but I cannot remember who. See also in consideration, My

Motion for Forma Pauperis.

Dated this _28_ day of _January_, 20_19_.

Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI MAE BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. |
| | ) | |
| v. | ) | 19-CV-21-S |
| | ) | |
| Beau J. Eggar, Arresting Officer; William | ) | |
| K. Struemke, Attorney; Sara L. Struemke, | ) | |
| Secretary; Servicm Legal Services, LLC; | ) | |
| Marlin D. Richardson, DC; Big Horn | ) | |
| Basin Chiropractic; City of Cody; Park County | ) | |
| Detention Center; Board of County | ) | |
| Commissioners of the County of Park. | ) | 1983 CIVIL RIGHT |
| | ) | COMPLAINT PURSUANT |
| Defendants. | ) | TO 42 USCS §1983 |
| | ) | |

### ORDER FOR APPOINTMENT OF COUNSEL.

The Court having considered and granted plaintiff's motion for

appointment of counsel, it is

**ORDERED** that counsel shall be appointed.

Dated this _____ day of _____, 2019.

_____
UNITED STATES DISTRICT JUDGE

Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 JAN 30  AM 11: 06

STEPHAN HARRIS, CLERK
CHEYENNE

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI MAE BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. |
| | ) | |
| v. | ) | 19-CV-21-S |
| | ) | |
| Beau J. Eggar, Arresting Officer; William | ) | |
| K. Struemke, Attorney; Sara L. Struemke, | ) | |
| Secretary; Servicm Legal Services, LLC; | ) | _____ |
| Marlin D. Richardson, DC; Big Horn | ) | |
| Basin Chiropractic; City of Cody; Park County | ) | |
| Detention Center; Board of County | ) | |
| Commissioners of the County of Park. | ) | 1983 CIVIL RIGHT |
| | ) | COMPLAINT PURSUANT |
| Defendants. | ) | TO 42 USCS §1983 |

### MOTION FOR SERVICE OF PROCESS AT GOVERNMENT EXPENSE.

The plaintiff moves the Court for an order directing the United States

Marshal to serve the summons and complaint pursuant to 28 U.S.C. §1915(d). The

full names and address of the defendants are contained in the complaint.

Dated this 28 day of January, 20 19.

Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI MAE BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. |
| | ) | |
| v. | ) | 19-Cv-21-S |
| | ) | |
| Beau J. Eggar, Arresting Officer; William | ) | |
| K. Struemke, Attorney; Sara L. Struemke, | ) | |
| Secretary; Servicm Legal Services, LLC; | ) | |
| Marlin D. Richardson, DC; Big Horn | ) | |
| Basin Chiropractic; City of Cody; Park County | ) | |
| Detention Center; Board of County | ) | |
| Commissioners of the County of Park. | ) | 1983 CIVIL RIGHT |
| | ) | COMPLAINT PURSUANT |
| Defendants. | ) | TO 42 USCS §1983 |
| | ) | |

ORDER DIRECTING SERVICE OF SUMMONS AND COMPLAINT AT
GOVERNMENT EXPENSE..

The Court having granted plaintiff's motion to proceed *in forma pauperis*,

it is

**ORDERED** the United States Marshal shall serve the summons, together

with a copy of the complaint upon the defendants.

Dated this _____ day of _____, 20___.


_____
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2019 FEB -1 AM 10: 17

STEPHAN HARRIS, CLERK
CASPER

---

TAMI MAE BRONNENBERG,

       Plaintiff,

   v.

BEAU J. EGGAR, Arresting Officer; WILLIAM K.
STRUEMKE, Attorney; SARA L. STRUEMKE,
Secretary; SERVICM LEGAL SERVICES, LLC;
MARLIN D. RICHARDSON, DC; BIG HORN BASIN
CHIROPRACTIC; CITY OF CODY; PARK COUNTY
DETENTION CENTER; BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF PARK;

       Defendants.

Case No. 19-CV-21-SWS

---

## ORDER DISMISSING COMPLAINT ON 28 U.S.C. § 1915 SCREENING

---

This matter comes before the Court on Ms. Bronnenberg's *pro se* 1983 Civil

Rights Complaint Pursuant to 42 USCS §1983 (Doc. 1), filed on January 30, 2019.

Because Ms. Bronnenberg seeks to proceed *in forma pauperis* in this action without the

prepayment of fees (Doc. 2), the litigation process begins with the Court screening her

complaint under 28 U.S.C. § 1915. *See Lister v. Dep't of Treasury*, 408 F.3d 1309, 1312

(10th Cir. 2005) (holding that § 1915(a) applies to all persons seeking to proceed *in*

*forma pauperis*). Section 1915(e)(2)(B) requires a district court to dismiss the case

whenever the court determines the action "fails to state a claim on which relief may be

granted or seeks monetary relief against a defendant who is immune from such relief."

*See Merryfield v. Jordan*, 584 F.3d 923, 926 (10th Cir. 2009). Having screened the

complaint as required by statute, the Court finds all claims must be dismissed because Ms. Bronnenburg has failed to state a claim upon which relief can be granted and seeks monetary relief against a defendant who is immune from such relief.

For § 1915 screening purposes, the Court accepts the Plaintiff's allegations as true and construes all reasonable inferences drawn from those allegations in the light most favorable to the Plaintiff. *See Kay v. Bemis*, 500 F.3d 1214, 1217-18 (10th Cir. 2007). The underlying basis for Ms. Bronnenburg's civil rights complaint seems to be an allegation that Defendant Beau Eggar[1], a peace officer, arrested her on January 31, 2017, on an invalid arrest warrant despite her attempts to explain to him why it was invalid. (Doc. 1 at pp. 3-4.) It appears she was released from detention less than an hour after being booked, ostensibly because the arrest warrant had indeed been canceled. (*Id.*)

Ms. Bronnenburg's complaint must be dismissed under 28 U.S.C. § 1915(e)(2)(B). As to Officer Eggar, she does not contend the arrest warrant he relied on was somehow invalid on its face; that is, there is nothing to suggest that Officer Eggar could know the warrant was invalid just by looking at it. "Unless a warrant is facially invalid[,] an officer has no constitutional duty to independently determine its validity." *Hill v. Bogans*, 735 F.2d 391, 393 (10th Cir. 1984). "'[F]acially valid' does not mean 'lawful,' and erroneous orders can be valid." *Moss v. Kopp*, 559 F.3d 1155, 1165 (10th Cir. 2009). The Tenth Circuit has held "that an official [including a police officer] charged with the duty of executing a facially valid court order enjoys absolute immunity from liability for damages in a suit challenging conduct prescribed by that order." *Valdez v. City & Cty. of*

---

[1] She also spells this defendant's name as "Edger" in her complaint.

*Denver*, 878 F.2d 1285, 1286 (10th Cir. 1989).  An arrest warrant is a court order commanding law enforcement to arrest the person named in the warrant and bring that person before the judge.  Thus, a police officer who executes a facially-valid warrant is immune from liability for complying with that order.  Because there is nothing to suggest that the warrant for Mr. Bronnenburg's arrest was invalid on its face, Officer Eggar (or "Edger") is immune from liability for executing that warrant.[2]  This lawsuit must be dismissed as to Officer Eggar under 28 U.S.C. § 1915(e)(2)(B)(iii) because it "seeks monetary relief against a defendant who is immune from such relief."

As to the remaining defendants, Ms. Bronnenburg's complaint fails to allege how each participated in the violation of her protected rights.  "In § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities.  Therefore it is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1249–50 (10th Cir. 2008) (emphasis in original) (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1970-71 n.10 (2007)).  Ms. Bronnenburg's sole assertion toward this end is that she "believe[s]" the remaining defendants "are equally responsible

---

[2] *See also Rivera v. Bates*, No. CIV 12-0473 JB/RHS, 2014 WL 3421050, at *46 (D.N.M. June 21, 2014) (unpublished) ("Rivera envisions a scenario where the police show him the warrant, and give him an opportunity to find papers that support his position and then make his case to the police.  That idyllic picture of how warrants are executed is not how it is done or should be done.  If there is a problem with a warrant, much of the time it is upstream, and the police have little discretion; if there is a problem, a criminal defendant's remedy is usually in a later court, not in negotiations with, and a mini-trial before, the arresting officers.").

for Kidnapping, False Arrest and False Imprisonment, Conspiracy of Kidnapping and Conspiracy of Civil Rights." (Doc. 1 at p. 4.) However, it is well-established that conclusory allegations such as this fail to state a viable claim, and more specific to this case, "[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989). An allegation that Ms. Bronnenburg "believe[s]" the defendants conspired against her, or even a conclusory allegation that they did conspire against her, is insufficient to state a viable claim for which relief may be granted under § 1983.[3]

**IT IS THEREFORE ORDERED** that the complaint in this matter must be **dismissed** without prejudice under 28 U.S.C. § 1915(e)(2)(B)(ii) and (iii).

**IT IS FURTHER ORDERED** that all pending motions in this case are **denied as moot.**

**DATED:** January 31st, 2019.

Scott W. Skavdahl
United States District Judge

---

[3] The Court notes that the entire "supporting facts" section in the complaint is actually a recitation of various rules of law and legal principles. It does not allege any facts about what happened in this case.



# United States District Court

## For The District of Wyoming

**FILED**

**2:02 pm, 2/5/19**

**U.S. Magistrate Judge**

|  |  |
|---|---|
| TAMI MAE BRONNENBERG, | |
| Plaintiff, | |
| vs. | |
| BEAU J. EGGAR, Arresting Officer; WILLIAM K. STRUEMKE, Attorney; SARA L. STRUEMKE, Secretary; SERVICM LEGAL SERVICES, LLC; MARLIN D. RICHARDSON, DC; BIG HORN BASIN CHIROPRACTIC; CITY OF CODY; PARK COUNTY DETENTION CENTER; BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF PARK; | Civil No. 19-CV-021-S |
| Defendants. | |

**ORDER GRANTING PLAINTIFFS' MOTION TO AMEND 1983 CIVIL RIGHTS COMPLAINT [DOC. 6]**

This matter is before the Court on Plaintiff's Motion to Amend 1983 Civil Rights Complaint [Doc. 6]. This case originally comes before the Court on Plaintiff's civil rights Complaint pursuant to 42 U.S.C. § 1983 filed on January 30, 2019 [Doc. 1]. Along with her Complaint, Plaintiff filed a Motion to Proceed In Forma Pauperis [Doc. 2], a Motion to Appoint Counsel [Doc. 3], and a Motion for Service of Process at Government Expense [Doc. 4]. Plaintiff's litigation process began with the trial Court screening her complaint under 28 U.S.C. § 1915. *See Lister v. Dep't of Treasury*, 408 F.3d 1309, 1312 (10th Cir. 2005) (holding that § 1915(a) applies to all persons seeking to proceed in forma pauperis).

During this initial screening, the trial Court dismissed all claims, finding Plaintiff failed to state a claim upon which relief could be granted and because Plaintiff sought monetary relief against a defendant who is immune from such relief.  Order Dismissing Complaint on 28 U.S.C. § 1915 Screening [Doc. 5].  The Court filed the Order Dismissing Plaintiff's Complaint on February 1, 2019, and sent Plaintiff a copy of the Order via the U.S. Postal Service on the same day.  On February 4, 2019, the Clerk of Court received, again via the U.S. Postal Service, Plaintiff's Motion to Amend [Doc. 6].  It appears highly likely the Court's Order Dismissing Plaintiff's Claims [Doc. 5] and the instant Motion to Amend [Doc. 6] crossed in the mail.

In looking at the procedural history of this case, Plaintiff is entitled to file an amended complaint.  First, Plaintiff's claims were dismissed without prejudice.  Second, amendment of pleadings are governed by Rule 15 of the Federal Rules of Civil Procedure, and the rule allows a party to amend its pleading once as a matter of course within twenty-one days of service, or twenty-one days after service of a responsive pleading or service of a Rule 12 motion.  Fed. R. Civ. P 15(a)(1).  Plaintiff's Motion to Amend comes well within the time frame for filing an amendment as a matter of course.  Therefore, Plaintiff may file an amended complaint.  Plaintiff must provide the Court with a complete amended complaint, as providing only the pages with changes is insufficient.  The Court will conduct its initial screening, and proceed accordingly, after the amended complaint is filed.

NOW, THEREFORE, IT IS ORDERED Plaintiff's Motion to Amend 1983 Civil Rights Complaint [Doc. 6] is GRANTED.

IT IS FURTHER ORDERED Plaintiff may file an Amended Complaint on or before February 22, 2019.

IT IS FURTHER ORDERED Plaintiff provide the Court with a complete Amended Complaint.

Dated this 5th day of February, 2019.

Kelly H. Rankin
U.S. Magistrate Judge

3

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 FEB 14  AM 10: 04

STEPHAN HARRIS, CLERK
CASPER

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

TAMI M. BRONNENBERG )
)
Plaintiff, )
)
vs. )
)
BEAU J. EGGAR, Arresting Officer; WILLIAM K. )
STRUEMKE, Attorney; SARA L. STRUEMKE, )      CASE NO.
Secretary; SERVICM LEGAL SERVICES, LLC; )      19-CV-021-SWS
MARLIN D. RICHARDSON, DC; BIG HORN BASIN )
CHIROPRACTIC; CITY OF CODY; PARK COUNTY )
DETENTION CENTER; BOARD OF COUNTY )
COMMISSIONERS OF THE COUNTY OF PARK; )
)
Defendants. )
)

### MOTION TO RECONSIDERATION.

The plaintiff respectfully moves this Court for a Motion to Reconsider the **Order**

**Dismissing Complaint on 28 U.S.C. §1915 Screening** pursuant to the United States

District Court Local Rule 7.1 upon the following:

1. Enclosed: Amended 1983 Civil Right Complaint pursuant to **ORDER**

**GRANTING PLAINTIFF' MOTION TO AMEND 1983 CIVIL RIGHTS**

**COMPLAINT [DOC. 6]**, also enclosed.

### MEMORANDUM OF LAW ON IMMUNITY.

"As the qualified immunity defense has evolved, it provides ample support to all

but the plainly incompetent or those who knowingly violate the law." See, **Burns v.**

1

**Reed**, 500 U.S. 478, at 495, 111 S. Ct. 1934 **(1991)**; **Malley v. Briggs**, 475 U.S. 335 at

341 **(1986)**; **Mitchell v. Forsyth**, 472 U.S. 511 at 524 **(1985)**. Although "this Court's

caselaw does not require a case directly on point for a right to be clearly established,

existing precedent must have placed the statutory or constitutional question beyond

debate." **White v. Pauly**, 580 U. S., at ___ **(2018)**) (Per Curiam.) (Slip op., at 6) (Internal

quotation marks omitted). "In other words, immunity protects all but the plainly

incompetent or those who knowingly violate the law." **Ibid**. (internal quotation marks

omitted). This Court has "'repeatedly told courts—and the Ninth Circuit in particular—

not to define clearly established law at a high level of generality.'" **City and County of**

**San Francisco v. Sheehan**, 575 U. S. ___, ___ **(2015)** (slip op., at 13) (quoting **Ashcroft**

**v. al-Kidd**, 563 U. S. 731, 742 **(2011)**); **see also Brosseau**, 543 U. S. 194, at 198–199

**(2004)** (per curiam); **See, Kisela v. Hughes**, 584 U. S. ____ **(2018)** (Per Curiam.) (Slip

op., at 6).

This Court has never suggested that the policy considerations which compel civil

immunity for certain governmental officials also place them beyond the reach of the

criminal law. Even judges, cloaked with absolute civil immunity for centuries, could be

punished criminally for willful deprivations of constitutional rights on the strength of **18**

**U.S.C. 242**, the criminal analog of **1983**. **O'Shea v. Littleton**, 414 U.S. 488 at 503

**(1974)**; **cf. Gravel v. United States**, 408 U.S. 606 at 627 **(1972)**.

> **"Every person who, under color of any statute, ordinance, regulation,**
> **custom, or usage, of any State or Territory, subjects, or causes to be**
> **subjected, any citizen of the United States or other person within the**
> **jurisdiction thereof to the deprivation of any rights, privileges, or immunities**
> **secured by the Constitution . . . shall be liable to the party injured in an**
> **action at law, suit in equity, or other proper proceeding for redress."**

As the language itself makes clear, the central purpose of **1983** is to "give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position." **Monroe v. Pape**, 365 U.S. 167, 172 **(1961) (emphasis added)**. The United States Constitution among other things, places substantial limitations upon state action, and the cause of action provided in **42 U.S.C. 1983** is fundamentally one for "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." **United States v. Classic**, 313 U.S. 299, 326 **(1941)**.

The **Constitution of the United States of America, Article 6** provides in part:

"**\*\*\*** The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and **all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; \*\*\***".

The **Constitution of the State of Wyoming, Article 6, §20** provides: Senators and representatives and all judicial, state and county officers shall, before entering on the duties of their respective offices, take and subscribe the following oath or affirmation:

"I do solemnly swear (or affirm) that **I will support, obey and defend the constitution of the United States and the constitution of this state and that I will discharge the duties of my office with fidelity;\*\*\***".

**Wyo. Const. Article 6, §20** provides in part:

"**\*\*\*** any person refusing to take said oath or affirmation shall forfeit his office, and any person who shall be convicted of having sworn or affirmed falsely or of having violated said oath or affirmation, shall be guilty of perjury, and be forever disqualified from holding any office of trust or profit within this state. \*\*\*'

The public interest demands strict adherence to judicial decree. The Supreme Court has stated that "Public officials ... who fail to ... implement decisions when they are made do not fully and faithfully perform the duties of their offices." **Scheuer v.**

**Rhodes,** 416 U.S. 232, 241-42, 94 S.Ct. 1683, 1689, 40 L. Ed2d 90 **(1974)**. Even Judges

are subject to professional discipline, constitutional or statutory removal, or in more

egregious cases, criminal prosecution under **18 U.S.C. Sec. 242** for willful deprivations

of constitutional rights. **Imbler v. Pachtman,** 424 U.S. 409, at 429, 96 S.Ct. 984 at 994,

47 L.Ed.2d128 **(1976). See, Valdez v. City & Cty of Denver,** 878 F2d 1285 at ¶10 &

¶11, **(10th Cir. 1989)**.The Supreme Court has explained, § 1983 "provides that [every]

person who acts under color of state law to deprive another of constitutional rights shall

be liable in a suit for damages." **Tower v. Glover**, 467 U.S. 914, 919, 104 S. Ct. 2820, 81

L.Ed.2d 758 **(1984)** (quoting **42 U.S.C. §1983**); **Moss v. Kopp**, 559 F.3d 1155, at III.

Discussion A. 3rd ¶ **(10th Cir. 2009)**. If a person cannot be deprived of life, liberty or

property without due process of law, (s)he necessarily must have the right to protect it.

**Cross v. State**, 370 P.2d 371 **(Wyo. 1962)**.

     **WHEREFORE,** because of the foregoing facts presented above Plaintiff, Tami

M. Bronnenberg, **THERFORE** prays this Motion be granted.

     **DATED: FEBRUARY 13, 2019**.

Tami M. Bronnenberg, Pro-se

CERTIFICATE OF SERVICE.

     I hereby certify that a copy of the forgoing Motion to Reconsideration pursuant to

the U.S.D.C.L.R, Rule 7.1 was mailed or delivered to United States Magistrate Judge,

Kelly H. Rankin, United States District Court, 2120 Capitol Ave., Suite 2204, Cheyenne,

Wyoming 82001 on **FEBRUARY 13, 2019**.

Tami M. Bronnenberg, Pro-se

4



1 LBS        1 of 1
SHP WT 1 LBS
DATE: 13 FEB 2019

TAMI BRONNENBERG
(307) 899-2159
THE UPS STORE #2394
1100 14TH ST
CODY WY 82414-3743

SHIP CLERK OF US DISTRICT COURT
TO:  RM 121
     111 S WOLCOTT ST

CASPER WY 82601-2534

WY 826 9-0

UPS GROUND
TRACKING #: 1Z V03 823 03 6802 2453

BILLING: P/P

Clerk, U.S. Dist. Ct.
111 S. Wolcott, Rm. 121
Casper, Wyo. 82601

Tami Bronnenberg
P.O. Box 802
Cody, Wyo. 82414

CLERK OF US DISTRICT COURT
111 S WOLCOTT ST
RM 121
CASPER WY 82601

P: BOTTOM S.GOLD
KITN - 26/93

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. **19-CV-021-S** |
| | ) | |
| BEAU J. EGGAR, Arresting Officer; WILLIAM K. | ) | |
| STRUEMKE, Attorney; SARA L. STRUEMKE, | ) | |
| Secretary; SERVICM LEGAL SERVICES, LLC; | ) | |
| MARLIN D. RICHARDSON, DC; BIG HORN BASIN | ) | **AMENDED** |
| CHIROPRACTIC; CITY OF CODY; PARK COUNTY | ) | 1983 CIVIL RIGHT |
| DETENTION CENTER; BOARD OF COUNTY | ) | COMPLAINT PURSUANT |
| COMMISSIONERS OF THE COUNTY OF PARK; | ) | TO 42 USCS §1983 |
| | ) | |
| Defendants. | ) | |
| | ) | |

### A. JURISDICTION.

1) Plaintiff, Tami M. Bronnenberg, is a citizen of Wyoming and the United

States of America who presently resides at 938 19th Street, Lower Ave., Space 23, Cody,

Wyoming 82414.

2) Defendant, Beau J. Eggar, the arresting Officer is a citizen of United States

of America who presently resides 4225 Road 2da, Cody, Wyoming 82414-9209. At the

time the claim alleged in this complaint arose this defendant was acting willful and

wanton misconduct under color of state law. Sued Individually, Personally, City **AND**

County Officially.

1

3)   Defendant, William K. Struemke, Attorney, is a citizen of United States of America who presently resides at 2906 Marlisa Ln., Cody, Wyoming 82414-6708. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City **AND** County Officially.

4)   Defendant, Sara L. Struemke, Secretary, is a citizen of United States of America who presently resides at 2906 Marlisa Ln., Cody, Wyoming 82414-6708. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City **AND** County Officially.

5)   Defendant, Servicm Legal Services, LLC, is a Wyoming Law Corporation at 1302 Beck Ave., Cody, Wyoming 82414. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City **AND** County Officially.

6)   Defendant, Marlin D. Richardson, DC, is a citizen of United States of America who presently resides 11 Beacon Dr., Cody, Wyoming 82414. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City **AND** County Officially.

7)   Defendant, Big Horn Basin Chiropractic is a Wyoming Medical Corporation at 1620 Beck Ave., Cody, Wyoming 82414. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City **AND** County Officially.

8) Defendant, City of Cody, P.O. Box 2200, Cody, Wyoming 82414 is a municipality in Park County. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City **AND** County Officially.

9) Defendant, Park County Detention Center, is a law enforcement center, 1402 River View Drive, Cody, Wyoming 82414. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally, City **AND** County Officially.

10) Defendant, Board of County Commissioners of the County of Park, 1002 Sheridan Ave., Cody, Wyoming 82414. At the time the claim alleged in this complaint arose this defendant was acting willful and wanton misconduct under color of state law. Sued Individually, Personally **AND** County Officially.

11) Jurisdiction is invoked pursuant to 28 USCS §1343 (3); 42 USCS §1983; 42 USCS §1985 (2, 3); Civil Rights Act 1871; 28 USCS §2201; 28 USCS 2202; Federal Rules of Civil Procedure, Rules 38, 65; 28 USCS §1651; 42 USCS §1988; 18 U.S.C.S. §1201 (a), (1), (c); 18 U.S.C. §241; 18 U.S.C. §242.

### B. NATURE OF THE CASE.

On January 31, 2017, at approximately 1699-1627, 16th & Bleistein Ave., Street, Cody, Wyoming, Tami M. Bronnenberg kept telling the defendant, arresting officer Beau J. Egger that the warrant he was relying on, issued January 9, 2017 in this matter, was vacated. Tami M. Bronnenberg shows him the court order vacating the warrant. **See, Exhibit –A-**, attached. Officer Beau J. Egger still arrested plaintiff, placed plaintiff in his patrol car, drove plaintiff to the Park County Detention Center, 1402 River View Drive,

3

booked plaintiff in at 10:19:40. **See, Exhibit –B-**, attached. Then released plaintiff after they were informed that the next stop with the court order would be the Park County Prosecuting Attorney's Office at 11:10:58. **See, Exhibit –C-**, attached. I, Tami M. Bronnenberg believes William K. Struemke, Attorney; Sara L. Struemke, Secretary; Servicm Legal Services, LLC representing Marlin D. Richardson, DC; Big Horn Basin Chiropractic; City of Cody; Park County Detention Center; Park County Commissioners are equally responsible for Kidnapping, False Arrest and False Imprisonment; Conspiracy of Kidnapping; Conspiracy to depriving persons of right or privileges; Conspiracy against rights; Deprivation of Rights Under Color of Law;

### C.   CAUSE OF ACTION.

1)     Plaintiff, Tami M. Bronnenberg, alleges that the following of her constitutional rights, privileges or immunities have been violated and that the following facts form the basis for her allegations:

a)     Count I:  Defendants denied plaintiff, Tami M. Bronnenberg, established law of the Constitution of the United States of America, Article 6, Amendment 4, Equal Protection Clause and the Due Process Clause secured by the Constitution of the United States of America, Amendment 14; Federal Rules of Criminal Procedure, Rules 4 (a), 41; Kidnapping 18 U.S.C. §1201 (a) (1); Conspiracy to kidnap 18 U.S.C. §1201 (c); Conspiracy to depriving persons of right or privileges 42 U.S.C. §1985 (3); Conspiracy against rights 18 U.S.C. §241; Deprivation of Rights Under Color of Law 18 U.S.C. 242; Constitution of the State of Wyoming, Article 6, §1, §20; Art., 1, §§2,3,4,6; Wyoming Rules of Criminal Procedure, Rule 4 (a), 41; W.S. § 6-2-201 (a), (i); W.S. § 6-2-201 (a),

4

(iii); (c); W.S. §6-2-203 (a); W.S. 33-5-112; W.S.33-10-110 (ix); City of Cody, Personnel and Policy Manual, Section 3.

    i)   Supporting facts:

1. After examining **Exhibit –A**-, defendant, arresting officer Beau J. Egger unlawfully removed Plaintiff from the vicinity where she was at the time of the removal and unlawfully confined plaintiff therefore terrorizing the plaintiff in violation of Wyoming Public Policy, W.S. § 6-2-201 (a), (iii); 18 U.S.C.S. §1201 (a), (1); 18 U.S.C. 242 and in violation of the Constitution of the United States of America, Article 6; Amendment 4; Constitution of the State of Wyoming, Article 6, §20; Art., 1 Section 4; Federal Rules of Criminal Procedure, Rules 4. (a); Wyoming Rules of Criminal Procedure, Rule 4; Equal Protection Clause and the Due Process Clause secured by the United States Constitution, Amendment 14 and the Wyoming Constitution , Article 1, §§2,3, 6; Article 6, §1.

2. Officer Beau J. Egger knowingly and unlawfully restrained the plaintiff so as to interfere substantially with her liberty in violation of Wyoming Public Policy, W.S. §6-2-203 (a), a legitimate expectation of privacy as to the property rights the plaintiff possessed in the invaded area.

3. Defendant, William K. Struemke, Attorney is a practicing and acting policy maker for defendant Servicm Legal Services, LLC, defendant City of Cody, defendant Park County is equally responsible for the practice and acts of the invalid warrant contracted and accepted by Marlin D. Richardson, DC., a practicing and acting policy maker for defendant, Big Horn Basin Chiropractic. See, **Exhibit –A**-, to hold for collections, (ransom), in violation of Wyoming Public Policy, W.S. § 6-2-201 (a), (i); ***

or to terrorize the victim \*\*\*. W.S. §6-2-201 (a), (iii) into submission; Conspiracy to kidnap 18 U.S.C. §1201 (c); Conspiracy to depriving persons of right or privileges 42 U.S.C. §1985 (3); Conspiracy against rights 18 U.S.C. §241; Deprivation of Rights under Color of Law 18 U.S.C. §242.

4. Defendant, William K. Struemke, Attorney threaten and confirmed that he would do it again after the violation in a phone call to the plaintiff on 2/16/17in violation of. Wyoming Public Policy, W.S. §6-2-201 (a), (iii).

5. Defendant, William K. Struemke, Attorney is bound by constitutional oath not to ignore valid legal court orders, in addition to W.S. 33-5-112. Oath of attorney. "No person shall be deemed admitted to the bar until he shall have taken and filed an oath as provided in this section. The oath shall be to the effect that he will support, obey, and defend the constitution of the United States, and the constitution and laws of this state, and that he will faithfully and honestly and to the best of his ability discharge the duties of an attorney and counselor-at-law.\*\*\*".

6. Defendant, Sara L. Struemke, as legal secretary on contract is also bound by constitutional oath not to ignore legal orders in their mail box for William K. Struemke, Attorney her employer, in violation of Conspiracy to kidnap 18 U.S.C. §1201 (c); Conspiracy to depriving persons of right or privileges 42 U.S.C. §1985 (3); Conspiracy against rights 18 U.S.C. §241; Deprivation of Rights Under Color of Law 18 U.S.C. §242.

7. Defendant, Servicm Legal Services, LLC in violation of Conspiracy to kidnap 18 U.S.C. §1201 (c); Conspiracy to depriving persons of right or privileges 42 U.S.C.

§1985 (3); Conspiracy against rights18 U.S.C. §241; Deprivation of Rights under Color of Law 18 U.S.C. §242.

8. Defendant Marlin D. Richardson, DC is prohibited, "To violate or attempt to violate, directly or indirectly or assist in or abet the violation or conspiring to violate any provision or terms of 33-10-101 through 33-10-117]; the Chiropractic Practice Act.". See, W.S.33-10-110 (ix); in violation of Conspiracy to kidnap 18 U.S.C. §1201 (c); Conspiracy to depriving persons of right or privileges 42 U.S.C. §1985 (3); Conspiracy against rights 18 U.S.C. §241; Deprivation of Rights under Color of Law 18 U.S.C. §242.

9. Defendant, Big Horn Basin Chiropractic is prohibited, "To violate or attempt to violate, directly or indirectly or assist in or abet the violation or conspiring to violate any provision or terms of 33-10-101 through 33-10-117], the Chiropractic Practice Act." See, W.S.33-10-110 (ix); in violation of Conspiracy to kidnap 18 U.S.C. §1201 (c); Conspiracy to depriving persons of right or privileges 42 U.S.C. §1985 (3); Conspiracy against rights18 U.S.C. §241; Deprivation of Rights under Color of Law 18 U.S.C. §242.

10. This practice and acts of the defendant, City of Cody is the second time this has occurred. See, **Exhibit -D-,-E-,F-**. "*** The City of Cody does not discriminate in employment opportunities or practices on the basis of race, color, religion, sex, national origin, age, disability, or any other characteristic protected by law. In addition, the City of Cody is committed to ensuring that employees do not harass or treat any other employee, job applicant or member of the public unfairly." See, City of Cody, Personnel and Policy Manual, Section 3. Equal Employment Opportunity; in violation of Conspiracy to kidnap 18 U.S.C. §1201 (c); Conspiracy to depriving persons of right or privileges 42 U.S.C.

7

§1985 (3); Conspiracy against rights 18 U.S.C. §241; Deprivation of Rights under Color of Law 18 U.S.C. §242.

11.   Defendant, Park County Detention Center, is a law enforcement center that was used to terrorize the victim ***. W.S. § 6-2-201 (a), (iii) into submission and to interfere substantially with her liberty in violation of Wyoming Public Policy, W.S. §6-2-203 (a), a legitimate expectation of privacy as to the property rights the plaintiff possessed in the invaded area; in violation of Conspiracy to kidnap 18 U.S.C. §1201 (c); Conspiracy to depriving persons of right or privileges 42 U.S.C. §1985 (3); Conspiracy against rights 18 U.S.C. §241; Deprivation of Rights Under Color of Law 18 U.S.C. §242.

12.   Defendant, Board of County Commissioners of the County of Park has entered into a contract or agreement to jointly establish and operate, police protection agency facilities and jail and administrative office facilities or any combination thereof. See, W.S. 18-2-108; in violation of Conspiracy to kidnap 18 U.S.C. §1201 (c); Conspiracy to depriving persons of right or privileges 42 U.S.C. §1985 (3); Conspiracy against rights 18 U.S.C. §241; Deprivation of Rights under Color of Law 18 U.S.C. §242.

### D. PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF.

1)   Plaintiff has In the United States Bankruptcy Court for the District of Wyoming., In re: Tami Mae Bronnenberg, Debtor, Randy L. Royal, Trustee of the Bankruptcy Estate of Tami Mae Bronnenberg,  Plaintiff, v. Tami Mae Bronnenberg, Defendant., Case No: 17-20201 Chapter 7, Adv. 17-02031., other administrative regarding the acts complained of in Part C.

### E. REQUEST FOR RELIEF.

I believe I am entitled to the following relief::

(A)    A declaratory judgment pursuant to 28 USCS §§2201 and 2202, (Wyoming

Statutes 1977, §§1-37-101 to 1-37-115), declaring that defendant's acts, polices and

practices herein described and complained of violated plaintiff's rights under the United

states Constitution  and the Wyoming Constitution.

(B)    A preliminary and permanent injunction pursuant to the Federal Rules of

Civil Procedure, Rule 65, (W.R.C.P., Rule 65; Wyoming Statutes 1977, §§1-28-101 to

111), which:

(i)    Prohibits the Defendants, their successors in office, agents, and employees

and all other persons in action concert and participation with them from denying plaintiff

established law of the Constitution of the United States of America, Article 6,

Amendment 4, Equal Protection Clause and the Due Process Clause secured by the

Constitution of the United States of America, Amendment 14; Federal Rules of Criminal

Procedure, Rules 4 (a), 41; Conspiracy to kidnap 18 U.S.C. §1201 (a), (c); 42 U.S.C.

§1985 (3) Conspiracy to depriving persons of right or privileges; 18 U.S.C. §241

Conspiracy against rights; Constitution of the State of Wyoming, Article 6, §1, §20; Art.,

1, §§2,3,4,6; Wyoming Rules of Criminal Procedure, Rule 4 (a), 41; W.S. § 6-2-201 (a),

(i); W.S. § 6-2-201 (a), (iii); (c); W.S. §6-2-203 (a); W.S. 33-5-112; W.S.33-10-110 (ix);

City of Cody, Personnel and Policy Manual, Section 3.

(ii)    Prohibit defendants, their successors in office, agents and employees and all

other persons in active concert and participation with them from retaliating against

plaintiff in any way.

(C)    Demand for jury trial pursuant to Federal Rules of Civil Procedure, Rule 38

(a), (b).

9

(D)    Compensatory damages for loss pain, suffering, humiliation irreparable injury and the consequences of deprivation or loss of rights in personal, individual, official capacity of the defendants jointly and severally in the amount as the proof may show plus taxation cost, (28 USCS §1915 (e).

(E)    Punitive damages for bad faith and willful actions of the defendants in their personal, individual, official capacity in the amount the court may determine, plus taxation cost, (28 USCS §1915 (e).

(F)    Award plaintiff her cost (28 USCS §1915 (e) and attorney fees, 42 USCS §1988), that attorney be appointed (28 USCS §1915 (d) and such other and further relief that the court deems to be appropriate and just (28 USCS §1615).

DECLARATION UNDER PENALTY OF PERJURY.

The undersigned declares under penalty of perjury that she is the plaintiff in the above action, that she read the above complaint and that the information contained therein is true and correct. 28 USCS §1746, 18 USCS §1621. Executed at Cody, Wyoming on **FEBRUARY 13, 2019**.

Tami M. Bronnenberg, Pro-se

CERTIFICATE OF SERVICE.

I hereby certify that a copy of the forgoing **Amended** 1983 Civil Right Complaint pursuant to 42 USCS §1983 was mailed or delivered to Clerk, United States District Court, United States District Judge, Scott W. Skavdahl, 111 S. Wolcott, Room 121, Casper, Wyoming 82601; Beau J. Eggar, Arresting Officer, 4225 Road 2da, Cody, Wyoming 82414-9209; William K. Struemke, Attorney, 2906 Marlisa Ln., Cody, Wyoming 82414-6708; Sara L. Struemke, Secretary, 2906 Marlisa Ln., Cody, Wyoming 82414-6708; Servicm Legal Services, LLC; 1302 Beck Ave., Cody, Wyoming 82414; Marlin D. Richardson, DC; 11 Beacon Dr., Cody, Wyoming 82414; Big Horn Basin Chiropractic; 1620 Beck Ave., Cody, Wyoming 82414; City of Cody; P.O. Box 2200, Cody, Wyoming 82414; Park County Detention Center; 1402 River View Drive, Cody, Wyoming 82414; Board of County Commissioners of the County of Park, 1002 Sheridan Ave., Cody, Wyoming 82414 **FEBRUARY 13, 2019**.

Tami M. Bronnenberg, Pro-se

| | | |
|---|---|---|
| STATE OF WYOMING | ) | IN THE DISTRICT COURT |
| | ) | |
| COUNTY OF PARK | ) | FIFTH JUDICIAL DISTRICT |

Civil Action No. 28047

BIG HORN BASIN CHIROPRACTIC, )
)
    Plaintiff, )
)
vs. )
)
TAMI BRONNENBURG, )
)
    Defendant. )

PATRA LINDENTHAL
Clerk of District Court

FILED JAN 17 2017

by _____
Deputy

### ORDER VACATING WARRANT AND RESETTING PREVIOUSLY SCHEDULED HEARING

UPON THE COURT'S OWN MOTION, IT IS HEREBY ORDERED that the Warrant issued January 9, 2017 in this matter is vacated.

IT IS ALSO HEREBY ORDERED that the hearing previously scheduled for January 17, 2017 by Order filed on December 30, 2016, is hereby rescheduled for Jan. 26, 2017 at 4:00, P.M., in the District Courtroom of the Park County Courthouse in Cody, Wyoming.

Cases shall not be continued upon stipulation of counsel alone, but such continuances may be allowed by Order of the Court. No such continuances shall be allowed, except for good cause shown.

DATED this 13ᵗʰ day of January, 2017.

STATE OF WYOMING ) SS
COUNTY OF PARK )
I certify that the foregoing is a true
copy of the original on file in this office.
Dated_____ FEB 07 2019

PATRA LINDENTHAL
Clerk of District Court
By_____
Deputy

DISTRICT JUDGE

Copies to:

William K. Struemke
Tami Bronnenberg

State of Wyoming )
) ss.
County of Park )

I certify that I distributed a true and
correct copy of the foregoing this
17 day of _____ 2017,
as indicated.

M = Mail / F = FAX / B = Clerk's Box
H = Hand Delivered

Exhibit -A-

\* \* \* \* \* \* RESIDENT COPY \* \* \* \* \* \*

## Intake
## Receipt #AO1838

Park County Detention Center

01/31/2017 10:19:40
ST 041| CD 001|                | OPR Aao

**BRONNENBERG,**
  TAMI MAE

  RIMS ID Number :    106375
  Date of Birth :     04/12/1969
  Location :

Open Amount   : $0.00

Cash

Booking

Commissary Balance :          $0.00
Debt Balance :                $0.00

*Exhibit -8-*

\* \* \* \* \* \* RESIDENT COPY \* \* \* \* \* \*

# Release
# Receipt #AO1839

Park County Detention Center

01/31/2017 11:10:58
ST 041| CD 001|                    | OPR  Aao

**BRONNENBERG,**
**TAMI MAE**

RIMS ID Number :        106375
Date of Birth :         04/12/1969
Location :

Cash Amount        :          $0.00
Total Released     :          $0.00

Comment: Release

Commissary Balance :            $0.00
Debt Balance :                  $0.00

*Exhibit -C -*

| STATE OF WYOMING | ) | IN THE MUNICIPAL COURT |
| COUNTY OF PARK | )SS | FIFTH JUDICIAL DISTRICT |

Docket No. MC-1303-009

CITY OF CODY,                    )
                                 )
          Plaintiff,             )
                                 )        Filed: 4/29/14
vs.                              )
                                 )        By: Barbara Furlass
TAMI BRONNENBERG,                )                        CLERK
                                 )
          Defendant.             )

---

### ORDER DISMISSING PENDING MOTION FOR EXPUNGEMENT AND OTHER RELIEF AND ORDER DISMISSING PENDING MATTER REFERENCED AS CRIMINAL DOCKET MC1303-009 WITH PREJUDICE

---

THIS MATTER HAVING come before this Court upon the stipulated motion of the Defendant Tami Bronnenberg, by and through her attorney, William L. Simpson, and City of Cody appearing by and through its attorney, City Attorney Scott Kolpitcke, and the Court having had an opportunity to review the stipulation and being otherwise fully advised in the premises;

IT IS THEREFORE HEREBY ORDERED that the previously filed motion seeking to expunge the Defendant's criminal record, and other relief sought in that motion is hereby dismissed with prejudice;

IT IS FURTHER ORDERED by this Court that the pending criminal case within the City of Cody, referenced as City of Cody MC-1303-009, shall be and is dismissed with prejudice.

IT IS FURTHER ORDERED that the Defendant shall bear her own costs and expenses affiliated with this matter, as will the City of Cody.

DATED this 29 day of April, 2014.

_____
Municipal Court Judge

APPROVED AS TO FORM:

_____
Scott Kolpitcke
City of Cody

RECEIVED

MAY 02 2014

SIMPSON, KEPLER &
EDWARDS, LLC

_____
William L. Simpson
Attorney for Defendant

Exhibit - D -

52



**City of Cody**
WYOMING

## Information Request

I am requesting the City of Cody provide the following information in accordance with Wyoming State Statute 16-4-201, Public Records, Article 2:

*"Certified"*

**PART I:** I hereby request to: _____ Inspect ✓ Copy the following records (fee required):
*(please be specific and include names, dates, keywords and the name of the record) Attach additional sheet if necessary.*

In the Municipal Court, Fifth Judicial District
Docket No. MC-1303-009
City of Cody vs. Tami Bronnenberg
Filed 4/29/14 by Barbera, clerk
Order Dismissing pending Motion for expurgement
and other relief and Order dismissing pending matter
referenced as criminal Docket MC1303-009 with prejudice

**PART II:** If the request is for Copy, what document format do you request? ✗ Paper _____ Electronic

If paper format what delivery method do you request? ✗ Pick up _____ US Mail _____ Fax

If electronic format what delivery method do you request? _____ Email _____ Disk

| | |
|---|---|
| Name of individual requesting information | Tami Bronnenberg |
| Mailing Address (required if US mail delivery is requested) | P.O. Box 802 |
| Phone Number | (307) 899-2150 |
| Fax Number (required if fax delivery is requested) | |
| Email Address (required if email delivery is requested) | |

The City of Cody will attempt to provide the information requested within a reasonable time frame. Please note that some requests may require additional research and preparation that may prolong the amount of time in which you receive your request.

I understand there may be a fee to provide the requested information. Fee must be paid at the time this request is submitted.

_____  2/13/19   (307) 899-2882
Requestors Signature       Date

Fee due to City $_____ Date Paid _____ Receipt #_____

Information Provided By: _____ Date Provided: _____ Request Denied By:_____ Notice Sent: _____

· · · · · · RESIDENT COPY · · · · · ·

## Bail
## Receipt #B11497
##              B11498

Park County Detention Center

03/07/2014 08:49:27
ST 002|          |       | OPR  JGH

**BRONNENBERG,**
**TAMI MAE**

RIMS ID Number :      106375
Date of Birth :       04/12/1969
Location :

Bail Account : Fine Payment
Set Amount    :        $110.00

Transfer Amt :         $110.00

Still Owed    :          $0.00

Check Information:
Checkbook     : Inmate Account
Check #       : 14312
Check Amount : $110.00
        Payee: City of Cody
        Memo : MC-1303-009

**Commissary Balance :**        $0.00
**Debt Balance :**              $0.00

*Exhibit -E-*

\* \* \* \* \* \* RESIDENT COPY \* \* \* \* \* \*

# Intake
# Receipt #B11496

Park County Detention Center

03/07/2014 08:48:16
ST 002| CD 001|              | OPR  JGH

**BRONNENBERG,**
  **TAMI MAE**

  RIMS ID Number :      106375
  Date of Birth :        04/12/1969
  Location :

Open Amount   : $110.00

Cash

Commissary Balance :         $110.00
Debt Balance :                $0.00

*Exhibit -F-*

STATE OF WYOMING )          IN THE MUNICIPAL COURT
)SS
COUNTY OF PARK )             FIFTH JUDICIAL DISTRICT

                                            Docket No. MC-1303-009

CITY OF CODY, )
)
          Plaintiff, )          Filed: 4/29/14
)          By: *Barbara Curless*
vs. )                                   CLERK
)
TAMI BRONNENBERG, )
)
          Defendant. )

---

### ORDER DISMISSING PENDING MOTION FOR EXPUNGEMENT AND OTHER RELIEF AND ORDER DISMISSING PENDING MATTER REFERENCED AS CRIMINAL DOCKET MC1303-009 WITH PREJUDICE

---

THIS MATTER HAVING come before this Court upon the stipulated motion of the Defendant Tami Bronnenberg, by and through her attorney, William L. Simpson, and City of Cody appearing by and through its attorney, City Attorney Scott Kolpitcke, and the Court having had an opportunity to review the stipulation and being otherwise fully advised in the premises;

IT IS THEREFORE HEREBY ORDERED that the previously filed motion seeking to expunge the Defendant's criminal record, and other relief sought in that motion is hereby dismissed with prejudice;

IT IS FURTHER ORDERED by this Court that the pending criminal case within the City of Cody, referenced as City of Cody MC-1303-009, shall be and is dismissed with prejudice.

IT IS FURTHER ORDERED that the Defendant shall bear her own costs and expenses affiliated with this matter, as will the City of Cody.

DATED this 29 day of April, 2014.

                                            _____
                                            Municipal Court Judge

APPROVED AS TO FORM:

_____
Scott Kolpitcke
City of Cody

_____
William L. Simpson
Attorney for Defendant

State of Wyoming )
County of Park )

I certify that the foregoing is a true copy of the
original document on file in the office of the
Municipal Court for the City of Cody, Wyoming.
Dated 3/13/19
By *Barbara Curless*
Barbara Curless, Clerk of the Municipal Court

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 FEB 25  AM 8:38

STEPHAN HARRIS, CLERK
CASPER

TAMI MAE BRONNENBERG,

      Plaintiff,

    v.

BEAU J. EGGAR, Arresting Officer; WILLIAM K.
STRUEMKE, Attorney; SARA L. STRUEMKE,
Secretary; SERVICM LEGAL SERVICES, LLC;
MARLIN D. RICHARDSON, DC; BIG HORN BASIN
CHIROPRACTIC; CITY OF CODY; PARK COUNTY
DETENTION CENTER; BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF PARK;

      Defendants.

Case No. 19-CV-21-SWS

---

## ORDER ON 28 U.S.C. § 1915 SCREENING OF AMENDED COMPLAINT

---

This matter comes before the Court on Ms. Bronnenberg's *pro se* Amended 1983

Civil Rights Complaint Pursuant to 42 USCS §1983 (Doc. 9), filed on February 14, 2019.

Because Ms. Bronnenberg seeks to proceed *in forma pauperis* in this action without the

prepayment of fees (Doc. 2), the litigation process generally begins with the Court

screening her amended complaint under 28 U.S.C. § 1915. *See Buchheit v. Green*, 705

F.3d 1157, 1161 (10th Cir. 2012) (noting that prompt screening, even for cases involving

non-prisoners, "may be a good thing and conserve the resources of defendants forced to

respond to baseless lawsuits"). Ms. Bronnenberg's original civil rights complaint was

dismissed without prejudice upon initial screening for failure to state a plausible claim

upon which relief could be granted. (Doc. 5.) She then sought and received leave to file this amended complaint (Docs. 6, 7), which the Court now screens.

## LAW

Section 1915(e)(2)(B) requires a district court to dismiss the case whenever the court determines the action "fails to state a claim on which relief may be granted or seeks monetary relief against a defendant who is immune from such relief." *See Merryfield v. Jordan*, 584 F.3d 923, 926 (10th Cir. 2009). For § 1915 screening purposes, the Court accepts the Plaintiff's allegations as true and construes all reasonable inferences drawn from those allegations in the light most favorable to the Plaintiff. *See Kay v. Bemis*, 500 F.3d 1214, 1217-18 (10th Cir. 2007).

## DISCUSSION

The underlying basis for Ms. Bronnenburg's amended civil rights complaint seems to be an allegation that Defendant Beau Eggar[1], a law enforcement officer at the relevant time, arrested her on January 31, 2017, on an invalid arrest warrant despite her attempts to explain to him why it was invalid. (Doc. 9 at pp. 3-4.) It appears she was released from detention less than an hour after being booked, ostensibly because the arrest warrant had indeed been canceled. (*Id.*) As for the other defendants, she alleges generally that they are somehow also responsible for her arrest and they conspired together to wrongfully arrest her.

1. **Ms. Bronnenburg has stated a plausible § 1983 claim for false arrest/false imprisonment under the Fourth Amendment against Defendant Beau Egger.**

---

[1] Ms. Bronnenburg also spells this defendant's name as "Egger" in her amended complaint.

Case 2:19-cv-00021-SWS    Document 10    Filed 02/25/19    Page 3 of 12

Officer Eggar "was relying on" an arrest warrant as his basis for arresting Ms. Bronnenburg. (Doc. 9 at p. 3.) Attached as "Exhibit A" to her amended complaint is an "Order Vacating Warrant and Resetting Previously Scheduled Hearing," entered by the state district judge of the Fifth Judicial District of Wyoming. (Doc. 9 at p. 11.) It was entered on January 17, 2017, and it ordered "that the Warrant issued January 9, 2017 in this matter is vacated." (*Id.*) Ms. Bronnenburg alleges she showed this order to Officer Eggar at the time he arrested her on January 31, 2017, to convince him not to execute the arrest warrant, but he ignored her and arrested her anyway. (Doc. 9 at pp. 3-4, 5.) Nowhere in her amended complaint does Ms. Bronnenburg suggest the arrest warrant on which Officer Eggar relied was somehow invalid on its face (*see generally* Doc. 9), but its facial validity can be reasonably questioned at this point, particularly considering that the order vacating the warrant had been filed two weeks prior to Ms. Bronnenburg's arrest.

Generally, an officer executing an arrest warrant that is valid on its face enjoys absolute immunity (also known as "quasi-judicial immunity"). "Just as judges acting in their judicial capacity are absolutely immune from liability under section 1983, official[s] charged with the duty of executing a facially valid court order enjoy[] absolute immunity from liability for damages in a suit challenging conduct prescribed by that order." *Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009) (alterations in original) (quoting *Turney v. O'Toole*, 898 F.2d 1470, 1472 (10th Cir. 1990)). However, to be entitled to this absolute immunity, "the judge issuing the disputed order must be immune from liability in his or her own right, the officials executing the order must act within the scope of their own

jurisdiction, and the officials must only act as prescribed by the order in question." *Id.* The amended complaint does not suggest whether these absolute-immunity requirements are or are not met. But construing Ms. Bronnenburg's alleges as true and making all reasonable inferences in her favor, as the Court must do at this preliminary stage, the Court finds a plausible claim of false arrest/false imprisonment in violation of the Fourth Amendment has been stated in the amended complaint, and the question remains whether Officer Eggar is entitled to absolute immunity from that claim.

## 2.  Ms. Bronnenburg has not stated any other plausible § 1983 claims against Officer Eggar or against any other defendant.

Ms. Bronnenburg's "Cause of Action" section in her amended complaint attempts to assert several other claims against Officer Eggar and the other defendants, but those allegations do not create viable claims under 42 U.S.C. § 1983 for several reasons.

First, there is no due process claim stated in connection with her false arrest/false imprisonment because there is no allegation that legal process was ever instituted against Ms. Bronnenburg. Indeed, her amended complaint suggests she was released about an hour after booking and nothing more ever came of it. (Doc. 9 at pp. 3-4.) Thus, there is no due process violation stated in her amended complaint. *See Mondragon v. Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008) (explaining that a false arrest/false imprisonment claim under the Fourth Amendment accrues during "[t]he period of time between an unlawful arrest and the institution of legal process," whereas a due process claim under the Fourteenth Amendment accrues during "[t]he period of time between the institution of [legal] process and its favorable termination").

Second, as to her claims of Wyoming Constitution violations, 42 U.S.C. § 1983 "applies to federal constitutional violations and not to state constitutional violations." *Herrera v. Santa Fe Public Schools*, 41 F. Supp. 3d 1027, 1081 n.123 (D.N.M. 2014); *see also Davis v. Reynolds*, 890 F.2d 1105, 1109 n.3 (10th Cir. 1989) (describing a claim grounded in the state constitution as a state law claim) (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1983)); *Brock v. Herbert*, 2012 WL 1029355, at *2 (D. Utah Mar. 26, 2012) (unpublished) (describing alleged violations of the Utah Constitution as "exclusively state law claims").   To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the U.S. Constitution or federal law, *West v. Atkins*, 487 U.S. 42, 48 (1988); an alleged violation of state law does not amount to a § 1983 claim.   However, Ms. Bronnenburg relies on § 1983 as the basis for asserting all her claims, even naming her complaint "Amended 1983 Civil Rights Complaint Pursuant to 42 USCS §1983." (Doc. 9.)   Section 1983 does not afford Ms. Bronnenburg the right to bring state law claims in federal court.   This principle also precludes her claims alleging the defendants violated state criminal statutes and state rules of criminal procedure.

Third, as to her claims alleging violations of federal criminal statutes (such as kidnapping and conspiracy to kidnap in violation of 18 U.S.C. § 1201), "a plaintiff may not recover civil damages for an alleged violation of a criminal statute." *Shaw v. Niece*, 727 F.2d 947, 949 (10th Cir. 1984).   Criminal statutes "do not provide for a private civil cause of action." *Henry v. Albuquerque Police Dep't*, 49 F. App'x 272, 273 (10th Cir. 2002) (unpublished) (stating that 18 U.S.C. §§ 241 and 242 do not create a private civil cause of action); *see also Diamond v. Charles*, 476 U.S. 54, 64-65 (1986) (holding that

private citizens cannot compel enforcement of criminal law); *Andrews v. Heaton*, 483 F.3d 1070, 1076 (10th Cir. 2007) ("criminal statutes that do not provide for a private right of action [] are [] not enforceable through a civil action"). Ms. Bronnenburg's claims that the defendants violated certain criminal statutes are not viable causes of action in this civil lawsuit.

Fourth, her claims alleging the defendants violated the Federal Rules of Criminal Procedure are also incognizable because "rules governing procedure in the federal courts do not give rise to private causes of action." *Good v. Khosrowshahi*, 296 F. App'x 676, 680 (10th Cir. 2008) (unpublished); *see also Duncan v. Jackson Energy Auth.*, No. 1:15-CV-1238-JDB-EGB, 2016 WL 4079033, at *2 (W.D. Tenn. June 28, 2016) (unpublished), *report and recommendation adopted*, No. 15-1238, 2016 WL 4074482 (W.D. Tenn. July 29, 2016) (unpublished) (stating that "[n]either the Federal Rules of Civil Procedure nor the Federal Rules of Criminal Procedure provides" a plaintiff with a private cause of action against a defendant); *Heiken v. Meeks*, No. 2:17-CV-304-WKW, 2018 WL 1163467, at *3 (M.D. Ala. Feb. 12, 2018) (unpublished), *report and recommendation adopted*, No. 2:17-CV-304-WKW, 2018 WL 1157550 (M.D. Ala. Mar. 5, 2018) (unpublished) (holding that a state's rules of criminal procedure "do not create a private right of action for violations of the rules"). Ms. Bronnenburg's claims that the defendants violated certain rules of criminal procedure are not viable causes of action in this civil lawsuit.

Fifth, as to all defendants except Officer Eggar, Ms. Bronnenburg's claims of a mass conspiracy to kidnap or falsely arrest her fail to state a plausible claim upon which

relief can be granted. Under the U.S. Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), federal pleading "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Gee v. Pacheco*, 627 F.3d 1178, 1184 (10th Cir. 2010) (internal quotation marks omitted). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). "In § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities. Therefore it is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249–50 (10th Cir. 2008) (emphasis in original) (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1970-71 n.10 (2007)). Ms. Bronnenburg's amended complaint, however, entirely fails to set forth any factual allegations in support of her claims against the remaining defendants. Ms. Bronnenburg's bald assertions, *e.g.*, that a local attorney and a local chiropractor conspired to have Ms. Bronnenburg falsely arrested so they could hold her "for collections (ransom)" (Doc. 9 at p. 5), are untethered to any supporting factual allegations and constitute no more than speculation and conjecture, which fails to state a plausible claim on which relief can be granted. "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989); *see also Fuller v. Davis*, 594 F. App'x 935, 939 (10th Cir. 2014)

(unpublished) (affirming the trial court's dismissal of a § 1983 claim of conspiracy because the "plaintiff's conjecture that [a defendant] conspired with other defendants to create an unenforceable no-contact order is too speculative and conclusory" to state a plausible claim for relief). Indeed, most of Ms. Bronnenburg's allegations against the remaining defendants consist of assertions that the defendants have certain duties, *e.g.*, that the local attorney is bound by Wyoming's attorney oath, but never actually alleges those duties were breached (let alone how they were breached). (*See* Doc. 9 at pp. 6-8.) A cause of action unsupported by factual allegations must be dismissed for failure to state a claim on which relief may be granted.

Sixth, concerning the § 1983 claims against the governmental entities (here, the City of Cody, the Park County Detention Center, and the Park County Board of County Commissioners), Ms. Bronnenburg has not identified any policy, custom, or practice as the driving force behind the alleged constitutional violation. Section 1983 does not allow governmental entities to be held vicariously liable for the unlawful acts of their employees under *respondeat superior* principles. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978). That is, they cannot be liable solely because they employed a liable employee. Instead, governmental entities may only be liable under § 1983 for their own unconstitutional conduct, specifically where constitutional deprivation is inflicted pursuant to the governmental entity's policy, custom, or practice. *Monell*, at 690–91, 694. "Locating a policy ensures that a municipality [or other governmental entity] is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those

of the municipality." *Board of County Commissioners of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403–04 (1997).

Here, Ms. Bronnenburg did not identify any policy from the Park County Detention Center or the Board of County Commissioners, let alone a policy that caused her alleged constitutional deprivation. (*See* Doc. 9 at p. 8.) As to the City of Cody, Ms. Bronnenburg identified a city policy that prohibits its employees from discriminating against or harassing others. (Doc. 9 at p. 7.) She did not explain how this policy caused her alleged constitutional deprivation. (*See id.*) In fact, it seems she has asserted the defendants *violated* this policy and their policy violation led to her alleged constitutional deprivation. (*See id.*) This is no basis for municipal liability under § 1983, though. As noted above, the City of Cody cannot be held liable under § 1983 for the illegal conduct of its employees unless the city caused such illegal conduct through a city policy, custom, or practice. Ms. Bronnenburg's allegation here is that one or more city employees caused her alleged constitutional violation because they failed to follow the city's non-discrimination/non-harassment policy, but this is the exact opposite of the municipal liability allowed under § 1983.

Seventh and finally, Ms. Bronnenburg sued each defendant "Individually, Personally, City **AND** County Officially" (sic). (Doc. 9 at pp. 1-3 (emphasis in original).) It is reasonable to construe this language as Ms. Bronnenburg's attempt to sue the defendants in both their individual and official capacities. However, official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)

(quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n.55 (1978)). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." *Id.* at 166 (internal citation omitted). Because the Court determined above that Ms. Bronnenburg failed to state plausible claims against the governmental entities, the official-capacity claims must be dismissed along with those governmental-entity claims because they are one and the same.

3.    <u>**All claims except for false arrest/false imprisonment against Defendant Eggar are dismissed with prejudice because further amendment would be futile.**</u>

When dismissing *pro se* claims for failure to state a plausible claim upon which relief can be granted, "the district court should allow a plaintiff an opportunity to cure technical errors or otherwise amend the complaint when doing so would yield a meritorious claim." *Curley v. Perry*, 246 F.3d 1278, 1284 (10th Cir. 2001). "Pro se litigants are to be given reasonable opportunity to remedy the defects in their pleadings." *Hall v. Bellmon*, 935 F.2d 1106, 1110 n.3 (10th Cir. 1991).

The Court dismisses with prejudice all claims except the false arrest/false imprisonment claim against Defendant Eggar because Ms. Bronnenburg was previously provided an opportunity to amend her complaint to state plausible claims for relief. (*See* Doc. 5 (dismissing without prejudice the original complaint); Doc. 7 (granting request for leave to amend the original complaint).) Ms. Bronnenburg was provided the opportunity to cure the deficiencies in her original complaint and did so with regard to her false

arrest/false imprisonment claim under the Fourth Amendment against Defendant Eggar. She has not cured her other pleading deficiencies, though, and after two bites at the same apple, the Court finds her repeated failures to plausibly state her other claims do not warrant additional amendment. Consequently, the Court concludes allowing further amendment would be futile.

## **ORDER**

**IT IS THEREFORE ORDERED** that the amended complaint (Doc. 9) states a plausible claim upon which relief can be granted against Defendant Beau J. Eggar in his individual/personal capacity for false arrest/false imprisonment in violation of the Fourth Amendment.

**IT IS FURTHER ORDERED** that the Clerk of Court shall serve Defendant Beau J. Eggar, in his individual/personal capacity, as follows:

1. The Clerk shall send Defendant Eggar a copy of the complaint, a notice of lawsuit, and a copy of this Order on 28 U.S.C. § 1915 Screening of Amended Complaint, and the Clerk shall request Defendant Eggar to waive service of a summons in the manner set forth in Fed. R. Civ. P. 4(d); and

2. If Defendant Eggar fails to return a waiver of service within thirty (30) days from the date on which the request for waiver was sent, the Clerk of Court shall issue a summons for Defendant Eggar and shall deliver the summons (along with a copy of the complaint and this Order) to the United States Marshal for service on Defendant Eggar pursuant to Fed. R. Civ. P. 4(c)(3).

**IT IS FURTHER ORDERED** that Defendant Eggar shall serve an answer within twenty-one (21) days of being served the summons and complaint, or, if service of the summons is timely waived under Fed. R. Civ. P. 4(d), then within sixty (60) days after the date when the request for waiver was sent.

**IT IS FURTHER ORDERED** that all other claims alleged in the amended complaint are **dismissed with prejudice** under 28 U.S.C. § 1915(e)(2)(B)(ii).

**IT IS FURTHER ORDERED** that Ms. Bronnenburg's Application to Proceed in District Court Without Prepaying Fees or Costs (Doc. 2) is **granted** under 28 U.S.C. § (a). However, "like any *ifp* litigant, [Ms. Bronnenburg] remains liable for the full amount of the filing fee." *Brown v. Eppler*, 725 F.3d 1221, 1231 (10th Cir. 2013); *see also Robbins v. Switzer*, 104 F.3d 895, 898 (7th Cir. 1997) ("[A]ll § 1915(a) does for any litigant is excuse the pre-payment of fees. Unsuccessful litigants are liable for fees and costs and must pay when they are able.").

**IT IS FINALLY ORDERED** that Ms. Bronnenburg's "Motion to Reconsideration" (Doc. 8) is **denied as moot** because the Court has herein screened anew her amended complaint.

**DATED:** February _25_, 2019.

Scott W. Skavdahl
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 FEB 28  AM 9: 00

STEPHAN HARRIS, CLERK
CASPER

TAMI MAE BRONNENBERG,

    Plaintiff,

    v.

BEAU J. EGGAR, Arresting Officer; WILLIAM K.
STRUEMKE, Attorney; SARA L. STRUEMKE,
Secretary; SERVICM LEGAL SERVICES, LLC;
MARLIN D. RICHARDSON, DC; BIG HORN BASIN
CHIROPRACTIC; CITY OF CODY; PARK COUNTY
DETENTION CENTER; BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF PARK;

    Defendants.

Case No. 19-CV-21-SWS

---

## ORDER DENYING MOTION FOR APPOINTMENT OF COUNSEL

---

This matter comes before the Court on the Plaintiff's Motion for Appointment of

Counsel (Doc. 3).

"There is no constitutional right to appointed counsel in a civil case." *Durre v.*

*Dempsey*, 869 F.2d 543, 547 (10th Cir. 1989). The United States Code, however, permits

the Court to "request an attorney to represent" an indigent party in a civil case where

appropriate. 28 U.S.C. § 1915(e)(1). Section 1915(e)(1) does not create any right to

counsel, and it does not allow the Court to "appoint" counsel because it "merely

empowers a court to *request* an attorney to represent a litigant proceeding *in forma*

*pauperis.*" *Mallard v. U.S. Dist. Ct. S. Dist. Iowa*, 490 U.S. 296, 301-02 (1989)

(emphasis in original) (addressing former § 1915(d), which is the predecessor to current §

1915(e)(1)); *see also Amin v. Voigtsberger*, 560 F. App'x 780, 786 (10th Cir. 2014) (unpublished) ("Under 28 U.S.C. § 1915(e)(1), the district court lacked authority to appoint an attorney…. Instead, the court could simply request an attorney to take the case.").

Plaintiff was previously permitted to proceed *in forma pauperis* in this matter. The Tenth Circuit has "directed district courts to evaluate, in connection with a request to appoint counsel under § 1915, the merits of a [plaintiff's] claims, the nature and complexity of the factual and legal issues, and the [plaintiff's] ability to investigate the facts and present his claims." *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1115 (10th Cir. 2004)

There are no unusual or exceptional circumstances that would warrant the appointment of counsel for Plaintiff in this case. *See Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995). Specifically, the Court finds that the instant matter is not so factually or legally complex as to demand a request for counsel. The totality of the circumstances here do not support requesting an attorney to represent Plaintiff.

**IT IS THEREFORE ORDERED** that the Plaintiff's Motion for Appointment of Counsel (Doc. 3) is **DENIED**.

**DATED:** February 27th, 2019.

Scott W. Skavdahl
United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 MAR 11 PM 2:02

STEPHAN HARRIS, CLERK
CHEYENNE

TAMI MAE BRONNENBERG

Plaintiff(s)

vs

Case Number: 19-CV-21-SWS

BEAU J. EGGAR

Defendant(s)

## ACCEPTANCE OF SERVICE ON BEHALF OF LISTED DEFENDANTS
## AND WAIVER OF SERVICE OF SUMMONS

TO: Clerk, US District Court

I acknowledge receipt of your request that we Accept and Waive Service of a Summons in the action of Tammi Mae Bronnenberg v. Beau J. Eggar, et al, which is case number 19-CV-21-SWS, in the United States District Court for the District of Wyoming. I have also received a copy of the complaint in the action.

I agree to accept electronic service as a reliable means of service as required under Rule 4(d)(1)(G).

I agree to Accept Service on behalf of those defendants listed on the following page(s) and to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not requiring that I (or the entity on whose behalf I am acting) be served with judicial process in the manner provided by Rule 4.

I (or the entity on whose behalf I am acting) will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the Court except for objections based on a defect in the summons or in the service of the summons.

Page 3 of 5

I understand that a judgment may be entered against me (or the party on whose behalf I am acting) if an answer or motion under Rule 12 is not served upon the Court before 60 days from the date designated as the date on which the Notice of Lawsuit was sent (or 90 days from that date if your address is not in any judicial district of the United States).

_3-7-19_
Date

_____
Signature

_BEAU  J-  EGGER_
Printed / Typed Name

### Duty to Avoid Unnecessary Costs of Service of Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain parties to cooperate in saving unnecessary costs of service of the summons and complaint. A defendant located in the United States who, after being notified of an action and asked by a plaintiff located in the United States to waive service of a summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return the waiver.

It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought in an improper place or in a court that lacks jurisdiction over the subject matter of the action or over its person or property. A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later object to the jurisdiction of the court or to the place where the action has been brought.

A defendant who waives service must within the time specified on the waiver form serve on the plaintiff's attorney (or unrepresented plaintiff) a response to the complaint and must also file a signed copy of the response with the court. If the answer or motion is not served within this time, a default judgment may be taken against that defendant. By waiving service, a defendant is allowed more time to answer than if the summons had been actually served when the request for waiver of service was received.

**List of entities and defendants to be represented and in which capacity:**

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 MAR 12  AM 11: 42

STEPHAN HARRIS, CLERK
CASPER

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| TAMI M. BRONNENBERG )<br><br>                    Plaintiff, )<br><br>           v. )<br><br>BEAU J. EGGAR, Arresting Officer; WILLIAM K. )<br>STRUEMKE, Attorney; SARA L. STRUEMKE, )<br>Secretary; SERVICM LEGAL SERVICES, LLC; )<br>MARLIN D. RICHARDSON, DC; BIG HORN BASIN )<br>CHIROPRACTIC; CITY OF CODY; PARK COUNTY )<br>DETENTION CENTER; BOARD OF COUNTY )<br>COMMISSIONERS OF THE COUNTY OF PARK; )<br><br>                    Defendants. )<br> ) | CASE NO. **19-CV-021-S**<br><br><br><br>**AMENDED**<br>1983 CIVIL RIGHT<br>COMPLAINT PURSUANT<br>TO 42 USCS §1983 |

### OBJECTION.

Comes now the plaintiff above mentioned, Ms. Bronnenberg, pro-se, and

respectfully objects, pursuant to **Federal Rules of Civil Procedure, Rule 12 (a) (1) (C);**

**Federal Rules of Evidence, Rules 103 (a) (1); 402**, in part, to the Order on 28

U.S.C.§1915 Screening of Amended Complaint as follows:

Ms. Bronnenberg is not a prisoner within the meaning of the Prison Litigation

Reform Act of 1995 (PLRA), see 28 U.S.C. §1915(h). See also, Merryfield v. Jordan, 584

F.3d 923 (10th Cir. 2009). The screening requirement of 28 U.S.C. §1915A (a) applies

only to prisoner complaints against government officials. "It simply does not require

district courts to review the merits of every claim that comes before them in an IFP (in

forma pauperis status) motion, and **we decline to read in such an extensive duty absent statutory language to that effect.**" See Buchheit v. Green, 705 F3d 1157 at 1161 (10th Cir. 2012). We think an affidavit is sufficient which states that one cannot because of his poverty 'pay or give security for the costs * * * and still be able to provide' himself and dependents 'with the necessities of life.' To say that no persons are entitled to the statute's benefits until they have sworn to contribute to payment of costs, the last dollar they have or can get, and thus make themselves and their dependents wholly destitute, would be to construe the statute in a way that would throw its beneficiaries into the category of public charges. **Adkins v. E. I. du Pont De Nemours & Co.** 335 U.S. 331 at 339, 69S. Ct.85, 93 L. Ed. 43 **(1948)**. "A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991); see also, e.g. Ledbetter v. City of Topeka, 318 F.3d 1183, 1187 (10th Cir. 2003).

　　**Federal Rule of Civil Procedure, Rule 8(a) (2)** provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Derived from Conley v. Gibson: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his (her) claim which would entitle him (her) to relief." 355 U.S. 41, 45-46, 78 S. Ct. 99, 21 L.Ed.2d 80 (1957) (emphasis added); see e.g. Kikumura v. Osagie, 461 F.3d 1269, 1294 (10th Cir. 2006).

　　The new formulation is less then pellucid referring to the "Conflicting signals" calling the opinion "confusing" The opinion seeks to find a middle ground between "heightened fact pleading," which is expressly rejected, Twombly,127 S. Ct. at 1974; see also id. At 1964 (a complaint "does not need detailed factual allegations"). The most difficult question in interpreting Twombly is what the Court means by "plausibility" See Robbins v. Oklahoma, 519 F.3 1242 at 1247 (10th Cir. 2008).

2

This short essay examines the seemingly contradictory definitions and associations of the word "plausibility" which the Supreme Court unexpectedly elevated to a key gate keeping role for all of federal civil litigation in its rulings altering the pleading standard in Twombly and Iqbal, [Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868, 2009 U.S. Lexis 3472 (2009). Justices, judges and commentators have not focused on what "plausibility" means, for some good reasons; it carries with it connotations of the "reasonable" and "fair" but also "superficial," "often specious" and "pretext." I can offer only a plausibility defense of the seemingly contradictory meanings of this word deployed to regulate allegations in federal complaints, for which the transparency of its vice is, for better and for worse, its main virtue. By Garrett, Brandon L., Applause for the Plausible **February 14, 2014**). University of Pennsylvania Law Review Online, **2014**; Virginia Public Law and Legal Theory Research Paper No. 2014-17. Available at SSRN: https//ssrn.com/abstract-2395912

"A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Twombly at 1965 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed.2d 90 (1974). See, Robbins v. Oklahoma, 519 F.3d 1242 at 1247 (10th Cir. 2008).

**"Plausibility" is ambiguous, open to more than one interpretation; having a**

**double meaning.** All defendants, above mentioned, violated Ms. Bronnenberg's

constitutional rights (False Arrest/False imprisonment), under the Forth, Equal Protection

Clause and Due Process Clause of the Fourteenth Amendment of the United States

Constitution, and those rights were clearly established at the time.

The Supreme Court in **Dunaway v. New York**, 442 U.S. 200 at 216, 99 S. Ct. 224, 860 L. Ed. 2d 824 **(1979)** stated, "We accordingly hold that the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation."

"The right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures, shall not be violated, and no Warrants shall

issue, but upon probable cause, supported by Oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized." This

provision binds the state and its officers, including local police. See, **Wolf v. Colorado**,

338 U.S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 **(1949)**. The Fourth Amendment requires that

3

warrants issue "upon probable cause, supported by Oath or affirmation." The significance

of the oath requirement is **"that someone must take the responsibility for the facts**

**alleged, giving rise to the probable cause for the issuance of a warrant."** United

States ex rel. Pugh v. Pate, 401 F.2d 6 (7th Cir. 1968); See also Frazier v. Roberts, 441

F.2d 1224 (8th Cir. 1971). To effect an arrest there must be actual or constructive seizure

or detention of the person arrested, or his voluntary submission to custody, and the

restraint must be under real or pretended legal authority. Neilson v. State, 599 P.2d 1326,

1979 Wyo. LEXIS 447 (Wyo. 1979), **cert. denied**, 444 U.S. 1079, 100 S. Ct. 1031, 62 L.

Ed. 2d 763, 1980 U.S. LEXIS 755 (U.S. 1980). Where the claim is that the police have

improperly searched or seized something, the claimant must have had a legitimate

expectation of privacy as to that thing. Factors to be considered in making this

determination include: (1) the precautions taken in order to maintain one's privacy; (2)

the likely intent of the drafters of the United States and Wyoming constitutions; (3) the

property rights the claimant possessed in the invaded area; and (4) the legitimacy of the

individual's possession of or presence in the property which was searched or seized.

Parkhurst v. State, 628 P.2d 1369, 1981 Wyo. LEXIS 347 (Wyo.), **cert. denied**, 454 U.S.

899, 102 S. Ct. 402, 70 L. Ed. 2d 216, 1981 U.S. LEXIS 3986 (U.S. 1981). **42 U.S.C. §**

**1983**, which provides that every "person" who, under color of any statute, ordinance,

regulation, custom, or usage of any State subjects, or "causes to be subjected," any person

to the deprivation of any federally protected rights, privileges, or immunities shall be

civilly liable to the injured party.

Parties can sue a municipality that has violated their constitutional rights "under

color of any statute, ordinance, regulation, custom, or usage." 42 U.S.C. § 1983 **(2015)**;

Case 2:19-cv-00021-SWS   Document 14   Filed 03/12/19   Page 5 of 10

see also **Monell,** 436 U.S. at 690 (holding that municipalities are "persons" for purposes

of § 1983). A governmental entity, such as the Mansfield I.S.D., can be sued and

subjected to monetary damages and injunctive relief under 42 U.S.C. § 1983 only if its

official policy or custom causes a person to be deprived of a federally protected right.

Board of the Cty. Comm'rs of Bryan Cty, v. Brown, 520 U.S. 397, 403 (1997); **Monell**,

436 U. S. at 694. **See, Bailey v. Mansfield Independent School District; Dr. Jim**

**Vaszauskas; and Dr. Kimberly Cantu, Civil Action No. 3:18-CV-1161-L.**, United

States District Court, N.D. Texas, Dallas Division. **January 10, 2019**.

       **Monell v. Department of Social Services of the city of New Your et al.,** 436

U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 **(1978) Held:** 2. Local governing bodies (and

local officials sued in their official capacities) can, therefore, be sued directly under §

1983 for monetary, declaratory, and injunctive relief in those situations where, as here,

the action that is alleged to be unconstitutional implements or executes a policy

statement, ordinance, regulation, or decision officially adopted or promulgated by those

whose edicts or acts may fairly be said to represent official policy. In addition, local

governments, like every other § 1983 "person," may be sued for constitutional

deprivations visited pursuant to governmental "custom" even though such custom has not

received formal approval through the government's official decision making channels.

**Pp. 436 U.S. 690-691**. 4. (c) In addition, municipalities cannot have arranged their affairs

on an assumption that they can violate constitutional rights for an indefinite period;

accordingly, municipalities have no reliance interest that would support an absolute

immunity. **Pp. 436 U.S. 699-700**. 5. Local governments sued under § 1983 cannot be

entitled to an absolute immunity, lest today's decision "be drained of meaning," Scheuer

5

v. Rhodes, 416 U.S. 232, 416 U.S. 248. **P. 436 U.S. 701**. **Owen v. City of**

**Independence**, 445 U.S. 622 **(1980)** Held: A municipality has no immunity from liability

under § 1983 flowing from its constitutional violations, and may not assert the good faith

of its officers as a defense to such liability. **Pp. 445 U.S.635-658**. Since a municipality

has no "discretion" to violate the Federal Constitution. **Pp.445 U.S. 644-650**.

The Supreme Court, in **Hafer v. Melo, et al.**, 502 U.S. 21, 112 S.Ct. 358, 116

L.Ed.2d 301 **(1991)**. Justice O'Conner, held that: (1) state officers may be personally

liable for damages under § 1983 based upon actions taken in their official capacities; (2)

officers' potential liability is not limited to acts under color of state law that are outside

their authority or not essential to operation of state government, but also extends to acts

within their authority and necessary to performance of governmental functions; and (3)

Eleventh Amendment does not erect barrier against suits to impose individual and

personal liability on state officers under § 1983. Because the real party in interest in an

official-capacity suit is the governmental entity and not the named official, "the entity's

'policy or custom' must have played a part in the violation of federal law." **\*\*\*** Personal-

capacity suits, seek to impose individual liability upon a government officer for actions

taken under color of state law. Thus, "on the merits, to establish personal liability in a §

1983 action, it is enough to show that the official, acting under color of state law, caused

the deprivation of a federal right." Id., at 166, 105 S.Ct., at 3105. While the plaintiff in a

personal-capacity suit need not establish a connection to governmental "policy or

custom," **Id., 502 U.S. at 25**. ("A state official in his or her official capacity, when sued

for injunctive relief, would be a person under § 1983 because 'official-capacity actions

for prospective relief are not treated as actions against the State'") (quoting Graham, 473

6

U.S., at 167, n. 14, 105 S.Ct., at 3106, n. 14). **Id., 502 U.S. at 27**. Congress enacted §

1983 " 'to enforce provisions of the Fourteenth Amendment against those who carry a

badge of authority of a State and represent it in some capacity, whether they act in

accordance with their authority or misuse it.'" Scheuer v. Rhodes, 416 U.S. 232, 243, 94

S. Ct. 1683, 1689, 40 L.Ed.2d 90 (1974) (quoting Monroe v. Pape, supra, 365 U.S., at

171-172, 81 S.Ct.., at 475-476). **Id., 502 U.S. at 28**. "Since Ex parte Young, 209 U.S.

123 28 S.Ct. 441, 52 L.Ed. 714 (1908)," we said, "it has been settled that the Eleventh

Amendment provides no shield for a state official confronted by a claim that he had

deprived another of a federal right under the color of state law." Scheuer, 416 U.S., at

237, 94 S.Ct., at 1687. While the doctrine of Ex parte Young does not apply where a

plaintiff seeks damages from the public treasury, damages awards against individual

defendants in federal courts "are a permissible remedy in some circumstances

notwithstanding the fact that they hold public office." 416 U.S., at 238, 94 S.Ct., at 1687.

That is, the Eleventh Amendment does not erect a barrier against suits to impose

"individual and personal liability" on state officials under § 1983. Ibid. **Id., 502 U.S. at

30, 31**. We hold that state officials, sued in their individual capacities, are "persons"

within the meaning of § 1983. The Eleventh Amendment does not bar such suits, nor are

state officers absolutely immune from personal liability under § 1983 solely by virtue of

the "official" nature of their acts. **Id., 502 U.S. at 31**.

Marlin D. Richardson; Big Horn Basin Chiropractic, made a contract or

agreement to hiring William K. Struemke, Attorney; Servicm Legal Services, LLC, to use

the judicial process to make a collection from Ms. Bronnenberg. **See, Amended 1983

Civil Rights Complaint Exhibit –A-**, (Caption of the Order Vacating Warrant And

Resetting Previously Scheduled Hearing) which crossed the line and violated Federal Constitutional Rights, **(False Arrest/False imprisonment), under the Forth, Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, and those rights were clearly established at the time.** And violated **Park County Policy** Manual, **(July 1, 2017)** Chapter 4, page 4-1, which states in part, \*\*\*. Park County is an equal opportunity employer: Pursuant to Title VI of the Civil Rights Act of 1964 Park County prohibits discrimination. And **City of Cody, Personnel and Policy** Manual, Section 3. **See, Amended 1983 Civil Rights Complaint C. Cause of Action, a) Count 1, Paragraph 10, Page 7.**

Officer Beau Egger used City and County Property, his patrol car and the Park County Detention Center as City and County jail and administrative office facilities to violate Federal Constitutional Rights, **(False Arrest/False imprisonment), under the Forth, Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, and those rights were clearly established at the time.** I believe there is a contract or agreement between the City of Cody and Park County to jointly establish and operate, police protection agency facilities and jail and administrative office facilities or any combination thereof. See, W.S. 18-2-108). **See, Amended 1983 Civil Rights Complaint, C. Cause of Action, Paragraph 12, Page 8.** Officer Egger used a two weeks old Vacated Warrant drafted by William K. Struemke, Attorney, Servicm Legal Services, LLC, to violate Federal Constitutional Rights, **(False Arrest/False imprisonment), under the Forth, Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, and those rights were clearly established at the time,** instead of giving

8

notice of the vacated order to Officer Beau Egger or the City or County Law

Enforcement Center. **See, Exhibit –A-**, lower left hand side where it states Copies to:

William K. Struemke.

**"A lawyer shall not: (a) unlawfully obstruct *** or conceal a document ***".**
**See, Rules of Professional Conduct, Rule 3.4 (a). It is professional misconduct for a**
**lawyer to: (a)** violate or attempt to violate the Rules of Professional Conduct; knowingly
assist  or induce another to do so, or do so through the acts of another.**(b)** commit a
criminal act that reflects adversely  on the lawyer's honesty, trustworthiness or fitness as
a lawyer in other respects; **(c)** engage in conduct involving dishonesty, fraud, deceit or
misrepresentation; **(d)** engage in conduct that is prejudicial to the administration of
justice; **(e)** state or imply an ability to influence improperly a government agency or
official or achieve results by means that violate the Rules of Professional Conduct or
other law; **Id., Rule 8.4.**

**Federal Rules of Civil Procedure, Rule 17 (b)** CAPACITY TO SUE OR BE
SUED. Capacity to sue or be sued is determined as follows: (1) for an individual who is
not acting in a representative capacity, by the law of the individual's domicile; (2) for a
corporation, by the law under which it was organized; and (3) for all other parties, by the
law of the state where the court is located, except that: (A) a partnership or other
unincorporated association with no such capacity under that state's law may sue or be
sued in its common name to enforce a substantive right existing under the United States
Constitution or laws; and (B) 28 U.S.C. §§754 and 959(a) govern the capacity of a
receiver appointed by a United States court to sue or be sued in a United States court.

**Federal Rules of Evidence, Rules 301** provides, for **presumptions in civil cases**

**only**. A presumption imposes on the party against whom it is directed the burden of going

forward with evidence to rebut or meet the presumption. **F.R.E., Rule 302** provides, "a

presumption respecting a fact which is an element of a claim or defense as to which state

law provides the rule of decision is determined in accordance with state law." The **Eric v.**

**Thompson doctrine**, 304 U.S. 64 **(1938)** of applying state law where it provides a rule of

decision applies to presumptions. However, only where the issue or claim "has its source

in state law" (Maternity Yours, Inc v. Your Maternity Shop, Inc., 234 F.2d 538 **(1956)**.

**F.R.E., Rule 501** provides that, "**in a civil case, state law governs privilege regarding**

**a claim** or defense for which state law supplies the rule of decision." **"These rules shall**

9

**be construed to secure fairness in administration,** elimination of unjustifiable expense

and delay, and **promotion of growth and development of the law of evidence to the**

**end that the truth may be ascertained and proceedings justly determined." See,**

**Federal Rules of Evidence, Rule 102.** The relevant question, to be answered under state

law, is whether a particular official is a policy maker to whom the local government has

delegated policy-decision making authority.

"This court has the same right, and can, if it deem it proper, decide the local
questions only, and omit to decide the federal questions, or decide them adversely to the
party claiming their benefit. Horner v. United States, 143 U.S. 570, 576, 36 S. L. ed. 266,
268, 12 Sup. Ct. Rep. 522; Fallbrook Irrig. Dist. v. Bradley, 164 U.S. 112, 154, 41 S. L.
ed. 369, 387, 17 Sup. Ct. Rep. 56; Penn Mut. L. Ins. Co. v. Austin, 168 U.S. 685, 694, 42
S. L. ed. 626, 630, 18 Sup. Ct. Rep. 223; Burton v. United States, 196 U.S. 283, 295, 49
S. L. ed. 482, 485, 25 Sup. Ct. Rep. 243; Williamson v. United States, 207 U.S. 425, 52
L. ed. 278, 28 Sup. Ct. Rep. 163; People's Sav. Bank v. Layman, 134 Fed. 635; Michigan
R. Tax Cases, 138 Fed. 223." **See, Siler v. Louisville & N. R. CO.** (1909) **213 U.S. 175,
at 191.**

## CONCLUSION.

The claims against the other defendants mentioned above should not be dismissed

with prejudice under 28 U.S.C. §1915(e) (2) (B) (ii).

DATED this 9th day of March 2019.

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

## CERTIFICATE OF SERVICE.

I, Tami M. Bronnenberg, Pro-se, swear and certify that I mailed this true and
correct original copy of the above Objection for the Court, (a copy for Ms. Bronnenberg's
stamped copy with a pre-paid stamped self addressed envelope to be mailed to her),
pursuant to **Federal Rules of Civil Procedure, Rule 12 (a) (1) (C); Federal Rules of
Evidence, Rules 103 (a) (1); 402** to the United States District Court Clerk's Office, 111
S. Wolcott, Room 121, Casper, Wyoming 82601 on this day of March 9th, 2019.

Tami M. Bronnenberg, Pro-Se

10

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 MAR 15 AM 11: 19

STEPHAN HARRIS, CLERK
CASPER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| TAMI M. BRONNENBERG )<br><br>Plaintiff, )<br><br>v. )<br><br>BEAU J. EGGAR, Arresting Officer; WILLIAM K. )<br>STRUEMKE, Attorney; SARA L. STRUEMKE, )<br>Secretary; SERVICM LEGAL SERVICES, LLC; )<br>MARLIN D. RICHARDSON, DC; BIG HORN BASIN )<br>CHIROPRACTIC; CITY OF CODY; PARK COUNTY )<br>DETENTION CENTER; BOARD OF COUNTY )<br>COMMISSIONERS OF THE COUNTY OF PARK; )<br><br>Defendants. ) | CASE NO. **19-CV-021-S**<br><br>**AMENDED**<br>1983 CIVIL RIGHT<br>COMPLAINT PURSUANT<br>TO 42 USCS §1983 |

---

### OBJECTION.

Comes now the plaintiff above mentioned, Ms. Bronnenberg, pro-se, and

respectfully objects, pursuant to **Federal Rules of Civil Procedure, Rule 12 (a) (1) (C);**

**Federal Rules of Evidence, Rules 103 (a) (1); 402.**

**28 U.S.C. §1915**, Proceedings in forma pauperis, provides in part, **(b)** any court

of the United States may authorize the commencement, prosecution or defense of any

suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees

or security therefor, by a person who submits an affidavit that includes a statement of all

assets ***.

1

(c) Upon the filing of an affidavit in accordance with *** subsection (b), the court may direct payment by the United States of the expenses of (1) printing the record on appeal in any civil or criminal case, if such printing is required by the appellate court; (2) preparing a transcript of proceedings before a United States magistrate judge in any civil or criminal case, if such transcript is required by the district court, in the case of proceedings conducted under section 636 (b) of this title or under section 3401 (b) of title 18, United States Code; and (3) printing the record on appeal if such printing is required by the appellate court, in the case of proceedings conducted pursuant to section 636 (c) of this title. Such expenses shall be paid when authorized by the Director of the Administrative Office of the United States Courts.

(d) The officers of the court shall issue and serve all process, and perform all duties in such cases. Witnesses shall attend as in other cases, and the same remedies shall be available as are provided for by law in other cases. (e) (1) the court may request an attorney to represent any person unable to afford counsel.

[See, 42 U.S.C. 2000a-3 (a) (appoint; complainant seeking injunction under civil rights laws). These federal statutes empowering courts to assign or appoint counsel were all passed well after 1915 attained its present broad coverage. See Act of Aug. 10, 1956, Pub. L. 1028, 827, 70A Stat. 46, 10 U.S.C. 827; Pub. L. 88-455, 78 Stat. 552 (1964), 18 U.S.C. 3006A; Pub. L. 91-452, 84 Stat. 934 (1970), 18 U.S.C. 3503(c); Pub. L. 95-144, 91 Stat. 1218 (1977), 18 U.S.C. 4109; Pub. L. 95-608, 92 Stat. 3071 (1978), 25 U.S.C. 1912 (b); Pub. L. 88-352, 78 Stat. 241 (1964), 42 U.S.C. 1971 (f); Pub. L. 88-352, 78 Stat. 244 (1964), 42 U.S.C. 2000 a-3 (a); Pub. L. 88-352, 78 Stat. 259 (1964), 42 U.S.C. 2000e-5 (f) (1); Pub. L. 89-793, 80 Stat. 1445 (1966), 42 U.S.C. 3413 (1). See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 306, 307 (1989). Footnote 7.]

(h) As used in this section, the term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.

Interpretation of a statute must begin with the statute's language E. g., United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989); Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985); Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 300, 301 **(1989)**.

Ms. Bronnenberg is not a prisoner within the meaning of the Prison Litigation Reform Act of 1995 (PLRA), see 28 U.S.C. §1915 (h). See also, Merryfield v. Jordan, 584 F.3d 923 (10th Cir. 2009). The screening requirement of 28 U.S.C. §1915A (a) applies only to prisoner complaints against government officials. "It simply does not require district courts to review the merits of every claim that comes before them in an IFP (in forma pauperis status) motion, and **we decline to read in such an extensive duty absent statutory language to that effect.**" See Buchheit v. Green, 705 F3d 1157 at 1161 (10th Cir. 2012). We think an affidavit is sufficient which states that one cannot because of his poverty 'pay or give security for the costs * * * and still be able to provide' himself and dependents 'with the necessities of life.' To say that no persons are entitled to the statute's benefits until they have sworn to contribute to payment of costs, the last dollar they have or can get, and thus make themselves and their dependents wholly destitute, would be to construe the statute in a way that would throw its beneficiaries into the category of public charges. Adkins v. E. I. du Pont De Nemours & Co. 335 U.S. 331 at 339 (1948).

Report of the House Judiciary Committee states that the bill containing 1915(d) was designed to enable persons unable to afford legal representation to avail themselves of the courts, as "[m]any humane and enlightened States" that had similar laws allowed

3

them to do. H. R. Rep. No. 1079, 52d Cong., 1st Sess., 2 (1892). See, Mallard v. U.S.

Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 302 (1989).

Some state statutes providing assignment or appointment of counsel are Ark. Stat. 1053 (1884) (assign); Ill. Rev. Stat., ch. 26, 3 (1845) (assign); Ind. Rev. Stat., Vol. 2, pt. 2, ch. 1, Art. 2, 15 (1852) (assign); Ky. Stat. 884 (1915) (Act of May 27, 1892) (assign); Mo. Rev. Stat. 2918 (1889) (assign); N. J. Gen. Stat., Vol. 2, Practice 369, p. 2598 (1896) (enacted 1799) (assign); 1876 N. Y. Laws, ch. 448, Art. 3, 460 (assign); 1869 N.C. Pub. Laws, ch. 96, 2 (assign); Tenn. Code 3980 (1858) (appoint and assign); Tex. Rev. Stat., Art. 1125 (1879) (enacted 1846) (appoint); Va. Code Ann. 3538 (1904) (appeared in 1849 Code) (assign); W. Va. Code, ch. 138, 1 (1891) (assign). Cf. N. Mex. Comp. Laws 2289 (1884) (judge may appoint attorney to represent Territory if Territory's attorneys are unable to attend by reason of sickness or inability); Nev. Comp. Laws 3126 (1900) (court may appoint attorney to appear on behalf of absent defendant in certain contract actions). See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 303 (1989).

**28 U.S.C. 1915 (a)**, as originally drafted it apparently applied only to suits

commenced by an indigent person. Act of July 20, 1892, ch. 209, 1, 27 Stat. 252. ***

And the floor debate in the House speaks only of poor persons suing as plaintiffs. See 23

Cong. Rec. 5199 (1892).  See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at

306 (1989). Footnote 5.

These federal statutes empowering courts to assign or appoint counsel were all passed well after 1915 attained its present broad coverage. See Act of Aug. 10, 1956, Pub. L. 1028, 827, 70A Stat. 46, 10 U.S.C. 827; Pub. L. 88-455, 78 Stat. 552 (1964), 18 U.S.C. 3006A; Pub. L. 91-452, 84 Stat. 934 (1970), 18 U.S.C. 3503(c); Pub. L. 95-144, 91 Stat. 1218 (1977), 18 U.S.C. 4109; Pub. L. 95-608, 92 Stat. 3071 (1978), 25 U.S.C. 1912(b); Pub. L. 88-352, 78 Stat. 241 (1964), 42 U.S.C. 1971(f); Pub. L. 88-352, 78 Stat. 244 (1964), 42 U.S.C. 2000a-3(a); Pub. L. 88-352, 78 Stat. 259 (1964), 42 U.S.C. 2000e-5(f)(1); Pub. L. 89-793, 80 Stat. 1445 (1966), 42 U.S.C. 3413(1). See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 307 **(1989)**. Footnote 7.

The fact that a court's power to require a lawyer to render assistance to the indigent is firmly rooted in the authority to define the terms and conditions upon which members are admitted to the bar, Frazier v. Heebe, 482 U.S. 641 (1987); United States v. Hvass, 355 U.S. 570 (1958), 3 and to exercise "those powers necessary to protect the functioning of its own processes." Young v. United States ex rel. Vuitton et Fils S. A., 481 U.S. 787, 821 (1987) (SCALIA, J., concurring in judgment). Cf. Sparks v. Parker, 368 So.2d 528 (Ala.) (rejecting constitutional challenges to compelled representation of indigent defendants), appeal dism'd, 444 U.S. 803 (1979). The lawyer's duty to provide professional assistance to the poor is part of the ancient traditions of the bar long

4

recognized by this Court and the courts of the several States. *** "Attorneys are officers of the court, and are bound to render service when required by such an appointment." Powell v. Alabama, 287 U.S. 45, 73 (1932). *** Congress intended to "open the United States courts" to impoverished litigants and "to keep pace" with the laws of these "[m]any humane and enlightened States." H. R. Rep. No. 1079, 52d Cong., 1st Sess., 1-2 (1892). *** To be faithful to the congressional design of ensuring the poor litigant equal justice whether the suit is prosecuted in federal or state court, the statute should be construed to require counsel to serve, absent good reason, when requested to do so by the court. See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 312, 313-315 (**dissenting**) (1989).

"An Act providing when plaintiff may sue as a poor person and when counsel shall be assigned by the court." Ch. 209, 27 Stat. 252. Every contemporary decision uses the word "assign" to describe the judge's authority to secure counsel for parties under 1915(d). See Boyle v. Great Northern R. Co., 63 F. 539 (CC Wash. 1894); Whelan v. Manhattan R. Co., 86 F. 219, 220-221 (CC SDNY 1898); Brinkley v. Louisville & N. R. Co., 95 F. 345, 353 (CC WD Tenn. 1899); Phillips v. Louisville & N. R. Co., 153 F. 795 (CC ND Ala. 1907), aff'd, 164 F. 1022 (CA5 1908); United States ex rel. Randolph v. Ross, 298 F. 64 (CA6 1924). It is evident that the drafters of this statute understood these terms to impose similar obligations and simply assumed that members of our profession would perform their assigned tasks when requested to do so by the court. See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 312, 316 (**dissenting**) (1989).

Because plaintiff is preceding pro se, this court will liberally construe her pleadings. **Cf.**, Haines V. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 595, 30 L. Ed.2d 652 (**1972**). Durre v. Dempsey, 869 F.2d 543 at 545 (**10th Cir. 1989**). Pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers. **Cf.**, Haines, 404 U.S. at 520, 92S. Ct. at 595. Durre v. Dempsey, 869 F.2d 543 at 547 (10th Cir. 1989); Hall v. Bellmon, 935 F.2d 1106, 1110 (**10th Cir. 1991**); see also, e.g. Ledbetter v. City of Topeka, 318 F.3d 1183, 1187 (**10th Cir. 2003**).

We have previously directed district courts to evaluate, in connection with a request to appoint counsel under § 1915, *** the nature and complexity of the factual and legal issues. Rucks v. Boergermann, 57 F.3d 978 at 979 (10th Cir. 1995); see also, Macline v. Freake, 650 F.2d 885, 887-89 (7th Cir.1981). **Cf.**, Hill V. SmithKline Beecham Corp., 393 F.3d 1111, at 1115 (10th Cir. 2004). In order to be liable pursuant to

5

§ 1983, a defendant must have personally participated in the alleged deprivation. Meade v. Grubbs, 841 F. 2d 1512 at 1527-58 (10th Cir. 1988); Durre v. Dempsey, 869 F.2d 543 at 548 (10th Cir. 1989). <u>See</u>, Amended 1983 Civil Rights Complaint Exhibits −A- thru −F.

I believe the statute has become unconstitutional by removing "indigent person" from the statute in violation of the Equal Protection Clause and Due Process Clause of the 14th Amendment see Buchheit v. Green, **Supra**, 705 F3d 1157 at 1161 (10th Cir. 2012). **"We decline to read in such an extensive duty absent statutory language to that effect."** Report of the House Judiciary Committee states that the bill containing 1915(d) was designed to enable persons unable to afford legal representation to avail themselves of the courts, as "[m]any humane and enlightened States" that had similar laws allowed them to do. H. R. Rep. No. 1079, 52d Cong., 1st Sess., 2 (1892). See, **Supra**, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 302 **(1989).**

### CONCLUSION.

Plaintiff's Motion for Appointment of Counsel should not be dismissed.

DATED this _12_ th day of March 2019.

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

### <u>CERTIFICATE OF SERVICE</u>

I, Tami M. Bronnenberg, Pro-se, swear and certify that I mailed this true and correct original copy of the above Objection for the Court, (a copy for Ms. Bronnenberg's stamped copy with a pre-paid stamped self addressed envelope to be mailed to her), pursuant to **Federal Rules of Civil Procedure, Rule 12 (a) (1) (C); Federal Rules of Evidence, Rules 103 (a) (1); 402**  to the United States District Court Clerk's Office, 111 S. Wolcott, Room 121, Casper, Wyoming 82601 on this day of March _12_ th, 2019.

Tami M. Bronnenberg, Pro-Se

6

Tami M
P.O. Box 80
Cody, Wyo. 82414

U.S. Dist. Ct. Clerk's Office
111 S. Wolcott Rm. 121
Casper, Wyo. 82601

7017 1000 0000 9323 0663





1000

82601

U.S. POSTAGE
CODY, WY
82414
MAR 18 19
AMOUNT
$4.80
R2305M144354

Bridget Hill
Attorney General

Michael J. McGrady
Deputy Attorney General

Daniel E. White [Wyo. State Bar No. 5-1545]
Senior Assistant Attorney General
Adrian Kowalski[Wyo. State Bar No. 7-6125]
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, Wyoming 82002
(307) 777-7862
(307) 777-8920 Facsimile
dan.white@wyo.gov
adrian.kowalski@wyo.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| TAMI MAE BRONNENBERG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-CV-21-SWS |
| | ) |
| BEAU J. EGGAR, | ) |
| | ) |
| Defendant. | ) |

---

## ENTRY OF APPEARANCE

---

**COMES NOW**, the undersigned counsel, and hereby enters his appearance as counsel of record for Beau J. Eggar, in his individual capacity as to all federal law claims and in all capacities as to all state law claims ("Individual Defendant").

DATED this 26th day of March 2019.

*/s/ Daniel E. White*
Daniel E. White [WSB No. 5-1545]
Senior Assistant Attorney General

## CERTIFICATE OF SERVICE

     I hereby certify that the foregoing was served this 26th day of March 2019, by the following means:


Tami M. Bronnenberg                                           [✔] US Mail
P.O. Box 802
Cody, WY  82414


                                        */s/ Jessica Curless*
                                        Jessica Curless, Paralegal
                                        Office of the Wyoming Attorney General

Bridget Hill
Attorney General

Michael J. McGrady
Deputy Attorney General

Daniel E. White [Wyo. State Bar No. 5-1545]
Senior Assistant Attorney General
Adrian Kowalski[Wyo. State Bar No. 7-6125]
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, Wyoming 82002
(307) 777-7862
(307) 777-8920 Facsimile
dan.white@wyo.gov
adrian.kowalski@wyo.gov

# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

| | |
|---|---|
| TAMI MAE BRONNENBERG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-CV-21-SWS |
| | ) |
| BEAU J. EGGAR, | ) |
| | ) |
| Defendant. | ) |

---

## ENTRY OF APPEARANCE

---

**COMES NOW**, the undersigned counsel, and hereby enters his appearance as counsel of record for Beau J. Eggar, in his individual capacity as to all federal law claims and in all capacities as to all state law claims ("Individual Defendant").

DATED this 26th day of March 2019.

*Adrian Kowalski*
Adrian Kowalski [WSB No. 7-6125]
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served this 26th day of March 2019, by the following means:

Tami M. Bronnenberg                                    [✓] US Mail
P.O. Box 802
Cody, WY  82414


                    */s/ Jessica Curless*_____
                    Jessica Curless, Paralegal
                    Office of the Wyoming Attorney General

2

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 MAR 26  PM 3: 42

STEPHAN HARRIS, CLERK
CASPER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. |
| v. | ) | **19-CV-021-S** |
| | ) | |
| BEAU J. EGGAR, Arresting Officer; WILLIAM K. | ) | |
| STRUEMKE, Attorney; SARA L. STRUEMKE, | ) | |
| Secretary; SERVICM LEGAL SERVICES, LLC; | ) | |
| MARLIN D. RICHARDSON, DC; BIG HORN BASIN | ) | **AMENDED** |
| CHIROPRACTIC; CITY OF CODY; PARK COUNTY | ) | 1983 CIVIL |
| DETENTION CENTER; BOARD OF COUNTY | ) | RIGHT |
| COMMISSIONERS OF THE COUNTY OF PARK; | ) | COMPLAINT |
| | ) | PURSUANT |
| | ) | TO 42 USCS |
| Defendants. | ) | §1983 |

---

## NOTICE OF UNCONSTITUTIONAL
## FEDERAL STATUTE, 28 U.S.C. §1915.

Comes now the plaintiff, Ms. Bronnenberg, pro-se, and respectfully

gives notice pursuant to the Federal Rules of Civil Procedure, Rule 5.1. (a)

(1) (A), (2), that on "Objection", dated March 12, 2019, of the Order, dated

February 27, 2019, denying Motion for Appointment of Attorney pursuant to

28 U.S.C. §1915 plaintiff noticed that the word "indigent" has been removed

from 28 U.S.C. §1915. I believe the "indigent intent" has specifically been

removed from the "specific intended purpose" of the statute, making the

text, structure of the statute unconstitutional and discriminatory for the

plaintiff.

Dated: March 25, 2019

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 FEB 28  AM 9:00

STEPHAN HARRIS, CLERK
CASPER

TAMI MAE BRONNENBERG,

    Plaintiff,

    v.                                     Case No. 19-CV-21-SWS

BEAU J. EGGAR, Arresting Officer; WILLIAM K.
STRUEMKE, Attorney; SARA L. STRUEMKE,
Secretary; SERVICM LEGAL SERVICES, LLC;
MARLIN D. RICHARDSON, DC; BIG HORN BASIN
CHIROPRACTIC; CITY OF CODY; PARK COUNTY
DETENTION CENTER; BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF PARK;

    Defendants.

## ORDER DENYING MOTION FOR APPOINTMENT OF COUNSEL

This matter comes before the Court on the Plaintiff's Motion for Appointment of
Counsel (Doc. 3).

"There is no constitutional right to appointed counsel in a civil case." *Durre v.
Dempsey*, 869 F.2d 543, 547 (10th Cir. 1989). The United States Code, however, permits
the Court to "request an attorney to represent" an indigent party in a civil case where
appropriate. 28 U.S.C. § 1915(e)(1). Section 1915(e)(1) does not create any right to
counsel, and it does not allow the Court to "appoint" counsel because it "merely
empowers a court to *request* an attorney to represent a litigant proceeding *in forma
pauperis*." *Mallard v. U.S. Dist. Ct. S. Dist. Iowa*, 490 U.S. 296, 301-02 (1989)
(emphasis in original) (addressing former § 1915(d), which is the predecessor to current §

1915(e)(1)); *see also Amin v. Voigtsberger*, 560 F. App'x 780, 786 (10th Cir. 2014) (unpublished) ("Under 28 U.S.C. § 1915(e)(1), the district court lacked authority to appoint an attorney.... Instead, the court could simply request an attorney to take the case.").

Plaintiff was previously permitted to proceed *in forma pauperis* in this matter. The Tenth Circuit has "directed district courts to evaluate, in connection with a request to appoint counsel under § 1915, the merits of a [plaintiff's] claims, the nature and complexity of the factual and legal issues, and the [plaintiff's] ability to investigate the facts and present his claims." *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1115 (10th Cir. 2004)

There are no unusual or exceptional circumstances that would warrant the appointment of counsel for Plaintiff in this case. *See Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995). Specifically, the Court finds that the instant matter is not so factually or legally complex as to demand a request for counsel. The totality of the circumstances here do not support requesting an attorney to represent Plaintiff.

**IT IS THEREFORE ORDERED** that the Plaintiff's Motion for Appointment of Counsel (Doc. 3) is **DENIED.**

**DATED:** February 27th, 2019.

Scott W. Skavdahl
United States District Judge

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

TAMI M. BRONNENBERG        )
                             )
             Plaintiff,    )
                             )
        v.               )    CASE NO. **19-CV-021-S**
                             )
BEAU J. EGGAR, Arresting Officer; WILLIAM K. )
STRUEMKE, Attorney; SARA L. STRUEMKE, )
Secretary; SERVICM LEGAL SERVICES, LLC; )
MARLIN D. RICHARDSON, DC; BIG HORN BASIN )    **AMENDED**
CHIROPRACTIC; CITY OF CODY; PARK COUNTY )   1983 CIVIL RIGHT
DETENTION CENTER; BOARD OF COUNTY )   COMPLAINT PURSUANT
COMMISSIONERS OF THE COUNTY OF PARK; )   TO 42 USCS §1983
                             )
           Defendants.   )

---

**OBJECTION.**

Comes now the plaintiff above mentioned, Ms. Bronnenberg, pro-se, and

respectfully objects, pursuant to **Federal Rules of Civil Procedure, Rule 12 (a) (1) (C);**

**Federal Rules of Evidence, Rules 103 (a) (1); 402.**

    **28 U.S.C. §1915,** Proceedings in forma pauperis, provides in part, **(b)** any court

of the United States may authorize the commencement, prosecution or defense of any

suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees

or security therefor, by a person who submits an affidavit that includes a statement of all

assets ***.

**(c)** Upon the filing of an affidavit in accordance with *** subsection (b), the court may direct payment by the United States of the expenses of (1) printing the record on appeal in any civil or criminal case, if such printing is required by the appellate court; (2) preparing a transcript of proceedings before a United States magistrate judge in any civil or criminal case, if such transcript is required by the district court, in the case of proceedings conducted under section 636 (b) of this title or under section 3401 (b) of title 18, United States Code; and (3) printing the record on appeal if such printing is required by the appellate court, in the case of proceedings conducted pursuant to section 636 (c) of this title. Such expenses shall be paid when authorized by the Director of the Administrative Office of the United States Courts.

**(d)** The officers of the court shall issue and serve all process, and perform all duties in such cases. Witnesses shall attend as in other cases, and the same remedies shall be available as are provided for by law in other cases. **(e) (1)** the court may request an attorney to represent any person unable to afford counsel.

[See, 42 U.S.C. 2000a-3 (a) (appoint; complainant seeking injunction under civil rights laws). These federal statutes empowering courts to assign or appoint counsel were all passed well after 1915 attained its present broad coverage. See Act of Aug. 10, 1956, Pub. L. 1028, 827, 70A Stat. 46, 10 U.S.C. 827; Pub. L. 88-455, 78 Stat. 552 (1964), 18 U.S.C. 3006A; Pub. L. 91-452, 84 Stat. 934 (1970), 18 U.S.C. 3503(c); Pub. L. 95-144, 91 Stat. 1218 (1977), 18 U.S.C. 4109; Pub. L. 95-608, 92 Stat. 3071 (1978), 25 U.S.C. 1912 (b); Pub. L. 88-352, 78 Stat. 241 (1964), 42 U.S.C. 1971 (f); Pub. L. 88-352, 78 Stat. 244 (1964), 42 U.S.C. 2000 a-3 (a); Pub. L. 88-352, 78 Stat. 259 (1964), 42 U.S.C. 2000e-5 (f) (1); Pub. L. 89-793, 80 Stat. 1445 (1966), 42 U.S.C. 3413 (1). See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 306, 307 (1989). Footnote 7.]

**(h)** As used in this section, the term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.

Interpretation of a statute must begin with the statute's language E. g., United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989); Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985); Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 300, 301 **(1989)**.

Ms. Bronnenberg is not a prisoner within the meaning of the Prison Litigation Reform Act of 1995 (PLRA), see 28 U.S.C. §1915 (h). See also, Merryfield v. Jordan, 584 F.3d 923 (10th Cir. 2009). The screening requirement of 28 U.S.C. §1915A (a) applies only to prisoner complaints against government officials. "It simply does not require district courts to review the merits of every claim that comes before them in an IFP (in forma pauperis status) motion, and **we decline to read in such an extensive duty absent statutory language to that effect.**" See Buchheit v. Green, 705 F3d 1157 at 1161 (10th Cir. 2012). We think an affidavit is sufficient which states that one cannot because of his poverty 'pay or give security for the costs * * * and still be able to provide' himself and dependents 'with the necessities of life.' To say that no persons are entitled to the statute's benefits until they have sworn to contribute to payment of costs, the last dollar they have or can get, and thus make themselves and their dependents wholly destitute, would be to construe the statute in a way that would throw its beneficiaries into the category of public charges. Adkins v. E. I. du Pont De Nemours & Co. 335 U.S. 331 at 339 (1948).

Report of the House Judiciary Committee states that the bill containing 1915(d) was designed to enable persons unable to afford legal representation to avail themselves of the courts, as "[m]any humane and enlightened States" that had similar laws allowed

them to do. H. R. Rep. No. 1079, 52d Cong., 1st Sess., 2 (1892). See, Mallard v. U.S.

Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 302 (1989).

Some state statutes providing assignment or appointment of counsel are Ark. Stat.
1053 (1884) (assign); Ill. Rev. Stat., ch. 26, 3 (1845) (assign); Ind. Rev. Stat., Vol. 2, pt.
2, ch. 1, Art. 2, 15 (1852) (assign); Ky. Stat. 884 (1915) (Act of May 27, 1892) (assign);
Mo. Rev. Stat. 2918 (1889) (assign); N. J. Gen. Stat., Vol. 2, Practice 369, p. 2598 (1896)
(enacted 1799) (assign); 1876 N. Y. Laws, ch. 448, Art. 3, 460 (assign); 1869 N.C. Pub.
Laws, ch. 96, 2 (assign); Tenn. Code 3980 (1858) (appoint and assign); Tex. Rev. Stat.,
Art. 1125 (1879) (enacted 1846) (appoint); Va. Code Ann. 3538 (1904) (appeared in
1849 Code) (assign); W. Va. Code, ch. 138, 1 (1891) (assign). Cf. N. Mex. Comp. Laws
2289 (1884) (judge may appoint attorney to represent Territory if Territory's attorneys are
unable to attend by reason of sickness or inability); Nev. Comp. Laws 3126 (1900) (court
may appoint attorney to appear on behalf of absent defendant in certain contract actions).
See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 303 (1989).

28 U.S.C. 1915 (a), as originally drafted it apparently applied only to suits

commenced by an indigent person. Act of July 20, 1892, ch. 209, 1, 27 Stat. 252. ***

And the floor debate in the House speaks only of poor persons suing as plaintiffs. See 23

Cong. Rec. 5199 (1892).  See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at

306 (1989). Footnote 5.

These federal statutes empowering courts to assign or appoint counsel were all
passed well after 1915 attained its present broad coverage. See Act of Aug. 10, 1956,
Pub. L. 1028, 827, 70A Stat. 46, 10 U.S.C. 827; Pub. L. 88-455, 78 Stat. 552 (1964), 18
U.S.C. 3006A; Pub. L. 91-452, 84 Stat. 934 (1970), 18 U.S.C. 3503(c); Pub. L. 95-144,
91 Stat. 1218 (1977), 18 U.S.C. 4109; Pub. L. 95-608, 92 Stat. 3071 (1978), 25 U.S.C.
1912(b); Pub. L. 88-352, 78 Stat. 241 (1964), 42 U.S.C. 1971(f); Pub. L. 88-352, 78 Stat.
244 (1964), 42 U.S.C. 2000a-3(a); Pub. L. 88-352, 78 Stat. 259 (1964), 42 U.S.C. 2000e-
5(f)(1); Pub. L. 89-793, 80 Stat. 1445 (1966), 42 U.S.C. 3413(1). See, Mallard v. U.S.
Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 307 (1989). Footnote 7.

The fact that a court's power to require a lawyer to render assistance to the
indigent is firmly rooted in the authority to define the terms and conditions upon which
members are admitted to the bar, Frazier v. Heebe, 482 U.S. 641 (1987); United States v.
Hvass, 355 U.S. 570 (1958), 3 and to exercise "those powers necessary to protect the
functioning of its own processes." Young v. United States ex rel. Vuitton et Fils S. A.,
481 U.S. 787, 821 (1987) (SCALIA, J., concurring in judgment). Cf. Sparks v. Parker,
368 So.2d 528 (Ala.) (rejecting constitutional challenges to compelled representation of
indigent defendants), appeal dism'd, 444 U.S. 803 (1979). The lawyer's duty to provide
professional assistance to the poor is part of the ancient traditions of the bar long

4

recognized by this Court and the courts of the several States. *** "Attorneys are officers of the court, and are bound to render service when required by such an appointment." Powell v. Alabama, 287 U.S. 45, 73 (1932). *** Congress intended to "open the United States courts" to impoverished litigants and "to keep pace" with the laws of these "[m]any humane and enlightened States." H. R. Rep. No. 1079, 52d Cong., 1st Sess., 1-2 (1892). *** To be faithful to the congressional design of ensuring the poor litigant equal justice whether the suit is prosecuted in federal or state court, the statute should be construed to require counsel to serve, absent good reason, when requested to do so by the court. See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 312, 313-315 **(dissenting)** (1989).

"An Act providing when plaintiff may sue as a poor person and when counsel shall be assigned by the court." Ch. 209, 27 Stat. 252. Every contemporary decision uses the word "assign" to describe the judge's authority to secure counsel for parties under 1915(d). See Boyle v. Great Northern R. Co., 63 F. 539 (CC Wash. 1894); Whelan v. Manhattan R. Co., 86 F. 219, 220-221 (CC SDNY 1898); Brinkley v. Louisville & N. R. Co., 95 F. 345, 353 (CC WD Tenn. 1899); Phillips v. Louisville & N. R. Co., 153 F. 795 (CC ND Ala. 1907), aff'd, 164 F. 1022 (CA5 1908); United States ex rel. Randolph v. Ross, 298 F. 64 (CA6 1924). It is evident that the drafters of this statute understood these terms to impose similar obligations and simply assumed that members of our profession would perform their assigned tasks when requested to do so by the court. See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 312, 316 **(dissenting)** (1989).

Because plaintiff is preceding pro se, this court will liberally construe her pleadings. **Cf.**, Haines V. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 595, 30 L. Ed.2d 652 **(1972)**. Durre v. Dempsey, 869 F.2d 543 at 545 **(10ᵗʰ Cir. 1989)**. Pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers. **Cf.**, Haines, 404 U.S. at 520, 92S. Ct. at 595. Durre v. Dempsey, 869 F.2d 543 at 547 (10ᵗʰ Cir. 1989); Hall v. Bellmon, 935 F.2d 1106, 1110 **(10th Cir. 1991)**; see also, e.g. Ledbetter v. City of Topeka, 318 F.3d 1183, 1187 **(10th Cir. 2003)**.

We have previously directed district courts to evaluate, in connection with a request to appoint counsel under § 1915, *** the nature and complexity of the factual and legal issues. Rucks v. Boergermann, 57 F.3d 978 at 979 (10ᵗʰ Cir. 1995); see also, Macline v. Freake, 650 F.2d 885, 887-89 (7th Cir.1981). **Cf.**, Hill V. SmithKline Beecham Corp., 393 F.3d 1111, at 1115 (10ᵗʰ Cir. 2004). In order to be liable pursuant to

§ 1983, a defendant must have personally participated in the alleged deprivation. Meade v. Grubbs, 841 F. 2d 1512 at 1527-58 (10th Cir. 1988); Durre v. Dempsey, 869 F.2d 543 at 548 (10th Cir. 1989). <u>See,</u> Amended 1983 Civil Rights Complaint Exhibits –A- thru –F. I believe the statute has become unconstitutional by removing "indigent person" from the statute in violation of the Equal Protection Clause and Due Process Clause of the 14th Amendment see Buchheit v. Green, **Supra,** 705 F3d 1157 at 1161 (10th Cir. 2012). **"We decline to read in such an extensive duty absent statutory language to that effect."** Report of the House Judiciary Committee states that the bill containing 1915(d) was designed to enable persons unable to afford legal representation to avail themselves of the courts, as "[m]any humane and enlightened States" that had similar laws allowed them to do. H. R. Rep. No. 1079, 52d Cong., 1st Sess., 2 (1892). See, **Supra,** Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 302 **(1989).**

## CONCLUSION.

Plaintiff's Motion for Appointment of Counsel should not be dismissed.

DATED this _12_ th day of March 2019.

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

## **CERTIFICATE OF SERVICE.**

I, Tami M. Bronnenberg, Pro-se, swear and certify that I mailed this true and correct original copy of the above Objection for the Court, (a copy for Ms. Bronnenberg's stamped copy with a pre-paid stamped self addressed envelope to be mailed to her), pursuant to **Federal Rules of Civil Procedure, Rule 12 (a) (1) (C); Federal Rules of Evidence, Rules 103 (a) (1); 402** to the United States District Court Clerk's Office, 111 S. Wolcott, Room 121, Casper, Wyoming 82601 on this day of March _12_ th, 2019.

Tami M. Bronnenberg, Pro-Se

UNITED STATES DISTRICT COURT FOR THE 10TH CIRCUIT COURT

DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2019 MAR 26  PM 3:42
STEPHAN HARRIS, CLERK
CASPER

FILE NUMBER _____

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | **NOTICE** |
| BEAU J. EGGAR, Arresting Officer; WILLIAM K. | ) | |
| STRUEMKE, Attorney; SARA L. STRUEMKE, | ) | **OF** |
| Secretary; SERVICM LEGAL SERVICES, LLC; | ) | |
| MARLIN D. RICHARDSON, DC; BIG HORN BASIN | ) | **APPEAL** |
| CHIROPRACTIC; CITY OF CODY; PARK COUNTY | ) | |
| DETENTION CENTER; BOARD OF COUNTY | ) | |
| COMMISSIONERS OF THE COUNTY OF PARK; | ) | |
| | ) | |
| Defendants. | ) | |

---

**NOTICE** is hereby given that plaintiff, Tami M. Bronnenberg, in the

above named case hereby appeal to the United States Court of Appeals for

the 10th Circuit from the "Order on 28 U.S.C. §1915 Screening of Amended

(1983 Civil Rights) Complaint." **IN PART, Ordered that all other claims**

**alleged in the amended complaint are dismissed with prejudice under 28**

**U.S.C. §1915 (e) (2) (B) (ii),** entered in this action on February 25, 2019.

Dated: March 25, 2019

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 APR -1 AM 10: 45

STEPHAN HARRIS, CLERK
CASPER

TAMI MAE BRONNENBERG,

Plaintiff,

v.

Case No. 19-CV-21-SWS

BEAU J. EGGAR, Arresting Officer; WILLIAM K.
STRUEMKE, Attorney; SARA L. STRUEMKE,
Secretary; SERVICM LEGAL SERVICES, LLC;
MARLIN D. RICHARDSON, DC; BIG HORN BASIN
CHIROPRACTIC; CITY OF CODY; PARK COUNTY
DETENTION CENTER; BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF PARK;

Defendants.

---

### ORDER GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS*

---

This matter comes before the Court on the Plaintiff's Motion for Permission to
Appeal In Forma Pauperis (Doc. 20). Ms. Bronnenburg was previously permitted to
proceed in forma pauperis in the district-court action. (Doc. 10 at p. 12.) This Court
does not believe Ms. Bronnenburg seeks an appeal in bad faith.

**IT IS THEREFORE ORDERED** that Ms. Bronnenburg's Motion for Permission
to Appeal In Forma Pauperis is **GRANTED**. Under Federal Rule of Appellate Procedure
24(a)(3), Ms. Bronnenburg may proceed on appeal without prepayment of fees.

**DATED:** March 31st, 2019.

Scott W. Skavdahl
United States District Judge

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

April 04, 2019

Chris Wolpert
Chief Deputy Clerk

Tami Mae Bronnenberg
P.O. Box 802
Cody, WY 82414

Mr. Stephan Harris
United States District Court for the District of Wyoming
Office of the Clerk
2120 Capitol Avenue, Room 2141
Cheyenne, WY 82001-0000

Ms. Adrian K. Kowalski
Mr. Daniel E White
Office of the Attorney General for the State of Wyoming
2320 Capitol Avenue
Cheyenne, WY 82002

**RE:**     **19-8026, Bronnenberg v. Eggar, et al**
           Dist/Ag docket: 2:19-CV-00021-SWS

Dear Counsel, Clerk and Appellant:

Please be advised that the court issued an order today dismissing this case.

In addition, please be advised that the mandate for this case has issued today. The clerk of the originating court shall file accordingly.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

EAS/lg

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**April 4, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

———————————————————

TAMI MAE BRONNENBERG,

      Plaintiff - Appellant,

v.

BEAU J. EGGAR, arresting officer, et al.,

      Defendants - Appellees.

No. 19-8026
(D.C. No. 2:19-CV-00021-SWS)
(D. Wyo.)

———————————————————

## ORDER

———————————————————

This matter is before the court on pro se appellant Tami Mae Bronnenberg's

*Motion for Voluntary Dismissal of Notice of Appeal*. Upon consideration, the court grants

the motion and dismisses this appeal.

A copy of this order shall stand as and for the mandate of the court.

Entered for the Court
ELISABETH A. SHUMAKER, Clerk

by: Lisa A. Lee
      Counsel to the Clerk

Bridget Hill
Attorney General

Michael J. McGrady
Deputy Attorney General

Daniel E. White [Wyo. State Bar No. 5-1545]
Senior Assistant Attorney General
Adrian Kowalski[Wyo. State Bar No. 7-6125]
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, Wyoming 82002
(307) 777-7862
(307) 777-8920 Facsimile
dan.white@wyo.gov
adrian.kowalski@wyo.gov

# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

| | |
|---|---|
| TAMI MAE BRONNENBERG, | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-CV-21-SWS |
| | ) |
| BEAU J. EGGAR, | ) |
| | ) |
|      Defendant. | ) |

---

## DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT

---

Defendant, by and through his undersigned counsel, hereby move this Court

for dismissal of the Plaintiffs' Complaint pursuant to Fed. R Civ. P. 12(b)(6). The

Defendant also submits his Memorandum in Support of Motion to Dismiss and

incorporate the same as if fully set forth herein.

DATED this 26th day of April, 2019.

/s/ Daniel E. White
Daniel E. White [WSB No. 5-1545]
Senior Assistant Attorney General

Adrian Kowalski
Adrian Kowalski [WSB No. 7-6125]
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served this 26th day of April 2019, by the following means:

Tami M. Bronnenberg                                          [✔] US Mail
P.O. Box 802
Cody, WY  82414

/s/ Jessica Curless
Jessica Curless, Paralegal
Office of Attorney General

Bridget Hill
Attorney General

Michael J. McGrady
Deputy Attorney General

Daniel E. White [Wyo. State Bar No. 5-1545]
Senior Assistant Attorney General
Adrian Kowalski[Wyo. State Bar No. 7-6125]
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, Wyoming 82002
(307) 777-7862
(307) 777-8920 Facsimile
dan.white@wyo.gov
adrian.kowalski@wyo.gov

# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 19-CV-21-S |
| | ) | |
| BEAU J. EGGAR, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## OFFICER EGGER'S
## MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Plaintiff Tami M. Bronnenberg (Bronnenberg) brings this *pro se* civil rights case over her arrest, which she argues was done based on an invalid arrest warrant. (Doc. 9 at 2-3); (Ex. 1, Narrative, at 1-2).[1] More specifically, Bronnenberg alleges that Defendant

---

[1] Exhibit 1 is a copy of the Narrative of the Arrest.

Officer Beau J. Egger[2] (Officer Egger) violated her Fourth Amendment rights by arresting her pursuant to a facially valid, albeit vacated, warrant, even though she "kept telling [him] . . . the warrant he was relying on . . . was vacated" and that she allegedly showed him a copy of the court order vacating the warrant. (Doc. 9 at 3).

On the basis of Bronnenberg's pleading, and the outside records attached to this memorandum, this case is ripe for dismissal under Federal Rule of Civil Procedure 12(b)(6). Because Officer Egger is attaching outside records to the present motion, he respectfully asks the Court to consider those records by treating the motion as one for summary judgment under Rule 12(d), and to dismiss the action on the basis of qualified immunity. The pleadings, and attached materials, show that Officer Egger is entitled to qualified immunity as a matter of law, because officers who execute a facially valid, albeit outdated, arrest warrant in good faith do not violate clearly established law.

## **STATEMENT OF FACTS**[3]

Bronnenberg alleges that Officer Egger arrested her on the morning of January 31, 2017, based on an outdated warrant for her arrest. (Doc. 9 at 3). She does not expand on this other than to allege that she "kept telling the Defendant, arresting officer Beau J. Egger that the warrant he was relying on, issued January 9, 2017 in this matter, was vacated," and alleging that she "shows [sic] him the court order vacating the warrant." (*Id*.). Before

---

[2] Bronnenberg incorrectly lists Officer Egger's last name as "Eggar" in the caption of the Complaint.

[3] As discussed below, the allegations contained in Bronnenberg's Complaint are taken as true, but only for the purposes of evaluating this motion to dismiss under Fed. R. Civ. P. 12(b)(6). Officer Egger does not necessarily admit or deny the allegations in the Complaint.

arresting her, Officer Egger checked whether the warrant was still active and outstanding through routine police procedures: he specifically called the Park County Dispatch Center to verify it was still active and outstanding. (Ex. 2, Egger Aff., at 1-2).[4] At the time of the arrest, the RIMS Computer Dispatch System in his vehicle also marked the warrant as active and outstanding. (Ex. 3, RIMS records, at 1-3).[5] RIMS records show that the order vacating the arrest was not input into the system until **after** the arrest, intake, and ultimate release of Bronnenberg. (*Id.* at 1) (indicating that order vacating warrant was input into system at 11:13:46); *see* (Doc. 9 at 3-4) (alleging that Bronnenberg was booked at 10:19:40 and released at 11:10:58).

Bronnenberg does not describe how or why the warrant was issued in the first place or ultimately vacated. And as this Court noted in its screening order, there is no factual allegation suggesting "the arrest warrant on which Officer Eggar [sic] relied was somehow invalid on its face." (Doc. 10 at 3). Indeed, the arrest warrant contains no discrepancy or indication that it was somehow invalid. (Ex. 4, Warrant).[6] Nor did Officer Egger have any personal knowledge suggesting that the arrest warrant was invalid or expired. (Egger Aff. at 1-2).

Bronnenberg alleges that Officer Egger arrested her and drove her to the Park County Detention Center. (Doc. 9 at 3). It appears that Bronnenberg alleges that she was

---

[4] Exhibit 2 is a notarized affidavit from Officer Egger.
[5] Exhibit 3 are screenshots from the RIMS computer system showing that the warrant was marked as withdrawn on January 31, 2017, the same day as the arrest.
[6] Exhibit 4 is a scanned copy of the arrest warrant.

booked into jail and then released after about fifty minutes. (*Id*. at 3-4). The Complaint also alleges that "the next stop with the court order would be the Park County Prosecuting Attorney's Office[.]" (*Id*. at 4). There is, however, no explanation of what this means, what the purpose of any visit to the Prosecuting Attorney's Office was, or even what actually happened after she was released from the Detention Center.

## PROCEDURAL HISTORY

On February 14, 2019, Bronnenberg filed a *pro se* Amended 1983 Civil Rights Complaint. (Doc. 9). Her Complaint includes the following relevant attachments: (1) order vacating warrant (*id*. at 11), (2) an intake receipt from the Park County Detention Center (*id*. at 12), (3) and a release receipt from the Park County Detention Center (*id*. at 13).[7]

Bronnenberg initially brought claims against a variety of individuals and entities, including Officer Egger; these claims generally alleged "a mass conspiracy to kidnap or falsely arrest her." (Doc. 9 at 5-10); (Doc. 10 at 6). This Court screened the Complaint and ultimately dismissed with prejudice **all** claims except the Fourth Amendment claim against Officer Egger. (Doc. 10 at 10-11).

Officer Egger now raises qualified immunity in response to the sole remaining claim and moves to dismiss on that basis pursuant to Federal Rule of Civil Procedure 12(b)(6). On a related note, Officer Egger asks the Court to treat this motion to dismiss as if it were one for summary judgment, as permitted under Rule 12(d), and to therefore consider the

---

[7] She also includes bail, intake, and release receipts for an unrelated stay in the Park County Detention Center that took place in 2014. (Doc. 9 at 15-17). There is no explanation of the relevance of these documents to any factual allegation.

Page 4

attached exhibits in ruling on the motion to dismiss.

As evident above, Officer Egger submits four exhibits in support of his Motion to Dismiss: (1) a copy of narrative for the arrest, (2) a notarized affidavit from Officer Egger, (3) a copy of screenshots of RIMS records showing the time the vacated warrant was input into the system, and, and (4) a copy of the executed warrant. (Exs. 1-4). These records may be considered in ruling on a motion to dismiss, per Rule 12(d):

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.

"Before treating a motion to dismiss as a summary judgment motion, a district court must give notice to the parties 'to prevent unfair surprise.'" *Calbart v. Sauer*, 504 F. App'x 778, 781 (10th Cir. 2012). The Tenth Circuit, however, has concluded "there is no unfair surprise when a party submits material beyond the pleadings in support of or in opposition to a motion to dismiss because the party's actions 'put[] [him] on notice that the judge may treat the motion as a Rule 56 motion.'" *Id.*

## STANDARD OF REVIEW

Officer Egger moves to dismiss pursuant to Rule 12(b)(6). A pleading must be dismissed if it fails to state a plausible claim for relief. FED. R. CIV. P. 12(b)(6). Although a court is obligated, in performing this analysis, to construe liberally the pleadings of a pro se litigant, it is not obligated "to act as counsel or paralegal" for him. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Pliler v. Ford*, 542 U.S. 225, 231 (2004). As such, a court is "not required to fashion [pro se plaintiff's] argument for him where his allegations are merely

conclusory in nature and without supporting factual averments." *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (citation omitted).

At the pleading stage, "qualified immunity protects defendants performing discretionary functions from individual liability unless, on the face of the complaint, the plaintiff alleges the violation of 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hammett v. Okla. Dep't of Mental Health & Substance Abuse Servs.*, 1998 U.S. App. LEXIS 16484 *6 (10th Cir. 1998) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity differs from typical defenses in that "officials enjoy a presumption of immunity when the defense of qualified immunity is raised." *Pahls v. Thomas*, 718 F.2d 1210, 1227 (10th Cir. 2013).

To overcome this presumption, a plaintiff must prove "that (1) the defendant violated her constitutional or statutory rights, and (2) the right was clearly established at the time of the alleged unlawful activity." *Castillo v. Day*, 790 F.3d 1013, 1019 (10th Cir. 2015). When asserted at the pleading stage, district courts may proceed directly to and address only the clearly-established prong of the qualified immunity analysis. *Kerns v. Bader*, 663 F.3d 1173, 7780-81 (10th Cir. 2011). To that end, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

In its analysis of qualified immunity, a court need only accept the well-pleaded facts

as true. *Weise v. Casper*, 507 F.3d 1260, 1266 (10th Cir. 2007). It need not accept as true

conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). Further, although a court must "accept all well-pleaded allegations as true and draw

all reasonable inferences in favor of the plaintiff, if there is a conflict between the

allegations in the complaint and the content of the attached exhibit, the exhibit controls."

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017).


## ARGUMENT

Qualified immunity bars the Fourth Amendment claim against Officer Egger for

two reasons. First, Bronnenberg's case does not meet the first element of qualified

immunity, showing that Officer Egger violated her Fourth Amendment rights. Second, as

to the second element of qualified immunity, Bronnenberg does not provide any case law

clearly prohibiting officers from conducting good-faith arrests pursuant to a facially valid

warrant verified through routine police procedures. Each of these points will be addressed

in turn.

**1. Officer Egger did not violate Bronneberg's Fourth Amendment Rights by arresting her pursuant to a facially valid warrant which he verified through routine police procedures.**

Bronnenberg cannot state a plausible constitutional violation as Officer Egger is

entitled to absolutely immunity when enforcing a facially valid warrant. "[O]fficial[s]

charged with the duty of executing a facially valid court order enjoy[] absolute immunity

from liability for damages in a suit challenging conduct prescribed by that order." *Turney*

*v. O'Toole*, 898 F.2d 1470, 1472 (10th Cir. 1990). "'Facially valid' does not mean 'lawful[,]'" and "[a]n erroneous order can be valid." *Id*. at 1473 (explaining that this is necessary to prevent officials executing warrants from becoming "a 'lightning rod for harassing litigation aimed at judicial orders.'"). For example, one court concluded that an already-executed warrant mistakenly executed for a second time was still facially valid where "there was no return information filled in and no indication that it had previously been served, recalled, canceled or quashed." *Peacock v. Mayor & City Council of Balt.*, 199 F. Supp. 2d 306, 309 (D. Md. 2002); *see also Mitchell v. Aluisi*, 872 F.2d 577, 579 (4th Cir. 1989) (recognizing a recalled warrant as still facially valid).

Here, the warrant that Officer Egger executed was valid on its face. As this Court already noted, Bronnenberg does not allege that the warrant was facially invalid. (Doc. 10 at 3) Nor can she plausibly do so. There are no mistakes or discrepancies in the warrant that suggest it was somehow invalid. (Warrant at 1). And although the warrant was vacated in a subsequent hearing, the warrant itself reflects no indication that it was no longer outstanding. (*Id*.). Further, Officer Egger possessed no independent knowledge to otherwise cast doubt on the validity of the warrant. (Egger Aff. at 1-2).

The facial validity of the executed warrant is fatal to Bronnenberg's Fourth Amendment claim. Courts have consistently held that "[u]nless a warrant is facially invalid an officer has no constitutional duty to independently determine its validity." *Hill v. Bogans*, 735 F.2d 391, 393 (10th Cir. 1984); *Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("we do not think a sheriff executing an arrest warrant is required by the Constitution to

investigate independently every claim of innocence").

When judging the immunity of an officer who executes an arrest warrant, the Tenth Circuit uses "an objective standard of good faith" and has consistently concluded that officers "act[] reasonably in relying on routine police procedures for establishing the existence of an outstanding warrant." *Bogans*, 735 F.2d at 393. For example, the Tenth Circuit recognized "[a]n officer on the highway is entitled to rely on an accurate computer notification that there is an existing warrant for an individual's arrest." *Smyth v. City of Lakewood*, 83 F.3d 433 (10th Cir. 1996). The Tenth Circuit does not require an officer to do more by, for example, "obtain[ing] a copy of the warrant, research[ing] supporting documentation, or go[ing] behind the facial validity of a warrant before making the arrest." *Id*. Nor must a police officer "investigate a detained prisoner's claim of innocence." *Echols v. Unified Gov't of Wyandotte Cnty.*, 399 F. Supp. 2d 1201, 1206 (D. Kan. 2005).

And here, Officer Egger acted in good faith by relying on routine police procedures when executing the warrant in question. First, as is routine for Cody Police Department officers, Egger verified that the warrant was still active and outstanding by calling into and checking with the Park County Dispatch Center. (Egger Aff. at 1-2) (RIMS records, at 1) (indicating that warrant was viewed during the time of the arrest). Second, a computer notification that indicated there was an active, outstanding warrant for Bronnenberg's arrest. (RIMS records, at 1). Officer Egger was not required to do more even if Bronnenberg showed him a copy of the order vacating the warrant and protested her innocence. The Complaint contains no factual allegations suggesting Officer Egger

somehow acted in bad faith. (Doc. 9 at 3-4).

Officer Egger's actions are supported by case law. One factually analogous case is a Tenth Circuit Court of Appeals case, *Hill v. Bogans*. 735 F.2d 391, 393 (10th Cir. 1984), in which the officer's conduct was found constitutional. In *Bogans*, a plaintiff arrestee sued a defendant police officer for arresting him on an outstanding bench warrant. *Id*. At the time of the arrest, the plaintiff "told Bogans [the officer] that he had cleared the speeding charge that was the subject of the warrant and asked Bogans to verify the validity of the warrant." *Id*. Bogans did so, by "verif[ying] the warrant over the police radio and again upon arrival at the warrant desk." *Id*. Despite these attempts, the officer did not learn that the warrant was in fact withdrawn, although "presumably Bogans would have learned the fact if he had contacted the county court." *Id*. The plaintiff later sued, arguing that the defendant officer "violated his civil rights" by not contacting the county court before arresting him on the otherwise facially valid warrant. *Id*. The Tenth Circuit rejected this argument concluding "[u]nless a warrant is facially invalid an officer has no constitutional duty to independently determine its validity," and the defendant officer "acted reasonably in relying on routine police procedures for establishing the existence of an outstanding warrant." *Bogans*, 735 F.2d at 393.

Measured against *Bogans*, Officer Egger properly relied on routine police procedures for establishing the existence of the outstanding warrant and is entitled to absolute immunity for enforcing a facially valid warrant.

**2. Case law does not clearly prohibit good-faith arrests pursuant to a facially valid warrant verified through routine police procedures.**

The Court must also dismiss the claim against Officer Egger based on the second prong of qualified immunity, because Bronnenberg does not identify case law clearly holding that a good-faith execution of facially valid arrest warrant, verified through routine police procedures, becomes unlawful if the arrestee protests her innocence and provides a copy of the recall order.

Qualified immunity shields public officials from civil-damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

The Tenth Circuit has outlined the need for such clearly established law before subjecting an officer to civil liability, explaining that "[d]amages actions against public officials under § 1983 . . . impose 'substantial social costs[,]'" by "threaten[ing] potentially significant personal liability for actions that arise out of the performance of official duties, and "subject[ing] officials to burdensome and distracting litigation." *Pahls*, 718 F.3d at 1226–27 (internal citations omitted) (emphasis added). And it elaborated on how these costs "this could lead to undesirable *ex ante* effects" such as "reticence of officials in carrying out important public functions and, perhaps worse, a general disaffection with

public service, rooted in the calculation that its costs simply outweigh its benefits." *Id*. "To avoid these and other evils, the Supreme Court has recognized that public officials enjoy qualified immunity in civil actions that are brought against them in their individual capacities and that arise out of the performance of their duties." *Id*. Accordingly "[t]his standard, by design," is meant to "**give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions.**" *Pahls*, 718 F.3d at 1226–27 (internal citations omitted) (emphasis added).

With these principles in mind, unless Bronnenberg identifies an applicable case on point, or clear weight of authority from other courts that make it "sufficiently clear" that Officer Egger acted wrongfully, the Court must dismiss the Fourth Amendment claim against Officer Egger. *Ashcroft*, 563 U.S. at 741. And here, the law in this area supports Officer Egger or is hazy at best.

For example, at least one court has concluded that officers acted reasonably in arresting someone, even where that person shows them a copy of the warrant recall order. *Lauer v. Dahlberg*, 717 F. Supp. 612, 614 (N.D. Ill. 1989). The court recognized the arrestee's claims that the warrant was recalled, along with "an uncertified copy of a recall order did not require [an officer] to investigate further than confirming the active status of the warrant over the police radio[,]" exactly as Officer Egger did in this case. *Id*. And the court found that "[t]o hold otherwise would be to  place impossible burdens upon police officers," as "[j]udgments as to the authenticity of recall orders, which like all other documents are subject to error, alteration, and forgery, are ordinarily best made in the

station house or the courthouse, rather than by a police officer in the field." *Id*. And at least one other court has extended this same reasoning to a situation an officer presented with a **certified** copy of an order quashing the warrant. *See e.g. Ochser v. Funk*, 228 Ariz. 365, 374 (2011) ("Although certified copies provide significant intrinsic assurances of authenticity, the concerns of alteration and forgery expressed in *Lauer* nonetheless extend to certified copies, particularly when proffered by an arrestee.").

While *Lauer* may not be controlling against Bronnenberg, the law also does not seem clearly established against Egger, which it must be for Bronnenberg to overcome Egger's qualified immunity. At least one court has even recognized the "conflicting case law" on the issue of whether an officer acts reasonably when executing an already-quashed warrant despite being presented with a certified copy of the court order quashing the warrant. *See Ochser*, 228 Ariz. at 374 (acknowledging that existing case law "could [be] reasonably be read as merely requiring officers to make 'a quick phone call to the precinct' to verify a warrant when presented with a certified copy of an order."). In this case, the Arizona Supreme Court concluded that officers acted unreasonably by "failing to retrieve the certified copy of the minute entry [vacating the warrant] from Ochser's nearby office and conduct appropriate inquiry into the warrant's validity before arresting him." *Ochser*, 228 Ariz. 365 at 371. It, however, concluded qualified immunity applied as "[t]he existing precedent did not place the question of reasonableness under these circumstances 'beyond debate.'" *Id*. at 374.

This case is not only factually distinguishable, but it also does not represent clearly established law for purposes of Egger's qualified immunity, because the Arizona case is not Tenth Circuit precedent, United States Supreme Court precedent, or a great weight of national authority. First, the Arizona case is distinguished from the one at hand in a significant way. The inquiry in *Ochser* appeared to revolve around only whether the officers acted wrongfully in declining to retrieve a copy of the order that was "easily at hand" only "twenty yards away." *Id*. Here, there is no such allegation. Second, it does not appear that the law related to enforcing facially valid, but outdated, arrest warrants is materially clearer since *Ochser*. Neither the Tenth Circuit nor the Supreme Court, nor the clear weight of authority from other courts have recognized a right against good-faith execution of facially valid arrest warrants verified through routine police procedures.

In sum, Officer Egger is entitled to dismissal on all claims against him because he arrested Bronnenberg pursuant to a facially valid arrest warrant, and acted in good faith by verifying the arrest warrant through routine police procedures when Bronnenberg protested her innocence. Further, there is no case law clearly protecting against a good-faith arrest done over the protests of the arrestee. Accordingly, qualified immunity bars the Fourth Amendment claim against him.

## **CONCLUSION**

Based on the arguments above, Defendant Egger asks this Court to dismiss Plaintiff Bronnenberg's action and award Defendant Egger his costs and any other relief the Court deems appropriate.

**DATED** this 26th day of April, 2019.

*/s/ Adrian K. Kowalski*
Adrian K. Kowalski
Assistant Attorney General


## CERTIFICATE OF SERVICE

I do hereby certify that I have sent a copy of the foregoing on this 26th day of April 2019, to the following individuals:

Tami M. Bronnenberg                                    [✓] U.S. MAIL
P.O. Box 802
Cody, WY 82414




*Jessica Curless*
Jessica Curless, Paralegal
Office of the Wyoming Attorney General



**CODY POLICE DEPARTMENT**

1402 RIVER VIEW DR    CODY, WY 82414    307-527-8700

**NARRATIVE**

17-124

## SUMMARY

On Tuesday, January 31, 2017, at approximately 1000 hrs, Tami Bronnenberg was arrested and booked into the Park County Detention Center on a Fifth Judicial District Court Warrant for Failing to Appear on a Civil Matter.

## ENCLOSURES

1. Copy of Warrant.

## INVESTIGATION

On Tuesday, January 31, 2017, at approximately 0955 hrs, I was patrolling in the area of Rumsey Avenue and 15th Street, when I observed Tami Bronnenberg driving in her late model Mercedes Benz SUV, bearing Wyoming Registration 11P34308. I was aware Bronnenberg had an outstanding District Court Warrant for failing to appear on a Civil Matter in that court.

Subsequently, I performed a traffic stop on Bronnenberg's vehicle to affect the arrest for the warrant in the 1600 block of Bleistein Avenue. I made contact with Bronnenberg who was aware of the warrant. She was taken into custody and placed in hand cuffs. A tightness check was performed and the handcuffs were double locked.

Bronnenberg was transported to the Park County Detention Center without incident and remanded to the custody of the Park County Detention Staff, where I provided her with a copy of the warrant.

No further action taken.

## UNDEVELOPED LEADS

None

## STATUS

Closed

**CONFIDENTIAL**

Exhibit 1

| Prepared By: C05  EGGER, BEAU ☐ BODY CAMERA RECORDED | Date: 01/31/2017 | Approved By: C16  STAFFORD, JASON | Date: 01/31/2017 |

Plaintiff

VS

TAMI BRONNENBURG

Defendant

# WARRANT

**TO ANY SHERIFF IN THE STATE OF WYOMING, GREETING:**

**WHEREAS,** within open court on 4 January 2017 the Plaintiff requested that a Warrant issue for the arrest of the above-named defendant, for failure to appear for the ORDER TO SHOW CAUSE hearing scheduled for 9:30 AM that day; in District Court, Fifth Judicial District, Park County Courthouse, Cody, WY, and the Court having been in session and not seeing the Defendant on the premises has found good cause to issue the same;

**YOU ARE, THEREFORE, HEREBY COMMANDED** forthwith to arrest the above-named Defendant and bring the Defendant before the Court for further proceedings.

**DATED THIS** _____ day of _____, 2017.

BY THE COURT:

_____

**HONORABLE STEVEN CRANFILL**
District Court Judge

**BOND RECOMMENDATION**_____

| DOB: | 4-12-69 |
|------|---------|
| SSN: | |
| LKA: | 938 19th St #23 |

# RETURN

**STATE OF WYOMING** }
} ss
**COUNTY OF PARK** }

I hereby certify that I received the above Warrant filed in the above matter, that I served the same in Park County on _JANUARY 2/5/1_ by delivering copies of both to _TT_ at _Park_.

128

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| TAMI MAE BRONNENBERG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-CV-21-SWS |
| | ) |
| BEAU J. EGGAR, | ) |
| | ) |
| Defendant. | ) |

## AFFIDAVIT OF BEAU J. EGGER

I, Beau J. Egger, being first duly sworn, depose and state as follows:

1.  I am a resident of Park County, Wyoming, am over the age of 21 years, and have personal knowledge of the facts and circumstances set forth in this affidavit.

2.  At all times relevant to this case, I was an officer employed with the City of Cody Police Department as a Sergeant.

3.  My duties include, but are not limited, to conducting traffic stops and executing arrest warrants.

4.  I have held my position as an Officer with the City of Cody for 16 years. I have 16 years of prior law enforcement experience.

5.  I have executed hundreds of arrest warrants. Some of standard practices to confirm a warrant include, but are not limited to; checking the RIMS Computer Aided Dispatch System at police headquarters, checking warrant boxes, and, by calling/ radioing dispatch to verify if the warrant is still outstanding/ active.

**Exhibit 2**

129

6. I have no knowledge of any invalid arrest warrant being executed or being listed in the RIMS system.

7. To the best of my knowledge, Exhibit 3 to the Motion to Dismiss are accurate screenshots of the RIMS system records pertaining to the warrant executed in this case. The RIMS records indicate that the order vacating the warrant was not input or processed until January 31, 2017, at 11:13:46. To the best of my knowledge this is not until after I arrested Tami Bronnenberg and transported her to the Park County Detention Center.

8. On January 31, 2017, at approximately 9:55 A.M., I performed a traffic stop on Tami Bronnenberg as she was driving her vehicle in order to execute an outstanding District Court Arrest Warrant for failing to appear on a Civil Matter. I confirmed the warrant through the Park County Dispatch Center, verifying it was still active and outstanding.

9. Tami Bronnenberg protested the warrant was invalidated. I do not recall Tami Bronnenberg showing me any copy of the order vacating the said warrant.

10. I had prior knowledge of Tami Bronnenberg through previous law enforcement contacts and was aware of the existence of said arrest warrant, justifying the reason for the traffic stop.

11. At approximately 1000 A.M. I arrested Tami Bronnenberg pursuant to the warrant and transported her to Park County Detention Center where I remanded her to the custody of the Park County Detention Staff, served the arrest warrant and provided

her with a copy of said warrant in accordance with Wyoming State Law. To the best of my knowledge, she was released after one hour.

12. To the best of my knowledge, Exhibit 1 to the motion to dismiss is a copy of police narrative report and Exhibit 4 is a copy of the executed warrant.

13. I followed standard procedure related to the detention and arrest of citizens wanted on active arrest warrants.

DATED this 26th day of April, 2019.

BEAU EGGER

STATE OF WYOMING    )
                    ) ss
COUNTY OF PARK      )

The foregoing instrument *Affidavit of Beau Egger* was subscribed and sworn to before me by Beau Egger, personally known to me on this 26 day of April, 2019.

VERNA THULL - NOTARY PUBLIC
COUNTY OF PARK    STATE OF WYOMING
MY COMMISSION EXPIRES SEPTEMBER 10, 2022

Notary Public

My commission expires: 9 - 10 - 22

3



| | | | | Page 1 |
|---|---|---|---|---|
| **PARK COUNTY SHERIFF'S OFFICE** | | | | |
| **Audit for Warrant 011715150** | | | | 04/25/2019 |

| Date | Time | By | Entry |
|---|---|---|---|
| 01/12/2017 | 15:58:45 | K ZELLER | Added warrant for BRONNENBERG, TAMI MAE |
| 01/12/2017 | 15:58:45 | K ZELLER | Warrant Date added: 01/09/2017 |
| 01/12/2017 | 15:58:45 | K ZELLER | Status added: Active |
| 01/12/2017 | 15:58:45 | K ZELLER | Felony/Misdemeanor added: Misdemeanor |
| 01/12/2017 | 15:58:45 | K ZELLER | Reason added: Failed to appear in court |
| 01/12/2017 | 15:58:45 | K ZELLER | Court added: DISTRICT |
| 01/12/2017 | 15:58:45 | K ZELLER | No Bail: NoBail changed to Checked |
| 01/12/2017 | 15:58:45 | K ZELLER | Charge 1 added: FTA-CIVIL |
| 01/12/2017 | 15:58:45 | K ZELLER | Comment added: 28047 |
| 01/12/2017 | 15:58:55 | K ZELLER | Attachment (7610) -  added: Created attachment record: Warrant |
| 01/12/2017 | 15:58:55 | K ZELLER | Warrant Date added: 01/09/2017 |
| 01/12/2017 | 15:58:55 | K ZELLER | Status added: Active |
| 01/12/2017 | 15:58:55 | K ZELLER | Felony/Misdemeanor added: Misdemeanor |
| 01/12/2017 | 15:58:55 | K ZELLER | Reason added: Failed to appear in court |
| 01/12/2017 | 15:58:55 | K ZELLER | Court added: DISTRICT |
| 01/12/2017 | 15:58:55 | K ZELLER | No Bail: NoBail changed to Checked |
| 01/12/2017 | 15:58:55 | K ZELLER | Charge 1 added: FTA-CIVIL |
| 01/12/2017 | 15:58:55 | K ZELLER | Comment added: 28047 |
| 01/12/2017 | 17:32:34 | E WRIGHT | Viewed |
| 01/12/2017 | 17:53:01 | P PARISI | Viewed |
| 01/12/2017 | 23:58:39 | T BREWER | Viewed |
| 01/13/2017 | 09:11:52 | M HARTMAN | Viewed |
| 01/16/2017 | 10:18:27 | P GERAGHTY | Viewed |
| 01/16/2017 | 11:30:47 | J MORRIS | Viewed |
| 01/25/2017 | 12:37:50 | B STINSON | Viewed |
| 01/31/2017 | 09:53:44 | J SUMMERS | Viewed |
| 01/31/2017 | 09:54:17 | J SUMMERS | Viewed |
| 01/31/2017 | 09:56:22 | M MCCLAIN | Viewed |
| 01/31/2017 | 09:56:51 | M MCCLAIN | Viewed |
| 01/31/2017 | 09:57:01 | M MCCLAIN | Viewed |
| 01/31/2017 | 10:01:53 | K ZELLER | Viewed |
| 01/31/2017 | 10:01:57 | K ZELLER | Attachment (7610) -  Viewed , Warrant |
| 01/31/2017 | 10:02:17 | J MORRIS | Viewed |
| 01/31/2017 | 10:27:59 | V THULL | Viewed |
| 01/31/2017 | 10:28:05 | V THULL | Attachment (7610) -  Viewed , Warrant |
| 01/31/2017 | 10:53:38 | K ZELLER | Viewed |
| 01/31/2017 | 10:53:42 | K ZELLER | Attachment (7610) -  Viewed , Warrant |
| 01/31/2017 | 11:02:37 | K ZELLER | Viewed |
| 01/31/2017 | 11:02:52 | K ZELLER | Viewed |
| 01/31/2017 | 11:06:37 | J SUMMERS | Viewed |
| 01/31/2017 | 11:08:26 | J SUMMERS | Status: Active changed to Closed |
| 01/31/2017 | 11:13:07 | K ZELLER | Viewed |
| 01/31/2017 | 11:13:46 | K ZELLER | Attachment (7672) -  added: Created attachment record: Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 08:27:19 | C TORCZON | Viewed |
| 01/29/2019 | 08:27:27 | C TORCZON | Attachment (7610) -  Viewed , Warrant |
| 01/29/2019 | 08:27:33 | C TORCZON | Attachment (7672) -  Viewed , Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 08:27:58 | C TORCZON | Attachment (7610) -  Viewed , Warrant |
| 01/29/2019 | 08:28:47 | C TORCZON | Attachment (7672) -  Viewed , Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 08:29:06 | C TORCZON | Attachment (7610) -  Viewed , Warrant |
| 01/29/2019 | 08:29:17 | C TORCZON | Attachment (7672) -  Viewed , Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 08:30:08 | C TORCZON | Attachment (7672) -  Viewed , Withdrawal not received til 1/31/2017 |

CONFIDENTIAL DOCUMENT, LE SENSITIVE

**Exhibit 3**

**PARK COUNTY SHERIFF'S OFFICE**

Page 2

**Audit for Warrant 011715150**

04/25/2019

| Date | Time | By | Entry |
|------|------|-----|-------|
| 01/29/2019 | 08:32:23 | C TORCZON | Attachment (7610) - Viewed , Warrant |
| 01/29/2019 | 08:32:40 | C TORCZON | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 08:32:46 | C TORCZON | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 08:38:34 | J TORCZON | Viewed |
| 01/29/2019 | 08:38:49 | J TORCZON | Attachment (7610) - Viewed , Warrant |
| 01/29/2019 | 08:39:33 | J TORCZON | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 08:46:09 | J TORCZON | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 08:46:34 | J TORCZON | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 12:20:00 | J TORCZON | Viewed |
| 01/29/2019 | 12:20:05 | J TORCZON | Attachment (7610) - Viewed , Warrant |
| 01/29/2019 | 12:20:37 | J TORCZON | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 12:24:47 | J TORCZON | Viewed |
| 01/29/2019 | 12:24:51 | J TORCZON | Attachment (7610) - Viewed , Warrant |
| 01/29/2019 | 12:25:24 | J TORCZON | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 12:35:25 | J TORCZON | Viewed |
| 01/29/2019 | 12:35:31 | J TORCZON | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 01/29/2019 | 15:31:38 | J TORCZON | Viewed |
| 01/29/2019 | 15:32:11 | J TORCZON | Attachment (7610) - Viewed , Warrant |
| 01/29/2019 | 15:33:09 | J TORCZON | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 03/27/2019 | 18:55:04 | B EGGER | Viewed |
| 03/27/2019 | 18:55:13 | B EGGER | Attachment (7610) - Viewed , Warrant |
| 03/27/2019 | 18:55:29 | B EGGER | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 03/27/2019 | 19:14:04 | B EGGER | Printed |
| 04/17/2019 | 15:24:57 | K ZELLER | Viewed |
| 04/17/2019 | 15:26:39 | K ZELLER | Viewed |
| 04/17/2019 | 15:50:00 | K ZELLER | Viewed |
| 04/17/2019 | 15:52:08 | K ZELLER | Viewed |
| 04/17/2019 | 15:54:20 | K ZELLER | Viewed |
| 04/17/2019 | 15:58:14 | K ZELLER | Viewed |
| 04/17/2019 | 16:00:46 | K ZELLER | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 04/18/2019 | 08:09:14 | M MCCLAIN | Viewed |
| 04/25/2019 | 13:29:02 | B EGGER | Viewed |
| 04/25/2019 | 13:29:53 | B EGGER | Printed |
| 04/25/2019 | 14:12:09 | B EGGER | Viewed |
| 04/25/2019 | 14:12:15 | B EGGER | Attachment (7672) - Viewed , Withdrawal not received til 1/31/2017 |
| 04/25/2019 | 14:50:22 | K ZELLER | Viewed |

CONFIDENTIAL DOCUMENT, LE SENSITIVE

Appellate Case: 19-8055    Document: 010110228393    Date Filed: 09/10/2019    Page: 134

# PARK COUNTY SHERIFF'S OFFICE
## WARRANT 011715150
## BRONNENBERG, TAMI MAE

04/25/2019

| War # 011715150 | | | | | Phone | | Cell Phone |
|---|---|---|---|---|---|---|---|

| Officer Safety | | | Sex F | Race White | Hair Brown | Eyes Brown | Height | Weight |
|---|---|---|---|---|---|---|---|---|

| Type | Reason Failed to appear in court | Fel/Mis Misdemeanor | Status Closed | Will Pick Up? | Night Svc |
|---|---|---|---|---|---|

| Date 01/09/2017 | Case | Court DISTRICT | | Judge | FCN |
|---|---|---|---|---|---|

| Citation | Docket | Reference # |
|---|---|---|

| Charges FTA-CIVIL | Note 28047 |
|---|---|

**Bail**

| Vehicle License | State | Make | Model | Color | Year |
|---|---|---|---|---|---|

**Attempted Service**

| Date | Time | Officer | Note |
|---|---|---|---|
| 01/31/2017 | 11:00 | 1135 | Arrested by C24, warrant was pulled by court on the 17th |

| STATE OF WYOMING | IN THE DISTRICT COURT |
| COUNTY OF PARK | FIFTH JUDICIAL DISTRICT |

BIG HORN BASIN CHIROPRACTIC

    Plaintiff

Civil No. 28047

vs

PATRA LINDENTHAL
Clerk of District Court

TAMI BRONNENBURG

FILED **FEB 01 2017**

    Defendant

by _____ Deputy

# WARRANT

**TO ANY SHERIFF IN THE STATE OF WYOMING, GREETING:**

    **WHEREAS**, within open court on 4 January 2017 the Plaintiff requested that a Warrant issue for the arrest of the above-named defendant, for failure to appear for the ORDER TO SHOW CAUSE hearing scheduled for 9:30 AM that day; in District Court, Fifth Judicial District, Park County Courthouse, Cody, WY, and the Court having been in session and not seeing the Defendant on the premises has found good cause to issue the same;

    **YOU ARE, THEREFORE, HEREBY COMMANDED** forthwith to arrest the above-named Defendant and bring the Defendant before the Court for further proceedings.

    **DATED THIS** _____ 9ᵘ _____ day of _____ Jan _____, 2017.

        **BY THE COURT:**

        _____
        **HONORABLE STEVEN CRANFILL**
        District Court Judge

**BOND RECOMMENDATION** _____

| DOB: | 4-12-69 |
| SSN: | |
| LKA: | 938 19th St #23 |

**R E T U R N**

| Exhibit 4 |

STATE OF WYOMING } ss

COUNTY OF PARK }

    I hereby certify that I received the above Warrant filed in the above matter, that I served the same in Park County on ___ JANUARY 31 ___ by delivering copies of both to _T.C._ at _PCDC_ .

                  SCOTT STEWARD
    BY: _____
              **SHERIFF**
              BEAU J. EDEN
              **DEPUTY**

Park County Sheriffs Office
WARRANT #
0117 15150

RECEIVED
PCSO
JAN 12 2017
BY ___

Ⓐ Neutral

As of: April 26, 2019 4:19 PM Z

## *Hammett v. Oklahoma Dep't of Mental Health & Substance Abuse Servs.*

United States Court of Appeals for the Tenth Circuit

July 21, 1998, Filed

No. 97-6374

### Reporter

1998 U.S. App. LEXIS 16484 *; 98 Colo. J. C.A.R. 3981

MARIBOB L. HAMMETT, Plaintiff - Appellee, v. OKLAHOMA DEPARTMENT OF MENTAL HEALTH & SUBSTANCE ABUSE SERVICES, Sued as State of Oklahoma ex rel; SHARRON BOEHLER, in her individual capacity; DWIGHT HOLDEN, MD, in his individual capacity; J. B. PRATT, MD, in his individual capacity; LAVERN PHILLIPS, in her individual capacity; PAUL BLEVINS, JD, in his individual capacity; JOHN A. CALL, PHD, JD, in his individual capacity; BETTY PFEFFERBAUM, MD, JD, in her individual capacity; and DUANE STEBENS, Ed.D, in his individual capacity, Defendants - Appellants.

**Notice: [*1]** RULES OF THE TENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Subsequent History:** Reported in Table Case Format at: *1998 U.S. App. LEXIS 25909*.

**Prior History:** (W.D. Okla.). (D.C. No. 96-CV-1333).

**Disposition:** AFFIRMED.

## Core Terms

qualified immunity, patients, regulations, rights, constitutional right, alleged violation, motion to dismiss, public concern, allegations, reporting

## Case Summary

### Procedural Posture

Appellants, State of Oklahoma, Department of Mental Health and Substance Abuse Services (department), and its board members, challenged the judgement of the federal district court (W. Dist. Okla), which denied the board members' motion to dismiss the claim of appellee employee brought for wrongful termination under *42 U.S.C.S. § 1983* on the basis of qualified immunity.

### Overview

The employee argued that disciplinary actions were taken in retaliation for her having reported patient abuses. The board members contended that the employee's *U.S. Const. amend. I* claim was barred because the board members were entitled to qualified immunity, and they asserted that the district court's denial of their motion to dismiss was immediately appealable because it was purely a legal decision. The court concluded that it had jurisdiction to review the denial of the motion to dismiss on the basis of qualified immunity because the court's decision solely involved applying principles of law to an assumed set of facts. The court found that the board members had not demonstrated that, the state interest in regulating the employee's speech outweighed her *First Amendment* interest in reporting patient abuses. Because the employee alleged a clearly established right of which a reasonable person should have known, and given the scant factual record on the motion, the court found it was premature to grant qualified immunity.

### Outcome

The judgment denying board members' motion to dismiss the employee's *§ 1983* claims was affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > Appealability

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

## HN1[⬇] Summary Judgment Review, Appealability

Orders denying qualified immunity before trial are immediately appealable when they resolve issues of law. A determination that the law allegedly violated by the defendant was clearly established at the time of the challenged actions is an abstract issue of law that is immediately appealable. A determination that under either party's version of the facts the defendant violated clearly established law is also immediately appealable. However, government officials cannot appeal pretrial denial of qualified immunity to the extent the district court's order decides nothing more than whether the evidence could support a finding that particular conduct occurred. An order denying qualified immunity on summary judgment is not appealable if it merely determines the facts asserted by the plaintiff are sufficiently supported by evidence in the record to survive summary judgment.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Immunity

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > Appeals > Standards of Review > De Novo Review

## HN2[⬇] Affirmative Defenses, Immunity

The appellate court reviews de novo the denial of a motion to dismiss based on qualified immunity because it is a question of law. At the *Fed. R. Civ. P. 12(b)(6)* stage, qualified immunity protects defendants performing discretionary functions from individual liability unless, on the face of the complaint, the plaintiff alleges the violation of clearly established statutory or constitutional rights of which a reasonable person would have known. Once a defendant pleads qualified immunity as an affirmative defense, the plaintiff must: (1) allege sufficient facts showing that the defendant's actions violated a constitutional or statutory law, and (2)

show that the relevant law was clearly established when the alleged violation occurred. In the appellate court's assessment of whether a plaintiff has asserted a violation of a constitutional right and whether the constitutional right was clearly established so that reasonable officials would have understood that their conduct violated that right. The appellate court, like the district court before it, must construe the complaint and amended complaint in the light most favorable to plaintiff, accept all well-pleaded allegations as true, and draw all reasonable inferences in plaintiff's favor.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Public Employees

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

## HN3[⬇] Freedom of Speech, Public Employees

Generally, public employment cannot be conditioned on a basis that infringes the employee's constitutionally protected interest in freedom of expression.

Healthcare Law > Medical Treatment > Incompetent, Mentally Disabled & Minors > General Overview

## HN4[⬇] Medical Treatment, Incompetent, Mentally Disabled & Minors

The quality of care given to patients in Oklahoma's Department of Mental Health system involves a matter of public concern.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

## HN5[⬇] Labor Arbitration, Discipline, Layoffs & Terminations

Under *Okla. Stat. tit. 74, § 840-2.5(A)*, a disciplinary action may constitute, among other things, a withholding of work, reprimand, admonishment, warning of possible dismissal or dismissal.

**Counsel:** For MARIBOB L. HAMMETT, Plaintiff -

Appellee: Stanley M. Ward, Norman, OK.

For OKLAHOMA DEPARTMENT OF MENTAL HEALTH & SUBSTANCE ABUSE SERVICES, Defendant - Appellant: Jim T. Priest, Timothy D. Eisel, McKinney, Stringer & Webster, Oklahoma City, OK. For SHARRON BOEHLER, J.B. PRATT, MD, LAVERN PHILLIPS, JOHN A. CALL, PHD, JD, BETTY PFEFFERBAUM, MD, JD, DUANE STEBENS, Ed.D., PAUL BLEVINS, JR., Defendants - Appellants: Timothy D. Eisel, McKinney, Stringer & Webster, Oklahoma City, OK. For DWIGHT HOLDEN, MD, Defendant - Appellant: Timothy D. Eisel, Dixie L. Coffey, McKinney, Stringer & Webster, Oklahoma City, OK.

**Judges:** Before ANDERSON, McKAY, and LUCERO, Circuit Judges.

**Opinion by:** MONROE G. McKAY

# Opinion

### ORDER AND JUDGMENT [*]

 [*2]  After examining the briefs and the appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Plaintiff Maribob Hammett brought an action against the State of Oklahoma, the Oklahoma Department of Mental Health and Substance Abuse Services [DMHSAS], and individual members of the Board of the DMHSAS in which she alleged a 42 U.S.C. § 1983 violation of her First and Fourteenth Amendment rights, a violation of Oklahoma's whistleblowing statute, and other state law claims including intentional infliction of emotional distress and wrongful termination. All of the defendants filed a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss all of Plaintiff's claims. The district court denied the motion to dismiss.

The individual members of the Board of DMHSAS

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[Defendants] appeal only the court's refusal to dismiss the First Amendment section 1983 claim on qualified immunity grounds. Plaintiff argues that disciplinary actions taken in retaliation against her as the [*3] Patient Advocate General for the DMHSAS violated her First Amendment right of free speech. Defendants contend that Plaintiff's First Amendment claim is barred because they are entitled to qualified immunity, and they assert that the district court's denial of their Rule 12(b)(6) motion to dismiss is immediately appealable because it was purely a legal decision.

HN1[↑] Orders denying qualified immunity before trial are immediately appealable when they resolve issues of law. See Behrens v. Pelletier, 516 U.S. 299, 311, 313, 133 L. Ed. 2d 773, 116 S. Ct. 834 (1996); Johnson v. Jones, 515 U.S. 304, 312-14, 132 L. Ed. 2d 238, 115 S. Ct. 2151 (1995); Clanton v. Cooper, 129 F.3d 1147, 1152 (10th Cir. 1997). This court summarized when the denial of qualified immunity is appealable in Foote v. Spiegel:

> A determination that the law allegedly violated by the defendant was clearly established at the time of the challenged actions is an abstract issue of law that is immediately appealable. A determination that under either party's version of the facts the defendant violated clearly established law is also immediately appealable. However, [*4] government officials cannot appeal pretrial denial of qualified immunity to the extent the district court's order decides nothing more than whether the evidence could support a finding that particular conduct occurred. An order denying qualified immunity on summary judgment is not appealable if it merely determines the facts asserted by the plaintiff are sufficiently supported by evidence in the record to survive summary judgment.

 118 F.3d 1416, 1422 (10th Cir. 1997) (citations omitted); see also Wilson v. Meeks, 98 F.3d 1247, 1251-52 (10th Cir. 1996) (surveying circuit court cases applying the rules announced in Behrens and Johnson).

In its denial of Defendants' Rule 12(b)(6) motion to dismiss the First Amendment claim on qualified immunity grounds, the district court relied on our decision in Ramirez v. Oklahoma Dep't of Mental Health, 41 F.3d 584, 589 (10th Cir. 1994). The court stated that, "having construed plaintiff's allegations in the light most favorable to her, as this Court must do at this stage of the litigation, the Court is satisfied that

plaintiff's complaint is sufficient to withstand dismissal. [*5] " Appellant's App., Doc. F at 3. Because the court appropriately accepted all well-pleaded factual allegations in Plaintiff's complaint as true and drew all reasonable inferences in her favor, its decision denying qualified immunity at the *Rule 12(b)(6)* stage did not involve any disputed questions of fact. We conclude that we have jurisdiction to review the denial of Defendants' motion to dismiss on the basis of qualified immunity because the court's decision solely involved applying principles of law to an assumed set of facts. See *Mitchell v. Forsyth, 472 U.S. 511, 528 n.9, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985)* (stating that "the appealable [immunity] issue is a purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law"); *Seamons v. Snow, 84 F.3d 1226, 1238 (10th Cir. 1996)* (retaining jurisdiction and reversing *Rule 12(b)(6)* motion to dismiss on qualified immunity because the complaint, and all inferences in favor of plaintiff, established a claim that defendants violated clearly established law); accord *Dickerson v. McClellan, 101 F.3d 1151, 1156-57 (6th Cir. 1996)* (concluding [*6] that where the facts giving rise to a claim of qualified immunity are undisputed, the court could exercise jurisdiction over the appeal to the extent that it raised legal questions); *Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996)* (stating that an interlocutory denial of a motion to dismiss on grounds of qualified immunity is a final appealable order), cert. denied, __ U.S. __, 137 L. Ed. 2d 216, 117 S. Ct. 1081 (1997).

*HN2*[↑] We review *de novo* the denial of a motion to dismiss based on qualified immunity because it is a question of law. See *Bella v. Chamberlain, 24 F.3d 1251, 1254 (10th Cir. 1994)*, cert. denied, *513 U.S. 1109, 130 L. Ed. 2d 783, 115 S. Ct. 898 (1995)*. At the *Rule 12(b)(6)* stage, qualified immunity protects defendants performing discretionary functions from individual liability unless, on the face of the complaint, the plaintiff alleges the violation of "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)*; see *Hafley, 90 F.3d at 266*. [*7] Once a defendant pleads qualified immunity as an affirmative defense, the plaintiff must (1) allege sufficient facts showing that the defendant's actions violated a constitutional or statutory law, and (2) show "'that the relevant law was clearly established when the alleged violation occurred.'" *Clanton, 129 F.3d at 1153* (quoting *Gehl Group v. Koby, 63 F.3d 1528, 1533 (10th Cir. 1995))*. In our assessment

of whether Plaintiff has asserted a violation of a constitutional right and whether the constitutional right was clearly established so that reasonable officials would have understood that their conduct violated that right, we, like the district court before us, must construe the complaint and amended complaint in the light most favorable to Plaintiff, accept all well-pleaded allegations as true, and draw all reasonable inferences in Plaintiff's favor. See *Bella, 24 F.3d at 1254*; see also *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)* (noting that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that a "plaintiff can prove no set of facts" [*8] that would entitle him to relief). At this stage of the proceedings, we do not determine the merits of Plaintiff's claim that Defendants' conduct actually violated clearly established statutory or constitutional rights.

Plaintiff rests her *section 1983* claim on an alleged violation of her *First Amendment* right to free speech. She alleges that she was retaliated against for her speech on matters of public concern. Specifically, she contends that Defendants restricted her duties and rights as Patient Advocate General to the DMHSAS and eventually terminated her in retaliation for her speech. The alleged speech encompasses Plaintiff's reporting of specific patient complaints and alleged violations of the rights of patients in DMHSAS facilities to those facilities and to her supervisor. Plaintiff's speech also includes her letter to a member of the Oklahoma Legislature which described patient abuses within the DMHSAS, Plaintiff's advocacy on behalf of her clients, her reporting of the abuses to the DMHSAS, and her resulting inability to discharge her duties in the face of DMHSAS harassment.

*HN3*[↑] Generally, public employment cannot be conditioned "on a basis that infringes the employee's constitutionally [*9] protected interest in freedom of expression." *Connick v. Myers, 461 U.S. 138, 142, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983)*; see *Ramirez, 41 F.3d at 593*. "It is essential that public employees be able to speak out freely [on matters of public concern] without fear of retaliatory dismissal." *Connick, 461 U.S. at 149*. We rely on Oklahoma statutes, DMHSAS regulations, and this court's decision in Ramirez to hold that Plaintiff has sufficiently stated a claim alleging a clearly established free speech right to report patient abuses and treatment at DMHSAS facilities.

Ramirez determined that *HN4*[↑] the quality of care given to patients in Oklahoma's Department of Mental

Health system "involves a matter of public concern." _41 F.3d at 593_; _see Connick, 461 U.S. at 145-46_ (discussing public concern as a matter relating to "political, social or other concern to the community"). In Ramirez, we recognized Oklahoma's strong public policy of protecting patients from abuse. _See 41 F.3d at 593-94_. We are convinced that the principles of Oklahoma law discussed in Ramirez apply equally **[*10]** to this case. Similar to the duty of medical and nursing personnel to safeguard patients, Plaintiff's job description and its authorizing regulations allegedly obligated her to protect the interests and rights of mental health patients within the DMHSAS. See Appellants' App., Docs. A & B & Exhs. 1-4. Under our interpretation in Ramirez, the relevant Oklahoma statutes, and the DMHSAS regulations, Plaintiff's alleged speech certainly involved matters of public concern. That Plaintiff's speech was motivated by a desire to expose wrongdoing and was related to her job duties as Patient Advocate General reinforces the public importance of her speech.

We also hold that the constitutional right alleged by Plaintiff was clearly established by Ramirez, which was decided in 1994 before the alleged retaliatory action in this case, and the Oklahoma statutes discussed therein, _see 41 F.3d at 593-94_, so that reasonable officials would have understood that their conduct violated that right. See _Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992)_; see also _Wren v. Spurlock, 798 F.2d 1313, 1318 (10th Cir. 1986)_ (holding **[*11]** that adverse employment action against public school teacher who was harassed, reprimanded, and suspended for speech may give rise to _First Amendment_ claim), cert. denied, _479 U.S. 1085, 94 L. Ed. 2d 145, 107 S. Ct. 1287 (1987)_.

Further, the DMHSAS regulations and another Oklahoma statute give a reasonable official notice that it would be a violation of Plaintiff's rights to discipline or terminate her after she blew the whistle on improprieties at the DMHSAS. It is a logical and reasonable inference that Defendants, who are members of the board of the DMHSAS, would be aware of DMHSAS regulations which describe the function and responsibility of the Patient Advocate General. This inference is especially reasonable in light of the fact that the DMHSAS itself created the Patient Advocate General position and its accompanying regulations. Plaintiff also alleges that Defendants knew or should have known of the Oklahoma statute which prohibits a state agency from taking disciplinary action against an employee for disclosing public information or reporting violations of

state or federal law, such as violations of patients' rights, and for discussing the operations and **[*12]** functions of the agency with a member of the Legislature. See _Okla. Stat. Ann. tit. 74, § 840-2.5(A)_. **HN5[↑]** Under that statute which was enacted in 1982, a disciplinary action may constitute, among other things, a withholding of work, reprimand, admonishment, warning of possible dismissal or dismissal. See id. _§ 840-2.5(D)_. Plaintiff's alleged attempt to care for patients in an aggressive manner by reporting violations to her supervisor at the DMHSAS and by writing to a member of the Legislature may not be stymied by the alleged retaliatory actions.

At this stage of the proceedings Defendants have not demonstrated that, under the balancing test established by _Pickering v. Board of Education, 391 U.S. 563, 568, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968)_, the state interest in regulating Plaintiff's speech outweighs Plaintiff's _First Amendment_ interest in reporting patient abuses by DMHSAS facilities. [1] See _Ramirez, 41 F.3d at 594-95_.

**[*13]** For these reasons, we cannot say that the district court was erroneous in its determination that Defendants were not entitled to qualified immunity at this stage of the proceedings. Because Plaintiff has alleged a clearly established right of which a reasonable person should have known, and given the scant factual record on this _Rule 12(b)(6)_ motion, it is premature to grant qualified immunity. See _Seamons, 84 F.3d at 1238-39_; see also 2 James Wm. Moore, _Moore's Federal Practice, § 12.34[4][b]_ & n.56 (3d ed. 1998) (stating that dismissal for failure to state a claim on qualified immunity grounds is generally inappropriate because qualified immunity defense requires a factual review); cf. _Workman v. Jordan, 958 F.2d 332, 336 (10th Cir. 1992)_ (stating that court cannot frame question of qualified immunity as factual to avoid determining whether the law was clearly established at time of alleged violation).

AFFIRMED.

Entered for the Court

Monroe G. McKay

Circuit Judge

_____

[1] This determination does not preclude Defendants from asserting the qualified immunity defense as the facts develop more fully. See _Ramirez, 41 F.3d at 595_ & n.7.

**End of Document**

✚ Positive
As of: April 26, 2019 4:20 PM Z

# *Calbart v. Sauer*

United States Court of Appeals for the Tenth Circuit

December 6, 2012, Filed

No. 12-1157

### Reporter

504 Fed. Appx. 778 *; 2012 U.S. App. LEXIS 25132 **

ERNIE CALBART, SR., Plaintiff-Appellant, v. DENVER
SHERIFF CAPT. SAUER; DENVER SHERIFF
SANTANGELO; DENVER SHERIFF PACHCO;
DENVER SHERIFF ESPINOZA, Defendants-Appellees.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF
APPELLATE PROCEDURE RULE 32.1* GOVERNING
THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** (D.C. No. 1:11-CV-01026-LTB-
CBS). (D. Colo.).

*Calbart v. Sauer, 2012 U.S. Dist. LEXIS 51302 (D.
Colo., Apr. 12, 2012)*

## Core Terms

grievance, inmate, district court, magistrate judge,
defendants', amended complaint, summary judgment
motion, administrative remedy, summary judgment,
notice, motion to dismiss, exhaust, parties, abused,
amend, steps, pod, grant summary judgment, fail to
exhaust, quotation, cell, exhaustion of administrative
remedies, converted, contends

## Case Summary

### Procedural Posture

Appellant pretrial detainee appealed the judgment of the
United States District Court for the District of Colorado
that granted summary judgment to appellee law
enforcement officers in a *42 U.S.C.S. § 1983* that
alleged the officers violated his rights under the *Eighth*
and *Fourteenth Amendments* by failing to protect him
from an attack by another inmate.

### Overview

The court held that the district court did not abuse its

discretion in converting the officers' *Fed. R. Civ. P.
12(b)(6)* motion to dismiss into a motion for summary
judgment under *Fed. R. Civ. P. 56* without additional
notice because all parties had submitted evidence
outside of the amended complaint. Summary judgment
was properly granted to the officers because the
detainee failed to exhaust his administrative remedies
and was barred from pursuing a *§ 1983* claim under the
Prison Litigation Reform Act. The detainee did not follow
all the steps specified in the inmate handbook, which
contained a multi-step grievance procedure. The
detainee's contention that the administrative remedies
were unavailable to him since the officers interfered with
his ability to access the necessary grievance forms was
belied by the numerous grievance forms in the record,
and the detainee failed to satisfy certain steps that did
not require the use of a grievance form. The detainee's
motion to amend his complaint was properly denied
because his proffered amended complaint would not
cure his failure to exhaust his administrative remedies.

### Outcome
The judgment was affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of
Review > Abuse of Discretion

Civil Procedure > ... > Responses > Defenses,
Demurrers & Objections > Motions to Dismiss

Civil Procedure > ... > Summary
Judgment > Motions for Summary
Judgment > General Overview

**HN1[⤓]  Standards of Review, Abuse of Discretion**

An appellate court reviews for an abuse of discretion a district court's decision to consider evidence beyond the pleadings and convert a motion to dismiss to a motion for summary judgment. Before treating a motion to dismiss as a summary judgment motion, a district court must give notice to the parties to prevent unfair surprise. But there is no unfair surprise when a party submits material beyond the pleadings in support of or in opposition to a motion to dismiss because the party's actions put him on notice that the judge may treat the motion as a *Fed. R. Civ. P. 56* motion.

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

**HN2[ ]** **Summary Judgment, Motions for Summary Judgment**

*Fed. R. Civ. P. 12(d)* plainly states if matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment.

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

**HN3[ ]** **Pro Se Litigants, Pleading Standards**

Pro se parties follow the same rules of procedure that govern other litigants.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Exhaustion of Remedies

Civil Rights Law > ... > Procedural Matters > Federal Versus State Law > Exhaustion Doctrine

Civil Rights Law > ... > Prisoner Rights > Prison Litigation Reform Act > Exhaustion of Administrative Remedies

**HN4[ ]** **Defenses, Demurrers & Objections, Exhaustion of Remedies**

Exhaustion of administrative remedies is mandatory under the Prison Litigation Reform Act (PLRA), and unexhausted claims cannot be brought in court. Because the prison's procedural requirements define the steps necessary for exhaustion, an inmate may only exhaust by properly following all of the steps laid out in the prison system's grievance procedure. An inmate who begins the grievance process but does not complete it is barred from pursuing a *42 U.S.C.S. § 1983* claim under PLRA for failure to exhaust his administrative remedies. The doctrine of substantial compliance does not apply.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Exhaustion of Remedies

**HN5[ ]** **Standards of Review, De Novo Review**

An appellate court reviews de novo a district court's finding of failure to exhaust administrative remedies.

**Counsel:** ERNIE CALBART, Plaintiff - Appellant, Pro se, Denver, CO.

For SAUER, SANTANGELO, PACHCO, ESPINOZA, Defendants - Appellees: Suzanne A. Fasing, Office of the Denver City Attorney, Litigation Section, Denver, CO.

**Judges:** Before GORSUCH, ANDERSON, and EBEL, Circuit Judges.

**Opinion by:** Stephen H. Anderson

# Opinion

**[*779]  ORDER AND JUDGMENT**[*]

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See Fed. R. App. P. 34(a)(2)*; *10th Cir. R. 34.1(G)*. The case is therefore ordered submitted without oral argument. This order and

Ernie Calbart, Sr., appeals pro se from the district court's grant of summary judgment in favor of defendants on his civil rights claims under *42 U.S.C. § 1983*. Exercising jurisdiction under *28 U.S.C. § 1291*, we affirm.

## I. Background

Calbart's claims related to events occurring on February 20 and 21, 2011, while he was a pre-trial **[**2]** detainee at the Denver Detention Center. In his amended complaint, he alleged that defendants, all of whom are Denver Deputy Sheriffs, violated his rights under the *Eighth* and *Fourteenth Amendments* by failing to protect him from an attack by another inmate. Calbart alleged that he was threatened by two other inmates on February 20. He **[*780]** reported the threat and received a grievance form, which he submitted, asking to be moved to a cell in a different pod. The next day, February 21, Calbart met with defendants with regard to the threat and he again asked to be moved to a different pod. Defendant Santangelo referred him to the officer in charge of moving inmates (who is not a defendant in this action). Calbart alleged that defendants Espinoza and Pachco went off duty on February 21, without informing the deputies who relieved them that the two inmates had threatened Calbart. He alleged that his cell door was opened at 4:00 p.m. that day so he could go to an appointment. The two inmates who had threatened him were in the pod, and one of them attacked him.

In claim one of his amended complaint, Calbart alleged that defendants violated his *Fourteenth Amendment* rights because they were aware **[**3]** that the two inmates had threatened him. His second claim alleged that defendant Sauer violated his *Eighth Amendment* rights because Sauer had the power to move him to a different pod as soon as possible, but failed to do so after becoming aware of the threats.

Defendants moved to dismiss Calbart's amended complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*, because he failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, *42 U.S.C. § 1997e(a)* ("PLRA"). They argued alternatively that they were entitled to qualified immunity. Defendants attached exhibits to their motion, and they noted that a

*Rule 12(b)(6)* motion could be treated as a motion for summary judgment under *Fed. R. Civ. P. 56* if matters outside of the pleading were presented to and considered by the court. Calbart did not object that defendants' motion referenced materials outside of the amended complaint. Instead, he attached an affidavit and over thirty pages of exhibits to his response to the motion.

A magistrate judge issued a report and recommendation (R&R) on defendants' motion. He initially determined that the motion to dismiss should be converted into a motion for summary judgment because **[**4]** the parties had relied on documents not attached to or incorporated into the amended complaint. After reviewing the evidence the parties submitted regarding Calbart's grievances, the magistrate judge concluded that Calbart failed to exhaust his administrative remedies as outlined in the Denver Sheriff Department Inmate Handbook ("Inmate Handbook"). He also determined that Calbart failed to establish a cognizable *Eighth Amendment* claim because he did not allege more than a de minimus injury and there was no evidence that his injury resulted from defendants' deliberate indifference. The R&R therefore recommended that defendants be granted summary judgment on Calbart's claims.

Calbart simultaneously filed objections to the R&R and a motion for permission to file an amended complaint. In his objections, he contended that the magistrate judge abused his discretion by treating defendant's motion to dismiss as a motion for summary judgment without first notifying the parties. As to his exhaustion of administrative remedies, Calbart argued that defendants had hindered his access to grievance forms. He also maintained that defendants had filed in the district court an exhibit purporting to be **[**5]** a copy of one of his grievance forms, but that the handwriting on that exhibit was not his. And he claimed that he had sent letters to the Division Chief and Director of Corrections, but defendants had not produced his letters and he had never received a response to them. Finally, Calbart argued that the magistrate judge erred in concluding that **[*781]** his *Eighth Amendment* claim failed because he alleged only a de minimus injury.

The district court denied Calbart's motion for permission to file an amended complaint. After reviewing the R&R de novo, the district court approved it and granted summary judgment in favor of defendants. Calbart filed a timely notice of appeal.

---

judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with **Fed. R. App. P. 32.1** and **10th Cir. R. 32.1**.

## II. Discussion

Calbart argues on appeal that the district court (1) abused its discretion in converting defendants' motion to dismiss into a motion for summary judgment; (2) abused its discretion in granting defendants summary judgment on their failure-to-exhaust defense without stating the bases for its decision; (3) erred in concluding that he failed to exhaust his administrative remedies; (4) erred in concluding his *Eighth Amendment* claim failed because he suffered only a de minimus injury; and (5) abused its discretion in **[**6]** denying him leave to further amend his amended complaint.

### A. Conversion of Defendants' Motion to Dismiss into a Motion for Summary Judgment

Calbart contends that he did not receive adequate notice before the magistrate judge treated defendants' *Rule 12(b)(6)* motion as a summary judgment motion under *Rule 56*. **HN1**[⬆] "We review for an abuse of discretion a district court's decision to consider evidence beyond the pleadings and convert a motion to dismiss to a motion for summary judgment." *Marquez v. Cable One, Inc., 463 F.3d 1118, 1120 (10th Cir. 2006)* (quotation omitted).

Before treating a motion to dismiss as a summary judgment motion, a district court must give notice to the parties "to prevent unfair surprise." *Wheeler v. Hurdman, 825 F.2d 257, 259 (10th Cir. 1987)* (quotation omitted). But we have held there is no unfair surprise when a party submits material beyond the pleadings in support of or in opposition to a motion to dismiss because the party's actions "put[] [him] on notice that the judge may treat the motion as a *Rule 56* motion." *Id. at 260*. Here, because all parties had submitted evidence outside of the amended complaint, the magistrate judge determined that additional notice was **[**7]** not required before treating defendants' motion as a motion for summary judgment. The district court agreed and therefore granted defendants summary judgment.

Calbart argues that this reasoning should not apply to a pro se litigant. He cites *Jaxon v. Circle K Corp., 773 F.2d 1138, 1140 (10th Cir. 1985)*, in which we reversed a grant of summary judgment in favor of the defendant. In that case the district court held that the plaintiff's unsworn evidence was insufficient to oppose summary judgment and also denied him a continuance in order to file affidavits. *See id. at 1139, 1140*. We noted that the

plaintiff's evidence would have precluded a grant of summary judgment on his claims if it had been submitted in the proper form, *see id. at 1139*, and we cautioned that "[d]istrict courts must take care to insure that *pro se* litigants are provided with proper notice regarding the complex procedural issues involved in summary judgment proceedings," *id. at 1140* (quotation omitted).

*Jaxon* is distinguishable from this case. While the plaintiff in *Jaxon* was tripped up by a highly technical requirement for the presentation of admissible evidence, Calbart acknowledges that **HN2**[⬆] *Rule 12(d)* plainly states **[**8]** if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment." We have "repeatedly insisted that **HN3**[⬆]] pro se parties follow **[*782]** the same rules of procedure that govern other litigants." *Garrett v. Selby Connor Maddux & Janer, 425 F.3d 836, 840 (10th Cir. 2005)* (quotation omitted). Here, defendants not only submitted evidence outside of the amended complaint with their *Rule 12(b)(6)* motion, they also alerted Calbart to the possibility that the court might treat the motion as seeking summary judgment. He responded in kind with his own evidence in opposition to the motion, which the magistrate judge admitted and thoroughly considered in the R&R. Calbart has not shown an abuse of discretion by the district court in converting defendants' motion to dismiss into a motion for summary judgment without additional notice to the parties.[1]

### B. Failure to Exhaust Administrative Remedies

---

[1] We decline to consider Calbart's additional contention that the district court abused its discretion by not permitting him to commence discovery before responding to defendants' converted summary judgment motion. Calbart did not make that argument in his objections to the magistrate judge's R&R, **[**9]** and as he is aware, "the failure to make timely objection waives appellate review of both factual and legal questions." *Casanova v. Ulibarri, 595 F.3d 1120, 1123 (10th Cir. 2010)* (ellipsis omitted). Calbart contends that his argument about lack of notice—which he did make in his objections—can be liberally read to include an argument about a lack of opportunity for discovery. We note that the R&R advised Calbart that his objections must be specific in order to preserve an issue for appellate review. Accordingly, we will not expand our liberal construction of his pro se objections to include an argument he plainly did not make. Nor does Calbart make any effort to demonstrate that the interests of justice support an exception to our firm waiver rule. *See id.*

HN4[⬆]] Exhaustion of administrative remedies is mandatory under the PLRA and "unexhausted claims cannot be brought in court." *Thomas v. Parker, 609 F.3d 1114, 1117 (10th Cir. 2010).* "Because the prison's procedural requirements define the steps necessary for exhaustion, an inmate may only exhaust by properly following all of the steps laid out in the prison system's grievance procedure." *Little v. Jones, 607 F.3d 1245, 1249 (10th Cir. 2010)* [**10] (citation omitted). "An inmate who begins the grievance process but does not complete it is barred from pursuing a *§ 1983* claim under PLRA for failure to exhaust his administrative remedies. The doctrine of substantial compliance does not apply." *Thomas, 609 F.3d at 1118* (citation, quotations, and brackets omitted).

Calbart first contends that the district court abused its discretion in granting summary judgment in favor of defendants on their affirmative defense of failure to exhaust administrative remedies. He maintains that the magistrate judge *did not* recommend that summary judgment be granted on that basis and that defendants failed to object to that aspect of the R&R. Calbart asserts that the district court therefore erred by granting summary judgment on that ground without stating its reasons for doing so. Calbart's argument has no merit because the magistrate judge *did* find that he failed to exhaust his administrative remedies, albeit with the qualifying statement that "the facts are not entirely clear as to exhaustion." R. at 187. In the next sentence the magistrate judge stated that "the court also concludes" that Calbart failed to establish a triable fact issue concerning [**11] his *§ 1983* claims, *id.,* thus confirming that the R&R recommended two independent bases for granting summary judgment in defendants' favor. Therefore, by approving the R&R, the district court adequately stated its reasons for granting summary judgment on defendants' failure-to-exhaust defense.

 [*783] Construing his pro se appellate briefs liberally, *see de Silva v. Pitts, 481 F.3d 1279, 1283 n.4 (10th Cir. 2007),* Calbart also appears to challenge the district court's conclusion that he failed to exhaust his administrative remedies. HN5[⬆]] "We review de novo the district court's finding of failure to exhaust administrative remedies." *Thomas, 609 F.3d at 1117* (quotation omitted).

The magistrate judge found that the Inmate Handbook specifies a multi-step grievance procedure. At Step One, the inmate delivers a signed grievance form detailing the date and time of the incident, the act or condition giving rise to the grievance, and the remedy requested. At Step Two the inmate writes a sealed letter to the Division Chief stating the specific grievance, the previous steps taken, and all previous answers received. And at Step Three the inmate writes a personal letter to the Director of Corrections. At each  [**12] step, the Inmate Handbook states that the recipient of the grievance form or letter will provide a written response within ten working days, and the Director's response at Step Three is considered the final resolution.

In opposition to the defendants' motion, Calbart presented evidence of numerous grievances he had submitted, but the magistrate judge found that only three potentially related to his claims in the amended complaint. In grievance number 10 94020, Calbart described the events on February 20, 2011, when two inmates threatened him. The relief he requested was to be moved to a cell in a different pod. The grievance form notes that Calbart received a response on February 21 indicating that no cells were available in the other pod. The magistrate found there was no evidence that Calbart satisfied Steps Two or Three with respect to this grievance.

Calbart submitted grievance number 10 94021 on February 22, 2011. After referencing grievance number 10 94020, he stated further that a deputy sheriff (who is not a defendant in this action) opened his cell door, and one of the inmates who had threatened him walked over and attacked him. Calbart asserted in grievance number 10 94021 [**13] that he was defending himself and following the rules. The relief he requested was to be moved back to a cell in his former pod and that all charges against him be dropped. Calbart stated in an affidavit that he did not receive a response to grievance number 10 94021. He also presented a letter that he wrote to Chief Diggans on March 14, 2011, appealing this grievance. But the magistrate judge found that he failed to satisfy Step Three by writing a letter to the Director of Corrections.

Finally, Calbart submitted grievance number 10 94330 on February 25, 2011, which he characterized as an appeal of grievance number 10 94020. But the remedy he sought in grievance number 10 94330 was to obtain access to a video tape of his attack by the other inmate. The grievance form notes that a response was provided the same day, indicating where Calbart could submit his request for the video tape. Although Calbart's March 14 letter also referenced grievance number 10 94330, the magistrate judge construed it as appealing only grievance number 10 94021. Calbart sent a letter to

504 Fed. Appx. 778, *783; 2012 U.S. App. LEXIS 25132, **13

Director Wilson on April 1, 2011, reiterating his claim that he had been exhausted after putting defendants on notice of the **[\*\*14]** other inmates' threats. But he referred only to grievance number 10 94330 and complained about the lack of a response to his request for a video tape of the attack. After reviewing all of the evidence submitted by the parties, the magistrate judge concluded that Calbart failed to exhaust his administrative remedies.

**[\*784]** Calbart contends that the administrative remedies were unavailable to him because defendants interfered with his ability to access the necessary grievance forms; therefore, the exhaustion requirement is inapplicable. *See Little, 607 F.3d at 1250* (holding "PLRA only requires the exhaustion of 'available' administrative remedies"). But Calbart's contention is belied by the numerous grievance forms in the record. Moreover, the magistrate judge found that he failed to satisfy Steps Two and Three of the grievance process, which do not require the use of a grievance form. Calbart argues further that he did satisfy those steps. But in support of this assertion he points generally to his affidavit and the exhibits he submitted in response to defendants' motion. He therefore fails to address the magistrate judge's reasons for concluding that the letters he sent were insufficient **[\*\*15]** to fully exhaust his administrative remedies with respect to any of the potentially relevant grievances.

Finally, Calbart claims that the exhibit defendants submitted in the district court, purporting to be grievance number 10 94020, is not a true and accurate copy of that grievance form. He asserts that defendants' exhibit was handwritten by someone other than him. In examining defendant's exhibit, *see* R. at 64, as compared to Calbart's exhibit that he claims is a true copy of his grievance number 10 94020, *see id.* at 134, there do appear to be differences in the handwriting and in some of the words written in the sections filled out by the inmate. But the substance of those sections in the two documents is identical, and Calbart fails to explain how the discrepancies he identifies could establish that he satisfied Steps Two and Three of the grievance process by sending appropriate letters to the Division Chief and the Director of Corrections.

We affirm the district court's grant of summary judgment in favor of defendants based on Calbart's failure to exhaust his administrative remedies. Accordingly, we need not address his contentions regarding the court's alternative ground for granting **[\*\*16]** defendants summary judgment.

## C. Denial of Motion to Amend Complaint

Calbart argues that the district court abused its discretion in denying his motion for permission to file a further amended complaint. His proposed amended complaint would have added factual allegations regarding the nature of his injury, as well as a claim that defendants "acted with a whimsical and cavalier attitude about [the other inmates' threats]." *Id.* at 233. In denying leave to amend, the district court stated that "Plaintiff is not entitled to a second bite of the apple so as to dispute the [R&R] at this late date." *Id.* at 245. Calbart contends that the district court should have granted his motion because his proposed amendments stated a claim for relief and because he had not been given notice of the conversion of defendants' motion to dismiss into a motion for summary judgment. We have already addressed the latter contention. And because Calbart's proffered amended complaint would not cure his failure to exhaust his administrative remedies, he has not demonstrated that the district court abused its discretion in denying leave to amend. *See Ketchum v. Cruz, 961 F.2d 916, 921 (10th Cir. 1992)* (finding no abuse **[\*\*17]** of discretion in denial of motion to amend where amendment would be futile).

## III. Conclusion

The judgment of the district court is AFFIRMED. We GRANT Calbart's motion for leave to proceed in forma pauperis, but remind him of his continuing obligation **[\*785]** to make partial payments until the filing fee is paid in full.

Entered for the Court

Stephen H. Anderson

Circuit Judge

---

**End of Document**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 APR 30   AM 10: 08

STEPHAN HARRIS, CLERK
CASPER

TAMI MAE BRONNENBERG,

      Plaintiff,

     v.

BEAU J. EGGAR, Arresting Officer

      Defendant.

Case No. 19-CV-21-SWS

---

## ORDER CONVERTING DEFENDANT'S MOTION TO DISMISS TO MOTION FOR SUMMARY JUDGMENT

---

This matter comes before the Court on Defendant's Motion to Dismiss Plaintiff's Complaint (Doc. 28) and accompanying memorandum (Doc. 29). Defendant moved for Plaintiff's complaint to be dismissed under F.R.C.P. 12(b)(6), but included materials from outside the pleadings as exhibits and requested the motion be treated as a motion for summary judgment under F.R.C.P. 56. (Doc. 29 at p. 2.) The materials from outside the pleadings will not be excluded by the Court from consideration; consequently, the motion to dismiss will be treated as a motion for summary judgment under Rule 56. *See* F.R.C.P. 12(d). In response to the motion, Plaintiff shall be given the opportunity to present all material, including that from outside the pleadings, that is pertinent to a motion for summary judgment.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss Plaintiff's Complaint (Doc. 28) and accompanying memorandum (Doc. 29) will be treated and

considered as a motion for summary judgment under Rule 56.    Plaintiff is hereby

provided the opportunity to include all materials pertinent to the motion with her

response to the motion, which she must file **no later than May 17, 2019**.

 **DATED:** April 30th, 2019.

 Scott W. Skavdahl
 United States District Judge

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 MAY 17  AM 11: 41

STEPHAN HARRIS, CLERK
CASPER

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | CASE NO. |
| | ) | 19-CV-021-S |
| Plaintiff, | ) | |
| | ) | RESPONSE TO |
| v. | ) | DEFENDANT'S |
| | ) | MOTION FOR |
| BEAU J. EGGER, et al., | ) | SUMMARY |
| | ) | JUDGMENT. |
| Defendants. | ) | |

---

The plaintiff respectfully responds to the Defendant's Motion for

Summary Judgment pursuant to the ORDER CONVERTING

DEFENDANT'S MOTION TO DISMISS TO MOTION FOR SUMMARY

JUDGMENT; United States District Court Local Rule 7.1 (b) and presents

the following in support: The Constitution of the United States of America,

Amendment 5, guarantees that:

"No person shall be *** deprived of life, liberty, or property, without
due process of law; ***." See, Judicial Notice,

Amendment 14, guarantees that:

"All persons born or naturalized in the United States and subject to the
jurisdiction thereof are citizens of the United States and of the State wherein
they reside. No State shall make or enforce any law which shall abridge the

1

privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." See, Amended Complaint, C, 1), a), Page 4; i), 1, Page 5.

1. The question here is whether the 4th Amendment and the 14th Amendments Due Process of Law was violated, a clearly established law barring Officer Egger from arresting and transporting Tami to the Park County Detention Center. See, Plaintiff's Exhibit-A-; Brokers' Choice of Am., Inc v. NBC Universal, Inc., 861 F. 3d 1081, 1105 (10th Cir. 2017) ("Exhibits controls"); See also, page 7 of Defendant's Motion For Summary Judgment; Exhibit 2, Affidavit of Beau J. Egger, Page 2, #9, ("Tami Bronnenberg protested the warrant was invalidated."); Affidavit of Tami M. Bronnenberg, attached as Exhibit -G-; Dunaway v. New York, 422 U.S. 200, 95 S. Ct. 2240 (1979), attached; See, Objection to the Order on 28 U.S.C. §1915 Screening Amended Complaint, Page 3, 4, filed March 12, 2019.

Because plaintiff is preceding pro se, this court will liberally construe her pleadings. Cf., Haines V. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 595, 30 L. Ed.2d 652 (1972). Durre v. Dempsey, 869 F.2d 543 at 545 (10th Cir. 1989). Pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers. Cf., supra, Haines, 404 U.S. at 520; Durre v. Dempsey, 869 F.2d 543 at 547 (10th Cir. 1989); Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991); see also, e.g. Ledbetter v. City of Topeka, 318 F.3d 1183, 1187 (10th Cir. 2003). See, Objection to Dismissal of Appointment of Attorney, Page 5, filed March 15, 2019. The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law. 28 U.S.C. §1651 (a). An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction. 28

2

U.S.C. §1651 (b). See, Amended Complaint, A. Jurisdiction, 11, Page 3, filed March 12, 2019.

## MEMORANDUM OF LAW ON IMMUNITY.

"As the qualified immunity defense has evolved, it provides ample support to all but the plainly incompetent or those who knowingly violate the law." See, Burns v. Reed, 500 U.S. 478, at 495, 111 S. Ct. 1934 (1991); Malley v. Briggs, 475 U.S. 335 at 341 (1986); Mitchell v. Forsyth, 472 U.S. 511 at 524 (1985). Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." White v. Pauly, 580 U. S., at ___ (2018)) (Per Curiam.) (Slip op., at 6) (Internal quotation marks omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." Ibid. (internal quotation marks omitted). This Court has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" City and County of San Francisco v. Sheehan, 575 U. S. ___, ___ (2015) (slip op., at 13) (quoting Ashcroft v. Al-Kidd, 563 U. S. 731, 742 (2011)); See also Brosseau, 543 U. S. 194, at 198–199 (2004) (per curiam); See, Kisela v. Hughes, 584 U. S. ___ (2018) (Per Curiam.) (Slip op., at 6). As we have explained many times: "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or

3

constitutional rights of which a reasonable person would have known."

Kisela v. Hughes, 584 U.S. ___, ___ (2018) (per curiam) (Slip op., at 4

(internal quotation marks omitted); see District of Columbia v. Wesby, 583

U. S. ___, ___–___ (2018); White v. Pauly, 580 U.S. ___, ___–___ (2017)

(per curiam); Mullenix v. Luna, 577 U. S. ___, ___–___ (2015) (per

curiam). *** "[W]e have stressed the need to identify a case where an

officer acting under similar circumstances was held to have violated the

Fourth Amendment. . . . While there does not have to be a case directly on

point, existing precedent must place the lawfulness of the particular [action]

beyond debate. . . . See, Escondido v. Emmons, 586 U. S. ____ (2019), No.

17–1660. Decided January 7, 2019, (Per Curiam) (Slip op., at 4, 5, and 6).

The Constitution of the United States of America, Amendment 4.

Guarantees that:

"The right of the people to be secure in their persons, houses, papers,
and effects, against unreasonable searches and seizures, shall not be violated,
and no Warrants shall issue, but upon probable cause, supported by Oath or
affirmation, and particularly describing the place to be searched, and the
persons or things to be seized."

This provision binds the state and its officers, including local police.

See, Wolf v. Colorado, 338 U.S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949);

See, Objection to the Order on 28 U.S.C. §1915 Screening Amended

Complaint, Page 3, filed March 12, 2019.

4

Fourth Amendment probable-cause requirements before a warrant for either arrest or search can issue require that the judicial officer issuing such warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant. Spinelli v. United States, 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct.584 (1969); United States v. Ventresca, 380 U.S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741 (1965); Aguilar v. Texas, 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964); Rugendorf v. United States, 376 U.S. 528, 11 L. Ed. 2d 887, 84 S. Ct. 825 (1964); Jones v. United States, 362 U.S. 257, 4 L. Ed. 2d 697, 80 S. Ct. 725, 78 ALR2d 233 (1960); Glordenello v. United States, 357 U.S. 480, 2 L. Ed. 2d 1503, 78 S. Ct. 1245 (1958); Whiteley v. Warden of Wyoming Penitentiary, 401 U.S. 560 at 564, 28 L. Ed. 2d 306, 91 S. ct. 1031. In Ker v. California, 374 U.S. 23, 10 L. Ed. 2d 726 , 83 S. Ct. 1623 (1963), the court held that the same probable cause standards were applicable to federal and state warrants under the Fourth and Fourteenth Amendments. Id. note 6. An arrest is a "seizure" 4th Amendment U.S. v. Watson, 423 U.S. 411, 428 (1976), 96 S. Ct. 1117. Severe restriction upon plaintiff's personal mobility, can only be justified by probable cause. Illinois v. Gates, 462 U.S. 213, (1983), 103 S. Ct. 2317, 76 L. Ed. 2d 527.

Where the plaintiff sued police officers for the allegedly unlawful search of their home and office, the Tenth Circuit distinguished between the Fourth Amendment, which in its view did not depend on the mental state of the defendantd, and quified immunity, which involved an inquiry into their "objective good faith," Even if the defendants acted in an objectively reasonable and non-negligent manner, that was irrelevent to the existence of a Fourth Amendment violation which was premised on the balancing of individual and state interests. See, Specht v. Jensen, 832 F.2d 1516 Paragrphs 18, 19 (10th Cir. 1987); Civil Rights And Civil Liberties Litigation, The Law of Section 1983, 3rd Ed., Sheldon H. Nahmod (1991) §8.14 note 38; §3.04 note 40.

This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law. Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U.S.C. 242, the criminal analog of 1983. O'Shea v. Littleton, 414 U.S. 488 at 503 (1974); cf. Gravel v. United States, 408 U.S. 606 at 627 (1972). See also, Imbler v. Pachtman, 424 U.S. 409, at 429, 96 S.Ct. 984 at 994, 47 L. Ed. 2d128

6

(1976); Valdez v. City & Cty of Denver, 878 F2d 1285 at ¶11, (10th Cir.

1989).

     "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

     As the language itself makes clear, the central purpose of 1983 is to

"give a remedy to parties deprived of constitutional rights, privileges and

immunities by an official's abuse of his position." Monroe v. Pape, 365 U.S.

167, 172 (1961) (emphasis added). The United States Constitution among

other things, places substantial limitations upon state action, and the cause of

action provided in 42 U.S.C. 1983 is fundamentally one for "[m]isuse of

power, possessed by virtue of state law and made possible only because the

wrongdoer is clothed with the authority of state law." United States v.

Classic, 313 U.S. 299, 326 (1941).

     **The public interest demands strict adherence to judicial decree.**

(See, Plaintiff's Exhibit A). The Supreme Court has stated that "Public

officials … who fail to … implement decisions when they are made do not

fully and faithfully perform the duties of their offices." Scheuer v. Rhodes,

416 U.S. 232, 241-42, 94 S.Ct. 1683, 1689, 40 L. Ed. 2d 90 (1974). See,

Valdez v. City & Cty of Denver, Supra, 878 F2d 1285 at ¶10 (10th Cir.

1989). The Supreme Court has explained, §1983 "provides that [every] person who acts under color of state law to deprive another of constitutional rights shall be liable in a suit for damages." Tower v. Glover, 467 U.S. 914, 919, 104 S. Ct. 2820, 81 L. Ed. 2d 758 (1984) (quoting 42 U.S.C. §1983); Moss v. Kopp, 559 F.3d 1155, at III. Discussion A. 3rd ¶ (10th Cir. 2009).

REGULATION, CUSTOM, OR USAGE.

2. The second question here is whether the RIMS computer system, (regulation, custom, or usage having a force of law), of the Park County Sheriff's Office violated the 5th Amendment, "due process of law", 4th Amendment, "unreasonable search and seizure" and 14th Amendment Due Process of Law and Equal Protection of Law a clearly established law. The RIMS computer system is a Regulation, Custom or Usage having the force of law, a settled practice; it is the State that has commanded the result by its law. Cf., Gamer v. Louisiana, 368 U.S. 157, 176-185 (Douglas, J., Concurring) (1961); Wright v. Georgia, 373 U.S. 284 (1963); Baldwin v. Morgan, 287 F. 2d 750, 754 (C.A. 5th Cir. 1961); Adickes v. Kress & Co. 398 U.S. 144, at 168, 169, 171, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). See, Amended Complaint, A. Jurisdiction, 11, Page 3, filed March 12, 2019.

3. The third question here is whether the Park County Detention Center violated the 5th Amendment, "due process of law", 4th Amendment,

"unreasonable search and seizure" and 14th Amendment Due Process of Law and Equal Protection of Law a clearly established law. This defendant was acting willful and wanton misconduct under color of state law in supplying the facility in the execution of the False Imprisonment  See, In Director General of Railrosds v. Kastenbaum (1923) 263 U.S. 25, 68 L.Ed. 146, 44 S. Ct. 52, attached, the court, in a civil action for for false imprisonment, affirmed a judgment in favor of the plaintiff and stated that good faith on the part of the defendant was not enough to constitute probable cause for the plaintiff's arrest; ***. In response to Note 7 of the Defendant's Motion ….Page 4. This is not a single incident of unconstitutional activity by the Park County Detention Center. Jenkins v. Wood, 81 F. 3d. 988, 994 (10th Cir 1996); Moss, 559 F. 3d 1155 at 1169 (10th Cir. 2009); See, Plaintiff's Exhibits –B- through –F-.

4. The fourth question here is whether Board of County of Commissioners of the County of Park and the City of Cody, W.S. 18-2-108 (agreement to jointly establish and operate the Park County Detention Center See, Amended Complaint, C. Cause of Action, 1), a), i), 11, Page 8, filed March 12, 2019.), violated the 5th Amendment, "due process of law", 4th Amendment, "unreasonable search and seizure" and 14th Amendment Due Process of Law and Equal Protection of Law a clearly established law.

9

Park County Policy Manual, (July 1, 2017) Chapter 4, page 4-1,

which states in part, ***. Park County is an equal opportunity employer:

Pursuant to Title VI of the Civil Rights Act of 1964 Park County prohibits

discrimination.

City of Cody, Personnel and Policy Manual, Section 3. Equal

Employment Opportunity. "*** The City of Cody does not discriminate

***" See, Amended Complaint, C. Cause of Action, 1), a), i), 10, Page 7,

filed March 12, 2019.

42 U.S. Section 1985(3):

(Depriving persons of rights or privileges., "If two or more persons in
any State or territory conspire or go in disguise on the highway or on the
premises of another, for the purpose of depriving, either directly or
indirectly, any person or class of persons of the equal protection of the laws,
or of equal privileges and immunities under the laws, or for the purpose of
preventing or hindering the constituted authorites of any State or Territory
from giving or securing to all persons within such State or Territory the
equal protection of the laws, or if two or more persons conspire to prevent
by force, intimidation, or threat, any citizen who is lawfully entitled to vote,
from giving support or advocacy ina legal manner, toward or in favor of the
election of any lawfully qualifed person as an elector for President or Vice
President, or as a Member of Congress of the United States or to injure any
citizen in person or property on account of such support or advocacy, in any
case of conspiracy set forth in this section, if one or more persons engaged
therein do, or cause to be done, any act in furtherance of the object of such
conspiracy, whereby another is injured in his person or property, or deprived
of having and exercising any right or privilege of a citizen of the United
States, the party so injured or deprived may have an action for the recovery
of damages occasioned by such injury or deprivation, against any one or
more or the conspirators."),  See, Amended Complaint, A. Jurisdiction, 11,
Page 3, filed March 12, 2019,

10

Appellate Case: 19-8055   Document: 010110225398   Date Filed: 09/10/2019   Page: 160

42 U.S. Section 1985(3) can also overlap 42 U.S.C. § 1983 to reach deprivations of constitutional rights which involve state action, (RIMS computer system; Park County Sheriff's Office; Park County Detention Center; Board of County of Commissioners of the County of Park and the City of Cody). Still another possible use of section 1985(3) involves a remedy for conspirator's deprivation of federal or state statutory rights. See, 1-1-1979, 42 U.S.C. § 1985 (3) - A Private Action to Vindicate Fourteenth Amendment Rights: A Paradox Resolved Stephanie M. Wildman Santa Clara University School of Law, swildman@scu.edu by the Faculty Scholarship at Santa Clara Law Digital Commons, Note 81; Missouri Law Review, volume 50, Issue 1, Winter 1985, Article 11 Winter 1985 Civil Rights Conspiracies: Section 1985(3) after Carpenters v. Scott Rick E. Temple. Temple: Civil Rights Conspiracies CIVIL RIGHTS CONSPIRACIES: SECTION 1985(3) AFTER CARPENTERS v. SCOTT United Brotherhood of Carpenters Local 610 v. Scot1. 103 S. Ct. 3352 (1983).

*** . In North America v. Reichardt. 591 F.2d 499 (9th Cir. 1979), the state is allegedly being manipulated by a private conspiracy, (Cf., here of William K. Struemke; Sara L. Struemke; Servicm Legal Services, LLC; Marlin D. Richardson, DC; Big Horn Basin Chiropractic, see, caption of

11

Plaintiff's Exhibit –A–. "**Private persons**, jointly engaged with state officials in the prohibited action, are acting `under color' of law for purposes of the statute. To act `under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents," United States v. Price, 383 U.S. 787, 794 (1966); Adickes, Supra, 398 U.S. 144, at 152, note 7, (1970). The Supreme Court has declared that action "under color of law" is a predicate for a cause of action under § 1983, or its criminal counterpart, 18 U. S. C. § 242. Id., Adickes, 398 U.S. at 165; Polk County v. Dodson, 454 U.S. 312, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981); Dennis v. Sparks, 449 U.S. 24, at Page 919-920, 101 S. Ct. 183, 66 L. Ed. 185 (1980). See, Amended Complaint, A. Jurisdiction, 11, Page 3, filed March 12, 2019.), *** which *is* frustrating the state's ability to ensure that a citizen receives equal protection of the laws. *** . The treatment of corporations as individuals, rather than as the powerful entities that they are, makes the task of developing a jurisprudence of civil rights that affords human individuals the protections envisioned by the Constitution an urgent one.  Id., Supra, 42 U.S.C. § 1985 (3) - A Private Action to Vindicate Fourteenth Amendment Rights, Note 55, 64.

12

In Scott v. Moore, 461 F. Supp. 224 (E.D. Tex. 1978), aft'd, 680 F.2d

979 (5th Cir. 1982), rev'd sub nom., United Bhd. of Carpenters, Local 610 v.

Scott, 103 S. Ct. 3352 (1983), the court felt compelled to follow the holding

in Griffin v. Breckenridge, 403 U.S. 88 (1971), that section 1985(3) reaches

both public and private constitutional wrongs. Id., Supra, 42 U.S.C. § 1985

(3) - A Private Action to Vindicate Fourteenth Amendment Rights, Notes

15, 19. In Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971). The Court

articulated a clear position that section 1985(3) was a remedial statute that

was constitutional on its face and that reached private conspiracies to

deprive citizens of civil rights. The Court stated: "That § 1985(3) reaches

private conspiracies to deprive others of legal rights can, of itself, cause no

doubts of its constitutionality." *** The manipulation of and interference

with the state purpose by private persons, who would conspire to frustrate

the citizens' enjoyment of these rights, is precisely the type of conduct that

Congress sought to protect citizens against by enacting section 1985(3) ***

Congress has broad enforcement power under section 5 of the fourteenth

amendment and is "chiefly responsible" South Carolina v. Katzenbach, 383

U.S. 301, 326 (1966), for implementing the rights which the amendment

guarantees. Under section 5 *** An example of a section 1985(3) suit

against defendants for a private conspiracy to deprive a citizen-plaintiff of

the fourteenth amendment right to the equal protection of the laws, which usually requires state involvement, is illustrated in a modern context by Life Insurance Co. of North America v. Reichardt, 591 F.2d 499 (9th Cir. 1979). Id., Supra, 42 U.S.C. § 1985 (3) - A Private Action to Vindicate Fourteenth Amendment Rights, Notes 24, 37, 38, 55.

42 U.S. Section 1985(3) specifically provides that a conspiracy to be actionable must be "for the purpose of depriving *** any person *** of the equal protection of the laws, or equal privileges and immunities under the laws *** (Emphasis supplied). In Collins v. Hardyman, 341 U.S. 651 (1951), 71 S. Ct. 937, 95 L. Ed. 1253, the action was brought under the predecessor of Section 1985(3). The Court said, at page 661 of 341 U.S. at page 942 of 71 S.Ct. : "*** it is clear that this statute does not attempt to reach a conspiracy to deprive one of rights, unless it is a deprivation of equality, of "equal protection of the law," or of "equal privileges and immunities under the law."" See, Egan v. Aurora, 365 U.S. 514, 81 S. Ct. 684, 5 L. Ed. 2d 741 (1961).

28 U.S.C. §1343 (a) (3) provides:

to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; . . .

14

In order to be liable pursuant to § 1983, a defendant must have personally participated in the alleged deprivation. Meade v. Grubbs, 841 F. 2d 1512 at 1527-58 (10th Cir. 1988); Durre v. Dempsey, 869 F.2d 543 at 548 (10th Cir. 1989). See, Amended 1983 Civil Rights Complaint Exhibits –A-thru –F; Affidavit of Tami M. Bronnenberg, attached as Exhibit -G-.

A governmental entity, such as the Park County Sheriff's Office; Park County Detention Center; Board of County of Commissioners of the County of Park and the City of Cody can be sued separately and subjected to monetary damages and injunctive relief under 42 U.S.C. § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right. See, Board of the Cty. Comm'rs of Bryan Cty, v. Brown, 520 U.S. 397, 403 (1997); Monell, 436 U. S. at 694. See, Bailey v. Mansfield Independent School District; Dr. Jim Vaszauskas; and Dr. Kimberly Cantu, Civil Action No. 3:18-CV-1161-L., United States District Court, N.D. Texas, Dallas Division. January 10, 2019. See, Objection to the Order on 28 U.S.C. §1915 Screening Amended Complaint, Page 5 - 7, filed March 12, 2019. More specifically, we have recognized that a municipally can be liable under §1983 if the "final policymaker" takes the unconstitutional action. We have also acknowledged two situations where municipal liability may by found even though the action is taken by an

15

Case 2:19-cv-00021-SWS    Document 33    Filed 05/17/19    Page 16 of 17

individual other than the final policymaker. Melton v. City of Oklahoma

City, 879 F. 2d 706, 724 (10th Cir. 1089) rev'd en bunc in part on other

grounds 928 F. 2d 920 (10th Cir. 1991); Moss, Supra, 559 F. 3d at 1168,

1169 (2009). The relevant question, to be answered under state law, is

whether a particular official is a policy maker to whom the local government

has delegated policy-decision making authority.

The Park County Sheriff's Office; Park County Detention Center;

Board of County of Commissioners of the County of Park; Officer Beau J.

Egger are all separately liable to Tami under §1983 for compensatory

damages. Owen v. City of Independence, 445 U.S. 622 (1980) Held: A

municipality has no immunity from liability under § 1983 flowing from its

constitutional violations, and may not assert the good faith of its officers as a

defense to such liability. Pp. 445 U.S.635-658. Since a municipality has no

"discretion" to violate the Federal Constitution. Pp.445 U.S. 644-650.

Officer Beau J. Egger is also, liable to Tami M. Bronnenberg for

compensatory damages under §1983 for unconstitutional application of the

RIMS computer system of the Park County Sheriff's Office. Id.

CONCLUSION.

"*** all executive and judicial Officers, both of the United States and
of the several States, shall be bound by Oath or Affirmation, to support this
Constitution; ***". See, Constitution of the United States of America,
Article 6; "***all judicial, state and county officers shall, before entering on

16

the duties of their respective offices, take and subscribe the following oath or affirmation: 'I do solemnly swear (or affirm) that I will support, obey and defend the constitution of the United States and the constitution of this state and that I will discharge the duties of my office with fidelity; ***'". See, Constitution of the State of Wyoming, Article 6, §20.

Defendant's Motion for Summary Judgment should be dismissed and Declaratory judgment granted for the Plaintiff pursuant to §§2201 and 2202 declaring that defendant's acts, policies and practices herein described and complained of violated plaintiff's rights under the Fourth Amendment and the Fourteenth Amendment of the Constitution of the United States of America. See, Amended Complaint, E. Request for Relief, (A), Page 9.

DATED: May 15, 2019.

Tami M. Bronnenberg, Pro-se

CERTIFICATE OF SERVICE.

I hereby certify that a copy of the forgoing Response to Defendant's Motion for Summary Judgment and attached Affidavit of Tami Bronnenberg pursuant to the ORDER CONVERTING DEFENDANT'S MOTION TO DISMISS TO MOTION FOR SUMMARY JUDGMENT; United States District Court Local Rule 7.1 (b) was mailed to the Office of the Attorney General, 2320 Capitol Avenue, Cheyenne, Wyoming 82002 on May 15, 2019.

Tami M. Bronnenberg, Pro-se

17

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 MAY 17  AM 11: 41

STEPHAN HARRIS, CLERK
CASPER

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | CASE NO. |
| | ) | 19-CV-021-S |
| Plaintiff, | ) | |
| | ) | AFFIDAVIT OF |
| v. | ) | TAMI M. |
| | ) | BRONNENBERG |
| BEAU J. EGGER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

I, Tami M. Bronnenberg, being first duly sworn, depose and states as follows:

Prior to being arrested Officer Wright was patrolling by my mom's house, 2821 Rocky Road #19, to which I was leaving when he stopped and informed me the warrant, was still out there. I asked him why, he stated, he didn't know but to keep my court order vacating it on me. Officer Wright is the officer who came to arrest me over failure to appear on the civil matter on January 17, 2019. I was not arrested. He allowed me to call Honorable Judge Canfield and the Judge vacated the warrant then the Judge spoke with Officer Wright and let him know he was vacating the warrant. Then on

January 31, 2017 Officer Egger pulled me over on Bleistein Street, Cody,

Wyoming. Across from Eastside School and said there was a warrant for me.

I Told him that warrant, he was relying on, had been vacated and showed

him the Court Order, filed January 17, 2017 setting a hearing on January 26

at 4p.m., which I and Mr. Struemke attended, that specifically states that

warrant has been vacated, see, Exhibit –A- of the Complaint. Egger said,

"Well, let's take you in and get it straightened out." Egger allowed me to

contact my boyfriend, Rudy Munoz, to tell him I was being arrested. Once at

the jail Egger informed, Jauna Harris, the intake deputy I had an Order

vacating the warrant and to allow me to hang on to it for court, whom I also

informed, showed the Court Order vacating the warrant. She looked at it and

said the Order must be for something else. I was booked in and put in a cell.

A little while later, Rudy Munoz came down and informed them they

had me locked up in jail illegally and if they didn't release me he was going

to the county attorney's office. What that means, in response to Defendant's

Statement of Facts, Page 4., is the exercise of exhaustion of administrative

remedies that maybe available before filing a petition for Habeas Corpus Ad

Subjiciendum in the Fifth Judicial District Court in behalf of Tami M.

Bronnenberg, W.S. §1-27-102, "The petition shall be sworn to by the person

confined or by someone in (her) his behalf, and presented to a court or

officer authorized to allow the writ." They released me. When they were

checking me out Officer Torcazon informed me that I needed to yell at

William Struemke because he did not file the paperwork he was suppose too

to take the warrant off.

"A lawyer shall not: (a) unlawfully obstruct *** or conceal a

document ***". See, Rules of Professional Conduct, Rule 3.4 (a). It is

professional misconduct for a lawyer to: (a) violate or attempt to violate the

Rules of Professional Conduct; knowingly assist  or induce another to do so,

or do so through the acts of another.(b) commit a criminal act that reflects

adversely  on the lawyer's honesty, trustworthiness or fitness as a lawyer in

other respects; (c) engage in conduct involving dishonesty, fraud, deceit or

misrepresentation; (d) engage in conduct that is prejudicial to the

administration of justice; (e) state or imply an ability to influence improperly

a government agency or official or achieve results by means that violate the

Rules of Professional Conduct or other law; Id., Rule 8.4. Officer Torcazon

didn't know why Mr. Struemke did this.

Marlin D. Richardson; Big Horn Basin Chiropractic,  made a contract

or agreement to hiring William K. Struemke, Attorney; Servicm Legal

Services, LLC, to use the judicial process to make a collection from Ms.

Bronnenberg. See, Amended 1983 Civil Rights Complaint Exhibit –A-,

3

(Caption of the Order Vacating Warrant And Resetting Previously

Scheduled Hearing) which crossed the line and violated Federal

Constitutional Rights, (False Arrest/False imprisonment), under the Fourth,

Due Process of Law and Equal Protection of the Laws of the Fourteenth

Amendment of the United States Constitution, and those rights were clearly

established at the time. William Struemke called on February 16, 2017 after

violating my Constitutional Rights and left me message stating in part "***

I'm ready to have you dragged back into court and if not arrested. You had a

warrant out for you once. I'll put one for you out again *** and my client

can get the money *** " I do have the recorded message from William

Struemke ready to submit to the court as evidence if the court gives me a

phone number to forward the message too.

    42 U.S.§1985 (3) specifically provides that a conspiracy to be

actionable must be "for the purpose of depriving *** any person *** of the

equal protection of the laws, or equal privileges and immunities under the

laws *** (Emphasis supplied). In Collins v. Hardyman, 341 U.S. 651

(1951), 71 S. Ct. 937, 95 L. Ed. 1253, the action was brought under the

predecessor of Section 1985(3). The Court said, at page 661 of 341 U.S. at

page 942 of 71 S.Ct. : "*** it is clear that this statute does not attempt to

reach a conspiracy to deprive one of rights, unless it is a deprivation of

4

equality, of "equal protection of the law," or of "equal privileges and immunities under the law."" See, Egan v. Aurora, 365 U.S. 514, 81 S. Ct. 684, 5 L. Ed. 2d 741 (1961).(". . . local attorney and local chiropractor conspired to have Ms. Bronnenberg falsely arrested . . .") (Doc. 9 at p. 5). See, Tower v. Grover, 467 U.S. 914, 104 S. Ct. 2820, 81 L. Ed 2d 758 (1984); Polk County v. Dodson, 454 U.S. 312, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981); Dennis v. Sparks, 449 US 24 at Pp. 919-920, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980); Adickes v. Kress & Co, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed 2d 142 (1970).

After my release I called my attorney, Sara Miles, to inform her of the arrest and she said at first, Struemke probably was going to try and use it against me in the child custody case, which was pending at the time, and then she said he was going to try and use it.

DATED this __15__ day of May, 2019.

_Tami M. Bronnenberg_

STATE OF WYOMING
COUNTY OF PARK

Subscribed and sworn to before me this day of __15th__ May, 2019.
Witness my hand and official seal: ___Amy K. Tardiff___
My commission expires:

_Amy Tardiff_

5

CERTIFICATE OF SERVICE.

I hereby certify that a copy of the forgoing AFFIDAVIT OF TAMI

M. BRONNENBERG was mailed to the Defendant, Office of the Attorney

General, 2320 Capitol Avenue, Cheyenne, Wyoming 82002 on <u>May 15,</u>

<u>2019</u>.

<u>Tami M. Bronnenberg, Pro-se</u>

6

No. 78-5066
U.S.

# Dunaway v. New York

442 U.S. 200 (1979) · 99 S. Ct. 2248
Decided Jun 5, 1979

MR. JUSTICE BRENNAN delivered the opinion of the Court.

We decide in this case the question reserved 10 years ago in *Morales* v. *New York*, 396 U.S. 102 (1969), namely, "the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest." *Id.*, at 106.

## I

On March 26, 1971, the proprietor of a pizza parlor in Rochester, N. Y., was killed during an attempted robbery. On August 10, 1971, Detective
203 Anthony Fantigrossi of the *203 Rochester Police was told by another officer that an informant had supplied a possible lead implicating petitioner in the crime. Fantigrossi questioned the supposed source of the lead — a jail inmate awaiting trial for burglary — but learned nothing that supplied "enough information to get a warrant" for petitioner's arrest. App. 60.[1] Nevertheless, Fantigrossi ordered other detectives to "pick up" petitioner and "bring him in." *Id.*, at 54. Three detectives located petitioner at a neighbor's house on the morning of August 11. Petitioner was taken into custody; although he was not told he was under arrest, he would have been physically restrained if he had attempted to leave. Opinion in *People* v. *Dunaway* (Monroe County Ct., Mar. 11, 1977), App. 116, 117. He was driven to police headquarters in a police car and placed in an interrogation room, where he was questioned by officers after being given the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966). Petitioner waived counsel and eventually made statements and drew sketches that incriminated him in the crime.

[1] [2] See opinion in *People* v. *Dunaway* (Monroe County Ct., Mar. 11, 1977), App. 116-117. An informant had reportedly told the other detective that one James Cole had said that he and someone named "Irving" had been involved in the crime. The informant did not know "Irving's" last name, but had identified a picture of petitioner Dunaway from a police file. After hearing this information, Fantigrossi interviewed Cole, who was in jail pending an indictment for burglary. Cole denied any involvement in the crime, but stated that he had been told about it two months earlier by another inmate, Hubert Adams. According to Cole, Adams had mentioned that his younger brother, Ba Ba Adams, had told him that he and a fellow named "Irving," also known as "Axelrod," had been involved in the crime.

[2] See 61 A.D.2d 299, 301, 402 N.Y.S.2d 490, 491 (1978). The first statement was made within an hour after Dunaway reached the police station; the following day he made a second, more complete statement.

At petitioner's jury trial for attempted robbery and felony murder, his motions to suppress the statements and sketches were denied, and he was
204 convicted. On appeal, both the *204 Appellate Division of the Fourth Department and the New York Court of Appeals initially affirmed the conviction without opinion. 42 A.D.2d 689, 346 N.Y.S.2d 779 (1973), aff'd, 35 N.Y.2d 741, 320 N.E.2d 646 (1974). However, this Court granted certiorari, vacated the judgment, and remanded the case for further consideration in light of the Court's supervening decision in *Brown* v. *Illinois*,

casetext

422 U.S. 590 (1975). 422 U.S. 1053 (1975). The petitioner in *Brown*, like petitioner Dunaway, made inculpatory statements after receiving *Miranda* warnings during custodial interrogation following his seizure — in that case a formal arrest — on less than probable cause. Brown's motion to suppress the statements was also denied and the statements were used to convict him. Although the Illinois Supreme Court recognized that Brown's arrest was unlawful, it affirmed the admission of the statements on the ground that the giving of *Miranda* warnings served to break the causal connection between the illegal arrest and the giving of the statements. This Court reversed, holding that the Illinois courts erred in adopting a *per se* rule that *Miranda* warnings in and of themselves sufficed to cure the Fourth Amendment violation; rather the Court held that in order to use such statements, the prosecution must show not only that the statements meet the Fifth Amendment voluntariness standard, but also that the causal connection between the statements and the illegal arrest is broken sufficiently to purge the primary taint of the illegal arrest in light of the distinct policies and interests of the Fourth Amendment.

In compliance with the remand, the New York Court of Appeals directed the Monroe County Court to make further factual findings as to whether there was a detention of petitioner, whether the police had probable cause, "and, in the event there was a detention and probable cause is not found for such detention, to determine the further question as to whether the making of the
205 confessions was rendered infirm \*205 by the illegal arrest (see *Brown* v. *Illinois*, 422 U.S. 590, *supra*)." *People* v. *Dunaway*, 38 N.Y.2d 812, 813-814, 345 N.E.2d 583, 584 (1975).

The County Court determined after a supplementary suppression hearing that Dunaway's motion to suppress should have been granted. Although reaffirming that there had been "full compliance with the mandate of *Miranda* v. *Arizona*," the County Court found that "this case does not involve a situation where the defendant voluntarily appeared at police headquarters in response to a request of the police . . . ." App. 117. The State's attempt to justify petitioner's involuntary investigatory detention on the authority of *People* v. *Morales*, 22 N.Y.2d 55, 238 N.E.2d 307 (1968) — which upheld a similar detention on the basis of information amounting to less than probable cause for arrest — was rejected on the grounds that the precedential value of *Morales* was questionable,[3] and that the controlling authority was the "strong language" in *Brown* v. *Illinois* indicating "disdain for custodial questioning without probable cause to arrest."[4] The County Court further held that "the factual predicate in this case did not amount to probable cause sufficient to support the arrest of the defendant," that "the *Miranda* warnings by themselves did not purge the taint of the
206 defendant's \*206 illegal seizure[,] *Brown* v. *Illinois, supra,* and [that] there was no claim or showing by the People of any attenuation of the defendant's illegal detention," App. 121. Accordingly petitioner's motion to suppress was granted. *Ibid.*

[3] We granted certiorari in *Morales* and noted that "[t]he ruling below, that the State may detain for custodial questioning on less than probable cause for a traditional arrest, is manifestly important, goes beyond our subsequent decisions in *Terry* v. *Ohio*, 392 U.S. 1 (1968), and *Sibron* v. *New York*, 392 U.S. 40 (1968), and is claimed by petitioner to be at odds with *Davis* v. *Mississippi*, 394 U.S. 721 (1969)." *Morales* v. *New York*, 396 U.S. 102, 104-105 (1969). Nevertheless, inadequacies in the record led us to remand for further development and to reserve the issue we decide today for a record that "squarely and necessarily presents the issue and fully illuminates the factual context in which the question arises." *Id.*, at 105. On remand, the New York courts determined that Morales had gone to the police voluntarily. *People* v. *Morales*, 42 N.Y.2d 129, 137-138, 366 N.E.2d 248, 252-253 (1977).

[4] App. 118; see *Brown* v. *Illinois*, 422 U.S., at 602, 605.

casetext

A divided Appellate Division reversed. Although agreeing that the police lacked probable cause to arrest petitioner, the majority relied on the Court of Appeals' reaffirmation, subsequent to the County Court's decision, that "[l]aw enforcement officials may detain an individual upon reasonable suspicion for questioning for a reasonable and brief period of time under carefully controlled conditions which are ample to protect the individual's Fifth and Sixth Amendment rights." 61 A.D.2d 299, 302, 402 N.Y.S.2d 490, 492 (1978), quoting *People* v. *Morales*, 42 N.Y.2d 129, 135, 366 N.E.2d 248, 251 (1977). The Appellate Division also held that even if petitioner's detention were illegal, the taint of his illegal detention was sufficiently attenuated to allow the admission of his statements and sketches. The Appellate Division emphasized that petitioner was never threatened or abused by the police and purported to distinguish *Brown* v. *Illinois*.[5] The Court of Appeals dismissed petitioner's application for leave to appeal. App. 134.

> [5] 61 A.D.2d, at 303-304, 402 N.Y. So.2d, at 493. Two of the five members of the court dissented on this issue. *Id.*, at 304, 402 N.Y. So.2d, at 493 (Denman, J., concurring); *id.*, at 305, 402 N.Y. So.2d, at 494 (Cardamone, J., dissenting).

We granted certiorari, 439 U.S. 979 (1978), to clarify the Fourth Amendment's requirements as to the permissible grounds for custodial interrogation and to review the New York court's application of *Brown* v. *Illinois*. We reverse.

## II

We first consider whether the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause to arrest, they took 207 petitioner into custody, transported *207 him to the police station, and detained him there for interrogation.

The Fourth Amendment, applicable to the States through the Fourteenth Amendment, *Mapp* v. *Ohio*, 367 U.S. 643 (1961), provides: "The right of the people to be secure in their persons . . . against

unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause . . . ." There can be little doubt that petitioner was "seized" in the Fourth Amendment sense when he was taken involuntarily to the police station.[6] And respondent State concedes that the police lacked probable cause to arrest petitioner before his incriminating statement during interrogation.[7] Nevertheless respondent contends that the seizure of petitioner did not amount to an arrest and was therefore permissible under the Fourth Amendment because the police had a "reasonable suspicion" that petitioner possessed "intimate knowledge about a serious and unsolved crime." Brief for Respondent 10. We disagree.

> [6] "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has `seized' that person." *Terry* v. *Ohio*, 392 U.S. 1, 16 (1968). Respondent contends that petitioner accompanied the police voluntarily and therefore was not "seized." Brief for Respondent 7-9. The County Court found otherwise, App. 117, quoted *supra*, at 205; and the Appellate Division treated the case as an involuntary detention justified by reasonable suspicion. See 61 A.D.2d, at 302-303, 402 N.Y. So.2d, at 492. See also ALI, Model Code of Pre-Arraignment Procedure § 2.01(3) and commentary, p. 91 (Tent. Draft No. 1, 1966) (request to come to police station "may easily carry an implication of obligation, while the appearance itself, unless clearly stated to be voluntary, may be an awesome experience for the ordinary citizen").

> [7] Both the County Court and the Appellate Division found that the police lacked probable cause, and respondent does not question those findings here. See 61 A.D.2d, at 302, 402 N.Y. So.2d, at 492; App. 120, citing *Spinelli* v. *United States*, 393 U.S. 410 (1969); *Aguilar* v. *Texas*, 378 U.S. 108 (1964).

Before *Terry* v. *Ohio*, 392 U.S. 1 (1968), the
208 Fourth *208 Amendment's guarantee against
unreasonable seizures of persons was analyzed in
terms of arrest, probable cause for arrest, and
warrants based on such probable cause. The basic
principles were relatively simple and
straightforward: The term "arrest" was
synonymous with those seizures governed by the
Fourth Amendment. While warrants were not
required in all circumstances,[8] the requirement of
probable cause, as elaborated in numerous
precedents,[9] was treated as absolute.[10] The "long-
prevailing standards" of probable cause embodied
"the best compromise that has been found for
accommodating [the] often opposing interests" in
"safeguard[ing] citizens from rash and
unreasonable interferences with privacy" and in
"seek[ing] to give fair leeway for enforcing the
law in the community's protection." *Brinegar* v.
*United States*, 338 U.S. 160, 176 (1949). The
standard of probable cause thus represented the
accumulated wisdom of precedent and experience
as to the minimum justification necessary to make
the kind of intrusion involved in an arrest
"reasonable" under the Fourth Amendment. The
standard applied to all arrests, without the need to
"balance" the interests and circumstances involved
in particular situations. Cf. *Camara* v. *Municipal
Court*, 387 U.S. 523 (1967).

[8] See, *e. g., Warden* v. *Hayden*, 387 U.S. 294
(1967) (hot pursuit); *United States* v.
*Watson*, 423 U.S. 411 (1976) (felony
arrests in public places).

[9] "Probable cause exists where 'the facts and
circumstances within their [the officers']
knowledge and of which they had
reasonably trustworthy information [are]
sufficient in themselves to warrant a man
of reasonable caution in the belief that' an
offense has been or is being committed [by
the person to be arrested]." *Brinegar* v.
*United States*, 338 U.S. 160, 175-176
(1949), quoting *Carroll* v. *United States*,
267 U.S. 132, 162 (1925). See generally 2
W. LaFave, Search and Seizure: A Treatise
on the Fourth Amendment 436-480 (1978).

[10] See *Gerstein* v. *Pugh*, 420 U.S. 103, 111-
112 (1975); *Ker* v. *California*, 374 U.S. 23
(1963).

*Terry* for the first time recognized an exception to
the requirement that Fourth Amendment seizures
209 of persons must *209 be based on probable cause.
That case involved a brief, on-the-spot stop on the
street and a frisk for weapons, a situation that did
not fit comfortably within the traditional concept
of an "arrest." Nevertheless, the Court held that
even this type of "necessarily swift action
predicated upon the on-the-spot observations of
the officer on the beat" constituted a "serious
intrusion upon the sanctity of the person, which
may inflict great indignity and arouse strong
resentment," 392 U.S., at 20, 17, and therefore
"must be tested by the Fourth Amendment's
general proscription against unreasonable searches
and seizures." *Id.*, at 20. However, since the
intrusion involved in a "stop and frisk" was so
much less severe than that involved in traditional
"arrests," the Court declined to stretch the concept
of "arrest" — and the general rule requiring
probable cause to make arrests "reasonable" under
the Fourth Amendment — to cover such
intrusions. Instead, the Court treated the stop-and-
frisk intrusion as a *sui generis* "rubric of police
conduct," *ibid*. And to determine the justification
necessary to make this specially limited intrusion
"reasonable" under the Fourth Amendment, the
Court balanced the limited violation of individual
privacy involved against the opposing interests in
crime prevention and detection and in the police
officer's safety. *Id.*, at 22-27. As a consequence,
the Court established "a narrowly drawn authority
to permit a reasonable search for weapons for the
protection of the police officer, where he has
reason to believe that he is dealing with an armed
and dangerous individual, regardless of whether
he has probable cause to arrest the individual for a
crime." *Id.*, at 27.[11] Thus, *Terry* departed from
traditional Fourth Amendment analysis in two
210 respects. *210 First, it defined a special category of
Fourth Amendment "seizures" so substantially less
intrusive than arrests that the general rule
requiring probable cause to make Fourth

Amendment "seizures" reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons.

> [11] The Court stressed the limits of its holding: the police officer's belief that his safety or that of others is in danger must be objectively reasonable — based on reasonable inferences from known facts — so that it can be tested at the appropriate time by "the more detached, neutral scrutiny of a judge," 392 U.S., at 21, 27; and the extent of the intrusion must be carefully tailored to the rationale justifying it.

Because *Terry* involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope. *Terry* itself involved a limited, on-the-street frisk for weapons.[12] Two subsequent cases which applied *Terry* also involved limited weapons frisks. See *Adams* v. *Williams*, 407 U.S. 143 (1972) (frisk for weapons on basis of reasonable suspicion); *Pennsylvania* v. *Mimms*, 434 U.S. 106 (1977) (order to get out of car is permissible *"de minimis"* intrusion after car is lawfully detained for traffic violations; frisk for weapons justified after "bulge" observed in jacket). *United States* v. *Brignoni-Ponce*, 422 U.S. 873 (1975), applied *Terry* in the special context of roving border patrols stopping automobiles to check for illegal immigrants. The investigative stops usually 211 consumed *211 less than a minute and involved "a brief question or two." 422 U.S., at 880. The Court stated that "[b]ecause of the limited nature of the intrusion, stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest." *Ibid.*[13] See also *United States* v. *Martinez-Fuerte*, 428 U.S. 543 (1976) (fixed checkpoint to stop and check vehicles for aliens); *Delaware* v. *Prouse*, 440 U.S. 648 (1979)

(random checks for drivers' licenses and proper vehicle registration not permitted on less than articulable reasonable suspicion).

> [12] *Terry* specifically declined to address "the constitutional propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation." *Id.*, at 19 n. 16. Mr. JUSTICE WHITE, in a concurring opinion, made these observations on the matter of interrogation during an investigative stop:
>
> "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way. However, given the proper circumstances, such as those in this case, it seems to me the person may be briefly detained against his will while pertinent questions are directed to him. Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation." *Id.*, at 34.

> [13] "[B]ecause of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." 422 U.S., at 881.

Respondent State now urges the Court to apply a balancing test, rather than the general rule, to custodial interrogations, and to hold that "seizures" such as that in this case may be justified by mere "reasonable suspicion." [14]*Terry* and its 212 *212 progeny clearly do not support such a result. The narrow intrusions involved in those cases were judged by a balancing test rather than by the

general principle that Fourth Amendment seizures must be supported by the "long-prevailing standards" of probable cause, *Brinegar* v. *United States*, 338 U.S., at 176, only because these intrusions fell far short of the kind of intrusion associated with an arrest. Indeed, *Brignoni-Ponce* expressly refused to extend *Terry* in the manner respondent now urges. The Court there stated: "The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, *but any further detention or search must be based on consent or probable cause.*" 422 U.S., at 881-882 (emphasis added). Accord, *United States* v. *Martinez-Fuerte, supra,* at 567.

> [14] The factors that respondent would consider relevant in its balancing test, and the scope of the rule the test would produce, are not completely clear. The Appellate Division quoted two apparently different tests from the Court of Appeals opinion in *People* v. *Morales*, 42 N.Y.2d 129, 366 N.E.2d 248 (1977):
>
> "'[L]aw enforcement officials may detain an individual upon reasonable suspicion for questioning for a reasonable and brief period of time under carefully controlled conditions which are ample to protect the individual's Fifth and Sixth Amendment rights' (42 N.Y.2d, at p. 135). '"[A] policeman's right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter'" (42 N.Y.2d, at p. 137, quoting from *People* v. *De Bour*, 40 N.Y.2d 210, 219)." 61 A.D.2d, at 302, 402 N.Y. So.2d, at 492.
>
> Then, in characterizing the case before it, the Appellate Division suggested yet a third "test":
>
> "[T]his case involves a brief detention for interrogation based upon reasonable suspicion, where there was no formal accusation filed against defendant Page 212 and where great public interest existed in solving a brutal crime which had

remained unsolved for a period of almost five months." *Id.*, at 303, 402 N.Y. So.2d, at 492.

In contrast to the brief and narrowly circumscribed intrusions involved in those cases, the detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody. The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an "arrest" under state law. The mere facts that petitioner was not told he was under arrest, was not "booked," and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, see *Cupp* v. *Murphy*, 412 U.S. 291 (1973), obviously do not

213 make petitioner's \*213 seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny. Indeed, any "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause.

The central importance of the probable-cause requirement to the protection of a citizen's privacy afforded by the Fourth Amendment's guarantees cannot be compromised in this fashion. "The requirement of probable cause has roots that are deep in our history." *Henry* v. *United States*, 361 U.S. 98, 100 (1959). Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that "common rumor or report, suspicion, or even 'strong reason to suspect' was not adequate to support a warrant for arrest." *Id.*, at 101 (footnotes omitted). The familiar threshold standard of probable cause for Fourth Amendment seizures

casetext

reflects the benefit of extensive experience accommodating the factors relevant to the "reasonableness" requirement of the Fourth Amendment, and provides the relative simplicity and clarity necessary to the implementation of a workable rule. See *Brinegar* v. *United States, supra*, at 175-176.

In effect, respondent urges us to adopt a multifactor balancing test of "reasonable police conduct under the circumstances" to cover all seizures that do not amount to technical arrests.[15] But the protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the "often competitive enterprise of ferreting out crime." *Johnson* v. *United States*, 333 U.S. 10, 14 (1948). A single, 214 familiar standard is essential to \*214 guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.[16] Indeed, our recognition of these dangers, and our consequent reluctance to depart from the proved protections afforded by the general rule, are reflected in the narrow limitations emphasized in the cases employing the balancing test. For all but those narrowly defined intrusions, the requisite "balancing" has been performed in centuries of precedent and is embodied in the principle that seizures are "reasonable" only if supported by probable cause.

[15] See n. 14, *supra.*

[16] While the rule proposed by respondent is not entirely clear, the Appellate Division cited with approval a test that would require an officer to weigh before any custodial interrogation "the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter." See n. 14, *supra.*

Moreover, two important decisions since *Terry* confirm the conclusion that the treatment of petitioner, whether or not it is technically characterized as an arrest, must be supported by probable cause. *Davis* v. *Mississippi*, 394 U.S. 721 (1969), decided the Term after *Terry*, considered whether fingerprints taken from a suspect detained without probable cause must be excluded from evidence. The State argued that the detention "was of a type which does not require probable cause," 394 U.S., at 726, because it occurred during an investigative, rather than accusatory, stage, and because it was for the sole purpose of taking fingerprints. Rejecting the State's first argument, the Court warned:

> "[T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the
> 215 personal security of our \*215 citizenry, whether these intrusions be termed `arrests' or `investigatory detentions.'" *Id.*, at 726-727.

The State's second argument in *Davis* was more substantial, largely because of the *distinctions* between taking fingerprints and interrogation:

casetext

"Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search. Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints. Furthermore, fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the `third degree.' Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time." *Id.*, at 727.

In *Davis*, however, the Court found it unnecessary to decide the validity of a "narrowly circumscribed procedure for obtaining" the fingerprints of suspects without probable cause — in part because, as the Court emphasized, "petitioner was not merely fingerprinted during the . . . detention but *also subjected to interrogation*." *Id.*, at 728 (emphasis added). The detention therefore violated the Fourth Amendment.

*Brown* v. *Illinois*, 422 U.S. 590 (1975), similarly disapproved arrests made for "investigatory" purposes on less than probable cause. Although Brown's arrest had more of the trappings of a technical formal arrest than petitioner's, such differences in form must not be exalted over 216 substance.[17] *216 Once in the police station, Brown was taken to an interrogation room, and his experience was indistinguishable from petitioner's. Our condemnation of the police conduct in *Brown* fits equally the police conduct in this case:

> [17] The officers drew their guns, informed Brown that he was under arrest, and handcuffed him. But Brown, unlike petitioner, was not a teenager; and the police had a report that he possessed a pistol and had used it on occasion, 422 U.S., at 594. The police in this case would

have resorted to similar measures if petitioner had resisted being taken into custody. App. 117.

"The impropriety of the arrest was obvious; awareness of the fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was `for investigation' or for `questioning.' . . . The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up." *Id.*, at 605.

See also *id.*, at 602.

These passages from *Davis* and *Brown* reflect the conclusion that detention for custodial interrogation — regardless of its label — intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest. We accordingly hold that the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation.

## III

There remains the question whether the connection between this unconstitutional police conduct and the incriminating statements and sketches obtained during petitioner's illegal detention was nevertheless sufficiently attenuated to permit the use at trial of the statements and sketches. See *Wong Sun* v. *United States*, 371 U.S. 471 (1963); *Nardone* v. *United States*, 308 U.S. 338 (1939); *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385 (1920).

The New York courts have consistently held, and petitioner does not contest, that proper *Miranda* warnings were given and that his statements were "voluntary" for purposes of the Fifth Amendment. 217 But *Brown* v. *Illinois, supra*, settled that *217 " [t]he exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests

and policies that are distinct from those it serves under the Fifth," 422 U.S., at 601, and held therefore that " *Miranda* warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation." *Ibid.*

> "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. . . . Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings." *Id.*, at 602.

Consequently, although a confession after proper *Miranda* warnings may be found "voluntary" for purposes of the Fifth Amendment,[18] this type of "voluntariness" is merely a "threshold requirement" for Fourth Amendment analysis, 422 U.S., at 604. Indeed, if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached.

> [18] But see *Westover* v. *United States*, 384 U.S. 436, 494-497 (1966) (decided with *Miranda* v. *Arizona*).

Beyond this threshold requirement, *Brown* articulated a test designed to vindicate the "distinct policies and interests of the Fourth Amendment." *Id.*, at 602. Following *Wong Sun*, the Court eschewed any *per se* or "but for" rule, and identified the relevant inquiry as "whether Brown's statements were obtained by exploitation of the illegality of his arrest," 422 U.S., at 600; see *Wong Sun* v. *United States, supra*, at 488. *Brown's* focus on "the causal connection between the illegality and the confession," 422 U.S., at 603, reflected the two policies behind the use of the exclusionary rule to effectuate *218 the Fourth Amendment. When there is a close causal connection between the illegal seizure and the

confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts.

*Brown* identified several factors to be considered "in determining whether the confession is obtained by exploitation of an illegal arrest[: t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct . . . . And the burden of showing admissibility rests, of course, on the prosecution." *Id.*, at 603-604.[19] Examining the case before it, the Court readily concluded that the State had failed to sustain its burden of showing the confession was admissible. In the "less than two hours" that elapsed between the arrest and the confession "there was no intervening event of significance whatsoever." *Ibid.* Furthermore, the arrest without probable cause had a "quality of purposefulness" in that it was an "expedition for evidence" admittedly undertaken "in the hope that something might turn up." *Id.*, at 605.

> [19] See generally, 3 LaFave, *supra* n. 9, at 630-638; Comment, 25 Emory L. J. 227, 239-244 (1976); Comment, 13 Houston L. Rev. 753, 763-770 (1976).

The situation in this case is virtually a replica of the situation in *Brown*. Petitioner was also admittedly seized without probable cause in the hope that something might turn up, and confessed without any intervening event of significance.[20] Nevertheless, three members of the Appellate Division purported to distinguish *Brown* on the ground that the police did not threaten or abuse petitioner (presumably putting aside his illegal 219 seizure and detention) and that the police *219 conduct was "highly protective of defendant's Fifth and Sixth Amendment rights." 61 A.D.2d, at 303, 402 N.Y. So.2d, at 493. This betrays a lingering confusion between "voluntariness" for purposes of the Fifth Amendment and the "causal connection" test established in *Brown*. Satisfying the Fifth Amendment is only the "threshold" condition of the Fourth Amendment analysis

casetext

required by *Brown*. No intervening events broke the connection between petitioner's illegal detention and his confession. To admit petitioner's confession in such a case would allow "law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth." [21]*Reversed*.

[20] The cases are even parallel in that both Brown and petitioner made subsequent statements, see n. 2, *supra; Brown* v. *Illinois*, 422 U.S., at 595-596, which in each case were "clearly the result and the fruit of the first." *Id.*, at 605, and n. 12.

[21] Comment, 25 Emory L. J. 227, 238 (1976).

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

Mr. JUSTICE WHITE, concurring.

The opinion of the Court might be read to indicate that *Terry* v. *Ohio*, 392 U.S. 1 (1968), is an almost unique exception to a hard-and-fast standard of probable cause. As our prior cases hold, however, the key principle of the Fourth Amendment is reasonableness — the balancing of competing interests. *E. g., Delaware* v. *Prouse*, 440 U.S. 648, 653-654 (1979); *Michigan* v. *Tyler*, 436 U.S. 499, 506 (1978); *Marshall* v. *Barlow's, Inc.*, 436 U.S. 307, 321-322 (1978); *United States* v. *Martinez-Fuerte*, 428 U.S. 543, 555 (1976); *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *Terry* v. *Ohio, supra*, at 20-21; *Camara* v. *Municipal Court*, 387 U.S. 523, 536-537 (1967). But if courts and law enforcement officials are to have workable rules, see *Rakas* v. *Illinois*, 439 U.S. 128, 168 (1978) (dissenting opinion), this balancing must in large part be done on a categorical basis — not in an ad hoc, case-by-case 220 *220 fashion by individual police officers. Cf. *Mincey* v. *Arizona*, 437 U.S. 385, 394-395 (1978). On the other hand, the need for rules of general applicability precludes neither the recognition in particular cases of extraordinary private or public interests, cf. *Zurcher* v. *Stanford Daily*, 436 U.S. 547, 564-565 (1978), nor the generic recognition

of certain exceptions to the normal rule of probable cause where more flexibility is essential. Cf., *e. g., Terry* v. *Ohio, supra*. It is enough, for me, that the police conduct here is similar enough to an arrest that the normal level of probable cause is necessary before the interests of privacy and personal security must give way.

MR. JUSTICE STEVENS, concurring.

Although I join the Court's opinion, I add this comment on the significance of two factors that may be considered when determining whether a confession has been obtained by exploitation of an illegal arrest.

The temporal relationship between the arrest and the confession may be an ambiguous factor. If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one. Conversely, even an immediate confession may have been motivated by a prearrest event such as a visit with a minister.

The flagrancy of the official misconduct is relevant, in my judgment, only insofar as it has a tendency to motivate the defendant. A midnight arrest with drawn guns will be equally frightening whether the police acted recklessly or in good faith. Conversely, a courteous command has the same effect on the arrestee whether the officer thinks he has probable cause or knows that he does not. In either event, if the Fourth Amendment is violated, the admissibility question will turn on the causal relationship between that violation and the defendant's subsequent confession.

I recognize that the deterrence rationale for the 221 exclusionary *221 rule is sometimes interpreted quite differently.[1] Under that interpretation, exclusion is applied as a substitute for punishment of the offending officer; if he acted recklessly or flagrantly, punishment is appropriate, but if he acted in good faith, it is not.[2] But when evidence is excluded at a criminal trial, it is the broad societal interest in effective law enforcement that suffers. The justification for the exclusion of evidence

casetext

obtained by improper methods is to motivate the law enforcement profession as a whole — not the aberrant individual officer — to adopt and enforce regular procedures that will avoid the future invasion of the citizen's constitutional rights. For that reason, exclusionary rules should embody objective criteria rather than subjective considerations.

[1] See, *e. g.*, MR. JUSTICE REHNQUIST, dissenting, *post,* at 226.

[2] I would agree that the officer's subjective state of mind is relevant when he is being sued for damages, but this case involves the question whether the evidence he has obtained is admissible at trial.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

If the Court did no more in this case than it announced in the opening sentence of its opinion — "decide . . . the question reserved 10 years ago in *Morales* v. *New York,* 396 U.S. 102 (1969), namely, `the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest'" — I would have little difficulty joining its opinion. The decision of this question, however, does not, contrary to the implication in the Court's opening sentence, decide this case. For the Court goes on to conclude that petitioner Dunaway was in fact "seized" within the meaning of the Fourth Amendment, and that the connection between Dunaway's purported detention and the evidence obtained therefrom was not sufficiently attenuated as to dissipate the taint of the alleged unlawful police conduct. *Ante,* at 207, 216-219. I cannot agree with either conclusion, and accordingly, I dissent.

222 *222 I

There is obviously nothing in the Fourth Amendment that prohibits police from calling from their vehicle to a particular individual on the street and asking him to come over and talk with them; nor is there anything in the Fourth Amendment that prevents the police from knocking on the door of a person's house and when the person answers the door, inquiring whether he is willing to answer questions that they wish to put to him. "Obviously, not all personal intercourse between policemen and citizens involves `seizures' of persons." *Terry* v. *Ohio,* 392 U.S. 1, 19 n. 16 (1968). Voluntary questioning not involving any "seizure" for Fourth Amendment purposes may take place under any number of varying circumstances. And the occasions will not be few when a particular individual agrees voluntarily to answer questions that the police wish to put to him either on the street, at the station, or in his house, and later regrets his willingness to answer those questions. However, such morning-after regrets do not render involuntary responses that were voluntary at the time they were made. In my view, this is a case where the defendant voluntarily accompanied the police to the station to answer their questions.

In *Terry* v. *Ohio,* the Court set out the test for determining whether a person has been "seized" for Fourth Amendment purposes. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred." *Ibid.* In this case three police officers were dispatched to petitioner's house to question him about his participation in a robbery According to the testimony of the police officers, one officer approached a house where petitioner was thought to be located and knocked on the door. When a person answered the door, the officer identified himself and asked the individual his name. App. 97-98. After learning that the person who 223 answered the door was *223 petitioner, the officer asked him if he would accompany the officers to police headquarters for questioning, and petitioner responded that he would. *Id.,* at 89-90; see 61 A.D.2d 299, 301, 402 N.Y.S.2d 490, 491 (1978). Petitioner was not told that he was under arrest or in custody and was not warned not to resist or flee. No weapons were displayed and petitioner was not handcuffed. Each officer testified that petitioner was not touched or held during the trip downtown; his freedom of action was not in any way

restrained by the police. App. 78-79, 99. In short, the police behavior in this case was entirely free of "physical force or show of authority."

The Court, however, categorically states in text that "[t]here can be little doubt that petitioner was 'seized' in the Fourth Amendment sense when he was taken involuntarily to the police station." *Ante*, at 207. In an accompanying footnote, the Court states: "Respondent contends that petitioner accompanied the police voluntarily and therefore was not 'seized.' . . . The County Court found otherwise . . . and the Appellate Division treated the case as an involuntary detention justified by reasonable suspicion." *Ante*, at 207 n. 6. The Court goes on to cite a commentary from the Tentative Draft of the ALI Model Code of Pre-Arraignment Procedure to the effect that a "request to come to [the] police station 'may easily carry an implication of obligation, while the appearance itself, unless clearly stated to be voluntary, may be an awesome experience for the ordinary citizen.'" *Ibid.*

The Court's heavy reliance on the conclusions of the Monroe County Court on this issue is misplaced, however. That court clearly did not apply the *Terry* standard in determining whether there had been a seizure. Instead, that court's conclusions were based solely on the facts that petitioner was in the physical custody of detectives until he reached police headquarters and that "had he attempted to leave the company of the said detectives, they would have physically restrained him (per stipulation of People at conclusion of hearing)." App. 117. But the fact 224 that the officers accompanied *224 petitioner from his house to the station in no way vitiates the State's claim that petitioner acted voluntarily. Similarly, the unexpressed intentions of police officers as to hypothetical situations have little bearing on the question whether the police conduct, objectively viewed, restrained petitioner's liberty by show of force or authority.

The Appellate Division's opinion also can be of no assistance to the Court. The Court's opinion characterizes the Appellate Division's treatment of the case "as an involuntary detention justified by reasonable suspicion." *Ante*, at 207 n. 6. But the Appellate Division did not accept the County Court's conclusion that petitioner did not voluntarily accompany the police to the station. To the contrary, in its recitation of the facts, the Appellate Division recites the officers' testimony that petitioner voluntarily agreed to come downtown to talk with them. 61 A.D.2d, at 301, 302, 402 N.Y. So.2d, at 491, 492. That the Appellate Division found that it was able to resolve the case on the basis of the Court of Appeals' decision in *People* v. *Morales*, 42 N.Y.2d 129, 366 N.E.2d 248 (1977), does not mean that the Appellate Division decided that petitioner had been "seized" within the meaning of the Fourth Amendment.

Finally, the Court quotes the Model Code for Pre-Arraignment Procedure to support its assertion. *Ante*, at 207 n. 6. I do not dispute the fact that a police request to come to the station may indeed be an "awesome experience." But I do not think that that fact alone means that in every instance where a person assents to a police request to come to headquarters, there has been a "seizure" within the meaning of the Fourth Amendment. The question turns on whether the officer's conduct is objectively coercive or physically threatening, not on the mere fact that a person might in some measure feel cowed by the fact that a request is made by a police officer. Cf. *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977).

[1] [1] Neither *Davis* v. *Mississippi*, 394 U.S. 721 (1969), nor *Brown* v. *Illinois*, 422 U.S. 590 (1975), which the Court treats as points of departure Page 225 for today's opinion, supports the Court's conclusion that petitioner was "seized" within the meaning of the Fourth Amendment. In *Davis*, the State made no claim that Davis had voluntarily accompanied the police officers to headquarters. 394 U.S., at 726. Similarly, in *Brown* there could be no reasonable disagreement that the defendant had been "seized" for Fourth Amendment purposes. In *Brown*, two detectives of the Chicago police force broke into Brown's

casetext

apartment and searched it. When Brown entered the apartment, he was told that he was under arrest, was held at gunpoint, and was searched. He then was handcuffed and escorted to the squad car that eventually took him to the police station. 422 U.S., at 593. No doubt this police activity was the cause of the Court's observation that "[t]he illegality here, moreover, had a quality of purposefulness. . . . The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." *Id.*, at 605. No such circumstances occurred here.

Therefore, although I agree that the police officers in this case did not have that degree of suspicion or probable cause that would have justified them in physically compelling petitioner to accompany them to the police station for questioning, I do not believe that the record demonstrates as a fact that this is what happened. No involuntary detention for questioning, was shown to have taken place. The Fourth Amendment, accordingly, does not require suppression of petitioner's statements.

## II

Assuming, *arguendo*, that there was a "seizure" in this case, I still cannot agree with the Court that the Fourth Amendment requires suppression of petitioner's statements and sketches. Relying on *Brown* v. *Illinois*, 422 U.S. 590 (1975), the Court concludes that this evidence must be suppressed primarily, it seems, because no intervening events broke the connection between petitioner's detention and his confession. *Ante*, at 219. In my view, the connection between petitioner's allegedly unlawful detention and the incriminating statements and sketches is sufficiently attenuated to permit their use at trial. See *Wong Sun* v. *United States*, 371 U.S. 471 (1963).

226 *226 In *Brown* v. *Illinois, supra*, we identified several factors to be considered in determining whether inculpatory statements were sufficiently a product of free will to be admissible under the Fourth Amendment. The voluntariness of the statements is a threshold requirement. That

*Miranda* warnings are given is "an important factor." 422 U.S., at 603-604. Also relevant are "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct." *Ibid*. But the Court did not assign equal weight to each of these factors. Given the deterrent purposes of the exclusionary rule, the "purpose and flagrancy" of the police conduct is, in my view, the most important factor. Where police have acted in good faith and not in a flagrant manner, I would require no more than that proper *Miranda* warnings be given and that the statement be voluntary within the meaning of the Fifth Amendment. *Brown* v. *Illinois, supra*, at 612 (POWELL, J., concurring in part). "Absent aggravating circumstances, I would consider a statement given at the station house after one has been advised of *Miranda* rights to be sufficiently removed from the immediate circumstances of the illegal arrest to justify its admission at trial." *Ibid*.

The Court concedes that petitioner received proper *Miranda* warnings and that his statements were "voluntary" for purposes of the Fifth Amendment. *Ante*, at 216. And the police acted in good faith. App. 61; see *United States* v. *Peltier*, 422 U.S. 531, 536-537 (1975). At the time of petitioner's detention, the New York Court of Appeals had held that custodial questioning on less than probable cause for an arrest was permissible under the Fourth Amendment. *People* v. *Morales*, 22 N.Y.2d 55, 238 N.E.2d 307 (1968).[2] Petitioner

227 *227 testified that the police never threatened or abused him. App. 35. Petitioner voluntarily gave his first statement to police about an hour after he reached the police station and then gave another statement to police the following day. Contrary to the Court's suggestion, the police conduct in this case was in no manner as flagrant as that of the police in *Brown* v. *Illinois, supra*. See 422 U.S., at 605; n. 1, *supra*. Thus, in my view, the record convincingly demonstrates that the statements and sketches given police by petitioner were of sufficient free will as to purge the primary taint of

 casetext

his alleged illegal detention. I would, therefore, affirm the judgment of the Appellate Division of the Supreme Court of New York.

228

[2] This Court granted certiorari in *Morales*, but, as the Court points out, *ante,* at 205 n. 3, we ultimately reserved decision on the question of the legality of involuntary investigatory detention on less than probable cause. *Morales* v. *New York,* 396 U.S. 102 (1969).

*228

casetext

Case 2:19-cv-00021-SWS   Document 33-3   Filed 05/17/19   Page 1 of 5

# Director General of Railroads v. Kastenbaum, 263 U.S. 25 (1923)

**Justia Opinion Summary and Annotations**

Syllabus   **Case**

## U.S. Supreme Court

## Director General of Railroads v. Kastenbaum, 263 U.S. 25 (1923)

**Director General of Railroads v. Kastenbaum**

**No. 39**

**Argued October 3, 4, 1923**

**Decided November 12, 1923**

**263 U.S. 25**

*CERTIORARI TO THE SUPREME COURT*

*OF THE STATE OF NEW YORK*

*Syllabus*

Case 2:19-cv-00021-SWS   Document 33-3   Filed 05/17/19   Page 2 of 5

*Syllabus*

Under § 10 of the Federal Control Act, an action for false imprisonment may be maintained against the Director General of Railroads by a person, who at the instigation of railroad detectives (agents of the Director General) acting without probable cause, was arrested without warrant for a theft of freight from the railroad while under federal control. P. 263 U. S. 27.

198 App.Div. 966; 199 *id.* 957, affirmed.

Certiorari to the Supreme Court of New York to review a judgment for damages recovered by the respondent from the petitioner in an action for false imprisonment. The judgment was affirmed by the Appellate Division, and leave to appeal to the Court of Appeals was denied.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

Page 263 U. S. 26

Respondent brought an action in the Supreme Court of Erie County, New York, against the Director General of Railroads, seeking damages for false imprisonment and malicious prosecution. The trial court, at the close of the plaintiff's case, dismissed the cause of action for malicious prosecution, but allowed the trial to proceed to verdict and judgment for $500 for false imprisonment. The judgment was affirmed by the Appellate Division of the Supreme Court, and a motion for leave to appeal was denied by the Court of Appeals of the state.

The brief for petitioner on the merits states the single question to be:

Does an action for false arrest lie against the petitioner, an officer of the United States government, under the provisions of § 10 of the Act of Congress of March 21, 1918, c. 25, 40 Stat. 451, providing for federal control of carriers?

Twenty-one tubs of butter were taken from a freight car of the Lehigh Valley Railroad in Buffalo. A trolley car of that city, late at night, collided with a horse and wagon, and, in the wreck which followed, the stolen tubs of butter were discovered. Two men who had been driving the wagon escaped. The detective force of the railway company sought to discover the owner of the horse, and thought they had traced the ownership to Kastenbaum, who was a huckster. The railroad detective notified the police authorities of the city, who detailed two policemen to accompany him to Kastenbaum's house, where they arrested him without warrant. They took him to a police station, and kept him there overnight and until

he was released the next day on bail. He was brought to a hearing before an examining magistrate on a charge of grand larceny and burglary. After four or five adjournments at the instance of the prosecution, the magistrate discharged Kastenbaum. His horse proved to be one of another color. Under the charge of the court,

Page 263 U. S. 27

the jury were permitted to return only compensatory damages.

Section 10 of the Federal Control Act provides:

"That carriers, while under federal control, shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except insofar as may be inconsistent with the provisions of this Act or any other act applicable to such federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law, and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government."

By General Order No. 50, the executive so limited suits to be brought against carriers for injuries to person or property under the section as to exclude those for recovery of fines, penalties and forfeitures.

As we said in *Missouri Pacific R. Co. v. Ault,* 256 U. S. 554, 256 U. S. 563:

"The government undertook as carrier to observe all existing laws; it undertook to compensate any person injured through a departure by its agents or servants from their duty under such law; but it did not undertake to punish itself for any departure by the imposition upon itself of fines and penalties, or to permit any other sovereignty to punish it."

The action for false imprisonment is in the nature of a trespass for a wrong or illegal act in which the defendant must have personally participated directly or by indirect procurement. The gist of it is an unlawful detention, and, that being shown, the burden is on the defendant to establish probable cause for the arrest. The want of probable cause, certainly in the absence of proof of guilt or conviction of the plaintiff, is measured by the state of

Page 263 U. S. 28

the defendant's knowledge, not by his intent. It means the absence of probable cause

known to the defendant when he instituted the suit. But the standard applied to defendant's consciousness is external to it. The question is not whether he thought the facts to constitute probable cause, but whether the court thinks they did. Holmes on the Common Law, 140. Probable cause is a mixed question of law and fact. The court submits the evidence of it to the jury, with instructions as to what facts will amount to probable cause if proved. *Stewart v. Sonneborn*, 98 U. S. 187, 98 U. S. 194; Pollock on Torts (8th ed.) 225; 1 Cooley on Torts (3d ed.) p. 321. Counsel for petitioner contends that, in an action against the sovereign government, it must be conclusively presumed that good faith existed upon its part so far as it is responsible for the arrest, and therefore that a complete defense of probable cause on its part is always made out. But, as we have seen, good faith is not enough to constitute probable cause. That faith must be grounded on facts within knowledge of the Director General's agent, which, in the judgment of the court, would make his faith reasonable.

The government, under § 10, in a case of false imprisonment stands exactly as if it were a railway corporation operating as a common carrier. Such a corporation would clearly be responsible for an arrest of the kind here shown if without probable cause and made by one of its detectives employed to protect the property entrusted to its care as a common carrier. It is within the scope of the agency of such an employee to discover the perpetrators of crime against the property in order to recover it and to procure the arrest of supposed offenders and their prosecution and conviction in order to deter others from further depredations. If, in the field of such employment, the agent acts without probable cause and an illegal arrest without judicial warrant is made, the corporation

Page 263 U. S. 29

is liable as for any other act of its agents within the scope of their employment in carrying on the business of a common carrier. *Philadelphia, Washington & Baltimore Railway v. Quigley*, 21 How. 202, 62 U. S. 210; *Genga v. Director General of Railroads*, 243 Mass. 101.

We have not before us the question whether the Director General might be held for exemplary damages in a case like this under the restrictions of Order No. 50, as construed in the *Ault* case, because, as already said, the court limited the recovery to compensatory damages.

*Affirmed.*

**Disclaimer:** Official Supreme Court case law is only found in the print version of the United States Reports. Justia case law is provided for general informational purposes only, and may not reflect current legal developments, verdicts or settlements. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or information linked to from this site. Please check official sources.

Justia Annotations is a forum for attorneys to summarize, comment on, and analyze case law published on our site. Justia makes no guarantees or warranties that the annotations are accurate or reflect the current state of law, and no annotation is intended to be, nor should it be construed as, legal advice. Contacting Justia or any attorney through this site, via web form, email, or otherwise, does not create an attorney-client relationship.

Daniel E. White [Wyo. State Bar No. 5-1545]
Senior Assistant Attorney General
Adrian Kowalski[Wyo. State Bar No. 7-6125]
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, Wyoming 82002
(307) 777-7862
(307) 777-8920 Facsimile
dan.white@wyo.gov
adrian.kowalski@wyo.gov

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 19-CV-21-S |
| | ) | |
| BEAU J. EGGAR, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT OFFICER EGGER'S
## REPLY BRIEF IN SUPPORT OF SUMMARY JUDGEMENT

Defendant Officer Egger files this reply brief in support of his converted motion for summary judgment. The Court should still grant summary judgment against Bronnenberg because Officer Egger is entitled to qualified immunity as a matter of law. Officers who execute a facially valid, albeit outdated, arrest warrant in good faith do not violate clearly established law. And here, Bronnenberg does not appear to dispute the facial validity of the warrant, nor Officer Egger's good-faith execution of the facially valid warrant. Further, the cases she cites do not clearly establish a constitutional right protecting against the good-faith execution of facially valid warrants.

## A. No Genuine Issue of Material Fact

There are no material factual disputes in this case which preclude summary judgment. Officer Egger arrested Bronnenberg for failing to appear in court pursuant to a facially valid, albeit outdated, arrest warrant. Bronnenberg told Officer Egger that the arrest warrant was vacated. She also alleges that she showed him a copy of the order vacating the warrant. Before arresting Bronnenberg, Officer Egger called the police station to inquire whether the arrest warrant was valid. Dispatched confirmed that it was still valid. The RIMS Computer System also indicated the arrest warrant was valid.[1]

Bronnenberg does not appear to dispute the above facts. *See generally* (Doc. 33 at 1-17). Bronnenberg, however, filed an affidavit in which she claims that another officer pulled her over to execute the same warrant some time before Officer Egger arrested her. (Doc. 33-1 at 1-2). The language in the affidavit is unclear; it states "Officer Wright is the

---

[1] Counsel for Officer Egger wishes to advise the Court and the parties of an error in the memorandum in support of the motion to dismiss. On page three of the memorandum, Defense counsel inadvertently made a misstatement in the following sentence:

> At the time of the arrest, the RIMS Computer Dispatch System in his vehicle also marked the warrant as active and outstanding.

(Doc. 29 at 3). The above sentence should have read: "At the time of the arrest, the RIMS Computer Dispatch System also marked the warrant as active and outstanding," because the RIMS Computer Dispatch System was **not** accessible from Officer Egger's vehicle.

Defense counsel apologizes for this mistake. It was unintentional and inadvertently retained language from a working draft of the memo. The mistake is not material and should not affect the arguments in the motion to dismiss because the executed arrest warrant was still facially valid and verified through dispatch who informed Officer Egger that the warrant was still active and outstanding in the RIMS system. (Doc. 29-2) (Doc. 29-3).

officer who came to arrest me over failure to appear on the civil matter on January 17, 2019." (Doc. 33-1 at 1). This can be read as either stating that this interaction took place on January 17, 2019 or that she was arrested for failing to appear on a separate matter which was scheduled for January 17, 2019. *Id*. Also, it is likely that Bronnenberg meant January 17, 2017, not 2019. She asserts that this officer did not arrest her, but rather allowed her to call "Judge Canfield" who subsequently informed this officer that he would vacate the warrant. (Doc. 33-1 at 1). By "Judge Canfield," Bronnenberg probably means Judge Steven Cranfill who initially signed the arrest warrant. (Doc. 29-4 at 1).

This interaction, however, is immaterial for two reasons. First, there is no connection between this interaction and the arrest by Officer Egger. Bronnenberg does not suggest that Officer Egger somehow had any knowledge of this interaction. And indeed, Officer Egger was not aware that the warrant was vacated or otherwise not outstanding. (Doc. 29-1 at 1) (Doc. 29-2 at 2). Thus, even if true, this interaction does not create any dispute over the fact that Officer Egger acted in good faith when executing the warrant. Second, Bronnenberg does not suggest this prior interaction was routine police procedure.

## B. <u>Clearly Established Law</u>

The majority of Bronnenberg's response appears to be directed towards her already-dismissed claims against Officer Egger and other defendants. *See generally* (Doc. 33 at 8-16). Bronnenberg, however, does appear to attempt to overcome the clearly-established prong of qualified immunity by discussing Fourth Amendment probable-cause requirements. (Doc. 33 at 4-6). This does not overcome qualified immunity for two reasons.

First, while it is true that "[i]t is clearly established that an arrest must be supported by probable cause, whether independently evaluated by the officer or embodied in a valid warrant," "a state law enforcement officer is entitled to qualified immunity if a reasonable officer **could have believed** that probable cause to arrest existed at the moment the arrest was made." *Taylor v. Burd*, 2016 U.S. Dist. LEXIS 168498, at *11 (D.N.M. Dec. 5, 2016) (emphasis added). And here, Officer Egger could have believed that probable cause existed because he was informed by dispatch that there was an active warrant for Bronneberg's arrest. *See id.* ("Because dispatch informed Burd that there was an active warrant for Plaintiff's arrest, the Court finds that it was reasonable for Burd to rely on this information."); *Hill v. Bogans*, 735 F.2d 391, 393 (10th Cir. 1984) ("Bogans acted reasonably in relying on routine police procedures for establishing the existence of an outstanding warrant").

Second, the cases Bronnenberg cites in her brief are far too general to provide adequate warning that the conduct here was unlawful. "A constitutional right is clearly established if it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019). Accordingly, "it is a 'longstanding principle that clearly established law should not be defined at a high level of generality[,]'" because "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Id.* Here, the cases Bronnenberg points to are generally not relevant to the facts and are not capable of providing fair and clear warning to officers that the good-faith execution of a facially valid,

Page 4

but outdated, warrant is unconstitutional.

First, Bronnenberg cites *Dunaway v. New York*, 442 U.S. 200 (1979). This case focused on "the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest." *Id*. at 202. Specifically, this was in the context of suppression of information gathered from a confession during the interrogation. *Id*. The Supreme Court affirmed that probable cause was necessary for an arrest and that the custodial interrogation in that case amounted to an arrest. *Id*. There was no discussion on whether an arrest pursuant to a facially valid, albeit outdated, warrant verified through routine police procedures implicated any constitutional rights.

Second, Bronnenberg cites *Director General of Railroads v. Kastenbaum*, 263 U.S. 25 (1923). This case is likewise not particularized to the facts of this case. Rather, the sole inquiry was whether "an action for false arrest lie against the petitioner, an officer of the United States government, under the provisions of § 10 of the Act of Congress of March 21,1918, c. 25, 40 Stat. 451, providing for federal control of carriers?" *Id*. at 26. It did not involve an arrest pursuant to a warrant at all, let alone one that was facially valid. *Id*. In sum, neither case places the constitutional issue here "beyond debate," especially in light of the case law already discussed in the memorandum in support of dismissal. *See Doe*, 912 F.3d at 1289 ("'existing precedent must have placed the statutory or constitutional question beyond debate' for a right to be clearly established."); (Doc. 29 at 11-14) (discussing existing case law on the issue).

## C. <u>Conclusion</u>

For the reasons above, and those already discussed in prior filings, Defendant Officer Egger respectfully requests the Court grant summary judgment against Bronnenberg.

**DATED** this 24th day of May, 2019.

/s/ Adrian K. Kowalski
Adrian K. Kowalski
Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have sent a copy of the foregoing on this 24th day of May 2019, to the following individuals:

Tami M. Bronnenberg
P.O. Box 802
Cody, WY 82414

[✓] U.S. MAIL

*Jessica Curless*
Jessica Curless, Paralegal
Office of the Wyoming Attorney General

No *Shepard's* Signal™
As of: May 24, 2019 5:34 PM Z

## *Taylor v. Burd*

United States District Court for the District of New Mexico

December 5, 2016, Filed

No. 15 CV 642 JAP/LAM

**Reporter**
2016 U.S. Dist. LEXIS 168498 *

MICHAEL TAYLOR, Plaintiff, v. ANTHONY ROBINSON AND JORDAN BURD, Defendants.

## Core Terms

arrest, dispatch, summary judgment, qualified immunity, facially valid, false arrest, outstanding, probable, summary judgment motion, enforcement officer, false imprisonment, absolute immunity, bench warrant, tort claim, quotation, REPLY, marks

**Counsel:** **[*1]** For Michael Taylor, Plaintiff: Kari T Morrissey, Law Office of Kari Morrissey, Albuquerque, NM.

For Anthony Robinson, Jordan Burd, Defendants: Deborah D. Wells, Debra J. Moulton, LEAD ATTORNEYS, Kennedy, Moulton & Wells PC, Albuquerque, NM.

**Judges:** James A. Parker, SENIOR UNITED STATES DISTRICT JUDGE.

**Opinion by:** James A. Parker

## Opinion

#### MEMORANDUM OPINION AND ORDER

On July 24, 2015, Plaintiff Michael Taylor (Plaintiff) filed a COMPLAINT FOR NEGLIGENCE AND VIOLATION OF THE *FOURTH AMENDMENT* (Doc. No. 1) (Complaint), alleging that Defendants Anthony Robinson (Robinson) and Jordan Burd (Burd) (together, Defendants) had caused Plaintiff's unlawful arrest through Robinson's negligence and Burd's violation of Plaintiff's civil rights. *See* Compl. ¶¶ 15-16, 19. Defendants moved for summary judgment on October 31, 2016. *See* DEFENDANTS ANTHONY ROBINSON AND JORDAN BURD'S OPPOSED MOTION FOR

SUMMARY JUDGMENT (Doc. No. 52) (Defendants' Motion); DEFENDANTS ANTHONY ROBINSON AND JORDAN BURD'S MEMORANDUM BRIEF IN SUPPORT OF THEIR OPPOSED MOTION FOR SUMMARY JUDGMENT (Doc. No. 53) (Defendants' Memorandum). Plaintiff filed a cross-motion for summary judgment the next day. *See* PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 54) (Plaintiff's Motion). Each **[*2]** party responded in opposition. *See* DEFENDANTS ANTHONY ROBINSON AND JORDAN BURD'S RESPONSE TO PLAINTIFF'S OPPOSED MOTION FOR SUMMARY JUDGMENT (Doc. No. 55) (Defendants' Response); PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 56) (Plaintiff's Response). The parties then replied in support of their Motions. *See* DEFENDANTS ANTHONY ROBINSON AND JORDAN BURD'S REPLY TO PLAINTIFF'S RESPONSE TO THEIR MOTION FOR SUMMARY JUDGMENT (Doc. No. 57) (Defendants' Reply); PLAINTIFF'S REPLY SUPPORTING HIS MOTION FOR SUMMARY JUDGMENT (Doc. No. 59) (Plaintiff's Reply). The Court will deny Plaintiff's Motion and will grant summary judgment in favor of Defendants.

#### I. BACKGROUND

The facts are undisputed unless otherwise noted. On December 2, 2014, Plaintiff was stopped for speeding by New Mexico State Police Officer Robinson. Defendant's Memo. ¶ 1, Ex. A Taylor Depo. 43:2-12, 36:6-8. Dispatch informed Robinson that Plaintiff had a valid outstanding bench warrant. Defendant's Memo. ¶ 2, Ex. A Taylor Depo. 34:15-23, Ex B Robinson Depo. 28:13-18. Robinson arrested Plaintiff for the warrant and transported Plaintiff to the San Miguel County Jail, where Plaintiff was booked **[*3]** into the facility. Defendant's Memo. ¶ 4, Ex. A Taylor Depo. 34:22-25, 35:22-23; Ex. B Robinson Depo. 28:19, 40:10-41:24. Robinson signed the warrant, gave it to dispatch at the

jail, and provided a copy to Plaintiff. Defendant's Memo. ¶ 5, Ex. B Robinson Depo. 40:23-44:21. Plaintiff bonded out of the San Miguel County Jail on December 4, 2014. Defendant's Memo. ¶ 6, Ex. A Taylor Depo. 36:1.

On December 16, 2014, Plaintiff was stopped again for speeding by Officer Burd, also of the New Mexico State Police. Defendant's Memo. ¶ 8, Ex. A Taylor Depo. 33:21-24. Dispatch informed Burd that Plaintiff had a valid outstanding bench warrant. Defendant's Memo. ¶ 9, Ex. G Burd Depo. 19:17-24. Plaintiff told Burd that he had already been arrested on the warrant and had been released on bond, and he presented Burd with a bond receipt. Plaintiff's Mot. ¶ 14, Ex. 1 Taylor Depo. Ex. C, Ex. 3 Burd Depo 19:25-20:10. Plaintiff alleges that he also presented release papers from San Miguel County Jail, but he did not submit copies of these papers with his Motion because they are no longer in his possession. Plaintiff's Mot. ¶ 14, Ex. 1 Taylor Depo. 46:10-47:12. Defendants acknowledge only the bond receipt **[*4]** showing the amount paid. Defendants' Resp. ¶¶ 3-5. The bond receipt contained Plaintiff's name, case number, and the amount and date of Plaintiff's bond. Plaintiff's Mot. ¶ 14, Ex. 1 Taylor Depo. Ex. C, Plaintiff's Resp. ¶¶ 9-10. Plaintiff further alleges that he called the bonding company for verification of his release but that Burd refused to speak to them. Plaintiff's Mot. ¶ 15, Ex. 1 Taylor Depo. 44:21-45:15. Defendants dispute this allegation. Defendants Resp. ¶ 4. When Plaintiff claimed the warrant was not active, Burd called dispatch and asked for verification of the outstanding warrant. Defendants Resp. ¶ 3, Ex. G Burd Depo. 20:13-21. Dispatch informed Burd that the warrant was indeed valid and active, and Burd placed Plaintiff under arrest. Defendants' Resp. ¶ 3. Burd then transported Plaintiff to Santa Fe County Adult Detention Center, where Plaintiff was booked and held for multiple days before being released again on bond. Plaintiff's Mot. ¶¶ 18-19, Ex. 3 Burd Depo. 20:21-21:4, Ex. 1 Taylor Depo. 49:2-50:7.

## II. LEGAL STANDARD

Plaintiff brings claims for unlawful arrest under the *Fourth Amendment* and under the *New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-1 to -29* (1976, as amended through 2009) (NMTCA). **[*5]** *See* Compl. ¶¶ 14-21. The Court has original jurisdiction over Plaintiff's *Fourth Amendment* claim, *see 28 U.S.C. § 1331*, and supplemental jurisdiction over the related state-law claims, *see 28 U.S.C. § 1367*.

Summary judgment may be granted if the moving party shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. "When applying this standard, [the Court] view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Scull v. New Mexico, 236 F.3d 588, 595 (10th Cir. 2000)* (internal quotation marks omitted). The court must analyze each motion individually and on its own merits if both parties have moved for summary judgment. *See Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979)* (explaining that "[c]ross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."). Cross-motions for summary judgment entitle the Court "to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000)*.

However, when a defendant raises qualified immunity as a defense, the plaintiff must demonstrate that the defendant's actions violated a clearly-established constitutional or statutory **[*6]** right before the defendant will bear the traditional burden. *See Scull, 236 F.3d at 595*. A right is clearly established only if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

Plaintiff contends that Burd unlawfully arrested him in violation of the *Fourth Amendment*, which the Court will construe as a claim under *42 U.S.C. § 1983*, and that Burd is also liable for false arrest under the NMTCA, although Plaintiff acknowledges that his Complaint did not expressly bring an NMTCA claim against Burd. *See* Compl. ¶¶ 17-21; Plaintiff's Mot. at 8-11. Plaintiff asserts that Robinson failed to fulfill his duty to cause Plaintiff's warrant to be cleared from the system after Robinson arrested Plaintiff, and therefore that Robinson is liable under the NMTCA for his negligence that resulted in Plaintiff's later false arrest by Burd. *See* Compl. ¶¶ 14-16; Plaintiff's Mot. at 6. Defendants maintain that Burd is entitled to absolute and qualified immunity for his arrest of Plaintiff on a facially valid warrant, and that neither Robinson nor Burd is liable under the NMTCA **[*7]** for Burd's reasonable actions. *See* Defendant's Memo. at

6-7, 12.

## A. *Fourth Amendment*

The *Fourth Amendment* prohibits unreasonable seizures, including unlawful arrests. *See Koch v. City of Del City, 660 F.3d 1228, 1238-39 (10th Cir. 2014)*. But even if an arrest is unlawful because it is based on an erroneous order, that order may still be facially valid. *See Turney v. O'Toole, 898 F.2d 1470, 1473 (10th Cir.1990)* ("[E]ven assuming that an order is infirm as a matter of state law, it may be facially valid, as 'facially valid' does not mean 'lawful,' and erroneous orders can be valid."). "Just as judges acting in their judicial capacity are absolutely immune from liability under *section 1983*, officials charged with the duty of executing a facially valid court order enjoy absolute immunity from liability for damages in a suit challenging conduct prescribed by that order." *Id. at 1472* (internal brackets, quotation marks, and citations omitted). "[L]aw enforcement officers are . . . entitled to absolute 'quasi-judicial' immunity for their actions in executing facially valid warrants, writs, and other court orders, such as bench warrants." *Zamora v. City of Belen, 383 F.Supp.2d 1315, 1325-26 (D.N.M. 2005)* (collecting cases).

Plaintiff argues that Burd is not entitled to absolute immunity because he should have known from the information on the bond receipt that the warrant was no longer valid. *See* Plaintiff's Resp. at 11-12. But "[u]nless a warrant **[*8]** is facially invalid an officer has no constitutional duty to independently determine its validity." *Hill v. Bogans, 735 F.2d 391, 393 (10th Cir. 1984)* (officer acted reasonably in relying on routine police procedures for establishing the existence of an outstanding warrant and should not be held responsible for the failure of county personnel to clear the warrant from the records). *See also Scull, 236 F.3d at 597-98* (jailers had no duty to independently investigate claims that a defendant should be released on writ of habeas corpus when facility was not named in writ and the warrant for arrest was facially valid). "An officer on the highway is entitled to rely on an accurate computer notification that there is an existing warrant for an individual's arrest. The officer is not required by the *Fourth Amendment* to obtain a copy of the warrant, research supporting documentation, or go behind the facial validity of a warrant before making the arrest." *Smyth v. City of Lakewood, 83 F.3d 433, 1996 WL 194715, at *4 (10th Cir. 1996)*.

Plaintiff cites to *Maresca v. Bernalillo County, 804 F.3d 1301, 1310 (10th Cir. 2015)*, for the proposition that "in determining whether there is probable cause, officers are charged with knowledge of any 'readily available exculpatory evidence' that they unreasonably fail to ascertain." But *Maresca* addressed a warrantless arrest based on a stolen vehicle report, brought up when the officer mistyped **[*9]** a license plate number, wherein the description of the stolen vehicle clearly did not match the vehicle occupied by the plaintiffs and the officer ignored repeated requests to recheck the number. *See id. at 1304-05*. The Tenth Circuit held that the officer was not entitled to rely on her unreasonable mistake as probable cause to arrest particularly due to the officer's "failure to use readily available information—already on the computer screen in front of her and from the dispatcher—to verify that the [plaintiffs'] vehicle was reported stolen before arresting them." *Id. at 1311*.

In contrast, Burd was not tasked with independently assessing probable cause, but only with carrying out a court order for Plaintiff's arrest. Burd testified in deposition that a bond receipt does not prove that a warrant is not active and that documents proving a defendant has been picked up on a warrant are given to the defendant upon release, but that Plaintiff did not have this documentation. *See* Defendants' Memo. Ex. G Burd Depo. 20:2-13. Plaintiff presents no evidence to contradict Burd's testimony beyond his assertion that "Burd had all the information necessary and sufficient to know that the warrant was no longer valid." *See* **[*10]** Plaintiff's Resp. ¶ 10. Plaintiff states that dispatch from the arresting agency communicates with the issuing agency, which has access to the relevant court records. *See id.* Yet Plaintiff does not dispute that dispatch informed Burd that the warrant was valid. *See id.* Burd contacted dispatch when presented with Plaintiff's bond receipt and confirmed the active status of the warrant for Plaintiff's arrest. *See* Defendants Resp. at 4. Nothing in *Maresca* requires an officer to question the veracity of official information obtained through routine police procedures for establishing the existence of an outstanding warrant.

The Court therefore finds that the warrant was facially valid when dispatch confirmed to Burd that there was a valid and active warrant for Plaintiff's arrest. Because Burd relied on the facially valid warrant as the basis for arresting Plaintiff, the Court concludes that Burd is entitled to absolute immunity on Plaintiff's *Fourth Amendment* claim.

Even if Burd were not entitled to absolute immunity, he would be protected by qualified immunity. Qualified immunity shields government officials from liability when they reasonably perform their duties. *Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*. To defeat Burd's assertion of qualified [*11] immunity, Plaintiff must demonstrate that Burd's actions violated a constitutional right that was clearly established at the time of the alleged misconduct. *See id. at 232*.

It is clearly established that an arrest must be supported by probable cause, whether independently evaluated by the officer or embodied in a valid warrant. *See Malley v. Briggs, 475 U.S. 335, 341, 345, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)* (warrant does not shield officer from liability when the officer had applied to the court for a warrant and "a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant."). But a state law enforcement officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause to arrest existed at the moment the arrest was made. *See Hunter v. Bryant, 502 U.S. 224, 227-28, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)*. Because dispatch informed Burd that there was an active warrant for Plaintiff's arrest, the Court finds that it was reasonable for Burd to rely on this information. *See Maresca, 804 F.3d at 1312* (deputy that assisted arresting officer was entitled to qualified immunity because deputy was entitled to rely on arresting officer's report that the car was stolen). Plaintiff has not presented any cases demonstrating [*12] that Burd's conduct in relying on dispatch's statement that there was a valid warrant for Plaintiff's arrest, rather than extrapolating contrary information from Plaintiff's bond receipt, was a clear violation of Plaintiff's rights. "[T]here is no clearly established law to the effect that an arrest based on execution of a court's bench warrant may constitute false arrest." *Zamora, 383 F.Supp.2d at 1338*. The Court therefore concludes that Burd is also entitled to qualified immunity. The Court will grant summary judgment for Burd on the *Fourth Amendment* claim.

## B. New Mexico Tort Claims Act

While both absolute and qualified immunity protect Burd from liability on Plaintiff's constitutional claim, these doctrines may not apply to Plaintiff's common-law tort claims even though those claims are based on the same factual circumstances. *See Romero v. Sanchez, 1995-NMSC-028, ¶ 25, 119 N.M. 690, 895 P.2d 212* (questioning the parties' assumption that qualified immunity protects an official sued under the NMTCA but declining to address the question because it was not properly before the Court). Under the NMTCA, "any public employee while acting within the scope of duty [is] granted immunity from liability for any tort except as waived." *Section 41-4-4(A)*. The NMTCA waives immunity for an enumerated list of torts, including false [*13] imprisonment and false arrest, "when caused by law enforcement officers while acting within the scope of their duties." *Section 41-4-12*. A law enforcement officer may be liable under the NMTCA both for perpetrating any listed tort and for negligent acts that result in an enumerated tort, even if that tort is actually committed by a third party. *See Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021, ¶ 21, 121 N.M. 646, 916 P.2d 1313*. Therefore, if Robinson's negligence caused Burd to falsely arrest Plaintiff, both Defendants could be held liable. Plaintiff brought an NMTCA claim against Robinson only, *see* Compl. ¶¶ 14-16, but informally requests leave to amend his Complaint to include an NMTCA claim against Burd as well, arguing that he sufficiently pleaded state-law tort claims for false arrest and false imprisonment against Burd, *see* Plaintiff's Mot. at 11.

"Under New Mexico law, false imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so." *Fuerschbach v. Southwest Airlines Co., 439 F.3d 1197, 1207 (10th Cir. 2006)* (quoting *Romero, 1995--NMSC-028, ¶ 13, 119 N.M. 690, 895 P.2d 212*) (internal quotation marks omitted). "False arrest or unlawful detention occurs when the facts available to a detaining officer would not warrant a person of reasonable caution to believe detention appropriate." *Id.* (internal quotation [*14] marks and brackets omitted). "A defendant possessed of a good faith and reasonable belief in the lawfulness of the action is not liable for false imprisonment or false arrest." *Id.*

Burd arrested Plaintiff after dispatch informed Burd that there was an outstanding warrant for Plaintiff's arrest. *See* Defendants' Resp. ¶ 3. Plaintiff has presented no evidence that Burd executed the arrest knowing that he was without lawful authority to do so. As discussed above, Burd's decision to arrest Plaintiff was reasonable when, after Plaintiff stated that the warrant was not valid, Burd contacted dispatch to verify the warrant and dispatch confirmed that it was active. *See* Defendants'

Resp. ¶ 3. Even if the Court liberally construes Plaintiff's Complaint to present a state-law tort claim against Burd, Burd cannot be held liable for false imprisonment or false arrest under these circumstances. The Court will grant summary judgment in Burd's favor on Plaintiff's claim under the NMTCA.

Accordingly, summary judgment must also be granted in Robinson's favor. Plaintiff argues that Robinson was negligent because New Mexico court rules require Robinson to have ensured that the warrant was cancelled. *See* **[*15]** Plaintiff's Resp. ¶ 7; Rule 6-207 NMRA ("If the warrant has been entered into a law enforcement information system, upon arrest of the defendant, the person executing the warrant shall cause it to be removed from the system."). But Defendants have presented evidence that the New Mexico Department of Public Safety relies on dispatch personnel to, "after service, . . . remove[] warrants from NCIC and the file from the manual filing system, as quickly as possible." *See* Defendants Resp. Ex. A-1 at 7. Plaintiff admits that Robinson signed the warrant and gave a copy to dispatch and that Robinson himself was not responsible for removing the warrant from the NCIC database. *See* Plaintiff's Resp. ¶¶ 5, 7. There is no basis for the Court to find that Robinson was responsible for further actions in clearing the warrant after he gave the copy to dispatch. *See Gose v. Board of County Comm'rs of County of McKinley, 778 F.Supp.2d 1191, 1199 n.6 (D.N.M. 2011)* ("Neither the statute nor the rule gives a correctional officer the power to cancel or modify a bench warrant. From a logical standpoint, it would seem that only a court could modify a court order."). But the Court need not decide this issue because, even if Robinson had been negligent, Robinson is not liable under the NMTCA when no false arrest resulted. **[*16]** *See Weinstein, 1996-NMSC-021, ¶ 25, 121 N.M. 646, 916 P.2d 1313* (law enforcement officer is not liable under the NMTCA for negligence that does not result in a listed tort or a statutory or constitutional violation). Therefore, the Court will grant summary judgment to Robinson.

IT IS ORDERED that:

1) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 54) is denied,

2) DEFENDANTS ANTHONY ROBINSON AND JORDAN BURD'S OPPOSED MOTION FOR SUMMARY JUDGMENT (Doc. No. 52) is granted, and

3) Plaintiff's COMPLAINT FOR NEGLIGENCE AND VIOLATION OF THE *FOURTH AMENDMENT* (Doc. No.

1) will be dismissed with prejudice by a summary judgment.

/s/ James A. Parker

SENIOR UNITED STATES DISTRICT JUDGE

---

**End of Document**

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 MAY 28  PM 2: 05

STEPHAN HARRIS, CLERK
CASPER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | CASE NO. |
| | ) | 19-CV-021-S |
| Plaintiff, | ) | |
| | ) | MOTION FOR |
| v. | ) | DECLARATORY |
| | ) | JUDGMENT. |
| BEAU J. EGGER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

The plaintiff, Tami M. Bronnenberg, respectfully requests to move this court for Declaratory Judgment declaring that defendant's acts, policies and practices herein described and complained of violated plaintiff's rights under the Fourth Amendment and the Fourteenth Amendment of the Constitution of the United States of America. See, Amended Complaint, E. Request for Relief, (A), Page 9; Response to Defendant's Motion for Summary Judgment, pursuant to the United States District Court Local Rule 7.1; 28 USCS §2201; 28 USCS 2202.

WHEREFORE, Plaintiff, Tami M. Bronnenberg, THEREFORE prays this Motion be granted.

DATED: May 24 2019.

Tami M. Bronnenberg, Pro-se

## CERTIFICATE OF SERVICE.

I hereby certify that a copy of the forgoing Motion for Declaratory

Judgment with proposed Order was mailed to the Defendant, Office of the

Attorney General, 2320 Capitol Avenue, Cheyenne, Wyoming 82002 on

May 24, 2019.

Tami M. Bronnenberg, Pro-se

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | CASE NO. |
| | ) | 19-CV-021-S |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | GRANTING |
| BEAU J. EGGER, et al., | ) | DECLARATORY |
| | ) | JUDGMENT. |
| Defendants. | ) | |

---

This matter comes before the Court on Plaintiff's Motion for Declaratory Judgment declaring that Officer Beau J. Egger's acts, policies and practices herein described and complained of violated plaintiff's rights under the Fourth Amendment and the Fourteenth Amendment of the Constitution of the United States of America.

IT IS THEREFORE ORDERED that the Plaintiff Motion for Declaratory Judgment declaring that Officer Beau J. Egger's acts, policies and practices herein described and complained of violated plaintiff's rights under the Fourth Amendment and the Fourteenth Amendment of the Constitution of the United States of America.

DATED: _____, 2019.

                                       _____
                                       Scott W. Skavdahl
                                       United States District Judge

1



US POSTAGE AND FEES PAID

FIRST—CLASS
May 24 2019
Mailed from ZIP 82414
2oz First—Class Pkg Svc Zone 1



endicia

CommercialBasePrice

071800864572

## FIRST — CLASS PKG SVC

TAMI MAE BRONNENBERG, PRO—SE
P.O. BOX 802
CODY WY 82414—3840

C001

SHIP TO:

**CLERK U.S. DISTRICT COURT**
**111 S. WOLCOTT**
**ROOM 121**
**Casper WY 82601**

### USPS TRACKING #



9400 1102 0088 2047 2616 29

SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 JUN -4 AM 10: 32

STEPHAN HARRIS, CLERK
CASPER

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | CASE NO. |
| | ) | 19-CV-021-S |
| Plaintiff, | ) | |
| | ) | MOTION FOR |
| v. | ) | SUMMARY |
| | ) | JUDGMENT. |
| BEAU J. EGGER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

In Response to Defendant Officer Egger's reply Brief in Support of

Summary Judgment. The plaintiff, Tami M. Bronnenberg, respectfully

requests to move this Court for Summary Judgment pursuant to United

States District Court Local Rule 7.1 (b) (1); Federal Rules of Civil

Procedure, Rules 12 (d) RESULT OF PRESENTING MATTERS

OUTSIDE THE PLEADINGS.; 56, (a):

"*** The court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law. ***";

Rule 56, (f) JUDGMENT INDEPENDENT OF THE MOTION. After
giving notice and a reasonable time to respond, the court may: (1) grant
summary judgment for a nonmovant; (2) grant the motion on grounds not
raised by a party; or (3) consider summary judgment on its own after

1

identifying for the parties material facts that may not be genuinely in dispute.

Declaring, pursuant to the Federal Rules of Civil Procedure, Rule 57,

"These rules govern the procedure for obtaining a declaratory judgment under 28 U.S.C. §2201. ***,"

that defendant's acts, policies and practices herein described and complained of violated plaintiff's rights under the Fourth Amendment and the Fourteenth Amendment of the Constitution of the United States of America.

Defendant is correct that Bronnenberg meant January 17, 2017 when the interaction took place with Officer Wright and Honorable Judge Steven Cranfill in Defendant Officer Egger's Reply Brief in Support of Summary Judgment, page 3. See, ORDER VACATING WARRANT AND RESETTING PREVIOUSLY SCHEDULED HEARING, Filed January 17, 2017, (Amended Complaint, Exhibit –A-). Officer Egger arrested and imprisoned Bronnenberg in jail on a vacated warrant without probable cause on January 31, 2017, after the hearing previously scheduled for January 17, 2017 by Order filed on December 30, 2016, that was rescheduled for January 26, 2017 at 4:00 pm, which Bronnenberg complied and attended.

In any given section 1983 action, the court must determine the state of mind, if any, necessary to violate the constitutional provision at issue.

2

Daniels v. Williams, 474 U.S.327, 106 S. Ct. 662 at 664, 88 L. Ed. 2d 662

(1986); McKay v. Kammock, 730 F. 2d 1367, 1373 (10th Cir. 1984) (en

banc); Specht v. Jensen, 832 F.2d 1516 (10th Circuit 1987), Paragrph 15.

Case Enclosed. "Could have believed" does not constitue probable cause. It

is a mental state. See Defendant Officer Egger's Reply Brief in Support of

Summary Judgment, Page 4. The 10th Circuit, in 1987 in the case of Specht

v. Jensen, 832 F.2d 1516, Supra., Paragrphs 19, 20, stated that, "In sum, a

Fourth Amendment violation occurs when police, (Officer Egger), engage in

a warrantless search and no exception to the warrant requirement applies, or

when police , (Officer Egger), search pursuant to a warrant not based on

probable cause. That the police officer, (Officer Egger), acted in an

objectively reasonable (i.e., non-negligent) manner is irrelevant to the

existence of a constitutional violation. See, e.g., Anderson v. Creighton, 483

U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Malley v. Briggs, 475

U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); United States v. Leon,

468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In a section 1983

action, the existence of qualified immunity for police officers, (Officer

Egger), who rely on a warrant is determined by an identical inquiry into the

objective good faith of the officer, (Officer Egger). *** no specific mental

state, (could have believed), is required to violate the Fourth Amndment."

See, Plaintiff's Response to Defendant's Summary Judgement, page 6; See

also, ORDER VACATING WARRANT AND RESTETTING

PREVIOUSLY SCHEDULED HEARING, Filed January 17, 2017,

(Amended Complaint, Exhibit –A-), Supra; Cf. Johnson v. United States,

333 U.S. 10, 68 S.Ct. 367, 92 L. Ed. 436 (1948) (post-hoc showing that

probable cause existed does not justify warrentless search); Specht v. Jensen,

832 F.2d 1516, Supra., Paragrph 18.

In Beck v. Ohio (1964) 379 U.S. 89, 13 L. Ed. 2d 142, 85 S. Ct. 223,

enclosed, the court stated that it could assume that the officers acted in good

faith in arresting the accused, but that "good faith on the part of the arresting

officers was not enough". Henry v. United States, 361 U.S. 98, 102 (1959).

If subjective good faith alone were the test, the protection of the Fourth

Amendment would evaporate, and the people would be secure in their

persons, houses, papers, and effects only in the discretion of (Officer Egger),

the police. Beck v. Ohio (1964) Supra, 379 U.S. at 97.

In Response to Defendant Officer Egger's Reply Brief in Support of

Summary Judgment, Page 5, Officer Egger went further than the legality of

custodial questioning on less than probable cause for a full-fledged arrest.

Dunaway v. New York, 422 U.S. 200, 95 S. Ct. 2240 (1979); In Director

General of Railroads v. Kastenbaum, 263 U.S. 25, (good faith is not enough

4

to constitute probable cause); Plaintiff's Response to Defendant's Summary

Judgement, pages 2, 9; Affidavit of Tami Bronnenberg , Exhibit –G-.

The language of the Fourth Amendment, that 'that . . . no Warrants shall issue, but upon probable cause . . .' of course applies to arrest as well as search warrants." Giordenello v. United States, 357 U.S. 480 at 485-486. Beck v. Ohio (1964) Supra, 379 U.S. at 96, note 6. In Ker v. California, 374 U.S. 23, 10 L. Ed. 2d 726 , 83 S. Ct. 1623 (1963), the court held that the same probable cause standards were applicable to federal and state warrants under the Fourth and Fourteenth Amendments. See, Whiteley v. Warden of Wyoming Penitentiary, 401 U.S. 560 at 564, note 6, 28 L. Ed. 2d 306, 91 S. ct. 1031 (1971); See also, Plaintiff's Response to Defendant's Summary Judgement, page 5. "While this Court does not sit as in nisi prius to appraise contradictory factual questions, it will, where necessary to the determination of constitutional rights, make an idependent examination of the facts, the findings, and the record so that it can determine for itself whether in the decision as to reasonableness the fundamental--i.e., constitutional--criteria established by this Court have been respected ***. Ker v. California, 374 U.S. 23, Supra; Beck v. Ohio (1964) Supra, at 92.

WHEREFORE, Plaintiff, Tami M. Bronnenberg, THEREFORE prays

this Motion for Summary Judgment be granted.

DATED: June ⸝ , 2019.

Tami M. Bronnenberg, Pro-se

CERTIFICATE OF SERVICE.

I hereby certify that a copy of the forgoing Motion for Summary Judgment was mailed to the U.S. Magistrate Judge, Kelly H. Rankin, United States District Court, 2120 Capitol Ave., Suite 2204, Cheyenne, Wyoming 82001and to the Defendant, Office of the Attorney General, 2320 Capitol Avenue, Cheyenne, Wyoming 82002 on June ⸝ , 2019.

Tami M. Bronnenberg, Pro-se

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

TAMI M. BRONNENBERG )        CASE NO.
                     )        19-CV-021-S
          Plaintiff, )
                     )
     v.              )        ORDER
                     )        GRANTING
BEAU J. EGGER, et al., )      SUMMARY
                     )        JUDGMENT.
          Defendants. )

---

  This matter comes before the Court on Plaintiff's Motion for

Summary Judgment declaring that Officer Beau J. Egger's acts, policies and

practices herein described and complained of violated plaintiff's rights under

the Fourth Amendment and the Fourteenth Amendment of the Constitution

of the United States of America.

  IT IS THEREFORE ORDERED that the Plaintiff Motion for

Summary Judgment declaring that Officer Beau J. Egger's acts, policies and

practices herein described and complained of violated plaintiff's rights under

the Fourth Amendment and the Fourteenth Amendment of the Constitution

of the United States of America.

  DATED: _____, 2019.

        _____
        Scott W. Skavdahl
        United States District Judge

1

832 F.2d 1516

24 Fed. R. Evid. Serv. 124

O. George SPECHT, Jr. and June B. Specht, Plaintiffs-Appellees,
v.
Roger JENSEN, Doug Martin, and Don Owens, Defendants-Appellants,
Pat Tellier and Ken Jacobs, Defendants.
O. George SPECHT, Jr. and June B. Specht, Plaintiffs-Appellants,
v.
Roger JENSEN, Pat Tellier, Doug Martin, Don Owens and Ken
Jacobs, Defendants- Appellees.

Nos. 85-1457, 85-1533.

United States Court of Appeals,
Tenth Circuit.

Nov. 10, 1987.
Rehearing en banc granted in part and judgment, but not
opinion, vacated Feb. 4, 1988.

Theodore S. Halaby and Robert M. Liechty, of Halaby & McCrea, Denver, Colo., for
defendants Jensen, Martin and Owens.

Arthur H. Bosworth, II (Michael J. Peterson with him on the brief), of Bosworth & Slivka,
Denver, Colo., for plaintiffs.

Before McKAY, SETH, and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Advertisement

1

George and June Specht, husband and wife, brought this action against Roger Jensen,
Dan Owens, and Doug Martin, three members of the Steamboat Springs, Colorado,
Police Department.1 The Spechts asserted claims under 42 U.S.C. Sec. 1983 (1982) and
Colorado law arising from the alleged unlawful search of the Specht home and George
Specht's office. A jury found in favor of the Spechts, awarding Mr. Specht $151,250 in
compensatory damages against Jensen, Owens, and Martin, and awarding Mrs. Specht
$76,250 in compensatory damages against Jensen and Owens and $7,500 in punitive

damages against Owens.2 Defendants appeal, asserting that 1) the district court erred in denying their various motions for judgment notwithstanding the verdict; 2) the trial court committed reversible error in its evidentiary rulings; and 3) the trial court erred in denying their motions for a new trial or a remittitur because the jury verdict is excessive. We affirm.3

1.

JUDGMENT NOTWITHSTANDING THE VERDICT

2

All three defendants moved for j.n.o.v., contending they were entitled to judgment as a matter of law on the state tort claims and the asserted constitutional violations, as well as on the issues of qualified immunity and punitive damages. Upon review of the grant or denial of a motion for j.n.o.v., we must view the evidence and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. Western Plains Service Corp. v. Ponderosa Development Corp., 769 F.2d 654, 656 (10th Cir.1985). In so doing, we may not weigh the evidence, pass on the credibility of witnesses, or substitute our judgment for that of the jury. Brown v. McGraw-Edison Co., 736 F.2d 609, 613 (10th Cir.1984). Accordingly, we must view the record in the light most favorable to the Spechts in setting out the facts presented at trial and in assessing individually defendants' motions for j.n.o.v.

3

The incidents giving rise to this lawsuit involve the attempts of Ken Jacobs,4 a private citizen, to repossess a computer that had previously been repossessed from Jacobs by the Spechts' son Timothy. Jacobs had obtained a state court order of possession and writ of assistance that directed any sheriff to assist Jacobs in obtaining the computer.

4

The Spechts, who are in their sixties, live in Steamboat Springs. Although Timothy, who was thirty-seven, had not lived with his parents for many years, he had been in business with his father for a time and Jacobs thought the computer might be located at the Spechts' home. Consequently, Jacobs traveled to Steamboat Springs with two friends, Peter Corr and Ken Long. Long, who owned a restaurant, had previously held positions as a law enforcement official. Corr was a Denver police officer on medical leave.

5

Before the trip, Long called defendant Jensen, a supervisor with the Steamboat Springs police department, whom Long had known for several years. Long told Jensen that a friend had a court order and might need some help executing it. Jacobs, Corr, and Long arrived at the Steamboat Springs police station in the early afternoon of Wednesday,

February 24, 1982. Jensen, who was just going off duty, told his replacement, Pat Tellier, "to take care of" the three men. Rec., vol. IV, at 70. Jacobs learned the location of the Specht residence at the police station, and he drove there that afternoon with Corr and Long. They were accompanied by defendant Owens, a Steamboat Springs police officer, at Tellier's direction. No one was home and they returned to the police station.

6

Jacobs then obtained the location of George Specht's business office. He, Corr, and Long drove to the office, found no one there, and went back to the police station again. Sometime early that evening, Tellier said he knew the person who owned the building in which Mr. Specht's office was located. Tellier called the daughter of the owner, Dorinda Wheeler, and told her about the court order. She called her brother, Steve Valdeck. Ms. Wheeler and Mr. Valdeck went to the building that evening and met Corr, Long, and Jacobs, who were accompanied by defendant Martin, another Steamboat Springs police officer, at Tellier's instruction. Martin asked Valdeck if he had brought the key. Valdeck asked if he could see the search warrant and Jacobs handed him the order of possession. Valdeck unlocked the building, and they all entered it and went into the reception area that served both George Specht's office and the other building occupant. At least some of the group then went into Mr. Specht's office, the doors of which were closed but not locked, turned on the lights, and looked around. Jacobs used a flashlight to look into the corners. Finding nothing, the men returned to the reception area, looked into a storage closet used by both building occupants, and left.

7

Early the next morning, Long called the police station and requested a police car to accompany them to the Specht residence. Long, Corr, and Jacobs went to the home and were met there at approximately 7:45 a.m. by defendant Owens and an officer-in-training, Gomez. Before approaching the front door, Owens asked Jacobs what powers the writ provided. Jacobs told him that it gave the same powers as a search warrant.

Advertisement

8

Owens then knocked on the door and June Specht answered. Owens asked for Mr. Specht, who was out of town on business. Mrs. Specht told Owens that her husband was not home and asked if she could help him. She asked him in, and the other four men came in uninvited. Jacobs stated that he had a search warrant to seize a stolen computer. Owens and Jacobs both told Mrs. Specht that if she obstructed Jacobs or did not cooperate, Owens would arrest her and take her to jail. She and Jacobs entered into a heated exchange while the men began milling around the kitchen, and living and dining areas.

Jacobs and Owens told her several times to cooperate or she would go to jail. When Mrs. Specht stated that she wanted to call her lawyer, Owens told her she had no right to do so unless Jacobs said she could. Jacobs then told her she could not. She finally gave them her son's work phone number and the men left. They had been at the home approximately thirty to forty minutes.

## A. Unconstitutionality of the Searches

9

The Spechts sought damages under section 1983, asserting that defendants' conduct violated their Fourth Amendment right to be free from unreasonable searches. Section 1983 applies to persons who both deprive others of a right secured by the Constitution or laws of the United States, and act under color of state law. See Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1428 (10th Cir.1984). Owens and Martin contend that the Spechts failed to present sufficient evidence that a search of the office or the home had occurred. Alternatively, they contend that they did not violate the Specht's constitutional rights because they were at most negligent in relying on the repossession order to conduct the searches.

10

### 1. Existence of the Searches.

11

The court instructed the jury without objection that "a search is a visual observation which infringes upon a person's reasonable expectations of privacy." Rec., vol X, at 921. George Specht testified that he closed his office doors and drapes when he was not there, and that he kept confidential business information on his desk. Assuming as we must that such assertions are true, Mr. Specht indisputably had a reasonable expectation of privacy in his office against police intrusions. O'Connor v. Ortega, --- U.S. ----, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987); see Mancusi v. DeForte, 392 U.S. 364, 369, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968). The evidence of the warrantless entry into his office and the activity that occurred there was sufficient to send to the jury the issue of whether this entry and activity constituted a search. Likewise the activity that took place in the Specht home clearly raised a fact issue regarding a visual inspection of that which the Spechts could reasonably have expected to remain private and which they did not voluntarily expose to public view.5

12

### 2. Mental State of Officials.

13

While the instant appeal was pending, the United States Supreme Court held that an injury arising from a state agent's negligent actions does not deprive an individual of life, liberty, or property under the Fourteenth Amendment due process clause. Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) ("mere lack of due care by a state official [will not] 'deprive' an individual of life, liberty or property under the Fourteenth Amendment"); Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986) (same). In these cases, the Court adopted the position recognized by this circuit at least since Hewitt v. City of Truth or Consequences, 758 F.2d 1375, 1379-80 (10th Cir.1985), that a state official's negligence does not invariably rise to the level of an abuse of power necessary to give rise to a due process violation. Defendants argue here that their negligence in relying on the repossession order cannot violate the Spechts' constitutional rights.

14

Daniels and Davidson involved procedural due process.6 The plaintiffs contended that negligent torts by state officials constituted a denial of their liberty without due process of law. The Supreme Court disagreed, holding that the plaintiffs' injuries were not compensable under section 1983 because negligently leaving a pillow on the stairs of a prison, as the guard did in Daniels, or failing to respond quickly to a prisoner's written request, as the official did in Davidson, does not constitute the deprivation of a liberty interest protected by procedural due process.

15

This case involves a section 1983 claim arising out of a search of plaintiffs' home and office, not a procedural due process claim. In Daniels, the Court recognized that in any given section 1983 action, the court must determine the state of mind, if any, necessary to violate the constitutional provision at issue. See 106 S.Ct. at 664; McKay v. Hammock, 730 F.2d 1367, 1373 (10th Cir.1984) (en banc). We must therefore determine what mental state, if any, a state official must have in order to conduct an unconstitutional search.

16

The right to be free from unreasonable searches and seizures originates in the Fourth Amendment and is applied to the states through the Fourteenth Amendment due process clause. Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (Fourteenth Amendment incorporates Fourth Amendment rights); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (exclusionary rule applies to state violations of Fourth Amendment rights). Specifically enumerated constitutional rights found in the first eight amendments are applied to the states in exactly the same fashion that the right is guaranteed against federal intrusion. Benton v. Maryland, 395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969); see Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (although disagreeing over the existence of probable cause, eight of nine justices agreed that same Fourth Amendment inquiry applies to state and federal

action). "The Court thus has rejected the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights....' " Malloy v. Hogan, 378 U.S. 1, 10-11, 84 S.Ct. 1489, 1494-1495, 12 L.Ed.2d 653 (1964) (privilege against self-incrimination applies to states in same manner as to federal government).

17

The Supreme Court has justified this form of incorporation by recognizing that both state and federal criminal justice systems have developed from the same common-law heritage and are in virtually every relevant sense identical systems. Duncan v. Louisiana, 391 U.S. 145, 148-49 & n. 14, 88 S.Ct. 1444, 1446-47 & n. 14, 20 L.Ed.2d 491 (1968). Although the particular genesis of a guarantee of individual liberty does not necessarily dictate the only imaginable way to protect a particular right, the similarity in origin and current practice of the criminal justice systems throughout the country leads to the conclusion that what is fundamental to fairness in the federal system "is fundamental in the context of the criminal processes maintained by the American States." Id. at n. 14. In this case, therefore, we must determine what mental state is necessary to violate an individual's Fourth Amendment rights.

18

The contours of the search and seizure and warrant clauses are not nearly so vague as those encompassed by the due process clause. Cf. Hewitt, 758 F.2d at 1379. The Constitution explicitly prohibits all unreasonable searches and mandates that no warrants shall issue except upon probable cause.7 As these clauses have been interpreted, a police officer must obtain a search warrant before conducting a search unless an exception to the warrant requirement exists. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); see Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (describing warrant requirement as a "cardinal principle" of Fourth Amendment law); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (post-hoc showing that probable cause existed does not justify warrantless search).

19

The Supreme Court has on numerous occasions delineated the scope of individual Fourth Amendment rights by clarifying the probable cause standard, e.g., Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (refining standard for determining whether probable cause exists to issue a warrant based on informant's tip), and defining exceptions to the warrant requirement, e.g., United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (clarifying search incident to arrest exception to warrant requirement). In these cases, the Court has never implied that the existence of a constitutional violation hinges upon the official's mental state. Instead, the Court has balanced "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the

intrusion." United States v. Place, <u>462 U.S. 696</u>, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); see Tennessee v. Garner, <u>471 U.S. 1</u>, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (balancing of individual and state interests is key principle of Fourth Amendment jurisprudence); Michigan v. Summers, <u>452 U.S. 692</u>, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340 (1981) (same). In sum, a Fourth Amendment violation occurs when police engage in a warrantless search and no exception to the warrant requirement applies, or when police search pursuant to a warrant not based on probable cause. That the police officer acted in an objectively reasonable (i.e., non-negligent) manner is irrelevant to the existence of a constitutional violation. See, e.g., Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Malley v. Briggs, <u>475 U.S. 335</u>, 106 S.Ct. 1092, **89** L.Ed.2d 271 (1986); United States v. Leon, <u>468 U.S. 897</u>, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

20

The mental state of an officer who violates the Fourth Amendment becomes relevant only when determining whether a particular remedy will be available. For example, although the officers conducting the search in Leon violated the defendant's Fourth Amendment rights, 468 U.S. at 904-05, 104 S.Ct. at 3410-11, the exclusionary rule did not apply because the officers acted in an objectively reasonable fashion. Had the police acted unreasonably (i.e., negligently) in relying on the warrant, the exclusionary rule would have prevented the fruits of the search from being introduced into evidence in a criminal prosecution against the individual whose rights were violated. Id. at 921 n. 20, 923-24, 104 S.Ct. at 3419 n. 20, 3420-21. In a section 1983 action, the existence of qualified immunity for police officers who rely on a warrant is determined by an identical inquiry into the objective good faith of the officers. Malley, 106 S.Ct. at 1098; cf. Anderson, 107 S.Ct. at 3039-40 (same rule for warrantless search). In either case, the availability of a remedy (exclusion of evidence or civil damages) involves a totally separate inquiry from that necessary to determine whether a constitutional violation has occurred. See Leon, 468 U.S. at 906, 104 S.Ct. at 3411.<u>8</u>

21

Thus, although good faith may shield individual actors from liability in appropriate cases, see Part IC infra., no specific mental state is required to violate the Fourth Amendment. Defendants' argument that no constitutional violation occurred because the officers in this case were merely negligent in relying upon a repossession order to conduct the office and home searches is without merit.

B. Officers' Participation in Searches

22

Defendants Owen and Martin contend that the evidence of their participation in the searches undertaken by the three private parties is insufficient as a matter of law to impose liability on them under section 1983. We are not persuaded. When a government

official affirmatively facilitates or encourages an unreasonable search performed by a private person, a constitutional violation occurs. See, e.g., Booker v. City of Atlanta, 776 F.2d 272, 274 (11th Cir.1985) (police presence, even absent active participation, could provide an intimidating "cachet of legality" establishing a constitutional violation); Harris v. City of Roseburg, 664 F.2d 1121, 1127 (9th Cir.1981) (issue whether police officer did more than merely " 'stand by in case of trouble' " involves factual determination.)

23

The evidence with respect to both Owens and Martin is sufficient to create a fact issue on whether their conduct was such that the searches at issue occurred under color of state law. Martin drove a police car to the office building upon Tellier's instruction after Tellier had asked Dorinda Wheeler to unlock the building. Martin asked Steve Valdeck if he had brought the key. Valdeck testified that Martin's presence had a great effect on his decision to unlock the building because he felt it gave the men an official reason for being there. This evidence supports the reasonable inference that no search of the office would have occurred absent Martin's activity. The evidence of Martin's role in gaining access to the office by lending the authority of the police to the entry was sufficient to permit the jury to find that he was more than a mere peace-keeping bystander. See Booker, 776 F.2d at 274; Howerton v. Gabica, 708 F.2d 380, 382-84 (9th Cir.1983); Harris, 664 F.2d at 1127.

24

The evidence of Owens' activity at the Specht residence is likewise sufficient to allow the jury to find that he actively participated in the search. Owens' threats to take June Specht to jail if she obstructed Jacobs' search for the computer and Owens' statement that she could not call her lawyer without Jacobs' consent support a finding that Owens made an important affirmative contribution to the private conduct. See Booker, 776 F.2d at 274; Howerton, 708 F.2d at 382-84; Harris, 664 F.2d at 1127. Thus, the district court properly denied Owens' and Martin's motions for a j.n.o.v. with respect to their participation in the searches.

25

Jensen argues that he was entitled to a j.n.o.v. because there was insufficient evidence of the required connection between his conduct and the alleged constitutional violations. A supervisor is not liable under section 1983 unless an "affirmative link" exists between the deprivation and either the supervisor's "personal participation, his exercise of control or direction, or his failure to supervise." McKay, 730 F.2d at 1374. The court in this case instructed the jury without objection that

26

"[a] person subjects another to the deprivation of a constitutional right within the meaning of ... section 1983 if he does an affirmative act, participates in another's

affirmative acts, or omits to perform an act which he is legally required to do that causes a deprivation of which complaint is made. Personal participation is not necessary. Anyone who causes any citizen to be subjected to a constitutional deprivation is also liable. Requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the unconstitutional injury."

27

Rec., vol. X, at 920-21.

28

The record here is sufficient to support the jury finding on Jensen's liability under the applicable law. The Spechts presented evidence that when Long called Jensen before the trip to Steamboat Springs and told Jensen that Jacobs might need assistance in executing an order, Jensen said "[s]ure, come on over, or something to that effect." Rec., vol. IV, at 68. When Long, Jacobs, and Corr arrived at the police station, Jacobs showed Jensen the order and Jensen told Tellier to "take care of" them. Id. at 70. In response to Jensen's instruction, Tellier assigned police officers to accompany the men to the Specht office and home. This evidence is sufficient to raise a fact issue as to either Jensen's personal participation in, or control or direction of, the events culminating in the alleged injuries. Cf. Miller v. City of Mission, 705 F.2d 368, 375-76 (10th Cir.1983) (upholding imposition of liability on council members who participated in wrongful termination decision). Thus, the district court properly denied the motion by Jensen for a j.n.o.v. with respect to his role in providing police participation in the searches.

C. Qualified Immunity

29

Defendants contend that they were entitled to a j.n.o.v. on their claim for qualified immunity. Government officials performing discretionary functions are entitled to qualified immunity "shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson, 107 S.Ct. at 3038. This inquiry turns on "the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken...." Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819, 818, 102 S.Ct. 2727, 2739, 2738, 73 L.Ed.2d 396 (1982)). The Supreme Court has pointed out that whether a search was objectively legally reasonable "will often require examination of the information possessed by the searching officials." Id. 107 S.Ct. at 3040. Thus the relevant inquiry "is the objective (albeit fact-specific) question whether a reasonable officer could have believed [defendants'] warrantless search to be lawful, in light of clearly established law and the information in the searching officers possession." Id.

30

The availability of qualified immunity is ordinarily decided on a motion for summary judgment. However, defendants did not move for summary judgment on that ground. Instead, the jury was instructed that defendants were not liable to plaintiffs if the jury found that "(1) the defendant believed at the time of the incident that the action he took was lawful; (2) the defendant held such a belief in good faith, and (3) it was reasonable for the defendant to reach the conclusion he did." Rec., vol. X, at 924. This instruction incorporates the element of subjective good faith that the Supreme Court eliminated from the qualified immunity defense in Harlow v. Fitzgerald, 457 U.S. 800, 815-19, 102 S.Ct. 2727, 2736-38, 73 L.Ed.2d 396 (1982). Although plaintiffs raised the propriety of the content of the instruction with the district court, defendants stated that they had no objection to the instruction as given.

31

On appeal, defendants do not assert that the instruction constitutes plain error. Instead they argue that there was no evidence upon which the jury could have found a violation of clearly established rights of which a reasonable officer would have known. We disagree. Even though Jacobs told Owens that the writ of assistance was equivalent to a warrant, the writ on its face was not a search warrant. Moreover, it was directed to any sheriff rather than to a police officer. These undisputed facts undermine defendants' assertion that their conduct in the face of this information was objectively reasonable as a matter of law. The district court properly denied their motions for judgment notwithstanding the verdict.

D. Outrageous Conduct and Punitive Damages

32

Owens contends that the evidence is insufficient to support the jury verdict finding him liable on June Specht's claims for outrageous conduct under state law and for punitive damages. Colorado recognizes a cause of action for intentional infliction of emotional distress when the plaintiff shows that:

33

"(1) the conduct is extreme and outrageous; (2) the conduct is intentional or reckless; (3) the conduct causes emotional distress; and (4) the distress is severe. [Citation omitted]. For the conduct to be considered extreme and outrageous, it must 'go beyond all possible bounds of decency and ... be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him *to* exclaim "Outrageous!" ' "

34

Malandris v. Merrill Lynch, Pierce, Fenner & Smith, 703 F.2d 1152, 1158 (10th Cir.1981) (en banc) (plurality opinion) (quoting Rugg v. McCarty, 173 Colo. 170, 476 P.2d 753, 756 (1970) (citation omitted)), cert. denied, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). "Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." DeCicco v. Trinidad Area Health Ass'n, 40 Colo.App. 63, 573 P.2d 559, 562 (1977) (quoting Restatement (Second) of Torts Sec. 46 comment h (1965)).

35

As we have noted above, Owens actively participated in the improper search by five men of the Specht home at an early hour when he knew June Specht was alone in the house. He repeatedly threatened to arrest her and take her to jail, and supported Jacobs' refusal to allow her to call her lawyer. This evidence is sufficient to raise a fact issue on the outrageous nature of Owens' conduct. The evidence is equally sufficient to support the award of punitive damages against Owens for conduct in "wanton and reckless disregard of the rights and feelings of [June Specht]." Rec., vol X, at 932.II.

EVIDENTIARY RULINGS

36

Defendants argue that the trial court erred in permitting a lay witness and an expert to testify as to the legal definition of a search, thereby usurping the province of the court. Defendants also contend that allowing these witnesses to give their opinions on whether a search took place invaded the province of the jury. These are matters committed to the discretion of the trial court, Karns v. Emerson Electric Co., 817 F.2d 1452, 1459 (10th Cir.1987), and we are not persuaded that an abuse of discretion occurred.

37

A lay witness may give an opinion if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony on the determination of a fact in issue." Fed.R.Evid. 701. Moreover, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704.

38

Plaintiffs proposed to ask Long, who had prior experience as a law enforcement officer, whether in his opinion the office building incident constituted a search. Defendants objected on the ground that the question called for a legal conclusion. The court overruled the objection, stating that Long could answer "in his experience how this compared with a search...." Rec., vol. V, at 102. Long was then asked whether, in his opinion, going into the building was a search, and he responded "we entered the building,

we did not go in any areas that could not have contained the subject computer, and we didn't go through doors or rummage through the place or anything like that. But within the confines of the purest definition, simply walking with your eyes open is a search." Rec., vol. V, at 103-04 (emphasis added).

39

Although the italicized sentence, which defendants cite as grounds for reversal, was arguably objectionable as not responsive to the question, defendants did not object or move to strike on that ground. The sentence may also have been objectionable as contrary to the court's instruction that Long "answer according to his experience, not to the legal definition." Id. at 103. However, defendants did not object on that ground either. The court subsequently instructed the jurors that they were "to follow the law stated in the instructions of the Court and to apply the rules of law so given to the facts as you find them from the evidence in the case." Rec., vol. X, at 911. Under these circumstances the error, if any, was harmless.

40

Defendants also contend that the court erroneously permitted opinion testimony from plaintiffs' witness Daniel Sears, who was qualified as an expert on the constitutional law of search and seizure and on criminal procedure. Plaintiffs proposed to ask Sears whether, in his expert opinion, the home and the office were subjected to searches and if so whether the searches were illegal. Defendants again objected, contending that this was a legal issue and that Sears would therefore intrude upon the province of the court by giving his opinion. Although the court offered to instruct the jury on the legality of the searches as a matter of law, defendants did not accept the offer. The court then ruled that if the legality of the searches was a matter for the jury to decide, Sears could give his opinion on that issue within the perimeters of the court's instructions on the law. Sears then testified, in response to hypothetical questions adopting evidence most favorable to plaintiffs, that searches had occurred and that in his opinion the searches were illegal. On appeal, defendants contend that Sears' testimony usurped the province both of the district court and of the jury.

41

Experts may give opinions if their specialized knowledge will assist the fact finder to understand the evidence or to determine a fact. Fed.R.Evid. 702. Significantly, as set forth above, an opinion is admissible even though it goes to an ultimate issue to be decided by the fact finder. Thus, to the extent defendants contend that the court erred by allowing Sears to express an opinion on an issue defendants agreed was a jury question, their argument is without merit.

42

Defendants also assert that reversible error occurred because Sears improperly told the jury what law to apply. We disagree. Although it constitutes error to allow a witness to instruct the jury on the applicable law, see, e.g., United States v. Zipkin, 729 F.2d 384, 386-87 (6th Cir.1984); Marx & Co., Inc. v. The Diners' Club, Inc., 550 F.2d 505, 510 (2d Cir.1977), a review of the entire record demonstrates that no such improper instruction occurred here. Defendants pointed out on cross-examination that Sears' opinions were based on his own view of the law, and that Sears did not know what the court's instructions on the law would be. Although Sears agreed that his view of the law in the area of search and seizure could very well differ from that of the trial judge, his definition of an illegal search was essentially the same as the one the judge gave to the jury. Cf. Karns, 817 F.2d at 1459. Sears further stated that the trial court's "understanding of the law is controlling in this case." Rec., vol. III, at 133. In addition to instructing the jury that it must apply the law as stated in the court's instructions, the court also informed the jury that it could determine what weight, if any, should be given to the expert testimony. Under these circumstances, we are not prepared to say that the jury misunderstood its duty to follow the law given by the court or that it gave improper credence to any legal definitions embodied in Sears' testimony. See Karns, 817 F.2d at 1459 (upholding admission of expert testimony on legal issue where " 'jury was [not] prevailed upon to abdicate its function or responsibility for reaching an independent judgment on the ultimate issues....' ").

43

We are not persuaded by defendants' contention that the court committed reversible error by refusing to allow Sears to be cross-examined on his knowledge of specific judicial decisions. The court found that defendants' proposed questioning on particular *constitutional* cases was irrelevant because it would mean nothing to the jury. "[T]he scope and extent of cross-examination of expert witnesses rests in the sound discretion of the trial court and 'is not subject to exception unless wholly arbitrary, unreasonable and abusive, and the examination need not be extended to permit interrogation about collateral, immaterial or irrelevant matters.' " United States v. 10.48 Acres of Land, 621 F.2d 338, 340 (9th Cir.1980) (quoting United States v. 25.02 Acres of Land, 495 F.2d 1398, 1402 (10th Cir.1974)). Even assuming that such cross-examination was relevant to Sears' credibility as an expert, "it was still within the discretion of the trial court to exclude this evidence if its probative value was substantially outweighed by the risk that its admission would confuse the issues or mislead the jury." 10.48 Acres of Land, 621 F.2d at 340. We agree with the trial court's assessment here that the requested cross-examination would have had no value to the jury. Accordingly, we find no abuse of discretion.

44

Defendants also object to the court's decision allowing evidence of a statement Jensen made to a process server regarding service in this action. Plaintiffs asked Jensen if he had said "we screwed up and now we're in trouble." Rec., vol. VIII, at 704. Defendants objected that the statement was prejudicial, inflammatory, and not probative. The district

court ruled that the alleged statement was relevant as an admission against interest and also was probative on the issue of good faith. Rec. vol. VIII, at 693-95. A trial court has broad discretion in determining whether relevant evidence is admissible under Fed.R.Evid. 403. See Higgins v. Martin Marietta Corp., 752 F.2d 492, 497 (10th Cir.1985). We are not convinced the court abused its discretion.

45

When Jensen denied making the statement, plaintiffs called the process server to the stand on rebuttal and he testified that Jensen made the statement to him. Jensen asserts on appeal that this testimony was inadmissible under Fed.R.Evid. 608(b). No objection was made to the testimony at trial, and we will not consider this allegation here. See Fed.R.Evid. 103(a)(1); Fed.R.Civ.P. 61.III.

DAMAGES

46

Defendants contend that the amount of damages was excessive and that the district court therefore erred in denying their motion for a new trial or, in the alternative, for remittitur. A district court's refusal to grant a new trial motion asserting excessive damages is afforded "considerable deference on appeal." Karns, 817 F.2d at 1460; Blevins v. Cessna Aircraft Co., 728 F.2d 1576, 1579 (10th Cir.1984). Moreover, "absent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate." Malandris, 703 F.2d at 1168; see also Karns, 817 F.2d at 1460; Aspen Highlands Skiing v. Aspen Skiing Co., 738 F.2d 1509, 1526 (10th Cir.1984), aff'd, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); Blevins, 728 F.2d at 1579.

47

Plaintiffs presented evidence through lay and expert testimony of Mrs. Specht's psychological injury. The Spechts also testified to their change in lifestyle and the resulting loss of their enjoyment in life. Mr. Specht testified that prior to the incidents at issue, he had been president of a company and had traveled extensively because he had been completely responsible for the company's sales in the United States and Canada. After the incidents, his wife was afraid to be left alone, so he resigned as president and retained four small accounts as a sales agent for the company.

48

In view of this largely undisputed evidence of emotional injury and financial loss, we find no ground for disturbing the trial court's refusal to grant a new trial or remittitur. Upon thorough review, the record does not provide an irresistible inference that the verdict amount was the product of passion or prejudice.

49

AFFIRMED.

1

The Spechts originally included as defendants various other public officials and private parties. The disposition of the claims against these defendants is not at issue in this appeal

2

June Specht also asserted a state tort claim for false imprisonment against two defendants. The jury decided this claim against her

3

Although the Spechts brought a cross-appeal, they asserted at oral argument that they would withdraw it if the judgment were affirmed. In view of our disposition of this appeal, we deem the cross-appeal abandoned

4

Jacobs was a defendant at trial and was found liable to the Spechts for violations of 42 U.S.C. Sec. 1983 and state tort law. The jury awarded both Spechts actual damages against Jacobs and, in addition, awarded Mrs. Specht exemplary damages. Jacobs did not appeal

5

The jury rejected defendants' argument that Mrs. Specht had consented to the search, and defendants do not raise the issue of consent on appeal

6

The phrase "procedural due process" is a term of art used by the federal courts to distinguish among different sorts of individual rights and liberties that the Fourteenth Amendment due process clause guarantees against state action. See Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 677, 678, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring in judgment). A "procedural due process" violation refers to an instance where the state violates the Constitution not in the action that it takes, but in its failure to provide sufficient process to guarantee that the individual is treated fairly. See, e.g., Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (meaningful notice and hearing must preceed state seizure of property); In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (proof beyond a reasonable doubt required to find an individual guilty of a crime). Conversely, a "substantive due process" violation occurs where the state action itself is unconstitutional regardless of the process extended.

Youngberg v. Romeo, 457 U.S. 307, 315, 319, 102 S.Ct. 2452, 2457, 2459, 73 L.Ed.2d 28 (1982) (mental patient admitted under proper procedures retains substantive liberty interests in safety and freedom from bodily restraint protected by Fourteenth Amendment); Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) ("sanctity of the family" is a right protected by substantive due process component of the Fourteenth Amendment); see Daniels, 106 S.Ct. at 665. A third sort of constitutional violation involves those enumerated rights found in the first eight amendments that the Fourteenth Amendment due process clause applies to the states. See, e.g., Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943) (First Amendment rights); Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (Fourth Amendment rights); Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (Fifth Amendment compelled self-incrimination clause); Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (Fifth Amendment double jeopardy clause); Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (Sixth Amendment right to a jury trial); Robinson v. California 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (Eighth Amendment cruel and unusual punishment clause)

7

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

U.S. Const. amend. IV.

8

In Leon, the Court stressed that lower courts may address underlying Fourth Amendment issues before deciding whether the remedy sought is available. Id. at 924-25, 104 S.Ct. at 3421-22 (alleged Fourth Amendment violations "undoubtedly raise live controversies which Art. III empowers federal courts to adjudicate"). This approach is essential to the continued development and articulation of the liberty protected by the Fourth Amendment. See id. at 925, 104 S.Ct. at 3421 ("If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers and magistrates, nothing will prevent reviewing courts from deciding that question before" deciding whether a remedy exists.)

175 Ohio St. 73, 191 N.E.2d 826, reversed.

# U.S. Supreme Court

**Beck v. Ohio, 379 U.S. 89 (1964)**

**Beck v. Ohio**

**No. 18**

**Argued October 15, 1964**

**Decided November 23, 1964**

**379 U.S. 89**

*CERTIORARI TO THE SUPREME COURT OF OHIO*

*Syllabus*

Police officers, who had received unspecified "information" and "reports" about petitioner, who knew what he looked like, and that he had a gambling record, stopped petitioner, who was driving an automobile. Placing him under arrest, they searched his car, though they had no arrest or search warrant. They found nothing of interest. They took him to a police station, where they found some clearing house slips on his person, for the possession of which he was subsequently tried. His motion to suppress the slips as seized in violation of the Fourth and Fourteenth Amendments was overruled, the slips were admitted into evidence, and he was convicted, his conviction being ultimately sustained on appeal by the Supreme Court of Ohio, which found the search valid as incident to a lawful arrest.

*Held:* No probable cause for petitioner's arrest having been shown, the arrest, and therefore necessarily the search for and seizure of the slips incident thereto, were invalid under the Fourth and Fourteenth Amendments. Pp. 379 U. S. 91-97.

175 Ohio St. 73, 191 N.E.2d 826, reversed.

MR. JUSTICE STEWART delivered the opinion of the Court.

On the afternoon of November 10, 1961, the petitioner, William Beck, was driving his automobile in the vicinity

Page 379 U. S. 90

of East 115th Street and Beulah Avenue in Cleveland, Ohio. Cleveland police officers accosted him, identified themselves, and ordered him to pull over to the curb. The officers possessed neither an arrest warrant nor a search warrant. Placing him under arrest, they searched his car, but found nothing of interest. They then took him to a nearby police station, where they searched his person and found an envelope containing a number of clearing house slips "beneath the sock of his leg." The petitioner was subsequently charged in the Cleveland Municipal Court with possession of clearing house slips in violation of a state criminal statute. [Footnote 1] He filed a motion to suppress as evidence the clearing house slips in question upon the ground that the police had obtained them by means of an unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments. After a hearing, the motion was overruled, the clearing house slips were admitted in evidence, and the petitioner was convicted. His conviction was affirmed by an Ohio Court of Appeals, and ultimately by the Supreme Court of Ohio, with two judges dissenting. 175 Ohio St. 73, 191 N.E.2d 825. We granted certiorari to consider the petitioner's claim that, under the rule of *Mapp v. Ohio,* 367 U. S. 643, the clearing house slips were wrongly admitted

Page 379 U. S. 91

in evidence against him because they had been seized by the Cleveland police in violation of the Fourth and Fourteenth Amendments. 376 U. S. 905.

Although the police officers did not obtain a warrant before arresting the petitioner and searching his automobile and his person, the Supreme Court of Ohio found the search nonetheless constitutionally valid as a search incident to a lawful arrest. And it is upon that basis that the Ohio decision has been supported by the respondent here. *See Draper v. United States,* 358 U. S. 307; *Ker v. California,* 374 U. S. 23.

There are limits to the permissible scope of a warrantless search incident to a lawful arrest, but we proceed on the premise that, if the arrest itself was lawful, those limits were not exceeded here. *See Harris v. United States,* 331 U. S. 145; *United States v. Rabinowitz,* 339 U. S. 56; *cf. Preston v. United States,* 376 U. S. 364. The constitutional validity of the search in this case, then, must depend upon the constitutional validity of the petitioner's arrest. Whether that arrest was constitutionally valid depends, in turn, upon whether, at the moment the arrest was made, the officers had probable cause to make it -- whether, at that moment, the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense. *Brinegar v. United States,* 338 U. S. 160, 338 U. S. 175-176; *Henry v. United States,* 361 U. S. 98, 361 U. S. 102.

"The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating . . . often opposing

interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

*Brinegar v. United States, supra,* at 338 U. S. 176.

Page 379 U. S. 92

In turning to the question of whether or not the record in the case before us can support a finding of probable cause for the petitioner's arrest, it may be well to repeat what was said by Mr. Justice Clark, speaking for eight members of the Court, in *Ker v. California:*

"While this Court does not sit as in *nisi prius* to appraise contradictory factual questions, it will, where necessary to the determination of constitutional rights, make an independent examination of the facts, the findings, and the record so that it can determine for itself whether in the decision as to reasonableness the fundamental -- *i.e.,* constitutional -- criteria established by this Court have been respected. The States are not thereby precluded from developing workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain. *See Jones v. United States,* 362 U. S. 257 (1960). Such a standard implies no derogation of uniformity in applying federal constitutional guarantees, but is only a recognition that conditions and circumstances vary, just as do investigative and enforcement techniques."

374 U. S. 374 **U.S. 23,** at 374 U. S. 34.

The trial court made no findings of fact in this case. The trial judge simply made a conclusory statement: "A lawful arrest has been made, and this was a search incidental to that lawful arrest." The Court of Appeals merely found "no error prejudicial to the appellant." In the Supreme Court of Ohio, Judge Zimmerman's opinion contained a narrative recital which is accurately

Page 379 U. S. 93

excerpted in the dissenting opinions filed today. But, putting aside the question of whether this opinion can fairly be called the opinion of the court, [Footnote 2] such a recital in an appellate opinion is hardly the equivalent of findings made by the trier of the facts. In any event, after giving full scope to the flexibility demanded by "a recognition that conditions and circumstances vary just as do investigative and enforcement techniques," we hold that the arrest of the

petitioner cannot on the record before us be squared with the demands of the Fourth and Fourteenth Amendments.

The record is meager, consisting only of the testimony of one of the arresting officers, given at the hearing on the motion to suppress. As to the officer's own knowledge of the petitioner before the arrest, the record shows no more than that the officer "had a police picture of him and knew what he looked like," and that the officer knew that the petitioner had "a record in connection with clearing house and scheme of chance." [Footnote 3] Beyond that, the officer

Page 379 U. S. 94

testified only that he had "information," that he had "heard reports," that "someone specifically did relate that information," and that he "knew who that person was." There is nowhere in the record any indication of what "information" or "reports" the officer had received, or, beyond what has been set out above, from what source the "information" and "reports" had come. The officer testified that, when he left the station house, "I had in mind looking for [the petitioner] in the area of East 115th Street and Beulah, stopping him if I did see him make a stop in that area." But the officer testified to nothing that would indicate that any informer had said that the petitioner could be found at that time and place. *Cf. Draper v. United States,* 358 U. S. 307. And the record does not show that the officers saw the petitioner "stop" before they arrested him, or that they saw, heard, smelled, or otherwise perceived anything else to give them ground for belief that the petitioner had acted or was then acting unlawfully. [Footnote 4]

Page 379 U. S. 95

No decision of this Court has upheld the constitutional validity of a warrantless arrest with support so scant as this record presents. The respondent relies upon *Draper v. United States,* 358 U. S. 307. But, in that case, the record showed that a named special employee of narcotics agents who had on numerous occasions given reliable information had told the arresting officer that the defendant, whom he described minutely, had taken up residence at a stated address and was selling narcotics to addicts in Denver. The informer further had told the officer that the defendant was going to Chicago to obtain narcotics, and would be returning to Denver on one of two trains from Chicago, which event in fact took place. In complete contrast, the record in this case does not contain a single objective fact to support a belief by the officers that the petitioner was engaged in criminal activity at the time they arrested him.

Page 379 U. S. 96

An arrest without a warrant bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable

procedure on an after-the-event justification for the arrest or search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment.

"Whether or not the requirements of reliability and particularity of the information on which an officer may act are more stringent where an arrest warrant is absent, they surely cannot be less stringent than where an arrest warrant is obtained. Otherwise, a principal incentive now existing for the procurement of arrest warrants would be destroyed."

*Wong Sun v. United States,* 371 U. S. 471, 371 U. S. 479-480. Yet even in cases where warrants were obtained, the Court has held that the Constitution demands a greater showing of probable cause than can be found in the present record. *Aguilar v. Texas,* 378 U. S. 108; *Giordenello v. United States,* 357 U. S. 480; [Footnote 5] *Nathanson v. United States,* 290 U. S. 41. [Footnote 6]

When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would "warrant a man of reasonable caution in the belief" that an offense has been committed. *Carroll v. United States,* 267 U. S. 132, 267 U. S. 162. If the court is not informed of the facts upon which the arresting officers acted, it cannot properly discharge that function. All that the trial court was told in this case was that the officers knew what the petitioner looked like and knew

Page 379 U. S. 97

that he had a previous record of arrests or convictions for violations of the clearing house law. Beyond that, the arresting officer who testified said no more than that someone (he did not say who) had told him something (he did not say what) about the petitioner. We do not hold that the officer's knowledge of the petitioner's physical appearance and previous record was either inadmissible or entirely irrelevant upon the issue of probable cause. *See Brinegar v. United States,* 338 U. S. 160, 338 U. S. 172-174. But to hold knowledge of either or both of these facts constituted probable cause would be to hold that anyone with a previous criminal record could be arrested at will.

It is possible that an informer did, in fact, relate information to the police officer in this case which constituted probable cause for the petitioner's arrest. But when the constitutional validity of that arrest was challenged, it was incumbent upon the prosecution to show with considerably more specificity than was shown in this case what the informer actually said, and why the officer thought the information was credible. We may assume that the officers acted in good faith *in* arresting the petitioner. But "good faith on the part of the arresting officers is not enough." *Henry v. United States,* 361 U. S. 98, 361 U. S. 102. If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.

*Reversed.*

[Footnote 1]

Ohio Revised Code, § 2915.111. Possession of "numbers game" ticket.

"No person shall own, possess, have on or about his person, have in his custody, or have under his control a ticket, order, or device for or representing a number of shares or an interest in a scheme of chance known as 'policy,' 'numbers game,' 'clearing house,' or by words or terms of similar import, located in or to be drawn, paid, or carried on within or without this state."

"Whoever violates this section shall be fined not more than five hundred dollars and imprisoned not more than six months for a first offense; for each subsequent offense, such person shall be fined not less than five hundred nor more than one thousand dollars and imprisoned not less than one nor more than three years."

[Footnote 2]

For more than 100 years, the rule in Ohio has been that its Supreme Court, except for per curiam opinions, speaks as a court only through the syllabi of its cases. *See* Rule VI, 94 Ohio St. ix; 6 Ohio St. viii; 5 Ohio St. vii. "Individual opinions speak the conclusions of their writer. What useful purpose they serve is an open question." *Thackery v. Helfrich,* 123 Ohio St. 334, 336, 175 N.E. 449, 450.

[Footnote 3]

It is not entirely clear whether the petitioner had been previously convicted, or only arrested. At one point, the officer testified as follows: "I heard reports and found that he has a record in connection with clearing house and scheme of chance. Q. Previous convictions? A. Yes."

Later he testified as follows:

"Q. You indicated that you knew of Mr. Beck's previous record?"

"A. Yes, I did."

"Q. What was that, sir?"

"A. Three arrests for clearing house violations."

"Q. When was this?"

"A. They were all during the year 1959, I believe."

"Q. All during the year 1959?"

"A. Yes."

"Q. Then you didn't have any arrests that you knew of as far as 1960 was concerned?"

"A. Not to my knowledge."

[Footnote 4]

"Q. About what time was it that you first saw Mr. Beck?"

"A. A few minutes before 1:00 p.m. that afternoon."

"Q. And he was in his automobile?"

"A. He was driving his automobile."

"Q. He was proceeding then lawfully down the street?"

"A. He was operating north on 115th Street."

"Q. And you stopped him?"

"A. We stopped him going east on Beulah."

"Q. You did not stop him for any traffic offense?"

"A. No; I did not stop him for that reason."

"Q. You caused him to pull over to the curb?"

"A. I identified myself and requested him to pull over to the curb."

"Q. Then you searched his automobile?"

"A. Yes, I did."

"Q. Prior to that, did you indicate to him that he was under arrest?"

"A. Not while searching the automobile."

"Q. In other words, you searched the automobile before you placed him under arrest?"

"A. I placed him under arrest just as we were searching the automobile."

"Q. Prior to that time, you had not discovered anything that was illegal?"

"A. Other than a hunting knife in the automobile, that was it."

"Q. Why then did you place him under arrest?"

"A. I placed him under arrest for a clearing house operation, scheme of chance."

"Q. At that time, you had discovered some evidence of a scheme of chance?"

"A. I did not."

"Q. At the time you placed him under arrest, you did not have any evidence?"

"A. Other than information."

[Footnote 5]

The Court has made clear that the *Giordenello* decision rested upon the Fourth Amendment, rather than upon Rule 4 of the Federal Rules of Criminal Procedure. *See Aguilar v. Texas,* 378 U. S. 108, at 378 U. S. 112, n. 3.

[Footnote 6]

The *Aguilar* and *Nathanson* cases involved search warrants rather than arrest warrants, but as the Court has said,

"The language of the Fourth Amendment, that '. . . no Warrants shall issue, but upon probable cause . . . ' of course applies to arrest, as well as search, warrants."

*Giordenello v. United States,* 357 U. S. 480, at 357 U. S. 485-486.

MR. JUSTICE CLARK, with whom MR. JUSTICE BLACK joins, dissenting.

The Supreme Court of Ohio, 175 Ohio St. 73, 74, 191 N.E.2d 825, 827, "determined" the following facts in this case:

"The Cleveland police had good reason to believe that defendant was regularly engaged in carrying on

Page 379 U. S. 98

a scheme of chance involving clearing house slips. There was testimony that he had previously been convicted on that score. Information was given to the police by an informer that defendant would be in a certain locality at a certain time pursuing his unlawful activities. He was found in that locality, as predicted, driving an automobile. Police officers stopped the car and searched it, without result. Defendant was then arrested and taken to a police station, and his clothing was examined, resulting in the discovery and seizure of the illegal clearing house slips, which formed the basis of the charge against him and his subsequent conviction."

These are the facts upon which Ohio's highest court based its opinion, and they have support in the record.

The syllabus rule, Rule VI, peculiar to that State and of which the majority speaks, was promulgated in 1858, 5 Ohio St. vii, and provides:

"A syllabus of the points decided by the Court in each case, shall be stated, in writing, by the Judge assigned to deliver the opinion of the Court, *which shall be confined to the points of law,* arising from the facts of the case, *that have been determined by the Court. . . .*"

(Emphasis supplied.) As my late Brother of revered memory, Mr. Justice Burton of Ohio, said in the Ohio case of *Perkins v. Benguet Consol. Mining Co.,* 342 U. S. 437, 342 U. S. 442, n. 3 (1952),

"[a] syllabus must be read in the light of the facts in the case, even where brought out in the accompanying opinion, rather than in the syllabus itself."

The good Justice was only following Ohio's own cases. *See Williamson Heater Co. v. Radich,* 128 Ohio St. 124, 190 N.E. 403 (1934); *Perkins v. Bright,* 109 Ohio St. 14, 19-20, 141 N.E. 689, 690 (1923); *In re Poage,* 87 Ohio St. 72, 82-83, 100 N.E. 125, 127-128 (1912).

Page 379 U. S. 99

The Court ignores these findings entirely. Where the highest court of a State, after detailed and earnest consideration, determines the facts, and they are reasonably supportable, I would let them stand. And I would, of course, give the same respect to findings of probable cause by United States district courts when approved by United States Courts of Appeals. Otherwise, this Court will be continually disputing with state and federal courts over the minutiae of facts in every search and seizure case. Especially is this true if the Court disputes the findings *sua sponte* where, as here, no attack is leveled at them.

Believing that the Ohio Supreme Court's findings, set out above, fully support its conclusion that probable cause existed in this case in support of the arrest and the search incident thereto, I would affirm.

MR. JUSTICE HARLAN, dissenting.

Judge Zimmerman of the Supreme Court of Ohio stated as a fact, [Footnote 2/1]

"Information was given to the police by an informer that defendant would be in a certain locality at a certain time pursuing his unlawful activities. He was found in that locality, as predicted, driving an automobile."

175 Ohio St. 73, 74, 191 N.E.2d 825, 827. I regard this as the crucial point in the case, for if the informant did give the police that information, the fact of its occurrence would sufficiently indicate the informant's reliability to provide a basis for petitioner's arrest,

Page 379 U. S. 100

*Draper v. United States,* 358 U. S. 307. It is this Court's function, therefore, to determine whether the State's finding is adequately supportable. In doing so it is essential to consider what are the appropriate standards of appellate review.

Generally "our inquiry clearly is limited to a study of the undisputed portions of the record." *Thomas v. Arizona,* 356 U. S. 390, 356 U. S. 402.

"[T]here has been complete agreement that any conflict in testimony as to what actually led to a contested confession [or to a contested arrest] is not this Court's concern. Such conflict comes here authoritatively resolved by the State's adjudication."

*Watts v. Indiana,* 338 U. S. 49, 338 U. S. 51-52. *See also, Gallegos v. Nebraska,* 342 U. S. 55, 342 U. S. 60-61; *Haley v. Ohio,* 332 U. S. 596, 332 U. S. 597-598. It is equally clear that, in cases involving asserted violations of constitutional rights, the Court is free to draw its own inferences from established facts, giving due weight to the conclusions of the state court, but not being conclusively bound by them, *Ker v. California,* 374 U. S. 23; *Spano v. New York,* 360 U. S. 315.

A distinction between facts and inferences may often be difficult to draw, but the guiding principle for this Court should be that, when a question is in doubt and demeanor and credibility of witnesses, or contemporaneous understandings of the parties, have a part to play in its resolution, this Court should be extremely slow to upset a state court's inferential findings. The impetus for our exercising *de novo* review of the facts comes from the attitude that, unless this Court can fully redetermine the facts of each case for itself, it will be unable to afford complete protection for constitutional rights. But when the "feel" of the trial may

have been a proper element in resolving an issue which is unclear on the record, our independent judgment should give way to the greater

Page 379 U. S. 101

capability of the state trial court [Footnote 2/2] in determining whether a constitutional right has been infringed. [Footnote 2/3] Proper regard for the duality of the American judicial system demands no less.

Federal habeas corpus, which allows a federal court in appropriate circumstances to develop a fresh record, *Townsend v. Sain,* 372 U. S. 293, provides a far more satisfactory vehicle for resolving such unclear issues, for the judge can evaluate for himself the on-the-spot considerations which no appellate court can estimate with assurance on a cold record. Those considerations are important to the case at bar.

While I agree that the record is not free from all doubt, I believe that the following selected portions of the testimony of one of the arresting officers are sufficient to carry the day for the State's judgment:

"Q. Did you have reasonable and probable cause to stop this man?"

"A. Yes, I did."

"* * * *"

"Q. Based on his previous record?"

"A. Information *and* previous record *and* observation. [Emphasis added.]"

"* * * *"

"Q. When you left the Station, did you have in mind stopping Mr. Beck?"

"A. I had in mind looking for him in the area of

Page 379 U. S. 102

East 115th Street and Beulah, stopping him if I did see him make a stop in that area."

"Q. You indicated that you were operating on information?"

"A. Yes."

"Q. From whom did you get this information?"

"A. I couldn't divulge that information."

"Q. But someone specifically did relate that information to you?"

"A. Yes."

"Q. And you knew who that person was?"

"A. Yes."

It is true that the officer never specifically said "The informant told me that Beck was operating in the area of East 115th Street and Beulah," but he did testify that he went looking for Beck in that specific area, that he was acting in part on information, and that his information had been related to him by some specific person whose name he felt privileged not to divulge. I find the state court inference reasonable, even on the basis of the admittedly sparse record before us, that the informant told the officer that Beck was operating in the mentioned area.

Furthermore, in reaching this inference, "on the spot" considerations might well have come into play. There appears to have been no lack of common understanding at trial that the informant had given the officer the crucial information. Petitioner argued in the Ohio Supreme Court, "the pattern is obvious, an officer testifies he had information from a confidential source that a particular person is "picking up" numbers in a given area and based on that information they arrest such person "on sight" without a warrant." [Footnote 2/4] Judge Zimmerman of the

Page 379 U. S. 103

Supreme Court of Ohio found it to be the fact without seeing any need for elaboration. Respondent, in its brief in this Court, assumed it to be the fact. [Footnote 2/5] And petitioner raised no question as to this inference in either his petition or brief. Indeed, the question is raised for the first time, *sua sponte,* by the Court's opinion.

On this basis, I vote to affirm.

[Footnote 2/1]

Although it was Judge Zimmerman's opinion for the Supreme Court of Ohio which articulated the specific finding in question here, that finding must be attributed to the trial court, for we must presume that its conclusion that the arrest was constitutionally permissible was based on the factual findings necessary to support it. If the Court is unwilling to accept this presumption, it should, at least,

remand the case to the Ohio courts in order that any question on this score may be set at rest.

[Footnote 2/2]

*See* note 1, *supra*.

[Footnote 2/3]

*Norris v. Alabama,* 294 U. S. 587, in which the Court concluded, contrary to a state court finding, that Negroes' names had been unlawfully added to a jury book, would at first glance appear to be an exception, but in fact it proves the rule. The evidence on which the conclusion was based was documentary, and no "on the spot" considerations were involved.

[Footnote 2/4]

Reply brief for appellant in the Supreme Court of Ohio, p. 5.

[Footnote 2/5]

Brief for respondent, p. 8.

This package is made property by any postal service. It is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® items. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rights reserved.

# PRIORITY® ★ MAIL ★

PRESS FIRMLY TO SEAL

**★ DATE OF DELIVERY SPECIFIED***

**★ USPS TRACKING™ INCLUDED***

**★ INSURANCE INCLUDED***

**★ PICKUP AVAILABLE**

* Domestic only

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

This envelope is made from post-consumer waste. Please recycle – again.

EP14F July 2013
OD: 12.5 x 9.5

P S00001000014

## VISIT US AT USPS.COM®
### ORDER FREE SUPPLIES ONLINE

UNITED STATES
POSTAL SERVICE®

**PRIORITY MAIL 2–DAY**

C001   0006 9000

FROM:
TAMI MAE BRONNENBERG, PRO-SE
P.O. BOX 802
CODY WY 82414–3840

SHIP TO:
CLERK U.S. DISTRICT COURT
111 S. WOLCOTT
ROOM 121
Casper WY 82601

USPS TRACKING #

9405 5102 0088 1053 2687 31



Commercial flatPrice
0715086545T2

US POSTAGE AND FEES PAID
PRIORITY MAIL
JUN 03 2019
Mailed from ZIP 82414
PM Legal Flat Env

Daniel E. White [Wyo. State Bar No. 5-1545]
Senior Assistant Attorney General
Adrian Kowalski[Wyo. State Bar No. 7-6125]
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, Wyoming 82002
(307) 777-7862
(307) 777-8920 Facsimile
dan.white@wyo.gov
adrian.kowalski@wyo.gov

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 19-CV-21-S |
| | ) | |
| BEAU J. EGGER, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT OFFICER EGGER'S RESPONSE
## TO MOTION FOR DECLARATORY JUDGMENT

Defendant Officer Egger files this response brief in opposition to Bronnenberg's motion for declaratory judgment. Bronnenberg moves for declaratory judgment. *See* (Doc. 36 at 1); *see also* 28 U.S.C § 2201 (creating remedy of declaratory judgment); *and* § 2202 (recognizing authority of courts to grant "[f]urther necessary or proper relief based on a declaratory judgment or decree"). The Court should dismiss her motion for the reasons below.

## <u>Argument</u>

Bronnenberg seeks a declaration that "defendant's acts, policies, and practices

herein described and complained of violated plaintiff's rights under the Fourth Amendment and Fourteenth Amendment." (Doc. 36 at 1). Her motion, however, does not identify which acts, policies, and practices she is seeking a ruling upon.  She does cite to other pleadings, like her Complaint and response to Officer Egger's motion for summary judgment. (*Id*.). But the cited portions of these pleadings do not provide much, if any, guidance. They essentially just repeat her request for declaratory relief or assert arguments against other defendants. *See* Doc. 9 at 9 (seeking a "declaratory judgment pursuant to 28 USCS §§ 2201 and 2202, (Wyoming Statutes 1977, §§ 1-37-101 to 1-37-115), declaring that defendant's acts, policies and practices herein described and complained of violated plaintiff's rights under the United States Constitution and the Wyoming Constitution."); *and* (Doc. 33 at 9) (generally making arguments against the Park County Detention Center and Board of Commissioners of the County of Park and City of Cody).

Officer Egger is not mentioned at all in either the motion for declaratory judgment or the cited materials within. The only mention of him is in the attendant proposed order for her motion. (Doc. 36-1 at 1). The Court should dismiss the motion on this basis alone. *See e.g. United States v. Ibarra-Diaz*, 805 F.3d 908, 918 n.5 (10th Cir. 2015) (declining to address argument mentioned in opening brief because plaintiff mentioned it "in a cursory fashion," "never develop[ed] this line of argument or applie[d] it to any specific statements."); *United States v. Yelloweagle*, 643 F.3d 1275, 1284 (10th Cir. 2011) (acknowledging that courts "cannot make arguments").

Officer Egger, however, responds to the extent Bronnenberg seeks a declaratory judgment against him. The Court should dismiss the motion for declaratory judgment

because no "actual controversy" exists. And that is required under Section 2201 of Title 28

of the United States Code (the Declaratory Judgment Act). *See* 28 U.SC. § 2201. The

Declaratory Judgment Act states:

> In a case of **actual controversy** within its jurisdiction, . . . any
> court of the United States, upon the filing of an appropriate
> pleading, may declare the rights and other legal relations of any
> interested party seeking such declaration, whether or not
> further relief is or could be sought.

*Id*. (emphasis added). The Supreme Court recognized "an actual controversy exists . . .

[when] 'there is a substantial controversy, between parties having adverse legal interests,

of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"

*Jarita Mesa Livestock Grazing Ass'n v. United States Forest Serv.*, 921 F. Supp. 2d 1137,

1187 (D.N.M. 2013) (*quoting Maryland Cas. Co. v. Pac. Coal & Oil Co*., 312 U.S. 270

(1941)). Crucially, "[a] declaratory judgment is meant to define the legal rights and

obligations of the parties in anticipation of some future conduct, not simply to proclaim

liability for a past act." *Lawrence v. Kuenhold*, 271 F. App'x 763, 766 (10th Cir. 2008).

The Tenth Circuit has accordingly recognized that a declaratory judgment aimed as past

conduct would "would serve no purpose [] and thus, is not available." *Id*.

Here, it appears that Bronnenberg seeks declaratory relief aimed at past conduct.

She cites her response to Officer Egger's motion for summary judgment in support of her

motion for declaratory judgment and is thus presumably seeking declaratory relief on the

same past conduct at issue there—whether he violated her constitutional rights by

enforcing a facially valid, albeit vacated, arrest warrant against her. *See* (Doc. 36 at 1). This

is solely past conduct. There is no suggestion in any of her filings that any similar future

conduct is anticipated. She does not allege the existence of any outstanding warrants, the imminent issuance of an arrest warrant, nor any fact to suggest that she will be arrested again pursuant to an outdated arrest warrant. The closest she gets to alleging future conduct is the bare allegation in her complaint that an unrelated defendant threatened to have her arrested again at some point in the future. (Doc. 9 at 6). This, however, is not enough as the possibility of an arrest happening again someday is simply "too remote and speculative to support the exercise of declaratory judgment jurisdiction." *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1329 (Fed. Cir. 2012); *see also Robinson v. Blank*, 2013 U.S. Dist. LEXIS 71471, at *15 (S.D.N.Y. May 20, 2013) (unpublished) ("'allegations of possible future injury' relating to either a hypothetical future arrest . . . 'are not sufficient' because they are 'too speculative for Article III purposes.'"); *and Potomac Ins. Co. v. Pella Corp.*, 2001 U.S. Dist. LEXIS 5909, at *6 (D. Kan. Apr. 20, 2001) (unpublished) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."). Thus, without declaratory relief aimed at future conduct, the Court should dismiss the motion.

Finally, even if the Court reaches the merits of the motion, it should still deny it. To reiterate, Bronnenberg seeks a declaration that "defendant's acts, policies, and practices herein described and complained of violated plaintiff's rights under the Fourth Amendment and Fourteenth Amendment." (Doc. 36 at 1). The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. But here there was no

unreasonable seizure because Officer Egger enforced a facially valid arrest warrant, as already discussed in his motion for summary judgment. (Doc. 29 at 7-10). The Fourteenth Amendment protects against violations of due process. U.S. Const. amend. XIV., § 1. But the Court already dismissed any Fourteenth Amendment claim in the Court's screening order. (Doc. 10 at 4, 12).

### Conclusion

For the reasons above, and those already discussed in his motion for summary judgment, Defendant Officer Egger respectfully requests the Court deny Bronnenberg's motion for declaratory judgment.

**DATED** this 11th day of June, 2019.

*/s/ Adrian K. Kowalski*
Adrian K. Kowalski [Wyo. Bar No. 7-6125]
Assistant Attorney General

### CERTIFICATE OF SERVICE

I do hereby certify that I have sent a copy of the foregoing on this 11th day of June 2019, to the following individuals:

Tami M. Bronnenberg                    [✔] U.S. MAIL
P.O. Box 802
Cody, WY 82414

*Jessica Curless*
Jessica Curless, Paralegal
Office of the Wyoming Attorney General

✚ Positive
As of: June 11, 2019 3:57 PM Z

## *Lawrence v. Kuenhold*

United States Court of Appeals for the Tenth Circuit

March 27, 2008, Filed

No. 06-1397

**Reporter**
271 Fed. Appx. 763 *; 2008 U.S. App. LEXIS 6614 **

JUDY LAWRENCE and GALE GREENSTREET, as Co-Trustees of the Red River Trust, Plaintiffs-Appellants, v. O. JOHN KUENHOLD, District Court Judge acting without jurisdiction of the proper parties, Defendant-Appellee.

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** D. Colo. (D.C. No. 06-CV-00711-REB-MEH).

*Lawrence v. Kuenhold, 2006 U.S. Dist. LEXIS 58522 (D. Colo., Aug. 9, 2006)*

## Core Terms

declaratory relief, judicial immunity, doctrine doctrine doctrine, declaratory, parties, district court, immune, rights, law law law, recommended, injunctive, Vacation, courts, Void, state-court, judgments, pleadings, quotation, default, cases, quiet, suits, act act act, declaration, unavailable, unspecified, equitable, concedes, monetary, Appeals

## Case Summary

### Procedural Posture

Appellants, co-trustees, filed a complaint in federal district court against appellee judge and alleged that he violated their due process rights by entering default judgment in a quiet title action to which the co-trustees were not parties. The United States District Court for the District of Colorado dismissed the complaint with prejudice and concluded that it was barred by the Rooker-Feldman doctrine and judicial immunity.

### Overview

On appeal, the co-trustees represented that the court erred by dismissing their complaint under Rooker-Feldman because they were not parties to the state court action. The judge conceded that the co-trustees were not parties to the state court action and thus, their complaint should not have been dismissed under Rooker-Feldman. The judge argued, however, the dismissal should have been affirmed on the alternate basis of judicial immunity or on the basis that a party was not entitled to equitable relief when there was an adequate remedy at law. The appellate court affirmed dismissal of the co-trustees' claim for declaratory relief against the judge because the co-trustees did not specify what form declaratory relief would take and their complaint could not have been read to request declaratory relief in the true legal sense since a declaratory judgment was meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act. Moreover, the co-trustees were not eligible for declaratory relief because there was a more suitable remedy, a motion for relief from judgment under Colo. R. Civ. P. 60(b).

### Outcome

The judgment of the district court was affirmed.

## LexisNexis® Headnotes

Real Property Law > General Overview

**HN1**[⤓] Colo. R. Civ. P. 105(b) provides that no person claiming any interest under or through a person named as a defendant need be made a party unless his interest is shown of record in the office of the recorder of the county where the real property is situated, and the decree shall be as conclusive against him as if he had

been made a party.

Civil Procedure > Parties > Pro Se
Litigants > Pleading Standards

*HN2*[⬇] **Pleading Standards**

Where plaintiffs have filed their complaint while proceeding pro se, the courts reviews their pleadings liberally.

Civil Procedure > ... > Preclusion of Judgments > Full Faith & Credit > Rooker-Feldman Doctrine

*HN3*[⬇] **Rooker-Feldman Doctrine**

The Rooker-Feldman doctrine prohibits federal suits that amount to appeals of state-court judgments.

Civil Procedure > ... > Preclusion of Judgments > Full Faith & Credit > Rooker-Feldman Doctrine

*HN4*[⬇] **Rooker-Feldman Doctrine**

The United States Supreme Court has reiterated that Rooker-Feldman is a narrow doctrine that has been applied by the lower courts far beyond the contours of the Rooker and Feldman cases. The Court has previously held Rooker-Feldman inapplicable where the party against whom the doctrine is invoked was not a party to the underlying state-court proceeding. The Rooker-Feldman doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Governments > Courts > Judges > Judicial Immunity

*HN5*[⬇] **Failure to State Claim**

An appellate court reviews a dismissal under *Fed. R. Civ. P. 12(b)(6)* de novo. The appellate court considers whether the complaint contains enough facts to state a claim to relief that is plausible on its face. The mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that the plaintiff has a reasonable likelihood of mustering factual support for the claims. In conducting that inquiry, the appellate court accepts as true all well-pleaded facts and views those facts in the light most favorable to the nonmoving party. In an action for monetary damages, judicial immunity is overcome in only two circumstances. First, a judge is not immune from liability for nonjudicial actions, actions not taken in the judge's judicial capacity. Second, a judge is not immune from actions, though judicial in nature, taken in the complete absence of jurisdiction. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction.

Governments > Courts > Judges > Judicial Immunity

*HN6*[⬇] **Judicial Immunity**

In an action for monetary damages, judicial immunity is overcome in only two circumstances. First, a judge is not immune from liability for nonjudicial actions, actions not taken in the judge's judicial capacity. Second, a judge is not immune from actions, though judicial in nature, taken in the complete absence of jurisdiction. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction.

Civil Procedure > ... > Declaratory Judgments > Federal Declaratory Judgments > General Overview

*HN7*[⬇] The only type of relief available to a plaintiff who sues a judge is declaratory relief, but not every plaintiff is entitled to this remedy. A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act. A

declaratory judgment action involving past conduct that will not recur is not justiciable.

Civil Procedure > ... > Federal Declaratory Judgments > Discretionary Jurisdiction > Factors

**HN8**[⤓] **Factors**

One of the factors for a court to consider in deciding whether to hear a declaratory action is whether there is an alternative remedy which is better or more effective.

Constitutional Law > State Sovereign Immunity > General Overview

**HN9**[⤓] The *Eleventh Amendment* does not permit judgments against state officers declaring that they violated federal law in the past.

Civil Procedure > Judgments > Relief From Judgments > Extraordinary Circumstances

Civil Procedure > ... > Relief From Judgments > Excusable Mistakes & Neglect > General Overview

Civil Procedure > Judgments > Relief From Judgments > Reversal of Prior Judgments

Civil Procedure > Judgments > Relief From Judgments > Void Judgments

**HN10**[⤓] **Extraordinary Circumstances**

See Colo. R. Civ. P. 60(b).

**Counsel:** For JUDY LAWRENCE, Plaintiff - Appellant: James D. Kilroy, Lee A. Mickus, Snell & Wilmer, Denver, CO; Judy Lawrence, Red River Trust, Dalhart, TX.

For GALE GREENSTREET, as Co-Trustees of the Red River Trust, Plaintiff - Appellant: James D. Kilroy, Lee A. Mickus, Snell & Wilmer, Denver, CO; Gale Greenstreet, Dalhart, TX.

O. JOHN KUENHOLD, District Court Judge acting without jurisdiction of the proper parties, Defendant - Appellee: State of Colorado, Department of Law, Denver, CO.

**Judges:** Before O'BRIEN, McKAY, and HOLMES, Circuit Judges.

**Opinion by:** Terrence L. O'Brien

# Opinion

**[*763]  ORDER AND JUDGMENT** *

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See Fed. R. App. P. 34(a)(2)*; *10th Cir. R. 34.1(G)*. The case is therefore ordered submitted without oral argument.

Judy Lawrence and Gale Greenstreet filed a complaint in federal **[**2]** district court against O. John Kuenhold, a judge in the District Court of Alamosa County, Colorado, alleging he violated their due process rights by entering default judgment in a quiet title action to which Lawrence and Greenstreet were not parties. The court dismissed the complaint with prejudice, concluding it was barred by the *Rooker-Feldman* **[*764]** doctrine and judicial immunity. We affirm.

## I. BACKGROUND

As it appears from the limited record, Eddie Stafford, Administrator of the Estate of Alex Stafford, filed a quiet title action against Martin Stafford, trustee of the A. M. & J. Trust, in Colorado state court. [1] Judge Kuenhold presided over the case and entered default judgment against Martin Stafford. Lawrence and Greenstreet claim the judgment was entered in contravention of **HN1**[⤒] Rule 105(b) of the Colorado Rules of Civil Procedure, which provides: "No person claiming any interest under or through a person named as a defendant need be made a party *unless his interest is shown of record* in the office of the recorder of the county where the real property is situated, and the

---

* This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with **Fed. R. App. P. 32.1** and **10th Cir. R. 32.1**.

[1] The record does not contain any pleadings or other documents from the state court action. Thus, we rely on the parties' description of the relevant events.

Case 2:19-cv-00021-SWS   Document 39-1   Filed 06/11/19   Page 4 of 6
Appellate Case: 19-8055   Document: 010110225398   Date Filed: 09/10/2019   Page: 251

271 Fed. Appx. 763, *764; 2008 U.S. App. LEXIS 6614, **2

decree shall be as conclusive against him as if he had been made a party . . . . " (emphasis added). They claim the **[\*\*3]** A. M. & J. Trust transferred the property at issue to the Red River Trust, of which they are co-trustees, by a warranty deed that was recorded.

Instead of seeking relief in state court, Lawrence and Greenstreet filed a *pro se* "Complaint for Vacation of a Void Judgment" in federal court alleging a due process claim, among others. [2] (R. Vol. I, Doc. 1 at 1.) The complaint seeks the following relief: (1) title to the property at issue be returned to the Red River Trust and the Red River Trust be compensated for the costs of suit; (2) the judgment entered by Judge Kuenhold be vacated and voided, along with any and all judgments in related cases; and (3) "[s]uch other relief as the Court may feel is needed to alter the behavior of the State Court and Judges thereof." ( *Id.* at 8.)

The magistrate judge *sua sponte* ordered Lawrence and Greenstreet to show cause why their complaint should not be dismissed under the *Rooker-Feldman* doctrine. [3] Lawrence and Greenstreet responded to the order to show cause and the magistrate judge recommended their complaint be dismissed without prejudice. Judge Kuenhold then filed a motion to dismiss the complaint under *Rule 12(b)(1) of the Federal Rules of Civil Procedure* on the basis of *Rooker-Feldman*. The magistrate judge again recommended the case be dismissed without prejudice under *Rooker-Feldman* . On August 9, 2006, the district court issued an order adopting the magistrate's recommendation, explaining: "[t]he recommendations are detailed and well-reasoned. Plaintiffs' objections are imponder[able] and without merit." (R. Vol. I, Doc. 21 at 2.) Though the issue was neither argued nor briefed by the parties, the district court concluded: "Judge Kuenhold is entitled to absolute judicial immunity . . . as the acts of which plaintiffs complain were all taken within his capacity **[\*\*5]** as a judicial officer." ( *Id.* ) The court dismissed the complaint with prejudice.

**[\*765]** On appeal, Lawrence and Greenstreet, now represented by counsel, contend the court erred by dismissing their complaint under *Rooker-Feldman* because they were not parties to the state court action. In his supplemental answer brief, Judge Kuenhold concedes Lawrence and Greenstreet were not parties to the state court action and thus, under *Lance v. Dennis, 546 U.S. 459, 464, 126 S. Ct. 1198, 163 L. Ed. 2d 1059 (2006)*, their complaint should not have been dismissed under *Rooker-Feldman*. [4] Judge Kuenhold argues, however, the dismissal should be affirmed on the alternate basis of judicial immunity or on the basis that a party is not entitled to equitable relief when there is an adequate remedy at law. In their supplemental reply brief, Lawrence and Greenstreet contend the court should not have ruled on judicial immunity as it was not raised by **[\*\*6]** the parties. In addition, and without citing legal authority, they claim Judge Kuenhold is not absolutely immune from their (unspecified) claim for declaratory relief.

## II. DISCUSSION HN5[↑] "We review a dismissal under *Fed. R. Civ. P. 12(b)(6)* de novo." *Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).* We consider "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 929 (2007)).* **[\*\*7]** "[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for

---

[2] **HN2[↑]** ] Because Lawrence and Greenstreet filed their complaint while proceeding *pro se*, we review their pleadings liberally. *See Beedle v. Wilson, 422 F.3d 1059, 1063 (10th Cir. 2005).* We note that Lawrence and Greenstreet's position has been substantially refined by **[\*\*4]** their appellate counsel, though they still have not explained what effect the default judgment had on their rights or on the rights of the Red River Trust.

[3] **HN3[↑]** ] The *Rooker-Feldman* doctrine is based on *Dist. of Columbia Ct. of Appeals v.Feldman, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983)* and *Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923).* It "prohibits federal suits that amount to appeals of state-court judgments." *Bolden v. City of Topeka, Kan., 441 F.3d 1129, 1139 (10th Cir. 2006).*

[4] In *Lance*, **HN4[↑]** ] the Supreme Court reiterated *Rooker-Feldman* "is a narrow doctrine" that has been applied by the lower courts "far beyond the contours of the *Rooker* and *Feldman* cases." *546 U.S. at 464* (quotations omitted). The Court explained it had previously "held *Rooker-Feldman* inapplicable where the party against whom the doctrine is invoked was not a party to the underlying state-court proceeding." *Id.* (citing *Johnson v. De Grandy, 512 U.S. 997, 1006, 114 S. Ct. 2647, 129 L. Ed. 2d 775 (1994)).* The Court clarified: Â"The *Rooker-Feldman* doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment." *Id. at 466.*

Case 2:19-cv-00021-SWS   Document 39-1   Filed 06/11/19   Page 5 of 6
Appellate Case: 19-8055   Document: 010110225398   Date Filed: 09/10/2019   Page: 5 of 6

271 Fed. Appx. 763, *765; 2008 U.S. App. LEXIS 6614, **7

*these* claims." *Id* . In conducting this inquiry, "[w]e accept as true all well-pleaded facts . . . and view those facts in the light most favorable to the nonmoving party." *Maher v. Durango Metals, Inc., 144 F.3d 1302, 1304 (10th Cir. 1998)*. Because Judge Kuenhold concedes Lawrence and Greenstreet's complaint should not have been dismissed under *Rooker-Feldman*, we will consider whether the court correctly concluded Judge Kuenhold was immune from suit. **HN6**[↑] In an action for monetary damages, "[judicial] immunity is overcome in only two circumstances. First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity. Second, a judge is not immune from actions, though judicial in nature, taken in the complete absence of jurisdiction." *Mireles v. Waco, 502 U.S. 9, 11-12, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991)* (citations omitted); *see also Beedle, 422 F.3d at 1072* ("'A judge will not be deprived of immunity **[**8]** because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction.'") ( *quoting Stump v. Sparkman, 435 U.S. 349, 356-57, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978))*. Lawrence and Greenstreet do not contend Judge Kuenhold acted outside of his judicial capacity; nor do they contend **[*766]** he lacked subject matter jurisdiction over the quiet title action. [5] Instead, they argue they should be allowed to seek an unspecified form of declaratory relief against Judge Kuenhold.

**HN7**[↑] ] The only type of relief available to a plaintiff who sues a judge is declaratory relief, *see Schepp v. Fremont County, 900 F.2d 1448, 1452 (10th Cir. 1990)*, but not every plaintiff is entitled to this remedy. [6]

---

[5] Such an argument would be unavailing as Colorado state district courts are courts of general jurisdiction. *See Colo. Const. art. VI, § 9* ("The district courts shall be trial courts of record with general jurisdiction, and shall have original jurisdiction in all civil, probate, and criminal cases . . . .").

[6] In *Schepp*, we cited *Pulliam v. Allen, 466 U.S. 522, 541-42, 104 S. Ct. 1970, 80 L. Ed. 2d 565 (1984)*, for the proposition that a judge "is not shielded by absolute [judicial] immunity from declaratory or injunctive relief." *900 F.2d at 1452*. In 1996, Congress effectively reversed *Pulliam* with the enactment of the Federal Courts Improvement Act of 1996 ("FCIA"), *Pub. L. No. 104-317, 110 Stat. 3847 (1996)* (amending *42 U.S.C. § 1983*). Section 309(c) of the FCIA bars injunctive relief in any *§ 1983* action "against a judicial officer for an act or omission taken in such officer's judicial capacity . . . unless a declaratory decree was violated or declaratory

Lawrence and Greenstreet do not specify what form declaratory relief would take and their complaint cannot be read to **[**9]** request declaratory relief in the true legal sense. A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act. *See Utah Animal Rights Coalition v. Salt Lake City Corp., 371 F.3d 1248, 1266 (10th Cir. 2004)* (McConnell, J., concurring) ("[A] declaratory judgment action involving past conduct that will not recur is not justiciable."); *Francis E. Heydt Co. v. United States, 948 F.2d 672, 676-77 (10th Cir. 1991)*.

Lawrence and Greenstreet's complaint is captioned as a "Complaint for Vacation of a Void Judgment." (R. Vol. I, Doc. 1 at 1.) What they are seeking is a declaration of past liability, not future rights between them and Judge Kuenhold. A declaratory judgment would serve no purpose here and thus, is not available. [7] *See S. Utah Wilderness Alliance v. Smith, 110 F.3d 724, 730 (10th Cir. 1997)* (concluding a declaratory judgment was not available because it "would serve no purpose in this case"). Moreover, Lawrence and Greenstreet are not eligible for declaratory relief because there is a more suitable remedy - namely, a motion for relief from judgment under Rule 60(b) of the Colorado Rules of Civil Procedure. **[**11]** [8] *See State Farm Fire &*

---

relief was unavailable." Thus, the doctrine **[**10]** of judicial immunity now extends to suits against judges where a plaintiff seeks not only monetary relief, but injunctive relief as well. *See Roth v. King, 371 U.S. App. D.C. 254, 449 F.3d 1272, 1286 (D.C. Cir. 2006)*, *cert. denied sub nom., Sitomer v. King, 127 S. Ct. 1357, 167 L. Ed. 2d 82 (2007)* ("*42 U.S.C. § 1983*, as amended in 1996 by the [FCIA], explicitly immunizes judicial officers against suits for injunctive relief."); *Bolin v. Story, 225 F.3d 1234, 1242 (11th Cir. 2000)* (discussing the effect of the FCIA on *Pulliam* ).

[7] Furthermore, it could not be granted as **HN9**[↑] ] "[t]he *Eleventh Amendment* does not permit judgments against state officers declaring that they violated federal law in the past." *Johns v. Stewart, 57 F.3d 1544, 1553 (10th Cir.1995)* (quotation omitted).

[8] Providing in pertinent part:

**HN10**[↑] ] On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment . . . for the following reasons: (1) Mistake, inadvertence, surprise, or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released, **[**12]** or discharged, or a prior

*Casualty [*767] Co. v. Mhoon, 31 F.3d 979, 983 (10th Cir. 1994) HN8*[⬆] (one of the factors for a court to consider in deciding whether to hear a declaratory action is "whether there is an alternative remedy which is better or more effective") (quotation omitted)). We decline Lawrence and Greenstreet's invitation to remand the case to allow them to fully brief the question of judicial immunity. [9] Their claim for declaratory relief (to the extent it exists at all) was properly dismissed, as was the rest of their complaint.

**AFFIRMED** .

ENTERED FOR THE COURT

Terrence L. O'Brien

Circuit Judge

---

End of Document

---

judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment.

*Colo. R. Civ. P. 60(b)*.

[9] Lawrence and Greenstreet did, of course, have the opportunity to argue the merits of the court's conclusion on judicial immunity in their appellate filings.

Positive
As of: June 11, 2019 3:43 PM Z

## *Potomac Ins. Co. v. Pella Corp.*

United States District Court for the District of Kansas

April 20, 2001, Decided

Case No. 00-4013-DES

**Reporter**
2001 U.S. Dist. LEXIS 5909 *; 2001 WL 421255

POTOMAC INSURANCE COMPANY OF ILLINOIS, Plaintiff, vs. PELLA CORPORATION, RAY ANDERSON, INC., d/b/a PELLA WINDOWS OF KANSAS, INC., and THE CINCINNATI INSURANCE COMPANIES, Defendants.

**Disposition:** [*1] Pella Corporation's Motion to Dismiss (Doc. 51) and defendant Cincinnati Insurance Companies' Motion for Judgment on the Pleadings, Or, in the Alternative, for Dismissal with Prejudice (Doc. 49) granted.

## Core Terms

declaratory, declaratory judgment, coverage, parties, windows, interested party, joined, motion to dismiss, asserts, insurer

## Case Summary

**Procedural Posture**
Plaintiff sought declaratory relief pursuant to *28 U.S.C.S. § 2201* regarding its liability on an insurance contract. Defendants window company moved to dismiss and defendant insurance company moved for judgment on the pleadings or, in the alternative, for dismissal with prejudice. Plaintiff filed responses to both motions.

**Overview**
A general contractor purchased windows from defendant window distributor that were manufactured by defendant window company for use in a home. The homeowners complained that the windows leaked and defendant distributor replaced the windows. Defendant window distributor made a claim to plaintiff, his insurance company, for repairs he undertook at the homeowner's residence. Plaintiff sought declaratory judgment on the question of whether it had a duty to defend and/or indemnify defendant for his claim. The

court found that plaintiff offered no dispute, claim or adverse legal interest between itself and defendant window company, nor did plaintiff demonstrate how defendant's rights directly flowed from the contract executed by plaintiff and defendant window distributor. Plaintiff offered no evidence of how the court's ruling would impact or resolve any dispute or controversy between itself and defendant insurance company and therefore, the court was unable to find how defendant insurance company's legal interests, rights, or liabilities intersected with plaintiff's.

**Outcome**
Defendant window company's motion to dismiss and defendant insurance companies' motion for judgment on the pleadings, or, in the alternative, for dismissal with prejudice was granted.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > Judgments > Relief From Judgments > General Overview

*HN1*[ ] **Motions to Dismiss, Failure to State Claim**

When deciding a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, a court must accept as true all well-pleaded factual allegations of the complaint and must draw all inferences in favor of the pleader. Dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

2001 U.S. Dist. LEXIS 5909, *1

entitle him to relief. In order to avoid dismissal, a plaintiff must do more than plead mere conclusory allegations or legal conclusions masquerading as factual conclusions.

Civil Procedure > ... > Declaratory Judgments > Federal Declaratory Judgments > General Overview

Civil Procedure > Judgments > Declaratory Judgments > General Overview

**HN2[⬇]** **Declaratory Judgments, Federal Declaratory Judgments**

See *28 U.S.C.S. § 2201*.

Civil Procedure > ... > Justiciability > Case & Controversy Requirements > Adverse Legal Interests

Constitutional Law > The Judiciary > Case or Controversy > Advisory Opinions

Civil Procedure > ... > Justiciability > Case & Controversy Requirements > Immediacy

Civil Procedure > Judgments > Declaratory Judgments > General Overview

Civil Procedure > ... > Declaratory Judgments > Federal Declaratory Judgments > General Overview

**HN3[⬇]** **Case & Controversy Requirements, Adverse Legal Interests**

The required controversy in declaratory actions must be definite and concrete. The controversy must touch the legal relations of parties having adverse legal interests, and the controversy must demand specific relief through a conclusive decree. This general rule must be applied on a case-by-case basis. The question in each case is whether the facts alleged, under all the circumstances, show there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. The line between impermissible advisory opinions and justiciable controversies is elusive. The difference between an abstract question and a controversy contemplated by the Declaratory Judgment

Act, *28 U.S.C.S. § 2201*, is necessarily one of degree, and it is difficult, if possible, to fashion a precise test for determining in every case whether there is such a controversy.

Civil Procedure > Judgments > Declaratory Judgments > General Overview

Civil Procedure > Parties > Joinder of Parties > General Overview

Civil Procedure > Parties > Joinder of Parties > Permissive Joinder

**HN4[⬇]** **Judgments, Declaratory Judgments**

The reference to an interested party made in *28 U.S.C.S. § 2201*, relates to possible plaintiffs not defendants.

Civil Procedure > Parties > Joinder of Parties > Permissive Joinder

**HN5[⬇]** **Joinder of Parties, Permissive Joinder**

Under *Fed. R. Civ. P. 20*, all persons may be joined in one action as defendants if there is asserted against them any right to relief in respect of or arising out of the same transaction.

Civil Procedure > Judgments > Declaratory Judgments > General Overview

Governments > Federal Government > Claims By & Against

Insurance Law > ... > Declaratory Judgments > Procedure > Relevant Parties

Civil Procedure > ... > Declaratory Judgments > Federal Declaratory Judgments > General Overview

Insurance Law > Remedies > Declaratory Judgments > General Overview

**HN6[⬇]** **Judgments, Declaratory Judgments**

Only those parties directly involved with the case's

controversy should be joined as defendants. In any cause of action there will be untold scores of individuals who will have peripheral interest in the action's outcome. The court's power to grant declaratory relief directly flows from *28 U.S.C.S. § 2201*, and the court is bound to restrict its action in accordance with the statute's directives. At the core of *28 U.S.C.S. § 220*, lies a requirement that any relief granted will directly impact and/or resolve an existing conflict between the parties. If a party's interest is not directly intertwined with the controversy, then any relief will only be advisory at best.

**Counsel:** For POTOMAC INSURANCE COMPANY OF ILLINOIS, plaintiff: Bernard T. Schmitt, Matthew F. Mulhern, Lorna L. Hilt, Jennifer L. Groover, Harris, McCausland & Schmitt, P.C., Kansas City, MO.

For PELLA CORPORATION, defendant: Kristopher A. Kuehn, Scott R. Ast, Blackwell Sanders Peper Martin LLP, Overland Park, KS.

For RAY ANDERSON, INC., defendant: Stephen P. Weir, Hein & Weir, Chartered, Topeka, KS.

For CINCINNATI INSURANCE COMPANY THE, defendant: J. Philip Davidson, Teresa L. Mah, Tristram E. Felix, James K. McMurray, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Wichita, KS.

For RAY ANDERSON, INC., counter-claimant: Stephen P. Weir, Hein & Weir, Chartered, Topeka, KS.

For POTOMAC INSURANCE COMPANY OF ILLINOIS, counter-defendant: Bernard T. Schmitt, Matthew F. Mulhern, Harris, McCausland & Schmitt, P.C., Kansas City, MO.

**Judges:** DALE E. SAFFELS, United States District Judge.

**Opinion by:** DALE E. SAFFELS

# Opinion

## MEMORANDUM AND ORDER

This matter is before **[*2]** the court on defendant Pella Corporation's ("Pella") Motion to Dismiss (Doc. 51) and defendant Cincinnati Insurance Companies' ("Cincinnati") Motion for Judgment on the Pleadings Or, in the Alternative, for Dismissal with Prejudice (Doc. 49). Plaintiff has filed responses (Docs. 57 and 55) to both motions. Cincinnati has filed a reply (Doc. 60), and Pella has filed a Supplemental Memorandum in Support (Doc.

78). The court is now prepared to rule on both motions.

## I. FACTUAL BACKGROUND

A full discussion of the facts of this case is not required for the disposition of the current motions, so the court will only briefly recount the factual record.

On January 28, 2000, plaintiff filed a Petition for Declaratory Judgment (Doc. 1) in this matter. Plaintiff seeks declaratory relief pursuant to *28 U.S.C. § 2201* regarding its liability on an insurance contract. The facts of this case ostensibly arise from the parties' relationship with construction work performed on the home of Jonson and Rebekah Huang. The Huangs were originally named defendants in this case, yet by its October 6, 2000, Order (Doc. 54), the court dismissed both Jonson and Rebekah.

**[*3]** The Huangs hired Dean Construction and Engineering, Inc. ("Dean") to act as general contractor for the construction of their home in Topeka, Kansas. Dean was also originally a named defendant, but on November 16, 2000, the court issued an Order (Doc. 63) dismissing Dean from the case. Dean apparently purchased Pella windows for the Huangs' home from defendant Ray Anderson Company, Inc. ("Ray Anderson"). Ray Anderson is an authorized distributor of Pella windows, which are of course manufactured by defendant Pella.

Approximately six months after the windows were installed, the Huangs complained to Dean that their windows were leaking. Ray Anderson was notified of the complaints, and in February 1996, Ray Anderson began attempting to correct the leaks. Apparently, the repair of the windows was unsuccessful because in the summer of 1996, Ray Anderson began replacing the existing windows with new Pella windows. However, the situation was not finalized because on September 27, 1997, the Huangs filed suit in state court against Pella and Ray Anderson. The lawsuit was subsequently settled and a release was executed by the parties.

Defendant Cincinnati was Ray Anderson's insurer **[*4]** from October 1, 1995, through October 1, 1997. Plaintiff subsequently became Ray Anderson's insurer on October 1, 1997, continuing through October 1, 1998. The policy between plaintiff and Ray Anderson was renewed for a one year period from October 1, 1998, through October 1, 1999. The present action involves the question of plaintiff's duty to defend and/or indemnify Ray Anderson for a claim Ray Anderson made to

plaintiff. The $ 80,000 claim allegedly concerns the window repairs Ray Anderson undertook at the Huang residence.

## II. PELLA'S MOTION TO DISMISS

Pella brings its motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*.

### A. *Rule 12(b)(6)* Standard

**HN1**[⬆] When deciding a motion to dismiss under *Rule 12(b)(6)*, a court must accept as true all well-pleaded factual allegations of the complaint and must draw all inferences in favor of the pleader. *See City of Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 493, 90 L. Ed. 2d 480, 106 S. Ct. 2034 (1986)*. Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to **[*5]** relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. In order to avoid dismissal, plaintiff must do more than plead mere conclusory allegations or legal conclusions masquerading as factual conclusions. *See generally Dunn v. White, 880 F.2d 1188, 1197 (10th Cir. 1989)*. Pella asserts that it is not a proper party to this declaratory action under *28 U.S.C. § 2201* and should be dismissed.

### B. Declaratory Judgment Standard

Plaintiff requests declaratory relief pursuant to the Declaratory Judgment Act, *28 U.S.C. § 2201*. **HN2**[⬆] The statute states:

In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

*28 U.S.C. § 2201*.

In *Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 81 L. Ed. 617, 57 S. Ct. 461 (1937),* **[*6]** the Supreme Court held **HN3**[⬆] the required controversy in declaratory actions must be definite and concrete. The controversy must touch the legal relations of parties having adverse legal interests, and the controversy must demand specific relief through a conclusive decree. This general rule must be applied on a case-by-case basis. Basically, the question in each case is whether the facts alleged, under all the circumstances, show there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *See ANR Pipeline Co. v. Corporation Comm'n, 860 F.2d 1571, 1576 (10th Cir. 1988)* (citing *Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 85 L. Ed. 826, 61 S. Ct. 510 (1941))*. *See generally Lewis v. Continental Bank Corp., 494 U.S. 472, 477, 108 L. Ed. 2d 400, 110 S. Ct. 1249 (1990)*. Admittedly, the line between impermissible advisory opinions and justiciable controversies is elusive. *See Maryland Cas., 312 U.S. at 273* ("The difference between an abstract question and a 'controversy' contemplated by the Declaratory **[*7]** Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy.").

### C. Discussion

In the present case, there exists, without question, a genuine controversy as between plaintiff, the insurer, and Ray Anderson, the insured. Declaratory judgments are routinely sought to decide questions of coverage between insurance providers and their customers. Plaintiff has, however, also joined Pella, a party with which plaintiff has no contractual relationship. Pella requests that it be dismissed as a party-defendant because no controversy exists between itself and plaintiff.

Plaintiff argues that Pella is an "interested party" to this declaratory action because Pella and Ray Anderson have agreed to share the costs of rectifying the situation at the Huang's residence. Plaintiff, therefore, appears to be making the argument that if Ray Anderson indeed has no coverage for the outlays, then Pella's liability will somehow be affected. Additionally, plaintiff asserts that Pella is interested because Ray Anderson may have a duty to indemnify Pella per their distributorship **[*8]** agreement. The question becomes, therefore, once an identified controversy exists in a case, what additional defendants may be properly joined in the action.

As a preliminary matter, the court would note *§ 2201*'s use of the phrase "interested party" may not be relied

upon by plaintiff in this context. *HN4*[↑] The statute's reference to an "interested party" relates to possible plaintiffs not defendants. Therefore, the language of *§ 2201* offers no support for the joinder of Pella. *See Reardon v. Pennsylvania-New York Cent. Transp. Co., 323 F. Supp. 598, 599 (N.D. Ohio 1971)* (noting also that the reference to "interested party" relates only to possible plaintiffs).

The Tenth Circuit, however, has stated: "We recognize that all *interested parties* should be joined in a declaratory judgment action whenever possible and that a declaratory judgment should not be entered unless it disposes of a controversy and serves a useful purpose." *State Farm Mut. Auto. Ins. Co. v. Mid-Continent Cas. Co., 518 F.2d 292, 296 (10th Cir. 1975)* (emphasis added). In *State Farm,* the Tenth Circuit was considering whether all conditionally necessary and indispensable **[*9]** parties were joined in accordance with *Rule 19 of the Federal Rules of Civil Procedure*. *See id.* In the present case, the court is faced with a substantially different procedural challenge. This challenge is more akin to the issue of permissive joinder as established in *Rule 20 of the Federal Rules of Civil Procedure*. *HN5*[↑] See *Fed. R. Civ. P. 20* ("All persons . . . may be joined in one action as defendants if there is asserted against them . . . any right to relief in respect of or arising out of the same transaction . . . .").

The court is persuaded, upon reflection on the historical purpose of declaratory judgments, [1] *HN6*[↑] that only those parties directly involved with the case's controversy should be joined as defendants. *See, e.g., Normandy Pointe Assocs. v. Federal Emergency Management Agency, 105 F. Supp. 2d 822, 830-31 (S.D. Ohio 2000)* (dismissing a party-defendant in a declaratory action because no "case or controversy" existed between the defendant and plaintiff); *Aetna Cas. & Sur. Co. v. Rasa Mgmt. Co., 621 F. Supp. 892, 893 (D. Nev. 1985)* (same); *Reardon, 323 F. Supp. at 599* (same). Cf. *Franklin Life Ins. Co. v. Johnson, 157 F.2d 653, 658 (10th Cir. 1946)* **[*10]** (holding contingent beneficiary of insurance contract was proper party to declaratory judgment action because beneficiary's rights flowed from the contract). In any cause of action there will be untold scores of individuals who will have

peripheral interest in the action's outcome. However, as the court's power to grant declaratory relief directly flows from *§ 2201*, the court is bound to restrict its action in accordance with the statute's directives. At the core of *§ 2201* lies a requirement that any relief granted will directly impact and/or resolve an existing conflict between the parties. If a party's interest is not directly intertwined with the controversy, then any relief will only be advisory at best.

Plaintiff has simply offered **[*11]** no dispute, claim, or adverse legal interest between itself and Pella, nor has plaintiff demonstrated how Pella's rights directly flow from the contract executed by plaintiff and Ray Anderson. While Pella may be interested to learn whether Ray Anderson has coverage, this determination does not create a controversy as between itself and plaintiff. As such, the court will grant Pella's motion.

## III. CINCINNATI'S MOTION FOR JUDGMENT ON THE PLEADINGS OR MOTION TO DISMISS

Cincinnati brings its motion pursuant to either *Rule 12(c)* or *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. Both theories of relief seek similar results.

### A. Appropriate Standard

Whether the court addresses Cincinnati's request under *Rule 12(c)* or *Rule 12(b)(6)* does not alter the general standards by which the court considers the motion. *See, e.g., Gallardo v. Board of County Comm'rs, 857 F. Supp. 783, 785 (D. Kan. 1994)*. In light of the court's previous discussion, the court will construe this motion as seeking dismissal under *Rule 12(b)(6)*.

### B. Discussion

The arguments presented by Cincinnati are generally equivalent to those asserted by Pella, i. **[*12]** e., plaintiff has failed to allege any controversy as existing between itself and Cincinnati. Plaintiff argues that Cincinnati is a proper party-defendant because both insurance providers disclaim coverage to Ray Anderson. In sum, plaintiff asserts that "a declaratory judgment action will clarify the legal issues and settle the controversy as the Court will decide whether or not Potomac's or Cincinnati's policy, if either, applies to Ray Anderson's claim." (Pl.'s Mem. at 3).

---

[1] "The purpose of the declaratory judgment action is to settle actual controversies before they have ripened into violations of law or legal duty or breach of contractual obligations." *Franklin Life Ins. Co. v. Johnson, 157 F.2d 653, 658 (10th Cir. 1946)*.

Cincinnati, however, argues that there is no controversy regarding which policy Ray Anderson may or may not have coverage under. In fact, it is presented to the court that neither the Huangs, Ray Anderson, or any entity involved in this matter have filed a claim with Cincinnati. Plaintiff asserts that "Cincinnati is an interested party in the present matter as Cincinnati's policy of insurance is at issue." (Pl.'s Mem. at 5). However, Cincinnati is correct in pointing out that the counts in plaintiff's complaint are solely concerned with plaintiff's policy not the existence of alternative coverage under Cincinnati's policy.

This is not a case wherein independent polices overlap due to the multiplicity of **[\*13]** coverage or insured individuals. *See, e.g., Security Ins. Co. v. Alliance Mut. Ins. Co., 408 F.2d 878 (10th Cir. 1969)*; *Maryland Cas. Co. v. National Mut. Cas. Co., 170 F.2d 759 (10th Cir. 1948)*. This action is squarely focused on the question of plaintiff's duty under its own policy with Ray Anderson. Plaintiff has offered no evidence of how the court's ruling would impact or resolve any dispute or controversy as between itself and Cincinnati. With no claim being asserted against Cincinnati, the court is unable to find how Cincinnati's legal interests, rights, or liabilities intersect with plaintiff's. As Cincinnati asserts, it "simply does not care whether Potomac's policy provides coverage in this matter." (Cincinnati's Reply Mem. at 5). In accordance with the court's earlier recitation of the applicable law, the court finds it appropriate to grant Cincinnati's motion.

**IT IS THEREFORE BY THIS COURT ORDERED** that Pella Corporation's Motion to Dismiss (Doc. 51) and defendant Cincinnati Insurance Companies' Motion for Judgment on the Pleadings, Or, in the Alternative, for Dismissal with Prejudice (Doc. 49) are granted.

Dated this **[\*14]** 20 day of April, 2001, at Topeka, Kansas.

DALE E. SAFFELS

United States District Judge

---

**End of Document**

 Positive
As of: June 11, 2019 3:24 PM Z

## *Robinson v. Blank*

United States District Court for the Southern District of New York

May 20, 2013, Decided; May 20, 2013, Filed

11 Civ. 2480 (PAC) (DF)

**Reporter**

2013 U.S. Dist. LEXIS 71471 *; 2013 WL 2156040

MAURICE G. ROBINSON, Plaintiff, - against - REBECCA M. BLANK, Acting Secretary of the Department of Commerce, Defendant.

**Prior History:** *Robinson v. Blank, 2013 U.S. Dist. LEXIS 72068 (S.D.N.Y., Feb. 22, 2013)*

## Core Terms

magistrate judge, terminated, hired, reinstatement, recommended, moot, injunctive, policies, Census, practices, enumerators, ***speculative***, expunge, declaration, remedied, courts, rehire, declaratory judgment, discovery, employees, equitable, effects, parties, ripe, circumstances, allegations, declaratory, quotations, wrongfully, ambiguous

**Counsel: [\*1]** For Maurice G. Robinson, Plaintiff: Adam T Klein, LEAD ATTORNEY, Melissa E. Pierre-Louis, Ossai Miazad, Outten & Golden, LLP (NYC), New York, NY; Judith Melissa Whiting, The Legal Action Center, New York, NY; Paul Francis Keefe, Community Service Society, New York, NY; Paul W. Mollica, Outten & Golden LLP, Chicago, IL.

For Rebecca M. Blank, Acting Secretary, United States Department of Commerce, Defendant: Natalie Nancy Kuehler, U.S. Attorney's Office, SDNY (Chambers Street), New York, NY.

**Judges:** HONORABLE PAUL A. CROTTY, United States District Judge.

**Opinion by:** PAUL A. CROTTY

## Opinion

### ORDER ADOPTING R&R

HONORABLE PAUL A. CROTTY, United States District

Judge:

On April 1, 2011, plaintiff Maurice Robinson ("Robinson") filed this action against his former employer, the United States Department of Commerce,[1] for discrimination on the basis of race in violation of *Title VII of the Civil Rights Act of 1964* ("Title VII"). He alleges that he was wrongfully terminated by the Census Bureau (the "Bureau"), a division of the Department of Commerce, pursuant to policies and practices that he alleges have a disparate impact on racial minorities.

A more complete recitation of the factual allegations and Robinson's complaint is set forth in this Court's prior opinion of March 28, 2012, denying Defendant's motion to dismiss for failure to exhaust administrative remedies. (Dkt. No. 33.) Briefly summarized, Robinson was hired as an enumerator for the 2010 Census, a job which was of a very limited duration. Therafter, Robinson was arrested for trespassing, and fired due to the arrest. The charges against him were subsequently dropped and Robinson's record expunged. Nevertheless, he was not rehired because the expungement records were not properly filed in Robinson's personnel folder at the Bureau. The current dispute centers around the timeliness of Robinson's complaint and the appropriateness of the relief sought, given the finite duration of the job he was hired to perform.

On April 13, 2012, Robinson **[\*3]** filed an Amended Complaint seeking lost wages and equitable relief, including "(i) a declaration that the policies and practices described in the First Amended Complaint are unlawful

---

[1] Robinson originally named Gary Locke, formerly the United States Secretary of Commerce, **[\*2]** as the defendant in this matter. (Dkt. 2.) After his resignation and the appointment of John Bryson as the United States Secretary of Commerce, the Court substituted John Bryson as the defendant. (Dkt. 34.). After he, in turn, resigned, Rebecca Blank, currently Acting Secretary of Commerce, was substituted as the defendant. (Dkt. 50).

and violate Title VII; (ii) an injunction prohibiting [the Bureau] from engaging in the policies and practices described in the First Amended Complaint; (iii) an order that [the Bureau] eradicate the effects of its past and present unlawful employment practices by instituting and carrying out policies, practices, and programs that provide equal employment opportunities for all applicants and employees; and (iv) an order reinstating his employment." (Objections at 1-2 (internal quotations and citations omitted).)

Defendant moves to dismiss Robinson's claims for injunctive and declaratory relief pursuant to *Fed. R. Civ. P. 12(b)(1)*. On February 26, 2013, Magistrate Judge Debra Freeman issued a Report and Recommendation ("R&R") recommending that Defendant's motion be granted in part and denied in part. Defendant's objections were received on April 9, 2013. For the reasons that follow, Defendant's motion is partially granted and partially denied, as set forth below.

## DISCUSSION

### I. Legal Standard

In reviewing a **[*4]** report and recommendation, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *28 U.S.C. § 636(b)(1)(C)*. "Where a party objects to an R&R, the Court must review the contested portions *de novo*, but the Court may adopt those portions of an R&R that are not objected to, so long as there is no clear error on the face of the record." *Etheridge v. Alliedbarton Sec. Servs., LLC, No. 12 Civ. 5057, 2013 U.S. Dist. LEXIS 62414, 2013 WL 1832141, at *1 (S.D.N.Y. May 1, 2013)*.

### II. The R&R

#### a. Standing

Defendant contends that Robinson lacks standing to seek a declaration that the Bureau's background checks are unlawful because the policies are no longer in place — indeed, that they were not even in place at the time of the initial complaint. Nor can their change possibly affect Robinson because hiring for the enumerator position is now over and, although such relief might be possible with respect to hiring for the 2020 census, that

is too **_remote_** to confer standing.

Plaintiffs must demonstrate three elements to prove that they have standing to bring suit:

> First, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest **[*5]** which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely **_speculative_**, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)* (quotations omitted). "'[A] plaintiff must demonstrate standing for each claim and form of relief sought.'" *NRDC v. FDA, 710 F.3d 71, 86 (2d Cir. 2013)* (quoting *Baur v. Veneman, 352 F.3d 625, 641 n.15 (2d Cir. 2003))*. When seeking injunctive relief, plaintiffs must also show that they have "'sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004)* (quoting *City of Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983))*. In doing so, plaintiffs generally "'cannot rely on past injury to satisfy the injury requirement but must show **[*6]** a likelihood that [they] . . . will be injured in the future,'" *id.* (quoting *DeShawn E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998))*, though courts have recognized an exception where the injunctive relief sought is the reinstatement of a former employee. See *Kassman v. KPMG LLP, 925 F. Supp. 2d 453, 2013 U.S. Dist. LEXIS 17491, 2013 WL 452913, at *10-11 (S.D.N.Y. 2013)*.

First, the magistrate judge recommended that Robinson has standing to seek an injunction requiring Defendant to expunge any agency records of his termination and/or provide a declaration that his termination was improper because "it is not 'merely **_speculative_**' to infer that the extremely short duration of Plaintiff's employment . . . would give rise to questions by a prospective employer regarding the circumstances under which Plaintiff left his position" or that "the disclosure of those circumstances would cause Plaintiff harm" which "could be remedied by a[n] . . . injunction." (R&R at 16 (quoting *Baur, 352 F.3d at 633*). Second, the magistrate judge

recommended that Robinson be allowed additional discovery into the Bureau's practices because the record was ambiguous as to whether he had standing to challenge rehiring policies and whether the Bureau **[*7]** was hiring for the position from which he was terminated at the time he filed his suit. (Id. at 17-19.) Third, the magistrate judge recommended that Robinson lacked standing to enjoin the Bureau's termination policy because alternative theories under which it might harm him in the future were "too '***speculative***.'" (Id. (quoting *City of Los Angeles v. Lyons, 461 U.S. 95, 109, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983))*.

### b. Mootness

Defendant argues that the instant dispute is now moot. The 2010 census is over, its work in the books, so the policies and practices which governed the Bureau in the hiring of enumerators are no longer in effect. "In general, a case becomes moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Murphy v. Hunt, 455 U.S. 478, 481, 102 S. Ct. 1181, 71 L. Ed. 2d 353 (1982)* (quoting *U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 396, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980))*. "While standing focuses on the status of the parties when an action is commenced, the mootness doctrine requires that the plaintiffs' claims remain alive throughout the course of the proceedings." *Etuk v. Slattery, 936 F.2d 1433, 1441 (2d Cir. 1991)*. "[T]he party seeking to have the case dismissed bears the burden of demonstrating mootness **[*8]** and that burden 'is a heavy one.'" Id. (quoting *County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979))*.

The magistrate judge recommended that the defendant failed to carry this "heavy burden" because Robinson "claims that the Bureau's objectionable policy is still in place, and even Defendant does not contend that the policy has been definitively abandoned and replaced with an alternative policy free of the alleged deficiencies." (R&R at 21.)

### c. Ripeness

Defendant asserts that Robinson's claims for injunctive and declaratory relief are not ripe because they relate to future hiring decisions. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 807-08, 123 S. Ct. 2026, 155 L. Ed. 2d 1017 (2003)* (quoting *Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967))*. In determining where a dispute is ripe, courts engage in a "two-pronged analysis **[*9]** of (1) whether the issues presented to the district court are fit for review, and (2) what hardship the parties will suffer in the absence of review." *Connecticut v. Duncan, 612 F.3d 107, 113 (2d Cir. 2010)*.

The magistrate judge recommended rejecting Defendant's argument because Robinson "is alleging a longstanding, and . . . continuing, policy of using background checks (and specifically criminal histories) in a discriminatory way." (R&R at 22.) Accordingly, the claims are ripe because they are "directed at preventing the continued application of the . . . discriminatory policies." (Id. at 22-23.)

## III. Defendant's Objections

### a. Standing to Seek Reinstatement

Defendant asserts error in the magistrate judge's recommendation that Robinson has standing to seek reinstatement to his job because "the relevant inquiry . . . is not . . . whether a plaintiff 'at the time the suit is commenced' could have been reappointed to his old position, but rather whether reinstatement is a feasible remedy." (Objections at 10.) Further, assuming *arguendo* that the magistrate judge applied the proper standard, Robinson could not have been reinstated when he filed his initial complaint on April 1, 2011. First, **[*10]** the magistrate judge is correct: "Standing is determined at the time a complaint is filed," whereas the ongoing feasibility of "injunctive relief . . . is a question of mootness, not standing." *Jones v. Goord, 435 F. Supp. 2d 221, 225 (S.D.N.Y. 2006)*. Defendant cites no authority to the contrary. Whether Robinson's suit is moot is addressed underlined. infra.

Second, with respect to whether Robinson had standing to seek injunctive relief, the magistrate judge concluded that "discovery . . . is needed to clarify the record." (R&R at 18-19.) The magistrate judge found that Defendant's

declaration concerning whether Robinson could have been reinstated to the same position was ambiguous and failed to explain why Robinson could not have been placed in a similar job elsewhere.[2] (R&R at 18-19.) The declaration was submitted by Viola Lewis Willis ("Willis"), Assistant Division Chief for Decennial Management Analysis and Special Censuses, and stated that all enumerators appointed on April 27, 2010, the date of Robinson's appointment, were terminated as of September 5, 2010. (Willis Decl. ¶ 15.) But Willis did not "indicate whether any enumerators . . . who were hired with earlier or later 'effective dates' **[*11]** of employment had similarly been terminated by the date this suit was filed." (R&R at 18.) Defendant now attempts to patch over this ambiguity by submitting an additional declaration stating that the last enumerator hired for the 2010 census was hired on August 30, 2010[3] (Second Willis Decl. at ¶¶ 2-3), but this appears to contradict other evidence in the record which states that the last employees hired through the Census Hiring and Employment Check Office ("CHECO"), which is "responsible for background check processing for applicants applying for and hired to conduct the . . . Census," were not terminated until June 18, 2011. (Patterson Decl. ¶¶ 1, 7.) While these statements may be reconcilable, they are sufficiently inconsistent and ambiguous to permit Robinson discovery on whether his employment could have been reinstated in April, 2011.

Moreover, the magistrate judge was correct that Defendant failed to explain "why . . . Plaintiff could not have been given a similar job for a different region." (R&R at 19.) Though Defendant established that under the normal Census hiring process, "Robinson . . . could only have been hired to work in LCO 2220," which ceased hiring enumerators on May 25, 2010 (Willis Decl. ¶¶ 8-14), reinstating an employee who was wrongfully terminated is inherently an atypical act done outside the bounds of the routine process. Congress

intended that Title VII "'make the victims of unlawful discrimination whole, and . . . the attainment of this objective . . . requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination,'" *Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 582 n.15, 104 S. Ct. 2576, 81 L. Ed. 2d 483 (1984)* (quoting 118 Cong. Rec. 7168 (1972)), such that "'federal courts are empowered to fashion such relief as the particular circumstances **[*13]** of a case may require to effect restitution.'" Id. (quoting *Franks v. Bowman Transp. Co., Inc., 424 U.S. 747, 764, 96 S. Ct. 1251, 47 L. Ed. 2d 444 (1976))*. Mindful of this admonition, courts have ordered the reinstatement of employees in different positions for which they are qualified where their original position was eliminated, see, e.g. *Woodhouse v. Magnolia Hosp., 92 F.3d 248, 257-58 (5th Cir. 1996)*; *Kuepferle v. Johnson Controls, Inc., 713 F. Supp. 171, 173 (M.D.N.C. 1988)*, or to positions in different geographic locations. See, e.g., *Farhat v. Sally Beauty Co., Inc., No. 91 Civ. 2177, 1994 U.S. Dist. LEXIS 21901, 1994 WL 645282, at *9 (E.D. Mo. Aug. 23, 1994)*. Defendant has not demonstrated that such a remedy was unfeasible when this litigation began.

### b. Standing to Seek Declaratory Relief

With respect to Robinson's request for "declaratory judgment that the practices complained of . . . are unlawful" (Am. Compl. ¶ 38), the magistrate judge recommended finding that Robinson "should be allowed some discovery into what the Bureau's actual practice was," based on Robinson's allegation that "despite any stated 'policy' regarding the availability of rehire to terminated employees who could demonstrate the dismissal of criminal charges against **[*14]** them, the Bureau's actual practice in Plaintiff's case was to ignore post-arrest submissions and neglect to investigate whether charges had in fact been dropped." (R&R at 18.)

"[W]here a conclusory allegation in the complaint is contradicted by a document . . . , the document controls and the allegation is not accepted as true." *Amidax Trading Group v. S.W.I.F.T. SCRL, 671 F.3d 140, 146 (2d Cir. 2011)*. The magistrate judge noted that while Defendant mentioned in its moving papers that, "but for an administrative error, Plaintiff would have been rehired in May, 2010, upon presentation of documentation showing that the criminal charge against

---

[2] Where a defendant moves to dismiss for lack of standing, "the court may resolve the disputed jurisdictional issues by referring to evidence outside of the pleadings, such as affidavits.'" *Unclaimed Property Recovery Serv., Inc. v. Credit Suisse AG, No. 12 Civ. 3290, 2013 U.S. Dist. LEXIS 59499, 2013 WL 1777761, at *1 (S.D.N.Y. Apr. 25, 2013)* (quoting *Zapata Middle E. Const. Co. Ltd. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000))*.

[3] The **[*12]** Court may "receive further evidence" in assessing objections to an R&R. *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72(b)(3)*.

2013 U.S. Dist. LEXIS 71471, *14

him had been dismissed," the evidence submitted by Defendant "never actually states that . . . the Bureau ever stood ready to rehire him." (R&R at 17-18.) This omission, which was pivotal to the magistrate judge's finding that the record did not contradict the alleged discrepancy between Defendant's stated policy and how that policy was applied in practice, has now been cured. (See Third Patterson Decl. at ¶ 3.) Based on the supplemented record, there was no injury that could be remedied by declaratory relief relating to the Bureau's hiring and re-hiring **[*15]** policies for the 2010 Census, and "allegations of *possible* future injury" relating to either a hypothetical ***future arrest*** or the 2020 Census "are not sufficient" because they are "too ***speculative*** for Article III purposes." *Clapper v. Amnesty Int'l, USA, 133 S.Ct. 1138, 1147, 185 L. Ed. 2d 264 (2013)* (internal quotations omitted, emphasis in original). Accordingly, Robinson lacks standing to seek declaratory judgment and discovery into the Bureau's general practice, as recommended by Judge Freedman, is no longer warranted.

*c. Standing to Seek Other Equitable Relief*

In light of the "'broad equitable powers'" afforded by Title VII "to provide victims . . . with 'complete relief,'" *Gulino v. Bd. of Educ. Of City Sch. Dist. of N.Y., 96 Civ. 8414, 907 F. Supp. 2d 492, 2012 U.S. Dist. LEXIS 172687, 2012 WL 6043803, at *3 (S.D.N.Y. Dec. 5, 2012)* (quoting *Loeffler v. Frank, 486 U.S. 549, 558 n.6, 108 S. Ct. 1965, 100 L. Ed. 2d 549 (1988))*, the magistrate judge noted that Robinson's request for "[a]n order that Defendant eradicate the effects of its past and present unlawful employment practices" (Am. Compl. ¶ 40) could be fairly read to include requests for an injunction directing Defendant to expunge Robinson's employment records and/or publicly state that Plaintiff's termination was unlawful. (R&R at 15-16.) **[*16]** The magistrate judge recommended that Robinson has standing to seek such relief because Robinson "assert[ed] a likelihood of 'adverse effects' from the disclosure of his employment history to other, prospective employers." (Id. at 16.) Since Robinson "would likely be required to disclose his prior employment and at least the dates of that employment" on future employment applications, which "would give rise to questions by a prospective employer regarding the circumstances under which Plaintiff left his position," it was appropriate for the magistrate judge to find that the harm from such a disclosure could be remedied by Robinson's requested relief. (Id. at 16.)

Defendant asserts that Robinson's "theory of *future* injury is too ***speculative*** to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *Clapper, 133 S.Ct. at 1143* (quoting *Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990)*, emphasis in original). In Clapper, the Supreme Court found that "the Second Circuit's 'objectively reasonable likelihood' standard is inconsistent with [the] requirement that threatened injury must be certainly impending to constitute injury in fact," and that the theory **[*17]** of standing asserted was overly ***speculative*** because it "relie[d] on a highly attenuated chain of possibilities." Id. (internal quotations omitted). Yet, "as the majority appear[ed] to concede, *certainty* is not . . . the touchstone of standing." *Id. at 1160* (Breyer, J., dissenting, emphasis in original). Rather, writing for the majority, Justice Alito acknowledged that the Supreme Court's prior opinions "do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about" and that standing may be "based on a 'substantial risk' that the harm will occur." *Id. at 1150 n.5* (collecting cases).

Moreover, *Clapper* is inapposite because Defendant has not corrected the clerical error that cost Robinson his job. See *Clapper, 133 S.Ct. at 1153* (distinguishing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 184, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)*, because the harm enjoined unlike in Laidlaw was "concededly ongoing, . . . quite unlike the present case."); see also *Baur, 352 F.3d at 640-41* ("Unlike in . . . cases where standing was found wanting because the threatened injury was wholly contingent on independent and unpredictable events," standing is satisfied **[*18]** by a "present exposure to a credible threat of harm."). Rather than addressing ***speculative*** or hypothetical future injuries, an injunction requiring an employer to expunge personnel files or provide a letter of recommendation for a wrongfully discharged employee remedies the "immediate harm" caused by improper termination. *EEOC v. HBE Corp., 135 F.3d 543, 557 (8th Cir. 1998)*. Indeed, in reversing a district court's denial of expungement, the Seventh Circuit explained that "[b]y refusing to expunge . . . a successful plaintiff's personnel file, a court may force the plaintiff to bear the brunt of his employer's unlawful conduct for the rest of his working career, which certainly contravenes the goal of making a plaintiff whole through equitable remedies." *Bruso v. United Airlines, Inc., 239 F.3d 848, 863-64 (7th Cir. 2001)*. Accordingly, Robinson "has alleged enough . . . to recognize his standing to pursue such relief to redress the negative consequences of his purportedly

unlawful termination." (R&R at 17.)

*d. Mootness*

Finally, Defendant asserts that Robinson's claim for reinstatement is now moot because "all 2010 decennial operations employing enumerators have ceased."[4] (Objections at 20.) **[*19]** As discussed <u>supra</u>, courts ordering the reinstatement of wrongfully terminated employees are not limited to ordering that they be reinstated in the same position from which they were discharged. Accordingly, Robinson's reinstatement claim is not moot because the Bureau has not addressed why it would be unable to provide him with a different, but comparable, job.

## CONCLUSION

The Court has reviewed the remaining sections of the R&R for clear error, and, finding none, hereby adopts them. For the foregoing reasons, Defendant's motion to dismiss is PARTIALLY GRANTED, with respect to Robinson's claim for declaratory judgment and to enjoin the Bureau's termination policy, and is otherwise DENIED. The reference to the magistrate judge is terminated. Defendant is directed to answer to the complaint and both parties are directed to jointly submit a civil case management plan by Friday, June 28, 2013. The Clerk of Court is directed to terminate **[*20]** the motion at docket number 38.

Dated: New York, New York

May 20, 2013

SO ORDERED

/s/ Paul A. Crotty

PAUL A. CROTTY

United States District Judge

---

End of Document

---

[4] Having found that Robinson lacks standing to seek declaratory judgment, the Court does not address Defendant's assertion that Robinson's claim for declaratory judgment is moot. Defendant has not asserted that Robinson's claims for other equitable relief are moot.

Daniel E. White [Wyo. State Bar No. 5-1545]
Senior Assistant Attorney General
Adrian Kowalski[Wyo. State Bar No. 7-6125]
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, Wyoming 82002
(307) 777-7862
(307) 777-8920 Facsimile
dan.white@wyo.gov
adrian.kowalski@wyo.gov

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 19-CV-21-S |
| | ) | |
| BEAU J. EGGER, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT OFFICER EGGER'S RESPONSE
## TO MOTION FOR SUMMARY JUDGMENT

Defendant Officer Egger files this response brief in opposition to Bronnenberg's motion for summary judgment. Bronnenberg moves for summary judgment. The Court should deny her motion for the reasons below.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *J. V. ex rel. C. V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1294-95 (10th Cir. 2016) (*quoting* Fed. R. Civ. P. 56(a)). The Court must deny her motion because she cannot overcome qualified immunity on either prong. *See Castillo v. Day*, 790 F.3d 1013, 1019 (10th Cir. 2015) ("To overcome this presumption, a plaintiff must prove 'that (1) the defendant violated her constitutional or statutory rights, and (2) the right was clearly

established at the time of the alleged unlawful activity.'"). Bronnenberg cannot show a constitutional violation and does not identify any case law clearly protecting against good faith arrests pursuant to a facially valid arrest warrant. The Court should accordingly deny her motion.

## I.   Bronnenberg still cannot show a constitutional violation

It is difficult to glean the grounds for summary judgment from her motion. For example, she begins by reciting her request for declaratory judgment and apparently asks the Court to declare "that defendant's acts, policies, and practices herein described and complained of violated plaintiff's rights under the Fourth Amendment and Fourteenth Amendment." (Doc. 38 at 1). To whatever extent she does seek declaratory judgment, Officer Egger refers the Court to his response to her motion for declaratory judgment. (Doc. 39).

Bronnenberg then clarifies the timing of an interaction described in her affidavit. (Doc. 38 at 2). This interaction, however, remains immaterial for the reasons given in Officer Egger's reply in support of summary judgment (Doc. 35 at 3). She still does not provide any evidence, nor allege, that the interaction in question was routine police procedure or that Officer Egger had any knowledge of said interaction.

Bronnenberg, however, appears to argue that Officer Egger violated the Fourth Amendment by arresting her without probable cause. (Doc. 38 at 2-5). She appears to assert that subjective intent is irrelevant to the analysis of the Fourth Amendment claim and goes a step further by appearing to suggest that a strict liability standard applies. (*Id*. at 2-4). In support of her position, she cites cases which considered the probable cause of **warrantless** searches and arrests. *See e.g. Specht v. Jensen*, 832 F.2d 1516, 1522-23 (10th Cir. 1987) ("In sum, a Fourth Amendment violation occurs when police engage in a **warrantless** search and no exception to the warrant requirement applies, or when police search pursuant to a warrant not based on probable cause.") (emphasis added).

This position, however, is flawed. While it is true that "[t]he probable cause inquiry is an objective one" and that the subjective intent of the arresting officer is irrelevant in

this analysis, "[p]robable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested." *Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012); *Devenpeck v. Alford*, 543 U.S. 146, 154-55 (2004) ("Subjective intent of the arresting officer, however it is determined (and of course subjective intent is always determined by objective means), is simply no basis for invalidating an arrest.").

And here, Bronnenberg was arrested pursuant to a facially valid arrest warrant. This is fatal to Bronnenberg's argument for two reasons. First, the warrant itself is enough to establish probable cause for the arrest. *See e.g. Bencomo v. Bd. of Cnty. comm'rs of Bernalillo*, 2016 U.S. Dist. LEXIS 189360, at *19 (D.N.M. Mar. 31, 2016) ("So too, here, even if Gonzales' mistake of booking Plaintiff into MDC on the Calletano warrant was unreasonable, Gonzales' action of booking Plaintiff into MDC nonetheless was reasonable under the Fourth Amendment because, regardless of Gonzales' subjective basis for booking Plaintiff into MDC, the objective facts known to Gonzales at the time of the booking establish a reasonable basis for Plaintiff's detention—namely, Plaintiff's own facially-valid arrest warrant."). Second, as discussed in the memorandum in support of summary judgment, the existence of the facially valid warrant constitutes an absolute bar to damages from an arrest pursuant to that warrant. *See* (Doc. 29 at 7-10). The analysis of this defense is independent from the analysis for probable cause and revolves around the good-faith execution of the arrest warrant in question. (*Id*.); *Hill v. Bogans*. 735 F.2d 391, 393 (10th Cir. 1984). And for the reasons already discussed in the memorandum in support of summary judgment, this defense bars any claim against Officer Egger. (Doc. 29 at 7-10).

Finally, Bronnenberg briefly appears to assert that the arrest was, in fact, an arrest and not non-custodial questioning. (Doc. 38 at 4). Officer Egger does not dispute this point, but contends it was a good-faith arrest pursuant to a facially valid arrest warrant. In sum, Bronnenberg cannot show any constitutional violation and the Court must dismiss her motion.

## II. Bronnenberg still does not identify any case law clearly establishing a right against good faith arrests pursuant to a facially valid arrest warrant.

Bronnenberg's motion for summary judgment also fails because it does not identify clearly established law by pointing "to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018). To reiterate, "the clearly established law must be 'particularized' to the facts of the case." *Scott v. City of Albuquerque*, 711 F. App'x 871, 879 n.7 (10th Cir. 2017) (*quoting White v. Pauly*, 137 S.Ct. 548, 552 (2017) (per curiam)).

As an initial matter, Bronnenberg's motion does not address this element. (Doc. 38 at 1-5). This alone is fatal to her motion. Bronnenberg, however, does attach two cases to her motion. (Doc. 38-1 and 38-2). Both cases fail to clearly establish the rights in question to whatever extent she seeks to use them in support of her argument on this element.

First, she cites *Specht v. Jensen*, a case where officers searched a computer without any warrant whatsoever. 832 F.2d 1516, 1523 (10th Cir. 1987). This case is distinguishable because it does not involve an arrest pursuant to a facially valid arrest warrant. *Id*. Rather, at most it condemns the conduct of officers who negligently rely on a repossession order to conduct a warrantless search of a computer. *Id*. This case did not involve an arrest, nor the execution of a facially valid warrant and is thus distinguishable from this case.

Second, she cites *Beck v. Ohio*, a case where the Supreme Court found a warrantless arrest lacked probable cause because "[n]o decision of this Court has upheld the constitutional validity of a warrantless arrest with support so scant as this record presents." 379 U.S. 89, 93(1964). The arrest was solely based on the officer's apparent prior knowledge of the arrestee through unidentified "reports" and "information;" the officer's testimony did not explain the source of any information. *Id. Beck* is distinguishable alone on the fact that it involved a warrantless arrest; it simply cannot serve as notice that the good-faith execution of a facially valid warrant was somehow wrongful.

For the reasons above, and those discussed in prior filings, Bronnenberg has not, and cannot, identify clearly established law protecting against the good-faith execution of

facially valid arrest warrants verified through routine police procedures. (Doc. 29 at 11-15); (Doc. 36 at 2-5). The Court should accordingly deny Bronnenberg's motion.

## III.   Conclusion

For the reasons above, and those already discussed in his motion for summary judgment, Defendant Officer Egger respectfully requests the Court deny Bronnenberg's motion for summary judgment.

**DATED** this 18th day of June, 2019.

*/s/ Adrian K. Kowalski*
Adrian K. Kowalski [Wyo. Bar No. 7-6125]
Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have sent a copy of the foregoing on this 18th day of June 2019, to the following individuals:

Tami M. Bronnenberg                                   [✔] U.S. MAIL
P.O. Box 802
Cody, WY 82414

*Jessica Curless*
Jessica Curless, Paralegal
Office of the Wyoming Attorney General

 Neutral
As of: June 18, 2019 7:59 PM Z

# *Bencomo v. Bd. of Cty. Comm'rs of Bernalillo*

United States District Court for the District of New Mexico

March 31, 2016, Filed

Civ. No. 14-1114 SCY/KBM

**Reporter**
2016 U.S. Dist. LEXIS 189367 *

SERGIO ALBERTO BENCOMO, Plaintiff, v. BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF BERNALILLO, et al., Defendants.

**Prior History:** *Bencomo v. Bd. of Cty. Comm'rs of Bernalillo, 2016 U.S. Dist. LEXIS 189360 (D.N.M., Mar. 31, 2016)*

## Core Terms

law enforcement officer, duties, summary judgment, immunity, law law law, corrections, inmates, personal property, principal duty, employees, booking, custody, entity, law enforcement, Defendants', non-movant, arrests, material fact, detention, documents, processes, purposes, genuine, parties, records, deprivation, courts, rights, waived, individuals

**Counsel:** **[*1]** For Sergio Alberto Bencomo, Plaintiff: Edward Chavez, Jr, LEAD ATTORNEY, Edward Chavez Jr Attorney at Law, Albuquerque, NM; Kenneth R. Wagner, Thomas J. McBride, LEAD ATTORNEYS, Albuquerque, NM.

For Board of County Commissioners of the County of Bernalillo, a political subdivision of the State of New Mexico, and its Subsidiary, the Bernalillo County Metropolitan Detention Center, Violette Gonzales, individually and in her official capacity with the Bernalillo County Metropolitan Detention Center, Defendants: Lindsay Drennan, LEAD ATTORNEY, Luis E. Robles, Marcus J Rael, Jr, Robles, Rael & Anaya, PC, Albuquerque, NM.

**Judges:** Steven C. Yarbrough, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** Steven C. Yarbrough

## Opinion

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Defendants Board of County Commissioners of the County of Bernalillo ("the County"), Bernalillo County Metropolitan Detention Center ("MDC"), and Violette Gonzales's Motion for Partial Summary Judgment No. II. ECF No. 40. In this motion, Defendants argue that they are entitled to summary judgment on Plaintiff's claims for Negligence (Count IV) and Deprivation of Rights, Privileges and Immunities (Count VI), both of which were brought pursuant **[*2]** to the *New Mexico Tort Claims Act ("NMTCA")*, *NMSA 1978, § 41-4-1 to -30* (1976, as amended through 2015). Having reviewed the parties' briefing, the relevant law, and otherwise being fully advised, the Court concludes that Defendants' motion for summary judgment on Counts IV and VI is well-taken and shall be **granted**. Accordingly, Counts IV and VI are dismissed with prejudice.

### I. BACKGROUND[1]

Plaintiff Sergio Alberto Bencomo's claims in this lawsuit arise from his booking into the MDC on two warrants by Defendant Violette Gonzales, a Corrections Technician employed by the facility. The parties do not dispute that the first warrant was for Plaintiff and charged him with receiving or transferring stolen motor vehicles, receiving stolen property, and one count of aggravated fleeing of a law enforcement officer. ECF No. 39-4. Nor do the parties dispute that the second warrant was for someone other than Plaintiff. This second warrant charged an individual named 'Calletano Bencomo' with criminal sexual penetration of a minor in the first degree, criminal sexual contact, and kidnapping. ECF No. 39-3.

---

[1] Except as otherwise noted, the following facts are undisputed.

Gonzales booked Plaintiff into the MDC on these two warrants on November 3, 2012, and Plaintiff remained incarcerated **[\*3]** at the MDC for seventeen (17) days until his release on November 20, 2012. ECF No. 50-1 at 2-4.

Based on his booking on the Calletano Bencomo warrant, Plaintiff commenced this civil rights action on November 3, 2014 against the County, the MDC, Gonzales, the City of Albuquerque, Albuquerque Police Department ("APD"), and unnamed John/Jane Doe employees of the MDC and APD. *See* Pl.'s Compl. (ECF No. 4-1). Plaintiff's complaint raises individual and municipal liability claims pursuant to *42 U.S.C. § 1983* as well as claims under the NMTCA. Defendants removed the action to this Court on December 9, 2014. ECF No. 1. On March 18, 2015, the Court dismissed Defendants the City of Albuquerque and its subsidiary, APD, without prejudice from this action based on a joint motion filed by the parties. ECF Nos. 24, 25.

On July 2, 2015, Defendants Gonzales, the County, and the MDC moved for summary judgment on Counts IV and VI of Plaintiff's complaint. *See* Def. Mot., ECF No. 40. In Count IV, Plaintiff asserts a negligence claim under the NMTCA against the County, claiming that the actions of Gonzales and other unnamed County correctional officers resulted in the "deprivation of his rights, privileges or immunities secured **[\*4]** by the Constitution and laws of the United States and New Mexico to remain free from false, unlawful, and/or unreasonable arrest and false, unlawful and/or unreasonable detention." ECF No. 4-1 at 12. Plaintiff further alleges in Count IV that the County had supervisory responsibility over its employees, including Gonzales, and that it breached this duty by failing to "properly screen, hire, train, monitor, supervise and/or discipline all of its employees." *Id.* In Count VI, Plaintiff asserts a claim for the "deprivation of rights, privileges, and immunities" under the NMTCA against Gonzales and the County. ECF No. 4-1 at 14. With regard to Gonzales, Plaintiff alleges in Count VI that Gonzales's conduct caused Plaintiff's damages and that Gonzales was acting as a law enforcement officer when she violated provisions of the NMTCA. ECF No. 4-1 at 14-15. With regard to the County, Plaintiff specifically alleges that the County is liable under the doctrine of respondeat superior for violations of the NMTCA by county employees, including Gonzales, who were acting as law enforcement officers at the time they allegedly violated the NMTCA. ECF No. 4-1 at 14-15.

Plaintiff filed a response in opposition **[\*5]** to

Defendants' motion for summary judgment on September 9, 2015.[2] *See* Pl. Resp., ECF No. 52.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. There is no genuine dispute as to any material fact unless the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson, 732 F.3d 1151, 1156-57 (10th Cir. 2013)* (quotation omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab., 992 F.2d 1033, 1036 (10th Cir. 1993)*. Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

## III. ANALYSIS

The NMTCA "preserves sovereign immunity against tort claims for state governmental entities and public employees acting in the scope of their duties," except as that immunity is waived by *Sections 41-4-5 to -12 of the NMTCA*. *Fernandez v. Mora-San Miguel Elec. Coop., Inc., 462 F.3d 1244, 1250 (10th Cir. 2006)*; *NMSA 1978, § 41-4-4(A)* (2001). The only waiver asserted by Plaintiff is *Section 41-4-12 of the NMTCA*, which waives sovereign immunity for tort **[\*6]** claims "caused by law enforcement officers while acting within the scope of their duties." *See NMSA 1978, § 41-4-12* (1977); *see*

---

[2] Plaintiff failed to comply with the Court's Local Rule regarding the format of a response brief. *See D.N.M.LR-Civ. 56.1(b)* (stating that "[e]ach fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed . . . . The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.").

Pl.'s Compl. ECF No. 4-1 at 14. "[I]n order to state a tort claim under the waiver of immunity set out in *Section 41-4-12*, a plaintiff must demonstrate that the defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law." *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021, ¶ 7, 916 P.2d 1313, 121 N.M. 646*. Because "[a]n entity or agency can only act through its employees," Plaintiff's NMTCA claims against the County rest on the County's potential liability for Gonzales's conduct. *See Abalos v. Bernalillo Cnty. Dist. Attorney's Office et al., 1987-NMCA-026, ¶ 18, 734 P.2d 794, 105 N.M. 554*.

Defendants argue they are entitled to summary judgment on Counts IV and VI of Plaintiff's complaint because Gonzales is not a law enforcement officer as that term is defined under the NMTCA, and alternatively, that even if she were a law enforcement officer, Gonzales did not commit any of the enumerated torts for which immunity is waived for law enforcement officers under the NMTCA.[3] Defs.' Mot. at 3, 10-16; Defs.' Reply at 6-12 (ECF No. 60). In response, Plaintiff contends that Gonzales is a law enforcement officer within the meaning of the NMTCA and **[*7]** further, that there are genuine issues of material fact as to whether she committed any of the torts for which immunity is waived for law enforcement officers under the NMTCA. Pl.'s Resp. at 7.

Thus, the threshold — and as it turns out, dispositive — inquiry for the Court is whether Gonzales, as a Corrections Technician, is a law enforcement officer for purposes of the waiver set forth in *Section 41-4-12 of the NMTCA*. A law enforcement officer is defined in the NMTCA as a:

> full-time salaried public employee of a governmental entity, or a certified part-time salaried

police officer employed by a governmental entity, *whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes*, or members of the national guard when called to active duty by the governor.

*NMSA 1978, § 41-4-3(D)* (2015) (emphasis added). New Mexico courts have construed this definition "strictly." *See Rayos v. State ex rel. NM Dep't of Corr. et al., 2014-NMCA-103, ¶ 8, 336 P.3d 428*. "The immunity waiver for law enforcement officers requires that the defendants' principal duties, those duties to which they devote a majority of their time, be of a law enforcement nature." *Id.* (citing *Weinstein, 1996-NMSC-021, ¶ 8*). Thus, the Court must "determine the duties upon which the employee spends the **[*8]** majority of his or her time (principal duties) and consider the character of those principal duties against the admittedly amorphous standard of the duties and activities traditionally performed by law enforcement officers." *Id.* "There is no exhaustive list of activities that fit within the law enforcement mold." *Id.* However, as the Tenth Circuit observed in *Fernandez*, the New Mexico Supreme Court has considered traditional law enforcement activities to "include preserving the public peace, preventing and quelling public disturbances, [and] enforcing state laws, including but not limited to the power to make arrests for violation of state laws." *See Fernandez, 462 F.3d at 1251* (citing *Anchondo v. Corrs. Dep't, 1983-NMSC-051, ¶ 8, 666 P.2d 1255, 100 N.M. 108*).

In this case, the Court will consider the MDC's job description for corrections technicians as well as the deposition testimony provided by the parties to determine whether Gonzales is a law enforcement officer for purposes of the NMTCA. *See Rayos, 2014-NMCA-103, ¶ 8* (stating that courts may consider departmental job descriptions, affidavits, statutes or regulations — among other items — in determining the duties of public employees). The job position summary states that a corrections technician "perform[s] duties involved with the intake and release of inmates **[*9]** into the Metropolitan Detention Center system; maintain[s] security of records and personal property associated with these processes[;] [p]erforms a variety of administrative duties such as answering telephones, typing memoranda and other documents, data entry, cash handling, and filing as needed." ECF No. 40-2. The duties and responsibilities are specifically enumerated in the job description as:

> 1. Review, interpret and process legal documents, court orders, and arrest documents using

---

[3] With regard to Count IV, Defendants also argue that the County is immune from tort liability under the NMTCA for simple negligence claims. Defs.' Mot. at 6-7. The Court need not reach this argument because, as stated earlier, the County's liability in Counts IV and VI rests on Gonzales's conduct and whether she is a law enforcement officer for purposes of the waiver set forth in *Section 41-4-12*. *See Abalos, 1987-NMCA-026, ¶ 23* (stating that an entity may be named in an NMTCA action if the plaintiff can show "(1) a negligent employee who meets one of the waiver exceptions" and "(2) an entity that has immediate supervisory responsibilities over the employee.").

applicable records management systems.

2. Collect, prepare and review data for statistical purposes and report to local, state and federal law enforcement agencies.

3. With high degree of accuracy, enter, cancel, and modify reports using applicable electronic record management systems.

4. Process and file all incoming documentation and maintain records according to established rules and regulations.

5. Receive, account for and release money, personal property and clothing submitted to MDC at booking; check property for safety hazards and secure items.

6. Maintain accurate records and logs of all personal property; retrieve and gather personal property for inmates being released.

7. Investigate and research missing or lost personal **[*10]** property.

8. Maintain security of work areas by limiting access to authorized personal only; maintain and control access to files.

9. Provide exceptional customer service to outside agencies, the public, coworkers, etc. by providing appropriate information according to policy and procedures.

10. Provide typing/word processing assistance for the department; answer telephone, transfer calls and take messages when necessary.

11. Maintain work area in a clean and orderly manner.

*Id.* This job description is consistent with Gonzales' description of her job duties in her deposition:

> [As a corrections technician], we either work in records which processes documentation for release or intake of inmates' files. Booking is when we process their actual — when we talk to inmates and actually process them into our system. And property is when we take . . . their personal property and release their personal property.

Gonzales Dep. 15:24 - 16:6, May 22, 2015, ECF No. 40-1.[4]

---

[4] The Court notes that Plaintiff set forth several facts in his response brief related to Gonzales's alleged actions in booking Plaintiff. *See* Pl.'s Resp. at 4-6. The Court does not consider these facts to be material to its analysis because "[t]he statutory requirement that the defendants be law enforcement officers does not focus on the defendants' specific acts at the time of their alleged negligence. Instead it simply requires that the defendants' principal duties, those duties to which they

After careful review of the evidence in the record, the Court concludes that Gonzales is not a law enforcement officer within the meaning of the NMTCA for a number of reasons. First, it is clear that Gonzales's duties are primarily administrative **[*11]** or clerical in nature in that she is responsible for inputting information into the MDC's record management systems, maintaining the personal property of inmates, answering telephones, providing word processing assistance and providing customer service to outside entities. These administrative duties and activities do not fit within the mold of those duties traditionally performed by law enforcement officers. *See Dunn v. State ex rel. Taxation & Revenue Dep't, 1993-NMCA-059, ¶ 11, 859 P.2d 469, 116 N.M. 1* (holding that director of the New Mexico Motor Vehicle Department was not a law enforcement officer because "the vast majority of [his] time and effort are involved in administrative matters"); *see also Anchondo, 1983-NMSC-051, ¶¶ 5-7* (holding that the secretary of corrections and warden of state penitentiary were not law enforcement officers because their principal duties were administrative in nature and they did "not deal directly with the daily custodial care of prison inmates.").

Second, there is no evidence in the record establishing that Gonzales had the authority to "make arrests for crimes," *Section 41-4-3(D)*, or that she had actually ever done so, in her position as a corrections technician. Nor is there evidence that Gonzales was required to hold any type of law enforcement certification or that she had any authority **[*12]** to enforce state laws while performing her duties as a corrections technician. *See Limacher v. Spivey, 2008-NMCA-163, ¶ 24, 198 P.3d 370, 145 N.M. 344* (affirming district court's determination that employee of the office of state engineer was not a law enforcement officer under the NMTCA where "she had never actually arrested anyone, her duties were mainly administrative, she had no law enforcement certification, she did not carry a gun, and her vehicle did not have police emergency lights."). Likewise, there is no indication that Gonzales was responsible for "maintain[ing] public order," *Section 41-4-3(D)*, in the course of performing her duties as a corrections technician. *See Dunn v. McFeeley, 1999-NMCA-084, ¶ 24, 984 P.2d 760, 127 N.M. 513* (interpreting the phrase "maintain public order" in *Section 41-4-3(D)* as "essentially the same as handling breaches of the peace").

---

devote a majority of their time, be of a law enforcement nature." *Weinstein, 1996-NMSC-021, ¶ 12.*

Third, the Court is not persuaded by Plaintiff's argument that corrections technicians are law enforcement officers within the meaning of the NMTCA because they "process people into a detention center, which holds inmates *accused* of offenses" and they "perform the first step in 'holding in custody any person accused of a crime.'" Pl.'s Resp. at 11. Plaintiff's argument rests on the portion of *Section 41-4-3(D)* that states that law enforcement officers include those individuals whose "principal duties under **[*13]** law are to hold in custody any person accused of a criminal offense." However, the Court disagrees that mere employment by a detention center facility that holds individuals accused of a criminal offense is sufficient to classify an employee as a law enforcement officer for purposes of the NMTCA. As the Tenth Circuit and New Mexico courts have emphasized, "[i]t is the employee's *primary duties* which are the crux of the inquiry." *Fernandez, 462 F.3d at 1251*; *see also Dunn, 1999-NMCA-084, ¶ 25* (noting that New Mexico courts "have repeatedly found that a connection to law enforcement activity, even being a member of the law-enforcement team, is insufficient by itself to make one a law enforcement officer; the person's duties must directly impact public order."). Although Gonzales is employed by a facility that holds individuals accused of offenses, there is no evidence establishing that any aspect of her duties — primary or otherwise — includes responsibility for the custodial care and supervision of inmates. Furthermore, although Gonzales conducts bookings and processes paperwork for the intake of inmates, the Court finds that these actions are not directly connected with those actions that are traditionally considered law enforcement activity. **[*14]** *Cf. Abalos, 1987-NMCA-026, ¶ 34, 105 N.M. 554, 734 P.2d 794* (holding that staff of district attorney's office were not law enforcement officers on the basis of "their alleged failure to timely process the paperwork [that] resulted in Moody's release from custody. An action or inaction indirectly affecting the release of a prisoner does not rise to a 'principal duty to hold in custody' under law.") (alterations omitted)).

## IV. CONCLUSION

Based on the foregoing, the Court finds that there are no issues of material fact from which it could be found that Gonzales falls within the law enforcement waiver under the NMTCA. Thus, because Gonzales is not a law enforcement officer as defined in *Section 41-4-3(D)*, the Court concludes that the waiver of immunity for law enforcement officers in *Section 41-4-12* does not apply to her or to the County. Defendants are entitled to

summary judgment on Counts IV and Count VI of Plaintiff's complaint. It is therefore ordered that Defendants' Motion for Summary Judgment No. II (ECF No. 40) is **GRANTED** and Counts IV and VI of Plaintiff's complaint are dismissed with prejudice.

**IT IS SO ORDERED**.

/s/ Steven C. Yarbrough

UNITED STATES MAGISTRATE JUDGE

Presiding by Consent

_____

End of Document

 Positive
As of: June 18, 2019 7:58 PM Z

## *Scott v. City of Albuquerque*

United States Court of Appeals for the Tenth Circuit

October 5, 2017, Filed

No. 15-2154

### Reporter

711 Fed. Appx. 871 *; 2017 U.S. App. LEXIS 19423 **; 2017 WL 4479357

QUENTIN SCOTT, Plaintiff - Appellant, v. CITY OF ALBUQUERQUE; RAY SCHULTZ, former Chief of Police; D. HENSLEY, Albuquerque Police Officer, Defendant - Appellees.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** (D.C. No. 1:14-CV-0665-SWS-WPL). (D. N.M.).

*Scott v. City of Albuquerque, 2015 U.S. Dist. LEXIS 189654 (D.N.M., Aug. 17, 2015)*

## Core Terms

arrest, disability, handcuffs, willful, probable cause, accommodation, classroom, constitutional violation, educational process, violations, injuries, hallway, teacher, wrists, qualified immunity, handcuffed, willfully, walking, argues, janitor's, excessive force, district court, circumstances, pain, the Fourth Amendment, municipal-liability, qualified-immunity, excessive-force, interfer[ing, officer's

## Case Summary

### Overview

HOLDINGS: [1]-Where a special education middle school student, who had permission to leave the classroom if he was anxious or distracted, was arrested for skipping class under *N.M. Stat. Ann. § 30-20-13(D)*, which made it illegal to willfully interfere with the educational process, the officer was entitled to qualified immunity in a *§ 1983 Fourth Amendment* unlawful arrest claim because even though the officer lacked probable cause to arrest under *§ 30-20-13(D)*, there was no clearly established law at that time that would have given the officer notice that the arrest was unlawful; [2]-The student's excessive force claim failed because he suffered only de minimus injury from the handcuffing; [3]-The student's ADA claim failed because there was no evidence of a request for an accommodation due to his disability or that the officer should have known that the student needed an accommodation.

### Outcome

Decision affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

**HN1**[ ] **Standards of Review**

Appellate courts review de novo a district court's grant of summary judgment.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

**HN2**[ ] **Appropriateness**

Summary judgment is appropriate when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

711 Fed. Appx. 871, *871; 2017 U.S. App. LEXIS 19423, **1

## HN3[⬇] Evidentiary Considerations

On summary judgment, courts view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

## HN4[⬇] Individual Capacity

Qualified immunity protects governmental officials from liability for civil damages for conduct that does not violate clearly-established statutory or constitutional rights. Appellate courts review qualified-immunity summary-judgment decisions differently from other summary-judgment decisions. When a defendant asserts a qualified-immunity defense, the plaintiff must show (1) that the defendant violated a federal constitutional or statutory right, and (2) that the right was clearly established at the time of the challenged conduct. If a plaintiff fails to establish either prong, the defendant is entitled to qualified immunity.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

## HN5[⬇] Probable Cause

A warrantless arrest violates the *Fourth Amendment* unless the arresting officer had probable cause to make the arrest. An officer has probable cause whenever he knows of reasonably trustworthy facts that would lead a prudent person to believe that the arrestee is committing—or has committed—a crime.

Civil Rights Law > ... > Section 1983 Actions > Elements > Protected Rights

## HN6[⬇] Protected Rights

*42 U.S.C.S. § 1983* imposes liability for violations of rights protected by the Constitution.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

## HN7[⬇] Individual Capacity

For a qualified immunity analysis, when a state Supreme Court has not spoken on the question at issue, courts assume (without deciding) that a reasonable police officer would seek guidance regarding the scope of proper conduct at least in part from any on-point decisions of the state's intermediate court of appeals.

Education Law > ... > Student Discipline > Misconduct > Disruptive Behavior

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Disruptive Conduct

## HN8[⬇] Disruptive Behavior

*N.M. Stat. Ann. § 30-20-13(D)* prohibits anybody from willfully interfering with the educational process. *N.M. Stat. Ann. § 30-20-13(D)*. The word "willfully" suggests that a violation occurs only when a person acts with the conscious objective of interfering with the educational process. In other words, it is not enough that a person simply commits an act that disrupts the functions of a school; to violate *§ 30-20-13(D)*, that person must act with the conscious purpose of interfering with the educational process. *N.M. Stat. Ann. § 30-20-13(D)*.

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Willfulness

## HN9[⬇] Willfulness

A willful violation of a provision of a statute or regulation is any conscious or intentional failure to comply therewith, as distinguished from accidental or involuntary noncompliance.

711 Fed. Appx. 871, *871; 2017 U.S. App. LEXIS 19423, **1

Education Law > ... > Student Discipline > Misconduct > Disruptive Behavior

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Disruptive Conduct

_HN10_[⬇] **Disruptive Behavior**

In _N.M. Stat. Ann. § 30-20-13(D)_, the New Mexico legislature sought to bar conduct that was designed to interfere with the educational process, rather than conduct that merely happened to have that effect. The statute is not genuinely ambiguous.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

_HN11_[⬇] **Individual Capacity**

For qualified immunity, a plaintiff ordinarily may show that a particular right was clearly established by pointing to an on-point decision from the U.S. Supreme Court or the applicable circuit court. But, courts often look to state-court decisions when they are asked to decide a question that depends on the contours of a state's substantive criminal law.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

_HN12_[⬇] **Individual Capacity**

The clearly established law for qualified immunity must be particularized to the facts of the case. The dispositive question is whether the violative nature of particular conduct is clearly established.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Reasonable Force

_HN13_[⬇] **Excessive Force**

A law-enforcement officer's right to make an arrest necessarily carries with it the right to use some degree of physical coercion. Courts evaluate excessive-force claims under an objective-reasonableness standard, using the perspective of a reasonable officer on the scene. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to underlying intent or motivation. The reasonableness of a police officer's actions is evaluated from the perspective of a reasonable officer on the scene, recognizing the police officer may have been forced to make split-second decisions in a stressful, dynamic, and dangerous environment.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Reasonable Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

_HN14_[⬇] **Excessive Force**

In excessive force cases, courts consider the totality of the circumstances to determine if an officer's actions were objectively reasonable. Reasonableness is evaluated under a totality of the circumstances approach. This involves (but is not limited to) examining the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Reasonable Force

_HN15_[⬇] **Excessive Force**

Precedent requires a showing in a handcuffing case of an actual, non-de minimis physical, emotional, or dignitary injury to succeed on an excessive force claim. A claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional. This is because handcuffing claims, in essence, concern the manner or course in which a petitioner is handcuffed, and because handcuffing itself is not necessarily an excessive use of force in connection with an arrest.

> Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

> Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

> Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Reasonable Force

**_HN16_[⬇]** **Excessive Force**

Unduly tight handcuffs can, in some cases, amount to excessive force. In some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight. But a plaintiff still must make a showing that the handcuffs caused some actual injury that is not de minimis before we can find a constitutional violation.

> Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

> Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Reasonable Force

> Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

**_HN17_[⬇]** **Excessive Force**

Courts have rejected minor, temporary injuries—like pain, numbness, or swelling—as de minimis in handcuff-related excessive-force cases. A plaintiff had failed to show actual injury when she alleges superficial abrasions and lingering nerve pain in her wrists. Courts have found no more than a de minimis injury stemming from tight handcuffs.

> Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

> Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

> Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Reasonable Force

**_HN18_[⬇]** **Excessive Force**

In some cases, an excessive-force claim may stand on an emotional injury like humiliation. But, in the context of an arrest, the alleged humiliation must be more harmful than that which accompanies the typical custodial arrest.

> Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

**_HN19_[⬇]** **Scope of Protection**

A public arrest does not violate the _Fourth Amendment_ simply because it is embarrassing.

> Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

> Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

> Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Reasonable Force

**_HN20_[⬇]** **Excessive Force**

There is no case law applying a different standard when the victim of the alleged excessive force is a minor.

> Governments > Local Governments > Claims By & Against

> Civil Rights Law > Protection of Rights > Immunity From Liability > Local Officials

**_HN21_[⬇]** **Claims By & Against**

711 Fed. Appx. 871, *871; 2017 U.S. App. LEXIS 19423, **1

Without an underlying constitutional violation, a municipal-liability claim is fatally infirm. A municipality may not be held liable where there was no underlying constitutional violation by any of its officers.

Governments > Local Governments > Claims By & Against

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Civil Rights Law > ... > Immunity From Liability > Local Officials > Direct Causal Links

*HN22*[↓]  **Claims By & Against**

To establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged. To establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right. In this regard, a municipality is not liable solely because its employees caused an injury, but rather, because the municipality, through its own deliberate conduct, was the moving force behind the injury.

Business & Corporate Compliance > ... > Protection of Disabled Persons > Americans With Disabilities Act > Enforcement Actions

*HN23*[↓]  **Enforcement Actions**

Title II of the Americans with Disabilities Act (ADA) states that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity. *42 U.S.C.S. § 12132*. To make out an ADA claim, a plaintiff has to show that he (1) has a disability; (2) was discriminated against by a public entity; and (3) the discrimination was by reason of his disability.

Education Law > Students > Student Discipline > Misconduct

*HN24*[↓]  **Misconduct**

There is no authority suggesting that a school may not regulate a student's conduct if that conduct is a manifestation of a disability.

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

*HN25*[↓]  Courts have not adopted a failure-to-train claim of discrimination under the *Americans with Disabilities Act*, *42 U.S.C.S. § 12132*, in the context of an arrest.

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Accommodations

*HN26*[↓]  **Accommodations**

An *Americans with Disabilities Act*, *42 U.S.C.S. § 12132*, plaintiff must show an obvious need for an accommodation. It would conflate a disability with a need for an accommodation to expect an accommodation whenever an official is aware of a diagnosis.

Governments > Local Governments > Claims By & Against

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

*HN27*[↓]  **Claims By & Against**

A failure to train must have caused some violation of law for an action against a municipality to lie.

**Counsel:** For QUENTIN SCOTT, Plaintiff - Appellant: Theresa V. Hacsi, Laura Louise Schauer Ives, Joseph P. Kennedy, Kennedy Kennedy & Ives, Albuquerque, NM.

For CITY OF ALBUQUERQUE, RAY SCHULTZ, former Chief of Police, D. HENSLEY, Albuquerque Police Officer, Defendant - Appellees: Kristin J. Dalton, Albuquerque City Attorney's Office, Albuquerque, NM.

**Judges:** Before HARTZ, HOLMES, and MATHESON, Circuit Judges.

Opinion by: JEROME A. HOLMES

# Opinion

### [*872]  ORDER AND JUDGMENT[*]

A New Mexico statute makes it illegal to "willfully interfere with the educational process" at a public school. *N.M. Stat. Ann. § 30-20-13(D)*. In 2009, an Albuquerque Police Officer assigned to a middle school as a School Resource Officer ("SRO") relied on that statute to arrest a thirteen-year-old for skipping class. The main question before us is whether qualified immunity shields that officer from a civil suit arising from the arrest. We find that it does. We also conclude that the plaintiff's other two claims—for municipal liability and violations of the *Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132*—have no merit.

### I

The relevant events happened in January 2009.[1] At the time, Quentin Scott[2] was a thirteen-year-old seventh-grader at **[*873]** Grant Middle School in **[**2]** Albuquerque, New Mexico. Scott had been diagnosed with bipolar disorder and oppositional defiant disorder. Both affected his behavior and concentration when he was in class.

Scott had a "504 plan"—a document acknowledging that a student has special needs—and an Individualized

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with *Fed. R. App. P. 32.1* and *10th Cir. R. 32.1*.

[1] This is a qualified-immunity case decided at the summary-judgment phase, so we accept the plaintiff's version of the facts, so long as those facts have some support in the record. *See, e.g., Thomson v. Salt Lake City, 584 F.3d 1304, 1312 (10th Cir. 2009)*; *Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009)*.

[2] Though a minor at the time of his arrest, Quentin is apparently "now an adult." Aplt.'s App. at 306 (Dist. Ct. Order, dated Aug. 17, 2015). In his appellate briefing, his counsel refers to the plaintiff simply by his last name, "Scott"; thus, hereinafter, so do we. To avoid any possible confusion, we refer to Scott's mother, Charlotte Scott, by her full name.

Education Program ("IEP") that detailed how his disabilities might affect him in class. The IEP listed a few accommodations for Scott in the classroom. Specifically, teachers were told to let him choose where he sat, to minimize auditory and visual distractions, and to let him move around the classroom every so often. Scott also had permission to leave the classroom if he was anxious or distracted. *See* Aplt.'s App. at 217-22 (Individualized Education Program, dated Aug. 11, 2008) (advising teachers to give Scott "[f]requent breaks" and to "encourage [Scott] to . . . get a drink" in the hallway if he felt overwhelmed). Scott said that when he had those feelings, he was usually allowed "to just kind of roam the halls" and to "g[e]t [his] mind off whatever was troubling [him]." *Id.* at 84 (Dep. of Quentin Scott, dated June 8, 2015).

Scott usually went to the janitor's office during these breaks. *Id.* He later testified that the office "was just kind of **[**3]** [his] safe haven" and felt that the janitors seemed "very understanding with [him]." *Id.* at 84, 86. Most of the time, he helped them sweep or mop the floors. If they were on a break when he arrived, Scott would sit down, read a magazine, and eat sunflower seeds with them. That is what he did on the morning of January 16, 2009.

After getting frustrated in typing class, Scott told his teacher that he was taking a break. He left the classroom and sat down at a desk that his teacher had put in the hallway. He tried returning to class a few minutes later, but the lesson was too far ahead by that point, and he "was already at the point of just being done." *Id.* at 201. He signaled to the teacher that he was going for a walk, then headed down the hall to the janitor's office. *See* Aplt.'s App. at 201, 209 (Test. of Charlotte Scott) (commenting that Scott was permitted to give "a nonverbal signal" to a teacher whenever he needed a break).

Scott was walking in the school hallway when Lupe Griego, the front desk secretary, noticed that he was out of class. Ms. Griego said something to Scott.[3] Scott did

---

[3] It is unclear what Ms. Griego said, or whether Scott heard her. Officer Hensley testified that Ms. Griego stopped Scott and asked him why he was in the hallway, and the Incident Report notes that Scott told Ms. Griego that he was helping the janitors. Yet Scott testified that if Ms. Griego "yelled at [him]," he "just didn't hear her," and that he "never talked to anybody on that walk" to the janitor's office. Aplt.'s App. at 206. We accept Scott's version of the facts as true, as we must. *See Thomson, 584 F.3d at 1312*; *Riggins, 572 F.3d at*

not hear her, so he continued walking to the janitor's office. Officer Damon Hensley, the SRO for Grant Middle School, heard Ms. Griego call out **[**4]** Scott's name. Officer Hensley later testified that, two days before the arrest, Scott had come into school "really late." *Id.* at 70. That instance of tardiness, along with the fact that Scott had run away from school once before, led Officer Hensley to think that Scott might be skipping class again. Officer Hensley asked Nancy Wiggins, Scott's teacher, whether Scott had permission to be in the hallway; Ms. Wiggins told Officer Hensley that she thought that Scott was skipping class.

Officer Hensley looked down the hallway towards the janitor's office. He saw Scott standing "like he was halfway in the door and halfway out the door." Aplt.'s App. at 72. He walked to the office and asked Scott **[*874]** if he had permission to be there; Scott told Officer Hensley that he did. But Ms. Wiggins, who was standing next to Officer Hensley, disagreed, telling Officer Hensley that Scott was "not supposed to be" out of class. *Id.*

Officer Hensley "grabbed [Scott's] arm," "stood [him] up," and put him in handcuffs. *Id.* at 203. He took Scott out of the office, walking behind Scott and holding the links that connected the two cuffs. As they walked through the hallway, Scott stopped abruptly a few times because he was "pissed" by Officer Hensley's **[**5]** physical contact with his person and the physical force he was applying; more specifically, Scott "didn't want to be touched." *Id.* at 202. When Scott stopped, Officer Hensley would "wrench[]" the links to force Scott forward. *Id.*

They were in the hallway when the class bell rang. Crowds of students rushed out of nearby classrooms. Scott, still handcuffed, was suddenly surrounded by his peers and classmates. Officer Hensley continued to walk behind Scott and shove him forward by the handcuffs. Scott felt that this was deliberate. It seemed as though Officer Hensley "wanted other kids to see [him] being dragged around" and to "set it in [Scott's] head that [he] was a piece of shit." *Id.* at 198.

They reached Officer Hensley's office a few minutes later. He ordered Scott to sit. According to Scott's testimony, Officer Hensley began "interrogating" and mocking Scott, who had started crying out of fear. After about twenty minutes, Ms. Wiggins and two other school administrators came into Officer Hensley's office to meet with Scott.

That meeting lasted for about an hour. Scott was handcuffed the entire time. Scott repeatedly complained to the administrators during the meeting about the pain that he was experiencing **[**6]** because of the handcuffs. Eventually, they noticed that Scott was in so much pain that he could not lift his arms to wipe away his tears, so Ms. Wiggins managed to loosen the handcuffs. Still, even after the cuffs were loosened, Scott felt pain in his arms and wrists. According to his testimony, his wrists "were bruised and swollen" for "at least a week afterwards."[4] *Id.* at 204.

The meeting ended. Officer Hensley then took Scott—still in handcuffs—to the Juvenile Detention Center in Albuquerque ("JDC"). *Id.* at 69, 225 (Officer Hensley testifying that, pursuant to department policy, he "[p]robably always handcuffs children when taking them to the Juvenile Detention Center). There, Scott was booked and charged with violating *New Mexico Statute section 30-20-13(D)*, which provides that "[n]o person shall willfully interfere with the educational process of any public or private school by" doing anything that "would . . . interfere with or obstruct the lawful mission, processes, procedures or functions of a public or private school." *N.M. Stat. Ann. § 30-20-13(D)*.

Scott filed a lawsuit against Officer Hensley, Chief of Police Ray Schultz, and the City of Albuquerque ("City"). In his complaint, Scott brought claims under *42 U.S.C. § 1983*: specifically, invoking the *Fourth Amendment*, Scott alleged that his arrest was unlawful **[**7]** and that Officer Hensley used unconstitutionally excessive force in effecting the arrest. The complaint also alleged that the arrest violated the ADA, **[*875]** *42 U.S.C. § 12132*, and included a municipal-liability claim against the City.[5]

Scott moved for partial summary judgment on his *Fourth Amendment* claims. The defendants then moved for summary judgment on all of Scott's claims. The district

---

[4] Charlotte Scott, Scott's mother, testified that she remembered seeing red marks and bruising on his wrists. She said that "you could absolutely see the handcuff [indentation] and the bruising like around it." *Id.* at 210. But she acknowledged that Scott suffered no permanent injuries and did not see a doctor about the injuries. *Id.* at 210, 269.

[5] Scott also brought claims against Officer Hensley for violations of procedural and substantive due process, state tort law, and the New Mexico state constitution. However, he only appeals from the district court's rulings on his *Fourth Amendment* claims, his ADA claim, and his municipal-liability claim.

*1107.*

court denied Scott's motion and granted the defendants' motion.

## II

In its order, the district court found that Officer Hensley was entitled to qualified immunity on Scott's *Fourth Amendment* unlawful-arrest and excessive-force claims. Scott argues that the court erred in reaching that conclusion.

*HN1*[⬆] We review de novo the district court's grant of summary judgment. *See Water Pik, Inc. v. Med-Sys., Inc., 726 F.3d 1136, 1143 (10th Cir. 2013)*. *HN2*[⬆] Summary judgment is appropriate when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. *HN3*[⬆] We view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. *See, e.g., Talavera ex rel. Gonzalez v. Wiley, 725 F.3d 1262, 1267 (10th Cir. 2013)*.

*HN4*[⬆] Qualified immunity protects governmental officials from liability for civil damages for conduct that does not violate clearly-established statutory or constitutional rights. *See Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2015)* (per curiam). We review qualified-immunity summary-judgment [**8] decisions differently from other summary-judgment decisions. *See Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007)* (en banc). When a defendant asserts a qualified-immunity defense, the plaintiff must show (1) that the defendant violated a federal constitutional or statutory right, and (2) that the right was clearly established at the time of the challenged conduct. *See Quinn v. Young, 780 F.3d 998, 1004 (10th Cir. 2015)*. If a plaintiff fails to establish either prong, the defendant is entitled to qualified immunity. *See Cox v. Glanz, 800 F.3d 1231, 1245 (10th Cir. 2015)*.

## A

Scott argues that Officer Hensley is not shielded by qualified immunity on the unlawful-arrest claim. Specifically, he contends that (1) the arrest was unconstitutional, since Officer Hensley lacked probable cause; and (2) Officer Hensley should have been on notice that the arrest was unlawful because the *Fourth Amendment* right that he violated was clearly

established at the time. Scott is half right. The arrest was unconstitutional, but Scott's right was not clearly established in January 2009. The district court correctly determined that Officer Hensley is entitled to qualified immunity on this claim.

## 1

*HN5*[⬆] A warrantless arrest violates the *Fourth Amendment* unless the arresting officer had probable cause to make the arrest. *E.g., Keylon v. City of Albuquerque, 535 F.3d 1210, 1216 (10th Cir. 2008)*. An officer has probable cause whenever he knows of reasonably trustworthy [**9] facts that would lead a prudent person to believe that the arrestee is committing—or has committed—a crime. *Id.*

 [*876] More specifically, the question here is whether Officer Hensley had an objectively reasonable belief that Scott had violated *section 30-20-13(D)*. The district court found that he did. It pointed out that "Officer Hensley knew Mr. Scott's absence from health class had involved the time and attention of three school officials" and that it had "disrupt[ed] Ms. Wiggins' preparation for her next class and the class itself." Aplt.'s App. at 314. Based on that information, the court reasoned, "a reasonable officer could have believed that [there was] probable cause" to arrest Scott for violating *section 30-20-13(D)*. *Id.*

We disagree. Our qualified-immunity inquiry focuses on whether Scott's *federal* constitutional rights were violated. *See., e.g., Baker v. McCollan, 443 U.S. 137, 146, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)* (*HN6*[⬆] "*Section 1983* imposes liability for violations of rights protected by the Constitution . . . ."). But Scott's unlawful-arrest claim asks us to determine if Officer Hensley had probable cause under a state statute. So, because this is a case in which the federal constitutional question "depends on the contours of a state's substantive criminal law," we rely on New Mexico state courts' interpretations of that law. *Kaufman v. Higgs, 697 F.3d 1297, 1300-01 (10th Cir. 2012)*. The [**10] New Mexico Supreme Court is the ultimate authority on that question. *Id. at 1301*. *HN7*[⬆] "When a state Supreme Court has not spoken on the question at issue, we assume (without deciding) that a reasonable officer would seek guidance regarding the scope of proper conduct at least in part from any on-point decisions of the state's intermediate court of appeals." *A.M. v. Holmes, 830 F.3d 1123, 1140-41 (10th Cir. 2016)*, cert. denied sub nom. A.M. ex rel. F.M. v. Acosta, 137 S. Ct.

*2151, 198 L. Ed. 2d 221 (2017).*

**HN8**[↑] *Section 30-20-13(D)* prohibits anybody from "*willfully* interfer[ing] with the educational process." *N.M. Stat. Ann. § 30-20-13(D)* (emphasis added). The word "willfully" suggests that a violation occurs only when a person acts with the conscious objective of "interfer[ing] with the educational process." *Id.* In other words, it is not enough that a person simply "commit[s] an[] act" that "disrupt[s] . . . [the] functions of" a school; to violate *section 30-20-13(D)*, that person must act with the conscious purpose of "interfer[ing] with the educational process." *§ 30-20-13(D)*.

New Mexico's courts have adopted this understanding of "willfulness." In *Rio Grande Gas Co. v. Gilbert, 1971-NMSC 113, 83 N.M. 274, 491 P.2d 162 (N.M. 1971)*, the New Mexico Supreme Court faced the question of whether a party's discovery violations had been "willful." *Id. at 164*. In holding that the violations were, in fact, willful, the court noted that **HN9**[↑] "a willful violation of a provision of a statute or regulation is any conscious or intentional failure to comply therewith, as [**11] distinguished from accidental or involuntary noncompliance." *Id. at 166* (quoting *Brookdale Mill v. Rowley, 218 F.2d 728, 729 (6th Cir. 1954))*.

The New Mexico Court of Appeals came to a similar conclusion in *Holguin v. Sally Beauty Supply Inc., 2011-NMCA 100, 150 N.M. 636, 264 P.3d 732, 736-37 (N.M. Ct. App. 2011)*. There, the court was asked to construe a state statute that provided merchants with a conditional privilege to detain a customer when the merchant had probable cause to believe that the customer "willfully conceal[ed]" merchandise. *Id. at 736-37*. The court found that "[t]he term 'willfully' . . . indicates an intent that requires more than merely putting merchandise out of sight." *Id. at 736*. Instead, the court held that probable cause for the conditional privilege exists only when the facts show "that *the purpose* of the concealment is adverse to the store owner's right to be paid for the merchandise." *Id. at 737* (emphasis **[*877]** added). In other words, probable cause for "willful" concealment required a reasonable belief that the customer hid something *for the purpose of stealing it. Id.*

This understanding of the term "willful" is consonant with the common understanding of the term. Specifically, "willful" means "intentional" or "deliberate." THE NEW OXFORD AMERICAN DICTIONARY 1922 (2d ed. 2005). And, in legal usage, a "willful" act is a "voluntary and intentional" one, "involv[ing] conscious wrong or evil

purpose [**12] on the part of the actor." *Willful*, BLACK'S LAW DICTIONARY (10th ed. 2009) [hereinafter BLACK'S]; *see also* Rollin M. Perkins & Ronald N. Boyce, CRIMINAL LAW, 875-76 (3d ed. 1982) ("[T]he requirement added by [the word 'willful'] is not satisfied unless there is a bad purpose or evil intent."). Or, put another way, "'willfulness' involves the voluntary, *intentional violation* or disregard of a *known* legal duty." *Willfulness*, BLACK'S, *supra* (emphasis added).

We read the term "willfully" in *section 30-20-13(D)* in this manner. More specifically, we conclude that **HN10**[↑] New Mexico legislature sought to bar conduct that was *designed to* "interfere with the educational process," rather than conduct that merely happened to have that effect. In our view, the statute is not "genuinely ambiguous," and we are able to reach this conclusion without "hard interpretive work." *Heien v. North Carolina, __ U.S. __, 135 S. Ct. 530, 541, 190 L. Ed. 2d 475 (2014)* (Kagan, J., concurring).[6]

_____

[6] In *Heien*, in a traffic-stop scenario where reasonable suspicion is ordinarily required, the Supreme Court held that "because [the officer's] mistake of law was reasonable, there was reasonable suspicion justifying the stop." *135 S. Ct. at 540*. The Court explained that its mistake-of-law holding does not relate to the appropriate remedy for a constitutional violation. See *id. at 539*. "[B]y contrast, the mistake of law relates to the antecedent question of whether it was reasonable for an officer to suspect that the defendant's conduct was illegal. If so, there was no violation of the *Fourth Amendment* in the first place." *Id.* Though Officer Hensley does not cite *Heien* or contend that he committed a mistake of law in arresting (i.e., seizing) Scott, assuming *arguendo* that *Heien*'s principles apply with full force to *Fourth Amendment* seizures resulting in arrests, and not just traffic stops, we believe two observations may clarify the course of our analysis.

*First*, the *Heien* majority stressed that "[t]he *Fourth Amendment* tolerates only *reasonable* mistakes," *id. at 539*, and Justice Kagan helpfully elaborated in concurrence that the laws that might be amenable to such mistakes of law are "genuinely ambiguous" and "pose[] quite difficult question of interpretation" that involves "hard interpretive work," *id. at 541* (Kagan, J., concurring); *see also United States v. Diaz, 854 F.3d 197, 204 n.12 (2d Cir. 2017)* (noting that "it is only when the legal question is unsettled that an officer's erroneous assessment of the law can be objectively reasonable"). A panel of our court has similarly viewed *Heien* as laying down restrictive "ground rules" governing its applicability. *United States v. Cunningham, 630 F. App'x 873, 876 (10th Cir. 2015)* (unpublished). Given our assessment of the unambiguous nature of *section 30-20-13(D)*, even if Officer Hensley had

Case 2:19-cv-00021-SWS   Document 40-2   Filed 06/18/19   Page 10 of 15
Appellate Case: 19-8055   Document: 010110225398   Date Filed: 09/10/2019   Page: 10 of 15

711 Fed. Appx. 871, *877; 2017 U.S. App. LEXIS 19423, **12

**[*878]** Based on the facts of this case, nothing would have given Officer Hensley the reasonable belief that Scott was "willfully" trying to interfere with the educational process at Grant Middle School. True, Scott's absence eventually led to somebody **[**13]** pulling Ms. Wiggins from her classroom and Ms. Griego from her desk. Aplt.'s App. at 72 (Officer Hensley testifying that he "got Ms. Wiggins" and "took her out of class"). But no reasonable officer would have believed that Scott went to the janitor's office *with the intent* of distracting school employees from other tasks. Indeed, Scott gave every indication that he was not trying to cause a disruption or break a rule. He made no disturbance as he left his classroom, and told Officer Hensley and Ms. Wiggins that he believed that he had permission to be outside the classroom at the time. If anything, Scott left the classroom to *avoid* disrupting his class: he left because he knew that when "[he] would get too antsy or frustrated, . . . it would just be bad if [he] kept on" trying to work through the typing lesson. *Id.* at 200. That, after all, was the purpose of his IEP

_____

claimed a mistake of law, he could not avail himself of *Heien*'s holding. *Cf. Heien, 135 S. Ct. at 540* (discussing the ambiguities of the North Carolina statute at issue that permitted a reasonable mistake of law); *Cunningham, 630 F. App'x at 878* & n.6 (conducting a similar analysis of the ambiguities of a Colorado statute). That is, we would still conclude that his arrest of Scott violated the **Fourth Amendment**.

And, *second*, our conclusion that Officer Hensley could not claim a reasonable mistake of law does not mean that he cannot demonstrate that he satisfies the qualified-immunity standard on the clearly-established-law element, and indeed we conclude *infra* that he has. In this regard, *Heien* stressed that "qualified immunity . . . depends on an inquiry distinct from whether an officer has committed a constitutional violation" and that "the [constitutional-violation] inquiry is *not as forgiving* as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation." *Heien, 135 S. Ct. at 537, 539* (emphasis added); *see also Corrigan v. District of Columbia, 841 F.3d 1022, 1046 (D.C. Cir. 2016)* (Brown, J., dissenting) ("What 'every reasonable' official would have understood to be 'clearly established' in case law is not the same question as what is 'objectively reasonable' for purposes of determining a **Fourth Amendment** violation."). Therefore, under the less stringent qualified-immunity inquiry, we may conclude (as we do) that Officer Hensley is entitled to qualified immunity because his "conclusions rest[ed] on an objectively reasonable, even if mistaken, belief that probable cause exist[ed]." *Stonecipher v. Valles, 759 F.3d 1134, 1141 (10th Cir. 2014)*; *see A.M., 830 F.3d at 1140* (collecting cases regarding the concept of "arguable probable cause").

accommodations in the first place. *See id.* at 208 (Test. of Charlotte Scott) (commenting that the IEP accommodations were in place because "th[e teachers and administrators] didn't want [Scott] to explode in the classroom").

None of this would suggest that Scott "willfully interfer[ed] with the educational process" by going to, and sitting in, the janitor's office. *Cf. [**14] G.M. ex rel. B.M. v. Casalduc, 982 F. Supp.2d 1235, 1243 (D.N.M. 2013)* ("B.M.'s conduct does not clearly fall outside the conduct prohibited by the plain language of the statute [i.e., *section 30-20-13(D)*]. B.M. ignored numerous requests to stop texting during class in violation of HMS policy. Unable to continue instruction, her teacher stopped class and eventually summoned Dean O'Gawa. After being removed from class, B.M. continued refusing to hand over her cell phone as required by school procedure."). We conclude, therefore, that Officer Hensley had no probable cause to arrest Scott under *section 30-20-13(D)*. And since a warrantless arrest without probable cause violates the *Fourth Amendment*, *Keylon, 535 F.3d at 1216*, Scott has shown that Officer Hensley violated Scott's right to be free from unlawful arrest.

**2.**

The next question is whether that right was clearly established in January 2009. *HN11*[↑] A plaintiff ordinarily may show that a particular right was clearly established by pointing to an on-point decision from the U.S. Supreme Court or the Tenth Circuit. *See, e.g., Quinn, 780 F.3d at 1005*. But, as previously noted, we often look to state-court decisions when we are asked to decide a question that "depends on the contours of a state's substantive criminal law." *Kaufman, 697 F.3d at 1300-01*; *see also A.M., 830 F.3d at 1140-41* (noting that state intermediate appellate courts can provide guidance in a clearly-established-law **[**15]** inquiry that involves construing state criminal law).

**[*879]** In *A.M.*, where an officer arrested a student under *section 30-20-13(D)* for "repeatedly fake-burping, laughing, and (later) leaning into the classroom," *830 F.3d at 1148*, we held in analyzing the clearly-established-law question that there were "no Supreme Court or published Tenth Circuit decisions" that squarely addressed *30-20-13(D)*'s probable-cause requirements in 2011, *id. at 1140*. The same necessarily must be true for Officer Hensley's violation, which occurred almost two years before the challenged conduct in *A.M.*

Without any on-point federal cases, Scott relies instead on *State v. Silva, 1974- NMCA 072, 86 N.M. 543, 525 P.2d 903, 903 (N.M. Ct. App. 1974)*, a 1974 case from the New Mexico Court of Appeals. "Silva involved a distant statutory predecessor of *N.M. Stat. Ann. § 30-20-13*." *A.M., 830 F.3d at 1143*. Under that provision, students who staged a sit-in inside a university president's office were charged with interfering with the "mission, processes, procedures or functions" of a university. *Id. at 905* (quoting N.M. Stat. Ann. § 40A-20-10(C) (1974)). Scott contends that *Silva* constitutes clearly-established law that defined the contours of probable cause for his arrest. However, in *A.M.*, we rejected an attempt to rely on *Silva* for clearly-established law in very analogous circumstances. *See 830 F.3d at 1145*. We view that conclusion as controlling here. [**16] [7]

---

[7] We recognize that pre-2009 Supreme Court authority in New Mexico had established a general understanding of the term "willful," *Gilbert, 491 P.2d at 164, 166*, and (as demonstrated *supra*) the illegality of Officer Hensley's arrest of Scott turns at least in substantial part on that understanding. In contrast, this was arguably not true in the analogous case of *A.M. See e.g.*, *830 F.3d at 1148* (arresting student for "repeatedly fake-burping, laughing, and (later) leaning into the classroom"). However, as *A.M.* indicates, no controlling federal or New Mexico caselaw had clearly established the requirements for probable cause under *section 30-20-13(D)* in January 2009—including regarding the "willfulness" requirement. More specifically, no New Mexico appellate court had applied the general understanding of "willfulness" to a prosecution under *section 30-20-13(D)*. In our view, in the circumstances of this case, that forecloses the possibility of finding clearly-established law. "As th[e] [Supreme] Court explained decades ago," *HN12*[↑] the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly, U.S. , 137 S.Ct. 548, 552, 196 L. Ed. 2d 463 (2017)* (per curiam) (quoting *Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)*; *see Mullenix v. Luna, U.S. , 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015)* ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" (quoting *Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)))*. Here, Scott has not demonstrated that it was clearly-established law in January 2009 that the general understanding of "willfulness" was controlling in the *section 30-20-13(D)* context—by "identif[ing] a case where an officer acting under similar circumstances as Officer [Hensley] was held to have violated the **Fourth Amendment**," *White, 137 S. Ct. at 552*, or otherwise. In particular, we conclude that the settled general understanding among New Mexico courts regarding the meaning of "willful" would not have put the unlawfulness of Officer Hensley's conduct under *section 30-*

In short, Scott has not identified any clearly-established law that would have given Officer Hensley "fair notice that his conduct would be unlawful in the circumstances he confronted." *Id. at 1141*. Accordingly, Scott cannot satisfy the second prong of the qualified-immunity standard; his *Fourth Amendment* unlawful-arrest claim necessarily fails.

**B**

Scott also challenges the district court's rejection of his excessive-force claim. Scott argues that "the force Officer Hensley used—in parading [Scott] through [*880] the school's halls in handcuffs and transporting him to the JDC—[was] excessive." Aplt.'s Opening Br. at 25. He notes that the arrest took place in front of his peers and other students, and that the tight handcuffs left his wrists bruised and swollen for a week after the arrest. The district court ruled that Scott had not demonstrated a constitutional violation. We agree, and conclude that Officer Hensley is entitled to qualified immunity on this claim.

"Under well-settled Supreme Court precedent, *HN13*[↑] a law-enforcement officer's 'right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion . . . to effect it.'" [**17] *A.M., 830 F.3d at 1151* (quoting *Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989))*. We evaluate excessive-force claims under an objective-reasonableness standard, using the perspective of a reasonable officer on the scene. *See, e.g., Graham, 490 U.S. at 396* ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *Weigel v. Broad, 544 F.3d 1143, 1151 (10th Cir. 2008)* ("The 'inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to underlying intent or motivation.'" (quoting *Graham, 490 U.S. at 397*)); *see also Lundstrom v. Romero, 616 F.3d 1108, 1120 (10th Cir. 2010)* ("The reasonableness of a police officer's actions is evaluated from the perspective of a reasonable officer on the scene, recognizing the police officer may have been forced to make split-second decisions in a stressful, dynamic, and dangerous environment.").

---

*20-13(D)* "beyond debate" in January 2009. *al-Kidd, 563 U.S. at 741*; *accord Mullenix, 136 S. Ct. at 308*.

HN14[⬆] We consider the totality of the circumstances to determine if an officer's actions were objectively reasonable. *See, e.g., Thomson, 584 F.3d at 1313* (noting that "[r]easonableness is evaluated under a totality of the circumstances approach"); *accord Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008).* This involves (but is not limited to) examining "the severity of the crime at issue, whether the suspect poses an immediate [**18] threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham, 490 U.S. at 396.*

Critically, however, HN15[⬆] "our precedent requires a showing in a handcuffing case of an actual, non-de minimis physical, emotional, or dignitary injury to succeed on a claim." *Fisher v. City of Las Cruces, 584 F.3d 888, 899 (10th Cir. 2009); accord A.M., 830 F.3d at 1151-52; see also Cortez v. McCauley, 478 F.3d 1108, 1129 (10th Cir. 2007)* (en banc) ("We believe that a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional."). "This is because '[h]andcuffing claims, in essence, concern the manner or course in which a petitioner is handcuffed,' and '[b]ecause handcuffing itself is not necessarily an excessive use of force in connection with an arrest.'" *A.M., 830 F.3d at 1152* (alterations in original) (quoting *Fisher, 584 F.3d at 897*); *cf. United States v. Rodella, 804 F.3d 1317, 1327 (10th Cir. 2015),* cert. denied, 137 S. Ct. 37, 196 L. Ed. 2d 26 (2016) (concluding that *Cortez*'s non-de-minimis-injury requirement "is limited to handcuffing cases"). Like the district court, we conclude that Scott's excessive-force claim fails to satisfy this non-de minimis-injury standard. Quite apart from whether one or more of the *Graham* factors noted above (e.g., severity of the crime) favors him, this failure is determinative.

 [*881] Scott alleges that the cuffs were "uncomfortably tight" when Officer Hensley put them on. Aplt.'s App. at 203. Ms. Wiggins [**19] loosened the cuffs after about twenty minutes, but Scott testified that he was in pain for the week after the arrest. HN16[⬆] Unduly tight handcuffs can, in some cases, amount to excessive force. *See Cortez, 478 F.3d at 1128-29* ("In some circumstances, unduly tight handcuffing can constitute excessive force *where a plaintiff alleges some actual injury* from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight." (emphasis added)). But a plaintiff still must make a showing that the handcuffs caused "some actual injury that is not de minimis" before we can find a

constitutional violation. *Id. at 1129.* Scott fails to make this showing.

Scott testified that his wrists "were bruised and swollen" for "about a week" after the arrest, and that "anything [he] did [that involved] moving [his] wrists hurt." Aplt.'s App. at 131, 204. He also alleged that the cuffs left "redness, soreness and indentations" on his wrists. *Id.* at 115 (Pl.s' Interrog. No. 17). Yet, he concedes that he never got any medical treatment for his injuries and that the injuries were gone after about a week.

This is not enough to show a constitutional violation. HN17[⬆] We have rejected minor, temporary injuries—like pain, numbness, or swelling—as [**20] de minimis in handcuff-related excessive-force cases. For example, in *Koch v. City of Del City, 660 F.3d 1228, 1247-48 (10th Cir. 2011),* we concluded that a plaintiff had failed to show "'actual injury'" when she alleged superficial abrasions and lingering nerve pain in her wrists. *Id.* Similarly, in *Segura v. Jones, 259 F. App'x 95, 103-04 (10th Cir. 2007)* (unpublished), a panel of our court found no more than a de minimis injury stemming from tight handcuffs. *Id.; cf. Vondrak v. City of Las Cruces, 535 F.3d 1198, 1209-10 (10th Cir. 2008)* (concluding that a plaintiff established a constitutional violation when tightened handcuffs caused permanent nerve damage in plaintiff's wrist).

Scott's injuries are no different. Even though he was in pain for hours while wearing the handcuffs, that pain did not last long. And the handcuffs left no permanent injury: the swelling went down after about a week, and the bruises faded around the same time. *See* Aplt.'s App. at 204 (Scott testifying that he had no "problems with [his] wrists" on the day he was deposed). Simply put, Scott's injuries were not severe enough to render Officer Hensley's force excessive.[8]

The same is true for Scott's emotional injuries. Scott said that he was humiliated when Officer Hensley walked him through the school hallways in handcuffs

---

[8] Though the inadequacy of Scott's injuries do not make the following point material to our analysis, we note that Scott's injuries may in part stem from his own conduct rather than any physical aggression of Officer Hensley. By Scott's own admission, he would abruptly stop while being led through the hallway in handcuffs by Officer Hensley because he was "pissed" and did not anyone to "touch" him. Aplt.'s App. at 202. Even accepting Scott's own version of the facts then, we may reasonably infer that, insofar as Scott's injuries were caused by the friction between the handcuffs and his wrists, his abrupt stops contributed to or exacerbated that friction.

during a break between classes. Scott felt that Officer Hensley had "made it his mission to embarrass [**21] [him] and set it in [Scott's] head that [he] was a piece of shit." Aplt.'s App. at 198. However, Officer Hensley's intent cannot factor into our analysis. *See Graham, 490 U.S. at 396* (noting that the excessive-force analysis should be "without regard to . . . underlying intent **[*882]** or motivation"); *accord Weigel v. Broad, 544 F.3d at 1151*. To be sure, we have recognized that, **HN18**[⬆️] in some cases, an excessive-force claim may stand on an emotional injury like humiliation. *See, e.g., Fisher, 584 F.3d at 903*. But, in the context of an arrest, the alleged humiliation must be more harmful than that which accompanies the typical custodial arrest. *See Atwater v. City of Lago Vista, 532 U.S. 318, 354, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001)*; *Petersen v. Farnsworth*, 371 F.3d 1219, 1223 (10th Cir. 2004).

Scott's arrest does not fit that description. Though Scott was surely humiliated when his peers saw him walking through the hallways in handcuffs, **HN19**[⬆️] a public arrest does not violate the *Fourth Amendment* simply because it is embarrassing. *See Atwater, 532 U.S. at 354-55*; *Cortez, 478 F.3d at 1128*. In short, Officer Hensley's use of force fell short of being "excessive," as the law defines that term. Scott has therefore failed to show a constitutional violation.[9]

---

[9] We are not blind to the obvious facts: At the time of the arrest, Scott was thirteen years old. The psychological effects of an arrest on somebody that young are bound to be more severe than they would be for an adult. *See Hedgepeth v. Wash. Metro. Area Transit, 284 F. Supp. 2d 145, 160 (D.D.C. 2003)*, *aff'd sub nom. Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth., 386 F.3d 1148, 363 U.S. App. D.C. 260 (D.C. Cir. 2004)* (noting that, though a child's arrest was constitutional under the applicable legal standard, "the Court can hardly overlook the humiliating and demeaning impact of the arrest" on that child); *cf. A.M., 830 F.3d at 1150 n.15* ("We are neither oblivious nor unsympathetic to 'the potential future consequences to [a] child,' such as F.M., of an arrest or other law-enforcement sanction for seemingly non-egregious classroom misconduct; such a law-enforcement response could potentially have a 'far-reaching impact' on a child's ability to lead a productive life." (quoting *Hawker v. Sandy City Corp., 774 F.3d 1243, 1244 (10th Cir. 2014)* (Lucero, J., concurring))). However, we have held that **HN20**[⬆️] there is "'no case law . . . applying a different standard when the victim of the alleged excessive force is a minor.'" *A.M., 830 F.3d at 1155* (quoting *Hawker v. Sandy City Corp., 591 F. App'x 669, 674 n.8 (10th Cir. 2014)* (unpublished) (emphasis omitted)). And we are bound to apply the law of excessive force as it is—not as we might wish it to be—even when, as here, the results might seem troubling. *See, e.g., A.M., 830 F.3d at 1169*

**III**

Scott also argues that the City employed a "de facto policy" of (1) failing to train SROs "before placement in a school which serves special education students," and (2) giving SROs "unbridled discretion to arrest students **[**22]** with special needs." Aplt.'s Opening Br. at 37, 39. These policies, Scott argues, effectively "require[d] the arrest" of Scott for skipping class on January 16, 2009.[10] *Id.* at 37.

**[*883]** **HN22**[⬆️] ] To establish municipal liability, a plaintiff must show (1) the "existence of a municipal custom or policy" and (2) a "direct causal link between the custom or policy and the violation alleged." *Jenkins v. Wood, 81 F.3d 988, 993 (10th Cir. 1996)*. "To establish the causation element, the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" *Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 770 (10th Cir. 2013)* (quoting Martin A. Schwartz, *Section 1983 Litigation Claims & Defenses*, § 7.12[B] (2013)); *accord Cacioppo v. Town of Vail, Colo., 528 F. App'x 929, 932 (10th Cir. 2013)* (unpublished). In this regard, a "municipality is not liable solely because its employees caused an injury," but rather, because the municipality, "[t]hrough its [own] deliberate conduct, . . . [was] the 'moving force' behind the injury." *Mocek v. City of*

---

(Gorsuch, J., dissenting); *Hawker, 774 F.3d at 1243-46* (Lucero, J., concurring).

[10] Insofar as Scott's municipal-liability arguments are predicated on Officer Hensley's claimed use of excessive force, they fail at the outset. **HN21**[⬆️] ] Without an underlying constitutional violation, a municipal-liability claim is fatally infirm. *See Hinton v. City of Elwood, Kan., 997 F.2d 774, 782 (10th Cir. 1993)* ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."); *see also Wilson v. Meeks, 98 F.3d 1247, 1255 (10th Cir. 1996)* ("The district court correctly concluded no municipal liability could be found in this case because there was no constitutional violation committed by any of the individual defendants."). Furthermore, Scott's briefing seemingly challenged the district court's judgment regarding his supervisory-liability claim against Albuquerque's chief of police, Ray Schultz. *See* Aplt.'s Opening Br. at 40 ("Scott's supervisory liability claim against Chief Schultz is also viable assuming that the Court finds a violation of Scott's rights."). However, during oral argument, Scott's counsel expressly and unequivocally indicated that actually Scott does not pursue a supervisory-liability claim against Chief Schultz on appeal—*viz.*, he does not challenge the district court's judgment as to this claim. Therefore, that matter is not before us.

*Albuquerque, 813 F.3d 912, 933 (10th Cir. 2015)*.

Scott fails to meet this standard. Specifically, he has not demonstrated that the alleged policies that he has identified—failing to train SROs placed in special-education school settings and giving them free rein in arresting special-needs children—are directly relevant to the constitutional violation—i.e., arresting a student without probable cause that **[**23]** the student *willfully* interfered with the educational process at a school—much less that the policies were the "moving force" behind the violation. *Mocek, 813 F.3d at 933*. For example, Scott does not specify what training the officers should have possessed and how the lack of that training was a moving force behind his unlawful arrest. Furthermore, his assertion that the City, as a matter of de facto policy, granted its officers "unbridled discretion" to arrest special-needs students is wholly conclusory. And, even if Scott were able to demonstrate that the City's SROs repeatedly arrested special-needs students under *section 30-20-13(D)* for willful interference with the educational process, one could not reasonably infer from this proof—without more—that such conduct was the product of an unconstitutional de facto policy. Special-needs students are not immune from arrest under this statute, and *section 30-20-13(D)* may well reach in certain instances willful conduct committed by such students that amounts to (in Scott's words) no more than "childhood misbehavior."[11] Aplt.'s Opening Br. at 41. Accordingly, these two policies cannot sustain Scott's municipal-liability claim.

Scott tries again in his reply brief. There, he shifts the focus away **[**24]** from special-needs students and simply avers that there was "a pattern of Albuquerque police officers enforcing *[section 30-20-13(D)]* in an over broad manner." Aplt.'s Reply Br. at 7. But that argument also fails to establish municipal liability. First, the argument **[*884]** was never raised in his opening brief, so we consider it waived. *United States v. Wayne, 591 F.3d 1326, 1332 n.4 (10th Cir. 2010)* ("Because [the appellant] raised this argument for the first time in her reply brief, she has waived it on appeal.").

And second, even if we did consider the argument, it still fails to show municipal liability. The policy articulated in Scott's reply brief concerns officers' practice of arresting students for "disruptions that were not the result of 'physical intrusions.'" Aplt.'s Reply Br. at 6-7. Scott's argument on this point seems derived from his reading of *Silva, 525 P.2d at 907*, in which the New Mexico Court of Appeals found that the statute at issue required a "more physical invasion" than a simple disturbance of the peace. But we rejected this analogy in *A.M., 830 F.3d at 1144-48* (declining to use *Silva* to guide our construction of *section 30-20-13(D)*). Simply put, an officer *may* arrest a student under *section 30-20-13(D)*, even when the student's conduct does not involve a physical intrusion. Thus, even if the City had a policy that authorized officers **[**25]** to make such non-physical-intrusion arrests when supported by probable cause, that policy would not run afoul of the Constitution. Accordingly, it ineluctably follows that such a policy could not have directly caused (i.e., been the moving force behind) the constitutional violation here.

In sum, for the foregoing reasons, Scott's municipal-liability claim is without merit.

## IV

Finally, Scott argues that the district court erred in granting summary judgment to the defendants on his ADA claim. We disagree.

**HN23**[⬆] *Title II of the ADA* states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." *42 U.S.C. § 12132*. To make out his ADA claim, Scott has to show that he (1) has a disability; (2) was discriminated against by a public entity; and (3) the discrimination was "by reason of [his] disability." *Gohier v. Enright, 186 F.3d 1216, 1219 (10th Cir. 1999)*.

Scott argues that "[i]f [he] had not been disabled, he

---

[11] As evidentiary support for his municipal-liability claim, Scott directs us to the testimony of a Juvenile Probation Officer and to a summary of City police reports prepared by Scott's counsel. Even assuming that all of this is properly admissible evidence, it is woefully insufficient to establish that the two policies Scott identifies in his opening brief were the moving force in his unlawful arrest. First, though this evidence purports to show that young children were repeatedly arrested by the City's police for violations of *section 30-20-13(D)*, it is silent regarding whether these children had special needs. Second, many (if not most) of the arrests that Scott's counsel identifies in his summaries involved, at least arguably, willful misconduct, which would place them on the question of intent within the ambit of *section 30-20-13(D)*. *See* Aplt.'s App. at 235-40 (describing arrests for, among other things, "knocking over a chair and throwing a pen," "throwing a stick when told not to," "blowing up a condom in class," and "[s]tepping toward a teacher in an aggressive manner").

would have had no need to leave class." Aplt.'s Opening Br. at 33. When "Officer Hensley handcuffed, arrested, transported and charged Scott," he continues, Officer Hensley **[**26]** did so "*because* [Scott] was disabled." *Id.* (emphasis added).

Not so. In some cases, a plaintiff's "disability might cause the police to incorrectly suspect that an individual committed a crime." *J.H. ex rel. J.P. v. Bernalillo Cty., 806 F.3d 1255, 1260 (10th Cir. 2015)*. But Scott is not arguing that Officer Hensley mistook his disability itself for illegal conduct. Instead, he argues that Officer Hensley arrested Scott because of the *manifestations* of his disability. *See* Aplt.'s Opening Br. at 21 ("Officer Hensley violated the ADA by arresting [Scott] for a manifestation of his disability.")

And we have repeatedly rejected such arguments. For instance, *J.H. ex rel. J.P. v. Bernalillo Cty., 806 F.3d at 1260*, we held that an SRO did not arrest a student "because of [his] disability" when the student kicked a teacher; we expressly held that an arrest based on the manifestation of a student's disability was not equivalent to an arrest *because* of that disability. And, in *J.V. v. Albuquerque Public Schools, 813 F.3d 1289, 1296 (10th Cir. 2016)*, we held that a SRO did not arrest a student "by reason of disability" when the student was disruptive for two hours. *Id.* In doing so, **[*885]** we noted that **HN24[↑]** there was "no authority suggesting [that] a school may not regulate a student's conduct if that conduct is a manifestation of a disability." *Id.* This case is no different from *J.H.* or *J.V.* Officer Hensley **[**27]** did not arrest Scott because Scott was disabled; he arrested Scott because he thought that Scott was "interfer[ing] with the educational process." *§ 30-20-13(D)*.

Scott also argues that the City, through Officer Hensley, failed to provide reasonable accommodations to Scott during the arrest. Specifically, he alleges that "the City established no meaningful policies to accommodate disabled children" and "require[d] that all children . . . be transported by an officer [while] handcuffed," regardless of "the child's age or health status." *Id.* at 36. Scott contends that this policy violated his rights under the ADA.

**HN25[↑]** ] We have never adopted a failure-to-train claim of discrimination under the ADA in the context of an arrest. *See, e.g., J.V., 813 F.3d at 1297* ("This circuit has not recognized a failure-to-train claim of discrimination under the ADA, but we have not foreclosed the possibility."); *Gohier, 186 F.3d at 1221*.

But, even assuming *arguendo* this was the law here, Scott's claim would still fail.

Crucially, Scott never points to any evidence of (1) a request for an accommodation; or (2) a reason that Officer Hensley should have known that he needed an accommodation. Instead, he points only to the fact that Officer Hensley knew about Scott's diagnosis of bipolar disorder. (The **[**28]** record bears this out. In his deposition, Officer Hensley was asked if Scott had been "diagnosed with bipolar disorder[.]" Aplt.'s App. at 67. He replied that Scott's "parents had told [Officer Hensley] that" during a meeting with Officer Hensley. *Id.* That meeting was "probably the week prior to [Scott's] arrest." *Id.*)

But knowledge of that diagnosis, without more, would not necessarily make Officer Hensley aware that Scott needed an accommodation. *See J.V., 813 F.3d at 1299* (**HN26[↑]**) "[A]n ADA plaintiff must show an obvious need for an accommodation."); *J.H., 806 F.3d at 1261* (concluding that it would "conflate[] a disability with a need for an accommodation" to expect an accommodation whenever an official is aware of a diagnosis).

And though Scott argues that the City's failure to train amounted to a failure to accommodate his disability, he never explains why. His claim fails without that explanation. *See, e.g., J.V., 813 F.3d at 1300 n.8* ("While plaintiff attempts to pose training in dealing with those with mental health problems a an 'accommodation,' it is well-settled that **HN27[↑]** the failure to train must have caused some violation of law for an action against a municipality to lie." (quoting *Waller ex. rel. Estate of Hunt v. Danville, Va., 556 F.3d 171, 177 n.3 (4th Cir. 2009))).*

**V**

We **AFFIRM** the district court's judgment.

Entered for the Court

JEROME A. HOLMES

Circuit Judge **[**29]**

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 JUN 24  AM 11: 02

STEPHAN HARRIS, CLERK
CASPER

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | CASE NO. |
| | ) | 19-CV-021-S |
| Plaintiff, | ) | |
| | ) | BRIEF IN |
| v. | ) | SUPPORT OF |
| | ) | MOTION FOR |
| BEAU J. EGGER, et al., | ) | DECLARATORY |
| | ) | JUDGMENT. |
| Defendants. | ) | |

---

The plaintiff, Tami M. Bronnenberg, respectfully replies to the Defendant Officer Egger's Response To Motion For Declaratory Judgment pursuant to the Federal Rules of Civil Procedure, Rule 12 (a) (1) (C), "A party must serve a reply to an answer within 21 days after being served ***.", and Rule 57, "**** the existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate. ***."

"The Declaratory Judgments Act gives courts no power to determine future rights or controversies in anticipation of events that have not occurred * * *" See, Cranston et al v. Thomson, 530 P.2d 726 at 729 (Wyo. 1975), enclosed. Basically, the problem in each case is whether the facts alleged

under all the circumstances show that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the declaratory judgment. Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 959-960, 22 L. Ed. 2d 113 (1969); Id.

In Cranston et al v. Thomson, Supra, 530 P.2d at 730 (Wyo. 1975), the Wyoming Federal Court was dealing with related matters, the issuance of a declaratory judgment concerning the constitutionality of abortion statutes. Stating, "the holdings in the mentioned decisions of the United States Supreme Court are consistent with the opinions of this court and in particular with that of Brimmer v. Thomson, Wyo., 521 P.2d 574, where we indicated that to present a justiciable controversy there must be the violation of a genuine, existing, and fundamental right, and that the court would not issue advisory opinions dealing with future speculative matters." p. 730; Steffel v. Thompson, 415 U.S. 452, 94 S. Ct. 1209, 39 L. Ed. 2d 505 (1974), enclosed. When federal claims are premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1343 (3) – as they are here -- we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights. See, e. g. McNeese v. Board of Education, 373 U.S. 668, 83 S. Ct. 1433, 10

Case 2:19-cv-00021-SWS   Document 41   Filed 06/24/19   Page 3 of 5

L. Ed. 2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 81 S. Ct. 473, 5 L. Ed.

2d 492 (1961); Steffel v. Thompson, Supra, 415 U.S. 452 at 472, 473.

A request for a declaratory judgment that a statute or ordinance, [In

this case RIMS computer system of the Park County Sheriff's Office, that

Officer Egger's, acts, policies and practices, applied and used in the

violation of the 4th and 14th amendments to the Constitution of America,

(false arrest and false imprisonment of the Plaintiff)], is unconstitutional

does not have to meet the stricter requirements justifying the issuance of an

injunction. Id. In cases covered by Steffel, the federal court may issue

preliminary or permanent injunctions to protect its judgments, without

satisfying the Younger tests. Doran v. Salem Inn, 422 U.S. 922, 930-931, 95

S. Ct. 2561, 45 L. Ed. 2d 648 (1975); Wooley v. Maynard, 430 U.S. 705,

712, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977).

Several noteworthy constitutional decisions were rendered in

declaratory actions. E.g., Currin v. Wallace, 306 U.S. 1, 59 S. Ct. 379, 83 L.

Ed. 441 (1939); Perkins v. Elg, 307 U.S. 325, 69 S. Ct. 884, 83 L. Ed. 1320

(1939); Ashwander v. TVA, 297 U.S 288, 56 S. Ct. 466, 80 L. Ed. 688

(1936); Evers v. Dwyer, 358 U.S.202 (1958).

The Court exhibited a greater receptivity to declaratory judgments in

constitutional litigation, especially cases involving civil liberties issues. E.g.,

Baggett v. Bullitt, 377 U.S. 360, 84 S. Ct. 1316, 12 L. Ed. 2d 377 (1964);

Keyishian b. Board of Regents, 385 U.S. 589, 87 S. Ct. 675, 17 L. Ed. 2d

629 (1967); Turner v. City of Memphis, 369 U.S. 350, 82 S. Ct. 805, 7 L.

Ed. 2d 762 (1962); Powell v. McCormack, 395 U.S. 486, 89 S. Ct. 1944, 23

L. Ed. 2d 491 (1969).

Congress "imposed the duty upon all levels of the federal judiciary *to*

give due respect to a suitor's choice of a federal forum for the hearing and

decision of his federal constitutional claims. Zwickler v. Koota, 389 U.S.

241, 248, 88 S. Ct. 392, 19 L. Ed. 2d 444 (1967); Legal Information

Institute, Declaratory Judgments. Notes 566, 567, 570, 574.

WHEREFORE, Plaintiff, Tami M. Bronnenberg, THEREFORE prays

that RIMS computer system of the Park County Sheriff's Office, that Officer

Egger's, acts, policies and practices, applied and used in the violation of the

4th and 14th amendments to the Constitution of America, (false arrest and

false imprisonment of the Plaintiff), is unconstitutional granting her Motion

for Summary Judgment.

DATED: June 20, 2019.

Tami M. Bronnenberg, Pro-se

## CERTIFICATE OF SERVICE.

I hereby certify that a copy of the forgoing Brief in Support of Motion

for Declaratory Judgment was mailed to the U.S. Magistrate Judge, Kelly H.

Rankin, United States District Court, 2120 Capitol Ave., Suite 2204,

Cheyenne, Wyoming 82001and to the Defendant, Office of the Attorney

General, 2320 Capitol Avenue, Cheyenne, Wyoming 82002 on June 20 ,

2019.

Tami M. Bronnenberg, Pro-se

530 P.2d 726 (1975)

Albert H. CRANSTON et al., Appellants (Plaintiffs below),

Wyoming Political Action Committee for Education and Wyoming State AFL-CIO (Intervenors Below),

v.

Thyra THOMSON, Secretary of State, et al., Appellees (Defendants below).

WYOMING POLITICAL ACTION COMMITTEE FOR EDUCATION, Appellant (Intervenor below),

Wyoming State AFL-CIO Intervenor below), and

Albert H. Cranston et al., (Plaintiffs below),

v.

Thyra THOMSON, Secretary of State et al., Appellees (Defendants below).

WYOMING STATE AFL-CIO, Appellant (Intervenor below),

Wyoming Political Action Committee for Education (Intervenor below), and

Albert H. Cranston et al., (Plaintiffs below),

v.

Thyra THOMSON, Secretary of State, et al., Appellees (Defendants below).

Nos. 4445-4447.

Supreme Court of Wyoming.

January 17, 1975.

Rehearing Denied March 31, 1975.

727  *727   Walter C. Urbigkit, Jr., of Urbigkit, Moriarity, Halle & Mackey, Cheyenne, for appellants Cranston and Wyo. State AFL-CIO.

Charles E. Graves and Patrick E. Hacker, Cheyenne, for appellant Wyo. Political Action Committee for Ed.

Laurence Gold, Washington, D.C., for appellant Wyo. State AFL-CIO.

David B. Kennedy, Atty. Gen., Jerome F. Statkus, Asst. Atty. Gen., and William M. Sutton, Sp. Asst. Atty. Gen., Cheyenne, for appellees, Thyra Thomson and the Office of the Attorney General, State of Wyoming.

John Lynch, Deputy County and Prosecuting Attorney, Cheyenne, for appellees, Thomas J. Carroll and John B. Huisman.

Before PARKER[*], C.J., McEWAN, GUTHRIE and McCLINTOCK, JJ., and ARMSTRONG, District Judge.

Mr. Chief Justice PARKER delivered the opinion of the court.

This is an appeal by plaintiffs and the two intervenor organizations from an order dismissing the complaints for failure to state a justiciable cause.[1] In their complaint plaintiffs sought to declare void and unconstitutional § 22.1-401, W.S. 1957, 1973 Cum.Supp., requiring a candidate's written approval to expenditures on his behalf, and certain subsections of § 22.1-389, W.S. 1957, 1974 Interim Supp.,[2] concerning the limitation of campaign expenditures and restricting certain practices. There was also a prayer seeking to prohibit enforcement of the mentioned statutes, but this aspect is not pursued in the appeal.

The complaint asserted plaintiffs' status as resident electors, that said Cranston and Doughty had been candidates for state representative in the 1972 election and Cranston was an announced candidate for the same office in 1974, that Otto "may become a candidate for office in 1974," and alleged the membership of all plaintiffs in one or more

organizations which seek through joint action to support the nomination and election of candidates for public office, which activities exposed the plaintiffs to potential civil and criminal penalties. It stated that the challenged statutes affected and harmed them, charging unconstitutionality on numerous grounds as violative of "Article I, Section 1, Article I, Section 2; Article I, Section 3; Article I, Section 6; Article I, Section 7; Article I, Section 9; Article I, Section 10; Article I, Section 11; Article I, Section 20; Article I, Section 21; Article I, Section 27; Article I, Section 34; Article I, Section 36; Article III, Section 27, of the Constitution of the State of Wyoming and the First, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States. Article I, Section 4 and Article VI of the Constitution of the United States * * *."

728   *728   The intervenor AFL-CIO stated its organizational structure, certain provisions in its constitution, and said that it had "in the past and anticipatorily in the future, will endorse candidates, make contributions from funds voluntarily contributed and otherwise support the electoral interests of candidates including specifically those seeking national office, deemed best to recognize and support the interests of labor." Its prayer was similar to that of plaintiffs.

The intervenor Wyoming PACE recited its voluntary nonprofit, unincorporated status, the individuals combined to support political candidates favorable to education, the receipt of donations from its members, and the selection through its board of directors of candidates favorable to education, who would receive the campaign donations. PACE charged unconstitutionality of the mentioned statutes on grounds substantially similar to those asserted by plaintiffs and by the intervenor AFL-CIO, appending a like prayer.

In an amended complaint the intervenor AFL-CIO recited additionally its contribution of moneys in various capacities to candidates in the 1972 general election as well as the fact that it had on hand substantial funds collected from per capita tax and moneys received from nonresidents of the State and desired to contribute some of the money to the Congressional candidate and presently planned and desired to continue its past practice of making contributions to candidates for election.

In an amended complaint, PACE further alleged that it presently held a checking account of $4,152.90 contributed by its members for the purposes of soliciting and receiving donations to the campaigns of announced political candidates supporting education or to the political parties they represent, and that its Board of Directors had selected certain candidates whom they wished to support and had donated the sum of $500 to the National Education Association Political Action Committee, an organization which makes campaign donations to candidates for the United States Congress and Senate from various states, including Wyoming.

From a dismissal of plaintiffs' and intervenors' complaints, on the grounds that neither the pleadings nor the testimony in evidence adduced in support thereof gave rise to a justiciable controversy upon which the court might act, this appeal has resulted.

The appellants here urge the existence of a justiciable controversy, the unconstitutionality of the challenged laws on the grounds asserted in the pleadings, and ask for a decision as to the merits of the action. The threshold question, of course, is that of justiciability, the basis for the trial court's order of dismissal. On that aspect, all parties here take comfort in the case of Brimmer v. Thomson, Wyo., 521 P.2d 574; and it may therefore be salutary to summarize our analysis of what was said therein.

Aside from general discussion explanatory of but unnecessary to the result, we held in Brimmer that each of the three senators who were defendants had, if qualified therefor, a genuine, existing, and fundamental right to seek the public office of governor. Such right had been improperly restricted and abrogated by a previous opinion of the Attorney General. Thus, a justiciable controversy existed. In reaching the decision, various incidental and foundation matters received some attention, including (a) the necessary elements of a justiciable controversy under the Uniform Declaratory Judgments Act, (b) a notation of the unquestioned axiom that the Declaratory Judgments Act cannot be relied upon to secure an advisory opinion, and (c) the caution essential to application of the public interest concept; but reference to any of these remarks taken out of context is unwarranted.

Perhaps there should be some delineation of the rule that a declaratory judgment cannot be relied upon to secure an advisory opinion.

"* * * Courts will not render advisory opinions on abstract questions of law about which there is only a disagreement 729 *729 rather than an actual controversy between the parties. * * *" Wagner v. Mahaffey, 195 Kan. 586, 408 P.2d 602, 605.

"The Declaratory Judgments Act gives courts no power to determine future rights or controversies in anticipation of events that have not occurred * * *." Glasgow v. Fox, 214 Tenn. 656, 383 S.W.2d 9, 13.

We adopt these holdings. The reasons for this rule are obvious since binding legal determinations made in the abstract and decisions rendered without concrete factual background would be imprecise, subject to speculation, and would create rather than diminish future controversies. We have thus made it clear that the court is precluded by logic as well as precedent from issuing advisory opinions. We have also indicated in Brimmer the requisites of a justiciable controversy under the Uniform Declaratory Judgments Act: (a) that it requires parties who have existing and genuine, as distinguished from theoretical rights and interests, (b) the controversy must be one upon which a court may effectively operate rather than an argument calling for a purely political, administrative, philosophic, or academic conclusion, and (c) it must be one of which a judicial determination may have the force and effect of a final judgment upon the rights, status, or legal relationships of a real party in interest.

We think that, wanting any of these requisites, a great public interest alone is insufficient to warrant the action of the court under any situation which we might at present foresee. As has been pointed out in numerous authorities, the difference between an abstract question and a controversy contemplated by the Uniform Declaratory Judgments Act is necessarily one of degree; and it is difficult, if not impossible, to fashion in advance a precise test for determining the question. Basically, the problem in each case is whether the facts alleged under all the circumstances show that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the declaratory judgment. Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 959-960, 22 L.Ed.2d 113.

In the matter before us, there are asserted either by the pleadings or the evidence no existing right or interest with the possible exception (1) of an opinion of April 29, 1974, by the Attorney General to the Secretary of State wherein the questions[3] were answered in the affirmative, and (2) the pleaded and undenied payment by PACE of $500 to the National Education Association Political Action Committee. As to the Attorney General's

opinion, the questions asked were not sufficiently concrete to dispose of any dispute here between the parties. As to the mentioned PACE $500 payment, there was no information presented showing it to have been received by the organization to which it was sent or what was done with it thereafter.

Next to Brimmer, appellants seem to place most reliance on Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201, and quote from 410 U.S. at 188, 93 S.Ct. at 745:

"Inasmuch as Doe and her class are recognized, the question whether the other appellants — physicians, nurses, clergymen, social workers, and corporations — present a justiciable controversy and have standing is perhaps a matter of no great consequence. We conclude, however, that the physician-appellants, who are Georgia-licensed doctors consulted by pregnant women, also present a justiciable 730 *730 controversy and do have standing despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes. The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief. * * *"

The quoted language is only a small portion of a rather involved opinion issued simultaneously with another case, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, dealing with related matters, inter alia, the issuance of a declaratory judgment concerning the constitutionality of abortion statutes. Justice Blackmun, the author of both opinions, stated in Roe that the two cases "of course, are to be read together," 410 U.S. at 165, 93 S.Ct. at 733. An analysis of these two cases discloses that in the instance where the woman plaintiff (or the married couple) is merely apprehensive of what may occur in the future plaintiff's position is held to be of a speculative character and an allegation concerning it does not present a justiciable controversy, while in a circumstance where there is an actual pregnancy the opposite is true. The situation of Jane Roe's physician, as to justiciability is unimportant to the present controversy since there the Supreme Court declined prosecution for abortion activities then pending before the Texas court and rejected his alternative contention that he was a "potential future defendant" since there was no showing that he would suffer great and immediate irreparable injury by virtue of being prosecuted in the state courts where he could make his constitutional contentions. In Doe v. Bolton, supra, May Doe was held to have presented a justiciable controversy since at the time of the complaint she was actually pregnant, the alleged interference with her rights was clear, immediate, and present, rather than speculative and futuristic. The same rationale was applied to the doctors.

It follows, therefore, that the holdings in the mentioned decisions of the United States Supreme Court are consistent with the opinions of this court and in particular with that of Brimmer v. Thomson, supra, where we indicated that to present a justiciable controversy there must be the violation of a genuine, existing, and fundamental right, and that the court would not issue advisory opinions dealing with future speculative matters.

Neither the complaints in the present case nor the evidence adduced before the trial court dealt with more than speculations and possibilities. Actually the requests presented by the three complaints were for advisory opinions on multifaceted matters, answers to which could scarcely fail to proliferate rather than resolve controversy.

We do not reach the various constitutional questions which are posed.

Affirmed.

ARMSTRONG, District Judge (concurring).

I concur in the majority opinion, especially with respect to the lack of a justiciable controversy on the part of the intervenors. I agree that the threshold to the successful maintenance of a declaratory judgment action is the clear demonstration of such a controversy.

The dissent in this case, and the majority opinion in *Brimmer,* approximate advisory opinions, from which everyone seems to shy away.

Semantics aside, in a case of this kind where a sizeable public interest is involved and where the legislature has presently pending a bill to amend the Frisby amendment, it behooves me to state candidly that if a controversy had been shown I would have concurred with the dissent in declaring the offensive section of the amendment unconstitutional.

731 *731  McCLINTOCK, Justice (dissenting).

I do not disagree with the majority in their view that an action for declaratory judgment must present a justiciable controversy and that the courts should not render advisory opinions.[1] My disagreement is with the application of those principles to the facts of this case and the expressed fear that a decision thereon would be "rendered without concrete factual background, * * * subject to speculation, and would create rather than diminish future controversies".

As shown by their complaint, the individual plaintiffs at the time of filing the action were actual or potential candidates for political office within the state or were members of organizations interested in supporting political candidates. Pleadings and evidence establish that Wyoming AFL-CIO is a voluntary union of unions within the state, which by its constitution has the declared purpose to participate in the political life of the local, state, and national communities, including fostering legislation which will safeguard and promote the principle of collective bargaining. The constitution of the Wyoming Political Action Committee for Education (PACE) declares one of its objectives to be "to solicit and receive donations which shall in turn be contributed to campaigns of announced political candidates chosen for their support of education or to the political parties they represent".

All pleadings further allege that application of the so-called Frisby amendment[2] to the activities of these individuals and organizations will constitute an improper and unconstitutional interference with the reasonable and practical exercise of their political rights. But under the view of the majority none of the plaintiffs may secure a determination of the invalidity of the statute because there is no justiciable controversy presented. A closing paragraph of the majority opinion sums up the objections to the action:

"Actually the requests presented by the three complaints were for advisory opinions on multifaceted matters, answers to which could scarcely fail to proliferate rather than resolve controversy."

Considering the first of three requisites of justiciability said to be recognized in Brimmer v. Thomson, Wyo., 521 P.2d 574, that there be parties who have existing and genuine, as distinguished from theoretical, rights and interests, I would first refer to the testimony *of*

L. Keith Henning, chief executive officer of the state AFL-CIO, and Ed Brennan, state chairman of PACE.

Mr. Henning testified as to the operations of the organization since its inception in 1956. Each affiliated local union contributes to the state organization dues of 40 cents per month for each of its members, of which sum five cents is earmarked as a political fund, expended through a standing Committee on Political Education 732 *732 (COPE). In addition to these funds, tickets are sold for $2.00 each to voluntary contributors to COPE's activities. These funds are forwarded to the national AFL-CIO but one-half comes back for use by the state organization. At a state convention of delegates from the various local unions a determination is made to endorse certain candidates for federal, state, or local office, a two-thirds majority of the delegates being necessary for such endorsement. Information concerning such endorsements is disseminated among the membership and the general public. Contributions of financial help are made to some of these candidates, depending upon the importance to COPE of a particular race and the need of a candidate for support. Henning testified concerning the difficulties of making such endorsements and contributions in the face of the Frisby amendment:

"The biggest problems that we have would be, number one, in getting the two-thirds vote of the entire membership before we can spend monies in individual cases. This becomes a function of the executive end of the organization and it changes day to day and we just could not function if we had to receive a two-thirds membership vote on this. Also, the very great problem is that we don't know where the money came from, what district it came from, and being able to decide that there were so many members in a certain county that we could expend funds on. There are also counties in the state that have officials up for election that we feel we have great interest in, yet we have very few members residing in that county."

Specific examples of this last problem were testified to by Henning.

During the 1972 campaign some $7,500, not representing funds contributed by its member locals but as to which COPE acted as agent, were distributed to federal candidates. $5,800, representing contributions through the five cent levy and sale of tickets was expended in support of endorsed candidates. $6,000 of such funds were on hand for expenditure in the 1974 campaign (the testimony was given on June 21, 1974), but in the witness' own words the "passage of the Frisby Amendment has put us at a standstill" because until some determination is made of the act the AFL-CIO could not proceed. Contributions would be made in the 1974 election campaign if the matter was settled.

Mr. Brennan, after stating the constitutional purpose of PACE, testified that his group consisted of some 1,000 members scattered through the 23 counties of the state; that all contributions to the committee were voluntary; that money was received from members of the teaching profession and the general public through drives, raffles, and other functions; that it had participated in the 1970 and 1972 elections, legislative, congressional and county, and had given financial support to a number of those candidates. Endorsement of candidates was in some instances expressed through supportive letters mailed to voters in the county where the candidate was running. At the time of the hearing there was a fund of some $4,100 available for financial support of candidates and the board of directors had gone through the entire list of incumbent legislators and others who might be seeking office and had reached a decision to support

some of the candidates. However, nothing could be done to effect this decision because the board was fearful of the criminal penalties that might result under the amendment. The possibility of taking a "negative" vote, that is, one where the board would advise the membership of its decisions on various candidates and would consider them approved unless more than one-third of the membership should by letter disclose their rejection of such candidate, had been considered, but no decision reached. The board has been unable to come up with any feasible plan for taking votes of its 1,000 members that is economically feasible. In Brennan's words: "We would spend more money collecting votes than we do have to give to candidates", and the effect of this is that "we could not be effective as an organization".

733 *733   I see nothing speculative or theoretical in this testimony. I view it as factual, a recitation of the manner in which these two organizations have operated up to the enactment of the amendment. I view as factual their testimony that they have funds on hand which they would like to spend in the support of candidates they consider favorable to their objectives but that they cannot do this because of the amendment.

The second requisite to the establishment of a justiciable controversy is said to be that the controversy must be one upon which the court may effectively operate as distinguished from an argument calling for an administrative, philosophic, or academic conclusion. I would consider this point more pertinent and of more importance were this an action only to obtain declarations as to the interpretation of the amendment, that is, if we were asked to tell the plaintiffs what they could or could not do and be in compliance with the statute. For example, PACE includes a prayer that the court answer certain questions as to whether designated conduct would constitute a violation of the statute. But this is an alternative prayer and all of the complaints specifically ask that subsection (e) be declared unconstitutional and void. To decide such a question, against the background of what I believe must be considered a factual situation, is not in my opinion an entry into any academic or philosophic discussion.

I hold the same views with respect to the third requisite cited by the majority, that the judicial determination must have the force and effect of a final judgment upon the rights, status, or legal relationships of a real party in interest. Again, upon my view that the plaintiffs have alleged and shown a definite and real interference with their method of operation, I do not see how it could possibly be said that a judgment declaring the statute unconstitutional would fail to be a final judgment upon the rights, status, or legal relationship of these plaintiffs, justifiably concerned with protecting their way of participating in political activity and therefore being real parties in interest. We had no difficulty in determining and declaring a criminal statute unconstitutional in Doe v. Burk, 513 P.2d 643. Although by a split decision, in State v. Stern, 526 P.2d 344, we declared our so-called breaking and entering statute unconstitutional. I would assume that these statutes may no longer be considered as effective in Wyoming. I would consider that a judgment that the Frisby amendment was unconstitutional would similarly have the practical effect of eliminating it from future concern to anyone. The Supreme Court of the United States in a host of cases, has held that the validity of a state statute may be properly challenged on constitutional grounds under the federal declaratory judgment law.[3] Under those decisions a declaration of unconstitutionality under the federal constitution is a final and effective judgment. I must disagree with the majority when

they conclude that a declaration of unconstitutionality in this case would create or proliferate future controversies.

I am further of the opinion that to distinguish *Brimmer* on the basis that in that case there was an official opinion of the attorney general's office which was adverse to the right of the defendants therein to seek the nomination for governor of the state, while in this case there is no such opinion is a distinction without significance.[4] Section 1-1052, W.S. 1957 provides in plain language that:

"**Any person * * *** whose rights, status or other legal relations are affected 734  *734  by a statute * * * may have determined any question of construction or validity arising under the * * * statute."

It does not provide that anyone whose rights under a statute as interpreted by the attorney general or other public official may have such declaration. While there might be reason *for* declining to exercise discretion to make declarations under such posited circumstances as to be ridiculous, there is nothing fanciful about the situation in which the plaintiffs find themselves, and the Frisby amendment, not the Attorney General's construction thereof, is what endangers the plaintiff's exercise of political rights in the only manner in which they consider such exercise effective.

The foregoing relates only to the justiciability of the action insofar as it seeks declarations as to the unconstitutionality of the Frisby amendment. However, all plaintiffs specifically raised the question that insofar as any legislation relating to the support of candidates for federal office is concerned, state laws are either inapplicable or invalid because federal legislation has preempted the field. This contention had been specifically rejected by an attorney general's opinion, No. 12, dated April 29, 1974. If *Brimmer* is valid only because the there asserted right of the midterm senators to run for the office of governor was clouded by the deputy attorney general's "qualified no" opinion, then it would seem in this case that the asserted right of AFL-CIO and PACE to endorse and support federal candidates of their choice is similarly clouded and there is a justiciable controversy in that respect. Counsel for AFL-CIO argue this question in their brief and the Attorney General responds thereto but does not again comment after plaintiffs' filed supplemental brief setting forth the final federal act and history thereof.

I shall not argue the merits of the Attorney General's contention that only a candidate for federal office would have standing to raise the question except to state that the action seeks to determine and protect the right of citizens, whether as individuals or associations, to express themselves in elections, a right which I consider a first amendment right of the first magnitude. I do not believe only a candidate has the standing to claim a constitutional right is clouded by improper state legislation. I think that a justiciable controversy on a serious question was raised by the pleadings, the briefs, and supplemental brief. I think that the majority improperly ignore that question.

I should add that I am convinced that subsection (e) of the Frisby amendment is unconstitutional and that the decision of this Court should be to that effect, notwithstanding that the district court did not reach a conclusion on that point. It is my opinion that the case of the plaintiffs was completely developed in the district court, the Attorney General presented all the evidence that he considered pertinent on the issues, and I find no questions of fact that should be left to the prior determination of the original trier of the fact. In the last analysis it is only this Court which can effectively decide the questions of validity under our state constitution, and we have an equal obligation,

subject to the final review of the Supreme Court of the United States, to enforce the constitution of the United States. While the original necessity for haste has been eliminated by the normal delays in getting a case to trial and then to this Court, I see nothing to be gained by further consideration in the trial court. I believe that a decision of this Court should and would end the controversy.

735  *735   Counsel for AFL-CIO and PACE argue effectively and with citations of

numerous authorities that subsection (e) is invalid under a number of state and federal constitutional provisions. Noting in passing that there is a very real vagueness of expression in certain portions of the subsection,[5] I do not think that this Court needs to reach or discuss all of the constitutional arguments raised, and I would hold the subsection unconstitutional because of its clear and unequivocal prohibiting of certain conduct by organizations other than political parties, except under conditions which the evidence shows could not be met in any practicable way so that in my opinion the statute amounts to a denial of the right of association and to operate as an association in the exercise of rights guaranteed under the first and fourteenth amendments to the United States Constitution and §§ 2, 3, 6, and 7 of Art. 1 of the Wyoming Constitution. While I find no cases directly in point, either of this Court or the Supreme Court of the United States, I do think that decisions of that court establish the principles that should govern our determination.

In Healy v. James, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972), it is said that: "Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs." In the same vein are Bates v. Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960), Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), and National Association for the Advancement of Colored People v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). In this last case it is said that:

"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. * * * Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."

As was said in Sweezy, 354 U.S. at 250, 77 S.Ct. at 1212, "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association." The individual plaintiffs in this action are persons who seek to associate and obtain the support of associations in political activity; AFL-CIO and PACE are organizations which seek to express and have their views known in political campaigns, and one of their methods of doing so is by the endorsement and support of candidates. Their activities are materially curtailed if not eliminated by the two-thirds vote requirement, and they are definitely discriminated against in their manner of contributions in that individuals, from within or outside the state, may make contributions in any election district they choose, while these associations may only contribute to the extent of the contributions by their *members* in the particular election district. They may not even seek the contributions of nonmembers for use in those areas. I confess myself unable to see how either subsections (e)(i) or (e)(ii) can be said to further any important

interest of the state of Wyoming. I fail to see how a contribution by one person of $1,000 can be good and an equal contribution representing the combined donations of 1,000 persons can be evil. There is then a very real denial of 736 *736 equal rights to those people who would combine their efforts to be politically effective.

Because of my conviction that the Frisby amendment is unconstitutional and my further question concerning its applicability to elections of federal candidates, I think it most unfortunate that a majority of this Court has seen fit to reject jurisdiction of the action, apparently brought in all good faith, and raising questions that are to me of substantial importance. I have cause to wonder how a solution of those problems will be reached. The Attorney General states that he does not want interested and conscientious citizens to flout the law, thereby risking civil penalties of considerable size, and even fine and imprisonment, but I find little help for these people in his suggestion that "[i]maginative legal procedure could be employed to establish a valid factual situation which would define the issues yet fall short of incurring any penalty". The brief does not suggest such procedures[6] and my imagination is not equal to the task he seeks to impose. The majority decision leaves this matter in the most regrettable situation that plaintiffs' important political rights are clouded by the action or inaction of the Attorney General. The only alternative to risk of criminal liability seems to me to be an action in the federal courts under federal legislation relating to civil rights or declaratory judgments relief. I would have preferred action by this Court.

Mr. Justice McEWAN, concurring in the dissent of Mr. Justice McCLINTOCK.

The majority seek to distinguish *Brimmer* from this case on the basis that in *Brimmer* there was an attorney general's opinion that the incumbent senators could not be candidates for governor, while in this case there was no opinion. The majority fail to recognize that in *Brimmer* the opinion was issued by the deputy attorney general and the attorney general himself instituted the action and asked that the incumbent senators be declared eligible to become candidates. The bringing of such an action by the attorney general must necessarily be construed as a tacit withdrawal of the opinion and tantamount to no opinion being issued. In any event, I cannot believe that a letter from a "friendly" attorney general or a cooperative county attorney could make the difference between a matter being or not being a justiciable controversy.

ORDER

GUTHRIE, Chief Justice.

Petition for rehearing having been filed by appellants, and the court having fully considered the same, but inasmuch as in the meantime Enrolled Act No. 131 relating to election procedures has been enacted by the Forty-Third Legislature and this amendment changes materially the provisions of §§ 22.1-389 and 22.1-401, W.S. 1957, 1973 Cum.Supp., involved in the action; and it further appearing that further consideration of the Act as involved in the action herein would have no effect upon existing rights, and that because of the amendment the action may be considered moot,

It is therefore ordered that the petition for rehearing be and the same is hereby denied.

[*] At the time these causes were considered and the opinion drafted, Justice Glenn Parker was a member of the court and the chief justice. He has, however, since retired.

[1] The order also dismissed the Secretary of State and the Laramie County Clerk as defendants.

[2] Section 22.1-389(c), (d), (e), (f) — and (g) as applied to (d), (e), and (f) — W.S. 1957, 1974 Interim Supp.

[3] [1]: Is the Campaign Expenditure Limitation of the Wyoming Election Code Applicable to Federal Candidates?

"QUESTION [2]: Are the Provisions of the Wyoming Election Code which Place Limitations on Contributions and Expenditures by Associations and Groups Applicable to Federal Candidates?

"QUESTION [3]: Will Reports filed by Federal Candidates in Accordance with Federal Statutes Satisfy State Campaign Reporting Requirements?"

[1] Brimmer v. Thomson, Wyo., 521 P.2d 574; Anderson v. Wyoming Development Company, 60 Wyo. 417, 154 P.2d 318; Holly Sugar Corporation v. Fritzler, 42 Wyo. 446, 296 P. 206.

[2] Subsection (e) of § 22.1-389, W.S. 1957, 1974 Int.Supp., provides in pertinent part that no monetary contribution or expenditure may be made by certain described organizations including trade associations and labor unions, unless:

"(i) The contribution or expenditure is approved by at least sixty-six and two-thirds percent (66 2/3%) of the members of the organization who reside within the area from which the candidate may be elected. Any blanket endorsement which could be construed to circumvent the intent of this subsection is prohibited. The individual vote and endorsement by the membership is required for each candidate who is to receive a contribution; and

"(ii) The monies contributed or expended are from funds or contributions of only those members of the organization who reside within the district from which the candidate may be elected.

"Any device contrived to circumvent the intent and purpose of this subsection is prohibited."

Violation of these prohibitions is punishable by imposition of civil penalties up to $10,000, plus costs and reasonable attorney fee, § 22.1-389(g), W.S. 1957, 1974 Int.Supp., as well as a fine up to $1,000 and imprisonment in the county jail for not more than six months, § 22.1-405, W.S. 1957, 1973 Cum. Supp.

[3] See Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

[4] It would hardly be denied, I think, that the controversy in this case is much more realistic than that in *Brimmer* where all the contesting parties were in agreement as to answer to the question posed by the suit. A number of motions were submitted and disposed of by the district court after filing of extensive briefs and oral argument, with the plaintiffs vigorously attacking the statute and the attorney general defending it with equal fervor. In *Brimmer,* only the deputy attorney general was heard to defend the "qualified no", given in the opinion of March 13, 1974, to the query of whether a state senator could become a candidate for state office in the middle of his term. Actually, a withdrawal of the opinion by the attorney general himself would have eliminated the controversy entirely.

[5] I am at a loss to understand just what is meant by the expression that "[a]ny blanket endorsement which could be construed to circumvent the intention of this subsection" ((e)(i)) and that "[a]ny device contrived to circumvent the intent and purpose of this subsection" ((e)(ii)) are prohibited. However, I do not consider that they are so important to the section that the legislature would not have enacted it with the deletion of these two sentences.

[6] Although upon the oral argument of the case I particularly asked the Attorney General for examples of such possible procedures, I confess that I remain unenlightened.

415 U.S. 452 (1974)
STEFFEL
v.
THOMPSON ET AL.
No. 72-5581.
Supreme Court of United States.
Argued November 13, 1973.
Decided March 19, 1974.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.

453   *453   *Howard Moore, Jr.,* argued the cause for petitioner. With him on the brief were *Elizabeth R.*

*Rindskopf* and *William R. Gignilliat III.*
*Lawrence M. Cohen* argued the cause for respondents. With him on the brief for respondents Hudgens et al, was *Dock H. Davis.*

454   *454   MR. JUSTICE BRENNAN delivered the opinion of the Court.

When a state criminal proceeding under a disputed state criminal statute is pending against a federal plaintiff at the time his federal complaint is filed, *Younger* v. *Harris,* 401 U. S. 37 (1971), and *Samuels* v. *Mackell,* 401 U. S. 66 (1971), held, respectively, that, unless bad-faith enforcement or other special circumstances are demonstrated, principles of equity, comity, and federalism preclude issuance of a federal *injunction* restraining enforcement of the criminal statute and, in all but unusual circumstances, a declaratory judgment upon the constitutionality of the statute. This case presents the important question reserved in *Samuels* v. *Mackell, id., at 73-74,* whether declaratory relief is precluded when a state prosecution has been threatened, but is not pending, and a showing of bad-faith enforcement or other special circumstances has not been made.

Petitioner, and others, filed a complaint in the District Court for the Northern District of Georgia, invoking the Civil Rights Act of 1871, 42 U. S. C. § 1983, and its jurisdictional implementation, 28 U. S. C. § 1343. The complaint requested a declaratory judgment pursuant to 28 U. S. C. §§ 2201-2202, that Ga. Code Ann.

§ 26-1503 (1972)[1] was being applied in violation of petitioner's 455   *455   First and Fourteenth

Amendment rights, and an injunction restraining respondents—the solicitor of the Civil and Criminal Court of DeKalb County, the chief of the DeKalb County Police, the owner of the North DeKalb Shopping Center, and the manager of that shopping center —from enforcing the statute so as to interfere with petitioner's constitutionally protected activities.

The parties stipulated to the relevant facts: On October 8, 1970, while petitioner and other individuals were distributing handbills protesting American involvement in Vietnam on an exterior sidewalk of the North DeKalb Shopping Center, shopping center employees asked them to stop handbilling and leave.[2] They declined to do so, and police officers were summoned. The officers told them that they would be arrested if they did not stop handbilling. The group then left to avoid arrest. Two days later petitioner and a companion returned to the shopping center and again began handbilling. The manager of the center called the police, and petitioner and his companion were once again told that failure to stop their handbilling would result in their arrests. Petitioner left to avoid arrest. His companion stayed, however, continued

456   *456   handbilling, and was arrested and subsequently arraigned on a charge of criminal trespass in

violation of § 26-1503.[3] Petitioner alleged in his complaint that, although he desired to return to the shopping center to distribute handbills, he had not done so because of his concern that he, too, would be arrested for violation of § 26-1503; the parties stipulated that, if petitioner returned and refused upon request to stop handbilling, a warrant would be sworn out and he might be arrested and charged with a violation of the Georgia statute.[4]

After hearing, the District Court denied all relief and dismissed the action, finding that "no meaningful contention can be made that the state has [acted] or will in the future act in bad faith," and therefore "the rudiments of an active controversy between the parties . . . [are] lacking." 334 F. Supp. 1386, 1389-1390 (1971). Petitioner appealed[5] only from the denial of declaratory relief.[6] The Court of Appeals for the

Fifth Circuit, one judge concurring in the result, affirmed the District Court's 457   *457   judgment

refusing declaratory relief.[7] *Becker* v. *Thompson,* 459 F. 2d 919 (1972). The court recognized that the holdings of *Younger* v. *Harris,* 401 U. S. 37 (1971), and *Samuels* v. *Mackell,* 401 U. S. 66 (1971), were expressly limited to situations where state prosecutions were pending when the federal action commenced, but was of the view that *Younger* v. *Harris* "made it clear beyond peradventure that irreparable injury must be measured by bad faith harassment and such test must be applied to a request for injunctive relief against *threatened* state court criminal prosecution" as well as against a pending prosecution; and, furthermore, since the opinion in *Samuels* v. *Mackell* reasoned that declaratory relief would normally disrupt the state

criminal justice system in the manner of injunctive relief, it followed that "the same test of bad *458   *458*

faith harassment is prerequisite . . . for declaratory relief in a threatened prosecution." 459 F. 2d, at 922. A petition for rehearing en banc was denied, three judges dissenting. 463 F. 2d 1338 (1972).[8]
We granted certiorari, 410 U. S. 953 (1973), and now reverse.
I
At the threshold we must consider whether petitioner presents an "actual controversy," a requirement imposed by Art. III of the Constitution and the express terms of the Federal Declaratory Judgment Act, 28 U. S. C. § 2201.[9]

*459   *459*   Unlike three of the appellees in *Younger* v. *Harris,* 401 U. S., at 41, petitioner has alleged

threats of prosecution that cannot be characterized as "imaginary or speculative," *id.,* at 42. He has been twice warned to stop handbilling that he claims is constitutionally protected and has been told by the police that if he again handbills at the shopping center and disobeys a warning to stop he will likely be prosecuted. The prosecution of petitioner's handbilling companion is ample demonstration that petitioner's concern with arrest has not been "chimerical," *Poe* v. *Ullman,* 367 U. S. 497, 508 (1961). In these circumstances, it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights. See, *e. g., Epperson* v. *Arkansas,* 393 U. S. 97 (1968). Moreover, petitioner's challenge is to those specific provisions of state law which have provided the basis for threats of criminal prosecution against him. Cf. *Boyle* v. *Landry,* 401 U. S. 77, 81 (1971); *Watson* v. *Buck,* 313 U. S. 387, 399-400 (1941).
Nonetheless, there remains a question as to the *continuing* existence of a live and acute controversy that must be resolved on the remand we order today.[10] In *Golden* v. *Zwickler,* 394 U. S. 103 (1969), the appellee sought a declaratory judgment that a state criminal statute prohibiting the distribution of anonymous election-campaign literature was unconstitutional. The appellee's complaint had expressed a desire to distribute handbills during the forthcoming re-election campaign of a Congressman, but it was

later learned that the Congressman *460   *460*   had retired from the House of Representatives to become a

New York Supreme Court Justice. In that circumstance, we found no extant controversy, since the record revealed that appellee's sole target of distribution had been the Congressman and there was no immediate prospect of the Congressman's again becoming a candidate for public office. Here, petitioner's complaint indicates that his handbilling activities were directed "against the War in Vietnam and the United States' foreign policy in Southeast Asia." Since we cannot ignore the recent developments reducing the Nation's involvement in that part of the world, it will be for the District Court on remand to determine if subsequent events have so altered petitioner's desire to engage in handbilling at the shopping center that it can no longer be said that this case presents "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941); see *Zwickler* v. *Koota,* 389 U. S. 241, 244 n. 3 (1967).
II
We now turn to the question of whether the District Court and the Court of Appeals correctly found petitioner's request for declaratory relief inappropriate.
Sensitive to principles of equity, comity, and federalism, we recognized in *Younger* v. *Harris, supra,* that federal courts should ordinarily refrain from enjoining ongoing state criminal prosecutions. We were cognizant that a pending state proceeding, in all but unusual cases, would provide the federal plaintiff with the necessary vehicle for vindicating his constitutional rights, and, in that circumstance, the restraining of an ongoing prosecution would entail an unseemly failure to give effect to the principle that state courts

have the solemn responsibility, 461 *461 equally with the federal courts "to guard, enforce, and protect

every right granted or secured by the Constitution of the United States . . . ." _Robb_ v. _Connolly,_ 111 U. S. 624, 637 (1884). In _Samuels_ v. _Mackell, supra,_ the Court also found that the same principles ordinarily would be flouted by issuance of a federal declaratory judgment when a state proceeding was pending, since _the_ intrusive effect of declaratory relief "will result in precisely the same interference with and disruption of state proceedings that the long-standing policy limiting injunctions was designed to avoid." 401 U. S., at 72.[11] We therefore held in _Samuels_ that, "in cases where the state criminal prosecution was begun prior to the federal suit, the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment . . . ." _Id.,_ at 73.

Neither _Younger_ nor _Samuels,_ however, decided the question whether federal intervention might be permissible in the absence of a pending state prosecution. In _Younger,_ the Court said:
"We express no view about the circumstances under which federal courts may act when there is no prosecution pending in state courts at the time the federal proceeding is begun." 401 U. S., at 41.
See also _id.,_ at 55 (STEWART and Harlan, JJ., concurring); _id.,_ at 57 (BRENNAN, WHITE, and MARSHALL, JJ., concurring). Similarly, in _Samuels_ v. _Mackell,_ the Court stated:

"We, of course, express no views on the propriety 462 *462 of declaratory relief when no state

proceeding is pending at the time the federal suit is begun." 401 U. S., at 73-74.
See also _id.,_ at 55 (STEWART and Harlan, JJ., concurring); _id.,_ at 75-76 (BRENNAN, WHITE, and MARSHALL, JJ., concurring).

These reservations anticipated the Court's recognition that the relevant principles of equity, comity, and federalism "have little force in the absence of a pending state proceeding." _Lake Carriers' Assn._ v. _MacMullan,_ 406 U. S. 498, 509 (1972). When no state criminal proceeding is pending at the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles. In addition, while a pending state prosecution provides the federal plaintiff with a concrete opportunity to vindicate his constitutional rights, a refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding. Cf. _Dombrowski_ v. _Pfister,_ 380 U. S. 479, 490 (1965).

When no state proceeding is pending and thus considerations of equity, comity, and federalism have little vitality, the propriety of granting federal declaratory relief may properly be considered independently of a request for injunctive relief. Here, the Court of Appeals held that, because injunctive relief would not be appropriate since petitioner failed to demonstrate irreparable injury—a traditional prerequisite to

463 *463 injunctive relief, _e. g., Dombrowski_ v. _Pfister, supra_— it followed that declaratory relief was

also inappropriate. Even if the Court of Appeals correctly viewed injunctive relief as inappropriate—a question we need not reach today since petitioner has abandoned his request for that remedy, see n. 6 _supra_—[12] the court erred in treating the requests for injunctive and declaratory relief as a single issue.
"[W]hen no state prosecution is pending and the only question is whether declaratory relief is appropriate[,] . . . the congressional scheme that makes the federal courts the primary guardians of constitutional rights, and the express congressional authorization of declaratory relief, afforded because it is a less harsh and abrasive remedy than the injunction, become the factors of primary significance." _Perez_ v. _Ledesma,_ 401 U. S. 82, 104 (1971) (separate opinion of BRENNAN, J.).

The subject matter jurisdiction of the lower federal courts was greatly expanded in the wake of the Civil War. A pervasive sense of nationalism led to enactment of the Civil Rights Act of 1871, 17 Stat. 13,

empowering the 464 *464 lower federal courts to determine the constitutionality of actions, taken by

persons under color of state law, allegedly depriving other individuals of rights guaranteed by the Constitution and federal law, see 42 U. S. C. § 1983, 28 U. S. C. § 1343 (3).[13] Four years later, in the Judiciary Act of March 3, 1875, 18 Stat. 470, Congress conferred upon the lower federal courts, for but the second time in their nearly century-old history, general federal-question jurisdiction subject only to a

jurisdictional-amount requirement, see 28 U. S. C. § 1331.[14] With this latter enactment, the lower federal courts "ceased to be restricted tribunals of fair dealing between citizens of different states and became the *primary* and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States." F. Frankfurter & J. Landis, The Business of the Supreme Court 65 (1928) (emphasis added).[15] These two statutes, together with the Court's decision in *Ex parte Young,* 209 U. S. 123 (1908)— holding that state officials who threaten to enforce an unconstitutional state statute may be enjoined by a

federal court of equity and that a federal court may, in appropriate circumstances, enjoin  465  \*465  future

state criminal prosecutions under the unconstitutional Act—have "established the modern framework for federal protection of constitutional rights from state interference." *Perez* v. *Ledesma, supra,* at 107 (separate opinion of BRENNAN, J.).

A "storm of controversy" raged in the wake of *Ex parte Young,* focusing principally on the power of a single federal judge to grant *ex parte* interlocutory injunctions against the enforcement of state statutes, H. Hart & H. Wechsler, The Federal Courts and the Federal System 967 (2d ed. 1973); see generally *Goldstein* v. *Cox,* 396 U. S. 471 (1970); Hutcheson, A Case for Three Judges, 47 Harv. L. Rev. 795, 804-805 (1934). This uproar was only partially quelled by Congress' passage of legislation, 36 Stat. 557, requiring the convening of a three-judge district court[16] before a preliminary injunction against enforcement of a state statute could issue, and providing for direct appeal to this Court from a decision granting or denying such

relief.[17] See 28  466  \*466  U. S. C. §§ 2281, 1253. From a State's viewpoint the granting of injunctive

relief—even by these courts of equal dignity—"rather clumsily" crippled state enforcement of its statutes pending further review, see H. R. Rep. No. 288, 70th Cong., 1st Sess., 2 (1928); H. R. Rep. No. 94, 71st Cong., 2d Sess., 2 (1929); H. R. Rep. No. 627, 72d Cong., 1st Sess., 2 (1932). Furthermore, plaintiffs were dissatisfied with this method of testing the constitutionality of state statutes, since it placed upon them the burden of demonstrating the traditional prerequisites to equitable relief—most importantly, irreparable injury. See, *e. g., Fenner* v. *Boykin,* 271 U. S. 240, 243 (1926).

To dispel these difficulties, Congress in 1934 enacted the Declaratory Judgment Act, 28 U. S. C. §§ 2201-2202. That Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction and to be utilized to test the constitutionality of state criminal statutes in cases where injunctive relief would be unavailable is amply evidenced by the legislative history of the Act, traced in full detail in *Perez* v. *Ledesma, supra,* at 111-115 (separate opinion of BRENNAN, J.). The highlights of that history, particularly pertinent to our inquiry today, emphasize that:

"[I]n 1934, without expanding or reducing the subject matter jurisdiction of the federal courts, or in any way diminishing the continuing vitality of *Ex parte Young* with respect to federal injunctions, Congress empowered the federal courts to grant a new remedy, the declaratory judgment. . . .

 467  \*467  "The express purpose of the Federal Declaratory Judgment Act was to provide a milder

alternative to the injunction remedy. . . . Of particular significance on the question before us, the Senate report [S. Rep. No. 1005, 73d Cong., 2d Sess. (1934)] makes it even clearer that the declaratory judgment was designed to be available to test state criminal statutes in circumstances where an injunction would not be appropriate. . . .

. . . . .

"Much of the hostility to federal injunctions referred to in the Senate report was hostility to their use against state officials seeking to enforce state regulatory statutes carrying criminal sanctions; this was the strong feeling that produced the Three-Judge Court Act in 1910, the Johnson Act of 1934, 28 U. S. C. § 1342, and the Tax Injunction Act of 1937, 28 U. S. C. § 1341. The Federal Declaratory Judgment Act was intended to provide an alternative to injunctions against state officials, except where there was a federal policy against federal adjudication of the class of litigation altogether. . . . Moreover, the Senate report's clear implication that declaratory relief would have been appropriate in *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), and *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926), both cases involving federal adjudication of the constitutionality of a state statute carrying criminal penalties, and the report's quotation from *Terrace* v. *Thompson,* which also involved anticipatory federal adjudication of the constitutionality of a state criminal statute, make it plain that Congress anticipated that the declaratory judgment procedure would be

used by the federal courts to test the constitutionality 468  *468  of state criminal statutes." 401 U. S., at 111-112, 115.[18]

It was this history that formed the backdrop to our decision in Zwickler v. Koota, 389 U. S. 241 (1967), where a state criminal statute was attacked on grounds of unconstitutional overbreadth and no state prosecution was pending against the federal plaintiff. There, we found error in a three-judge district court's considering, as a single question, the propriety of granting injunctive and declaratory relief. Although we noted that injunctive relief might well be unavailable under principles of equity jurisprudence canvassed in Douglas v. City of Jeannette, 319 U. S. 157 (1943), we held that "a federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the

propriety of the issuance of the injunction." 389 U. S., at 254. Only one year ago, we 469  *469

reaffirmed the Zwickler v. Koota holding in Roe v. Wade, 410 U. S. 113 (1973), and Doe v. Bolton, 410 U. S. 179 (1973). In those two cases, we declined to decide whether the District Courts had properly denied to the federal plaintiffs, against whom no prosecutions were pending, injunctive relief restraining enforcement of the Texas and Georgia criminal abortion statutes; instead, we affirmed the issuance of declaratory judgments of unconstitutionality, anticipating that these would be given effect by state authorities. We said: "The Court has recognized that *different considerations* enter into a federal court's decision as to declaratory relief, on the one hand, and injunctive relief, on the other. Zwickler v. Koota, 389 U. S. 241, 252-255 (1967); Dombrowski v. Pfister, 380 U. S. 479 (1965)." Roe v. Wade, supra, at 166 (emphasis added).

See Doe v. Bolton, supra, at 201.

The "different considerations" entering into a decision whether to grant declaratory relief have their origins in the preceding historical summary. First, as Congress recognized in 1934, a declaratory judgment will have a less intrusive effect on the administration of state criminal laws. As was observed in Perez v. Ledesma, 401 U. S., at 124-126 (separate opinion of BRENNAN, J.):

"Of course, a favorable declaratory judgment may nevertheless be valuable to the plaintiff though it cannot make even an unconstitutional statute disappear. A state statute may be declared unconstitutional *in toto*— that is, incapable of having constitutional applications; or it may be declared unconstitutionally vague or overbroad—that is, incapable of being constitutionally applied to the full extent of its purport. In either case,

a federal declaration of unconstitutionality reflects the 470  *470  opinion of the federal court that the

statute cannot be fully enforced. If a declaration of total unconstitutionality is affirmed by this Court, it follows that this Court stands ready to reverse any conviction under the statute. If a declaration of partial unconstitutionality is affirmed by this Court, the implication is that this Court will overturn particular applications of the statute, but that if the statute is narrowly construed by the state courts it will not be incapable of constitutional applications. Accordingly, the declaration does not necessarily bar prosecutions under the statute, as a broad injunction would. Thus, where the highest court of a State has had an opportunity to give a statute regulating expression a narrowing or clarifying construction but has failed to do so, and later a federal court declares the statute unconstitutionally vague or overbroad, it may well be open to a state prosecutor, after the federal court decision, to bring a prosecution under the statute if he reasonably believes that the defendant's conduct is not constitutionally protected and that the state courts may give the statute a construction so as to yield a constitutionally valid conviction. Even where a declaration of unconstitutionality is not reviewed by this Court, the declaration may still be able to cut down the deterrent effect of an unconstitutional state statute. The persuasive force of the court's opinion and judgment may lead state prosecutors, courts, and legislators to reconsider their respective responsibilities toward the statute. Enforcement policies or judicial construction may be changed, or the legislature may repeal the statute and start anew. Finally, the federal court judgment may have some *res judicata* effect, though this point is not free from difficulty and the governing rules remain to be developed with

471  *471  a view to the proper workings of a federal system. What is clear, however, is that even though

a declaratory judgment has 'the force and effect of a final judgment,' 28 U. S. C. § 2201, it is a much milder form of relief than an injunction. Though it may be persuasive, it is not ultimately coercive; noncompliance with it may be inappropriate, but is not contempt."[19] (Footnote omitted.)

Second, engrafting upon the Declaratory Judgment Act a requirement that all of the traditional equitable prerequisites to the issuance of an injunction be satisfied before the issuance of a declaratory judgment is considered would defy Congress' intent to make declaratory relief available in cases where an injunction would be inappropriate.

"Were the law to be that a plaintiff could not obtain a declaratory judgment that a local ordinance was unconstitutional when no state prosecution is pending unless he could allege and prove circumstances justifying a federal injunction of an existing state prosecution, the Federal Declaratory Judgment Act would have been *pro tanto* repealed." *Wulp* v. *Corcoran,* 454 F. 2d 826, 832 (CA1 1972) (Coffin, J.). See *Perez* v. *Ledesma,* 401 U. S., at 116 (separate opinion of BRENNAN, J.). Thus, the Court of Appeals was in error when it ruled that a failure to demonstrate irreparable injury—a traditional prerequisite to

injunctive relief, 472   *472   having no equivalent in the law of declaratory judgments, see *Aetna Life Ins.*

*Co.* v. *Haworth,* 300 U. S. 227, 241 (1937); *Nashville, C. & St. L. R. Co.* v. *Wallace,* 288 U. S. 249, 264 (1933)—precluded the granting of declaratory relief.

The only occasions where this Court has disregarded these "different considerations" and found that a preclusion of injunctive relief inevitably led to a denial of declaratory relief have been cases in which principles of federalism militated altogether against federal intervention in a class of adjudications. See *Great Lakes Co.* v. *Huffman,* 319 U. S. 293 (1943) (federal policy against interfering with the enforcement of state tax laws);[20] *Samuels* v. *Mackell,* 401 U. S. 66 (1971). In the instant case, principles of federalism not only do not preclude federal intervention, they compel it. Requiring the federal courts totally to step aside when no state criminal prosecution is pending against the federal plaintiff would turn federalism on its head. When federal claims are premised on 42 U. S. C. § 1983 and 28 U. S. C. § 1343 (3)—as they are

here—we have not required exhaustion of state judicial or administrative remedies, 473   *473

recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights. See, *e. g., McNeese* v. *Board of Education,* 373 U. S. 668 (1963); *Monroe* v. *Pape,* 365 U. S. 167 (1961). But exhaustion of state remedies is precisely what would be required if both federal injunctive and declaratory relief were unavailable in a case where no state prosecution had been commenced.

III

Respondents, however, relying principally upon our decision in *Cameron* v. *Johnson,* 390 U. S. 611 (1968), argue that, although it may be appropriate to issue a declaratory judgment when no state criminal proceeding is pending and the attack is upon the *facial validity* of a state criminal statute, such a step would be improper where, as here, the attack is merely upon the constitutionality of the statute as applied, since the State's interest in unencumbered enforcement of its laws outweighs the minimal federal interest in protecting the constitutional rights of only a single individual. We reject the argument.

In *Cameron* v. *Johnson,* the appellants sought a declaratory judgment that a Mississippi anti-picketing law was an overly broad and vague regulation of protected expression and an injunction restraining *pending* prosecutions against them for violations of the statute. We agreed with the District Court that the statute was not overly broad or vague and that nothing in the record supported appellants' assertion that they were being prosecuted in bad faith. In that circumstance, we held that "[t]he mere possibility of erroneous application of the statute does not amount `to the irreparable injury necessary to justify a disruption of orderly state proceedings.'. . . The issue of guilt or innocence is for the state court at the criminal trial; the

State was not required to prove appellants guilty in the federal proceeding to 474   *474   escape the finding

that the State had no expectation of securing valid convictions." *Id.,* at 621. Our holding in *Cameron* was *thus* that the state courts in which prosecutions were already pending would have to be given the first opportunity to correct any misapplication of the state criminal laws; *Cameron* is plainly not authority for the proposition that, in the absence of a pending state proceeding, a federal plaintiff may not seek a declaratory judgment that the state statute is being applied in violation of his constitutional rights.

Indeed, the State's concern with potential interference in the administration of its criminal laws is of lesser dimension when an attack is made upon the constitutionality of a state statute as applied. A declaratory judgment of a lower federal court that a state statute is invalid *in toto*—and therefore incapable of any valid application—or is overbroad or vague—and therefore no person can properly be convicted under the statute until it is given a narrowing or clarifying construction, see, *e. g., United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 369 (1971); *Gooding* v. *Wilson,* 405 U. S. 518, 520 (1972)—will likely have a **more**

significant potential for disruption of state enforcement policies than a declaration specifying a limited number of impermissible applications of the statute. While the federal interest may be greater when a state statute is attacked on its face, since there exists the potential for eliminating any broad-ranging deterrent effect on would-be actors, see *Dombrowski v. Pfister*, 380 U. S. 479 (1965), we do not find this consideration controlling. The solitary individual who suffers a deprivation of his constitutional rights is no less deserving of redress than one who suffers together with others.[21]

475   *475   We therefore hold that, regardless of whether injunctive relief may be appropriate, federal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute, whether an attack is made on its face or as applied.[22] The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE joins, concurring.

While joining the opinion of the Court, I add a word by way of emphasis.

476   *476   Our decision today must not be understood as authorizing the invocation of federal declaratory judgment jurisdiction by a person who thinks a state criminal law is unconstitutional, even if he genuinely feels "chilled" in his freedom of action by the law's existence, and even if he honestly entertains the subjective belief that he may now or in the future be prosecuted under it.

As the Court stated in *Younger* v. *Harris*, 401 U. S. 37, 52:

"The power and duty of the judiciary to declare laws unconstitutional is in the final analysis derived from its responsibility for resolving concrete disputes brought before the courts for decision . . . ."

See also *Boyle* v. *Landry*, 401 U. S. 77, 80-81.

The petitioner in this case has succeeded in objectively showing that the threat of imminent arrest, corroborated by the actual arrest of his companion, has created an actual concrete controversy between himself and the agents of the State. He has, therefore, demonstrated "a genuine threat of enforcement of a disputed state criminal statute . . . ."[*] Cases where such a "genuine threat" can be demonstrated will, I think, be exceedingly rare.

MR. JUSTICE WHITE, concurring.

I offer the following few words in light of MR. JUSTICE REHNQUIST'S concurrence in which he discusses the impact on a pending federal action of a later filed criminal prosecution against the federal plaintiff, whether a federal court may enjoin a state criminal prosecution under a statute the federal court has earlier declared unconstitutional 477   *477   at the suit of the defendant now being prosecuted, and the question whether that declaratory judgment is res judicata in such a later filed state criminal action.

*It* should be noted, first, that his views on these issues are neither expressly nor impliedly embraced by the Court's opinion filed today. Second, my own tentative views on these questions are somewhat contrary to my Brother's.

At this writing at least, I would anticipate that a final declaratory judgment entered by a federal court *holding* particular conduct of the federal plaintiff to be immune on federal constitutional grounds from prosecution under state law should be accorded res judicata effect in any later prosecution of that very conduct. There would also, I think, be additional circumstances in which the federal judgment should be considered as more than a mere precedent bearing on the issue before the state court.

Neither can I at this stage agree that the federal court, having rendered a declaratory judgment in favor of the plaintiff, could not enjoin a later state prosecution for conduct that the federal court has declared immune. The Declaratory Judgment Act itself provides that a "declaration shall have the force and effect of a final judgment or decree," 28 U. S. C. § 2201; eminent authority anticipated that declaratory judgments would be res judicata, E. Borchard, Declaratory Judgments 10-11 (2d ed. 1941); and there is every reason for not reducing declaratory judgments to mere advisory opinions. *Toucey* v. *New York Life Insurance Co.*, 314 U. S. 118 (1941), once expressed the view that 28 U. S. C. § 2283 forbade injunctions against relitigation in state courts of federally decided issues, but the section was then amended to overrule that case, the consequence being that "[i]t is clear that the Toucey rule 478   *478   is gone, and that to protect or effectuate its judgment a federal court may enjoin relitigation in the state court." C. Wright, Federal

Courts 180 (2d ed. 1970). I see no more reason here to hold that the federal plaintiff must always rely solely on his plea of res judicata in the state courts. The statute provides for "[f]urther necessary or proper relief . . . against any adverse party whose rights have been determined by such judgment," 28 U. S. C. § 2202, and it would not seem improper to enjoin local prosecutors who refuse to observe adverse federal judgments.

Finally, I would think that a federal suit challenging a state criminal statute on federal constitutional grounds could be sufficiently far along so that ordinary consideration of economy would warrant refusal to dismiss the federal case solely because a state prosecution has subsequently been filed and the federal question may be litigated there.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, concurring.

I concur in the opinion of the Court. Although my reading of the legislative history of the Declaratory Judgment Act of 1934 suggests that its primary purpose was to enable persons to obtain a definition of their rights before an actual injury had occurred, rather than to palliate any controversy arising from *Ex parte Young,* 209 U. S. 123 (1908). Congress apparently was aware at the time it passed the Act that persons threatened with state criminal prosecutions might choose to forgo the offending conduct and instead seek a federal declaration of their rights. Use of the declaratory judgment procedure in the circumstances presented by this case seems consistent with that congressional expectation.

If this case were the Court's first opportunity to deal with this area of law, I would be content to let the

479   *479   matter rest there. But, as our cases abundantly illustrate, this area of law is in constant

litigation, and it is an area through which our decisions have traced a path that may accurately be described as sinuous. Attempting to accommodate the principles of the new declaratory judgment procedure with other more established principles —in particular a proper regard for the relationship between the independent state and federal judiciary systems—this Court has acted both to advance and to limit the Act. Compare *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227 (1937), and *Zwickler* v. *Koota,* 389 U. S. 241 (1967), with *Great Lakes Co.* v. *Huffman,* 319 U. S. 293 (1943), and *Samuels* v. *Mackell,* 401 U. S. 66 (1971). Because the opinion today may possibly be read by resourceful counsel as commencing a new and less restrictive curve in this path of adjudication, I feel it is important to emphasize what the opinion does and does not say.

To begin with, it seems appropriate to restate the obvious: the Court's decision today deals only with declaratory relief and with threatened prosecutions. The case provides no authority for the granting of any injunctive relief nor does it provide authority for the granting of any relief at all when prosecutions are pending. The Court quite properly leaves for another day whether the granting of a declaratory judgment by a federal court will have any subsequent res judicata effect or will perhaps support the issuance of a later federal injunction. But since possible resolutions of those issues would substantially undercut the principles of federalism reaffirmed in *Younger* v. *Harris,* 401 U. S. 37 (1971), and preserved by the decision today, I feel it appropriate to add a few remarks.

First, the legislative history of the Declaratory Judgment Act and the Court's opinion in this case both

480   *480   recognize that the declaratory judgment procedure is an alternative to pursuit of the arguably

illegal activity.[1] There is nothing in the Act's history to suggest that Congress intended to provide persons wishing to violate state laws with a federal shield behind which they could carry on their contemplated conduct. Thus I do not believe that a federal plaintiff in a declaratory judgment action can avoid, by the mere filing of a complaint, the principles so firmly expressed in *Samuels, supra.* The plaintiff who continues to violate a state statute after the filing of his federal complaint does so both at the risk of state prosecution and at the risk of dismissal of his federal lawsuit. For any arrest prior to resolution of the federal action would constitute a pending prosecution and bar declaratory relief under the principles of *Samuels.*

Second, I do not believe that today's decision can properly be raised to support the issuance of a federal

injunction based upon a favorable declaratory judgment.[2]   481   *481   The Court's description of

declaratory relief as " `a milder alternative to the injunction remedy,' " *ante,* at 467, having a "less intrusive effect on the administration of state criminal laws" than an injunction, *ante,* at 469, indicates to me critical distinctions which make declaratory relief appropriate where injunctive relief would not be. It would all but totally obscure these important distinctions if a successful application for declaratory relief came to be

regarded, not as the conclusion of a lawsuit, but as a giant step toward obtaining an injunction against a subsequent criminal prosecution. The availability of injunctive relief must be considered with an eye toward the important policies of federalism which this Court has often recognized.

If the rationale of cases such as *Younger* and *Samuels* turned in any way upon the relative case with which a federal district court could reach a conclusion about the constitutionality of a challenged state statute, a pre-existing judgment declaring the statute unconstitutional as applied to a particular plaintiff would, of course, be a factor favoring the issuance of an injunction as "further relief" under the Declaratory Judgment Act. But, except for statutes that are " `flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph . . . ,' " *Younger* v. *Harris, supra,* at 53, the rationale of those cases has no such basis. Their direction that federal courts not interfere with state prosecutions does not vary depending on the closeness of the constitutional issue or on the degree of confidence which the

federal court possesses in the correctness of its conclusions on the constitutional 482  *482   point. Those

decisions instead depend upon considerations relevant to the harmonious operation of separate federal and state court systems, with a special regard for the State's interest in enforcing its own criminal laws, considerations which are as relevant in guiding the action of a federal court which has previously issued a declaratory judgment as they are in guiding the action of one which has not. While the result may be that injunctive relief is not available as "further relief" under the Declaratory Judgment Act in this particular class of cases whereas it would be in similar cases not involving considerations of federalism, this would be no more a *pro tanto* repeal of that provision of the Declaratory Judgment Act than was *Younger* a *pro tanto* repeal of the All Writs Act, 28 U. S. C. § 1651.

A declaratory judgment is simply a statement of rights, not a binding order supplemented by continuing sanctions. State authorities may choose to be guided by the judgment of a lower federal court, but they are not compelled to follow the decision by threat of contempt or other penalties. If the federal plaintiff pursues the conduct for which he was previously threatened with arrest and is in fact arrested, he may not return the controversy to federal court, although he may, of course, raise the federal declaratory judgment in the state court for whatever value it may prove to have.[3] In any event, the defendant at that point is able to present

his case 483  *483   for full consideration by a state court charged, as are the federal courts, to preserve the

defendant's constitutional rights. Federal interference with this process would involve precisely the same concerns discussed in *Younger* and recited in the Court's opinion in this case.[4]

Third, attempts to circumvent *Younger* by claiming that enforcement of a statute declared unconstitutional by a federal court is *per se* evidence of bad faith should not find support in the Court's decision in this case. As the Court notes, quoting my Brother BRENNAN'S separate opinion in *Perez* v. *Ledesma,* 401 U. S. 82, 125:

"The persuasive force of the [federal] court's opinion and judgment *may* lead state prosecutors, courts, and legislators to reconsider their respective responsibilities toward the statute. Enforcement policies or judicial construction *may* be changed, or the legislature *may* repeal the statute and start anew." (Emphasis added.) This language clearly recognizes that continued belief in the constitutionality of the statute by state prosecutorial officials would not commonly be indicative of bad faith and that such allegations, in the

absence of highly unusual circumstances, would not justify a federal 484  *484   court's departure from the

general principles of restraint discussed in *Younger.*

If the declaratory judgment remains, as I think the Declaratory Judgment Act intended, a simple declaration of rights without more, it will not be used merely as a dramatic tactical maneuver on the part of any state defendant seeking extended delays. Nor will it force state officials to try cases time after time, first in the federal courts and then in the state courts. I do not believe Congress desired such unnecessary results, and I do not think that today's decision should be read to sanction them. Rather the Act, and the decision, stand for the sensible proposition that both a potential state defendant, threatened with prosecution but not charged, and the State itself, confronted by a possible violation of its criminal laws, may benefit from a procedure which provides for a declaration of rights without activation of the criminal process. If the federal court finds that the threatened prosecution would depend upon a statute it judges unconstitutional, the State may decide to forgo prosecution of similar conduct in the future, believing the judgment persuasive. Should the state prosecutors not find the decision persuasive enough to justify forbearance, the successful federal plaintiff will at least be able to bolster his allegations of unconstitutionality in the state

trial with a decision of the federal district court in the immediate locality. The state courts may find the reasoning convincing even though the prosecutors did not. Finally, of course, the state legislature may decide, on the basis of the federal decision, that the statute would be better amended or repealed. All these possible avenues of relief would be reached voluntarily by the States and would be completely consistent with the concepts of federalism discussed above. Other more intrusive forms of relief should not be routinely available.

485   *485   These considerations should prove highly significant in reaching future decisions based upon

the decision rendered today. For the present it is enough to say, as the Court does, that petitioner, if he successfully establishes the existence of a continuing controversy on remand, may maintain an action for a declaratory judgment in the District Court.

[1] This statute provides:
"(a) A person commits criminal trespass when he intentionally damages any property of another without his consent and the damage thereto is $100 or less, or knowingly and maliciously interferes with the possession or use of the property of another person without his consent.
"(b) A person commits criminal trespass when he knowingly and without authority:
"(1) Enters upon the land or premises of another person, or into any part of any vehicle, railroad car, aircraft, or watercraft of another person, for an unlawful purpose; or
"(2) Enters upon the land or premises of another person, or into any part of any vehicle, railroad car, aircraft, or watercraft of another person, after receiving, prior to such entry, notice from the owner or rightful occupant that such entry is forbidden; or
"(3) Remains upon the land or premises of another person, or within the vehicle, railroad car, aircraft, or watercraft of another person, after receiving notice from the owner or rightful occupant to depart.
"(c) A person convicted of criminal trespass shall be punished as for a misdemeanor."
[2] At a hearing in the District Court, petitioner testified that on another occasion, prior to June 1970, he had also been threatened with arrest for handbilling at the shopping center. At that time the police had shown him the statute they intended to enforce presumably § 26-1503. R. 140-141.
[3] We were advised at oral argument that the trial of petitioner's companion, Sandra Lee Becker, has been stayed pending decision of this case. See Tr. of Oral Arg. 31.
[4] At the District Court hearing, counsel for the police officers indicated that arrests in fact would be made if warrants sworn out by shopping center personnel were facially proper. R. 134.
[5] The complaint was initially styled as a class action. Named as plaintiffs were petitioner, a minor suing through his father, Sandra Lee Becker, petitioner's handbilling companion against whom a prosecution was pending under the Georgia statute, see n. 3, *supra,* also a minor suing through her father, and the Atlanta Mobilization Committee. The complaint had also sought to enjoin plaintiff Becker's pending prosecution. Only petitioner appealed from the District Court's decision denying all relief.
[6] Petitioner's notice of appeal challenged the denial of both injunctive and declaratory relief. However, in his appellate brief, he abandoned his appeal from denial of injunctive relief. *Becker v. Thompson,* 459 F. 2d 919, 921 (CA5 1972).
[7] Since the complaint had originally sought to enjoin enforcement of the state statute on grounds of unconstitutionality, a three-judge district court should have been convened. See 28 U. S. C. § 2281; *Goosby v. Osser,* 409 U. S. 512 (1973); *Idlewild Bon Voyage Liquor Corp. v. Epstein,* 370 U. S. 713, 715 (1962). A three-judge court is required even if the constitutional attack—as here—is upon the statute as applied, see *Department of Employment v. United States,* 385 U. S. 355 (1966); *Query v. United States,* 316 U. S. 486 (1942); *Ex parte Bransford,* 310 U. S. 354, 361 (1940); see generally Currie, The Three-Judge District Court in Constitutional Litigation, 32 U. Chi. L. Rev. 1, 37-50 (1964); and is normally required even if the decision is to dismiss under *Younger-Samuels* principles, since an exercise of discretion will usually be necessary, see *Jones v. Wade,* 479 F. 2d 1176, 1180 (CA5 1973); *Abele v. Markle,* 452 F. 2d 1121, 1125 (CA2 1971); see generally Note, The Three-Judge District Court: Scope and Procedure Under Section 2281, 77 Harv. L. Rev. 299, 309 (1963). But since petitioner's request for injunctive relief was abandoned on appeal, see n. 6, *supra,* and only a request for declaratory relief remained, the Court of Appeals did not err in exercising jurisdiction over the appeal. Cf. *Roe v. Wade,* 410 U. S. 113, 123 (1973); *Mitchell v. Donovan,* 398 U. S. 427 (1970); *Kennedy v. Mendoza-Martinez,* 372 U. S. 144, 152-155 (1963); *Stratton v. St. Louis S. W. R. Co.,* 282 U. S. 10, 16 (1930).
[8] Other federal courts have entertained applications for injunctive and declaratory relief in the absence of a pending state prosecution. See, e. g., *Thoms v. Heffernan,* 473 F. 2d 478 (CA2 1973), aff'g 334 F. Supp. 1203 (Conn. 1971) (three-judge court); *Wulp v. Corcoran,* 454 F. 2d 826 (CA1 1972); *Crossen v. Breckenridge,* 446 F. 2d 833 (CA6 1971); *Lewis v. Kugler,* 446 F. 2d 1343 (CA3 1971); *Anderson v. Vaughn,* 327 F. Supp. 101 (Conn. 1971) (three-judge court). Even the Court of Appeals for the Fifth Circuit has limited the scope of the instant decision by entertaining an action for declaratory and injunctive relief in the absence of a state prosecution when the federal suit attacked the facial validity of a state statute rather than the validity of the statute as applied. See *Jones v. Wade, supra* (Wisdom, J.).
[9] Section 2201 provides:
"In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."
Section 2202 further provides:
"Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."
[10] The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed. See *e. g., Roe v. Wade,* 410 U. S., at 125; *SEC v. Medical Comm. for Human Rights,* 404 U. S. 403 (1972); *United States v. Munsingwear, Inc.,* 340 U. S. 36 (1950).

[11] The Court noted that under 28 U. S. C. § 2202 a declaratory judgment might serve as the basis for issuance of a later injunction to give effect to the declaratory judgment, see n. 9, *supra*, and that a declaratory judgment might have a res judicata effect on the pending state proceeding. 401 U. S., at 72.

[12] We note that, in those cases where injunctive relief has been sought to restrain an imminent, but not yet pending, prosecution *for past conduct*, sufficient injury has not been found to warrant injunctive relief, see *Beal v. Missouri Pacific R. Co.*, 312 U. S. 45 (1941); *Spielman Motor Sales Co. v. Dodge*, 295 U. S. 89 (1935); *Fenner v. Boykin*, 271 U. S. 240 (1926). There is some question, however, whether a showing of irreparable injury might be made in a case where, although no prosecution is pending or impending, an individual demonstrates that he will be required to *forgo* constitutionally protected activity in order to avoid arrest. Compare *Dombrowski v. Pfister*, 380 U. S. 479 (1965); *Hygrade Provision Co. v. Sherman*, 266 U. S. 497 (1925); and *Terrace v. Thompson*, 263 U. S. 197, 214, 216 (1923), with *Douglas v. City of Jeannette*, 319 U. S. 157 (1943); see generally Note, Implications of the *Younger* Cases for the Availability of Federal Equitable Relief When No State Prosecution is Pending, 72 Col. L. Rev. 874 (1972).

[13] "Sensitiveness to 'states' rights', fear of rivalry with state courts and respect for state sentiment, were swept aside by the great impulse of national feeling born of the Civil War. Nationalism was triumphant; in national administration was sought its vindication. The new exertions of federal power were no longer trusted to the enforcement of state agencies." F. Frankfurter & J. Landis, The Business of the Supreme Court 64 (1928).

[14] In the last days of the John Adams administration, general federal-question jurisdiction had been granted to the federal courts by § 11 of the Midnight Judges Act, 2 Stat. 92 (1801). The Act was repealed only one year later by § 1 of the Act of Mar. 8, 1802, 2 Stat. 132.

[15] The histories of the Civil Rights Act of 1871 and the Judiciary Act of 1875 are detailed in *Zwickler v. Koota*, 389 U. S. 241, 245-247 (1967).

[16] The three-judge-court procedure, with expedited review, was modeled after the Expediting Act, 32 Stat. 823, now 15 U. S. C. §§ 28-29; 49 U. S. C. §§ 44-45, requiring that for certain antitrust cases certified by the Attorney General to be of particular public importance a three-judge court be convened with direct appeal to the Supreme Court, as well as a 1906 Act, 34 Stat. 584, 592, applying the same procedure to suits brought to restrain, annul, or set aside orders of the Interstate Commerce Commission. See Hutcheson, A Case for Three Judges, 47 Harv. L. Rev. 795, 810 (1934).

[17] The three-judge-court provision was amended in 1913 to apply also to interlocutory injunctions restraining enforcement of state administrative or commission orders. C. 160, 37 Stat. 1013. It was further amended in 1925 to extend the three-judge requirement and the direct-appeal provisions to the final hearing on a permanent injunction, thereby ending the anomalous situation in which a single judge, at the final hearing, could overrule the decision of three judges granting an interlocutory injunction. 43 Stat. 936, 938. When the statute was codified in 1948, it was made applicable to all actions seeking either a preliminary or permanent injunction, *Goldstein v. Cox*, 396 U. S. 471, 478 n. 3 (1970). See generally H. Hart & H. Wechsler, The Federal Courts and the Federal System 967-968 (2d ed. 1973); C. Wright, Federal Courts § 50, pp. 188-189 (2d ed. 1970).

[18] As Professor Borchard, a principal proponent and author of the Federal Declaratory Judgment Act, said in a written statement introduced at the hearings on the Act:

"It often happens that courts are unwilling to grant injunctions to restrain the enforcement of penal statutes or ordinances, and relegate the plaintiff to his option, either to violate the statute and take his chances in testing constitutionality on a criminal prosecution, or else *to [forgo]*, in the fear of prosecution, the exercise of his claimed rights. Into this dilemma no civilized legal system operating under *a* constitution should force any person. The court, in effect, by refusing an injunction informs the prospective victim that the only way to determine whether the suspect is a mushroom or a toadstool, is to eat it. Assuming that the plaintiff has a vital interest in the enforcement of the challenged statute or ordinance, there is no reason why a declaratory judgment should not be issued, instead of compelling a violation of the statute as a condition precedent to challenging its constitutionality." Hearings on H. R. 5623 before a Subcommittee of the Senate Committee on the Judiciary, 70th Cong., 1st Sess., 75-76 (1928). See E. Borchard, Declaratory Judgments x-xi (2d ed. 1941).

[19] The pending prosecution of petitioner's handbilling companion does not affect petitioner's action for declaratory relief. In *Roe v. Wade*, 410 U. S. 113 (1973), while the pending prosecution of Dr. Hallford under the Texas Abortion law was found to render his action for declaratory and injunctive relief impermissible, this did not prevent our granting plaintiff Roe, against whom no action was pending, a declaratory judgment that the statute was unconstitutional. *Id.*, at 125-127, 166-167; see *Lewis v. Kugler*, 446 F. 2d 1343, 1349 (CA3 1971).

[20] In *Great Lakes Co. v. Huffman*, employers sought a declaration that a state unemployment compensation scheme imposing a tax upon them was unconstitutional as applied. Although not relying on the precise terms of 28 U. S. C. § 41 (1) (1940 ed.), now 28 U. S. C. § 1341, which ousts the district courts of jurisdiction to "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State," the Court, recognizing the unique effects of anticipatory adjudication on tax administration, held that declaratory relief should be withheld when the taxpayer was provided an opportunity to maintain a refund suit after payment of the disputed tax. "In contrast, there is no statutory counterpart of 28 U. S. C. § 1341 applicable to intervention in state criminal prosecutions." *Perez v. Ledesma*, 401 U. S. 82, 128 (1971) (separate opinion of BRENNAN, J.).

[21] Abstention, a question "entirely separate from the question of granting declaratory or injunctive relief." *Lake Carriers' Assn. v. MacMullan*, 406 U. S. 498, 509 n. 13 (1972), might be more appropriate when a challenge is made to the state statute as applied, rather than upon its face, since the reach of an uncertain state statute might, in that circumstance, be more susceptible of a limiting or clarifying construction that would avoid the federal constitutional question. Cf. *Zwickler v. Koota*, 389 U. S., at 249-252, 254; *Baggett v. Bullitt*, 377 U. S. 360, 375-378 (1964).

[22] Some two years after petitioner attempted to handbill at the shopping center, respondent Hudgens, the owner of the center, commenced an action in the Superior Court of Fulton County seeking a declaration of his rights concerning the center's rules against handbilling and related activities. We were advised at oral argument that the state action had been dismissed by the trial court but that an appeal is pending before the Georgia Supreme Court. Since we do not require petitioner first to seek vindication of his federal rights in a state declaratory judgment action, see *Lake Carriers' Assn. v. MacMullan, supra*, at 510; *Wisconsin v. Constantineau*, 400 U. S. 433 (1971), consideration of abstention by the District Court would be inappropriate unless the action commenced by respondent Hudgens could be shown to present a substantial and immediate possibility of obviating petitioner's federal claim by a decision on state law grounds. Cf. *Askew v. Hargrave*, 401 U. S. 476, 478 (1971); *Reetz v. Bozanich*, 397 U. S. 82 (1970).



$2.35⁹
US POSTAGE
FIRST-CLASS

071S0D054572
82414
00020112

5

Tami M Raven
P.O. Box 5
Cody, Wyo. 82414

Clerk of U.S. Dist. Ct.
111 S. Wolcott St., Rm. 121
Casper, Wyo. 82601-25-34

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 JUL -1 AM 11: 00

STEPHAN HARRIS, CLERK
CASPER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | CASE NO. |
| | ) | 19-CV-021-S |
| Plaintiff, | ) | Reply To |
| | ) | Defendant |
| v. | ) | Officer Egger's |
| | ) | Response To |
| BEAU J. EGGER, et al., | ) | Motion For |
| | ) | Summary |
| Defendants. | ) | Judgment. |

The plaintiff, Tami M. Bronnenberg, respectfully replies to the

Defendant Officer Egger's Response To Plaintiff's Motion For Summary

Judgment pursuant to the Federal Rules of Civil Procedure, Rule 12 (a) (1)

(C), "A party must serve a reply to an answer within 21 days after being

served ***." Officer Egger went further than the legality of custodial

questioning on less than probable cause for a full-fledged arrest. See,

Dunaway v. New York, 422 U.S. 200, 95 S. Ct. 2240 (1979); In Director

General of Railroads v. Kastenbaum, 263 U.S. 25, (1923) (good faith is not

enough to constitute probable cause) on false arrest. "good faith on the part

1

of the arresting officers was not enough". **Henry v. United States**, 361 U.S. 98, 102 (1959).

The language of the Fourth Amendment, that 'that . . . no Warrants shall issue, but upon probable cause . . .' of course applies to arrest as well as search warrants." **Giordenello v. United States**, 357 U.S. 480 at 485-486 (1958); Beck v. Ohio (1964) Supra, 379 U.S. at 96, note 6. In Ker v. California, 374 U.S. 23, 10 L. Ed. 2d 726 , 83 S. Ct. 1623 (1963), the court held that the same probable cause standards were applicable to federal and state warrants under the Fourth and Fourteenth Amendments. The decisions of this Court concerning Fourth Amendment probable-cause requirements before a warrant for either arrest or search can issue require that the judicial officer issuing such warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant. See, **<u>Whiteley v. Warden of Wyoming Penitentiary</u>**, 401 U.S. 560 at 564, note 6, 28 L. Ed. 2d 306, 91 S. Ct. 1031 (**Wyo. 1971**), enclosed (cited by the following Supreme Court decisions: Illinois Petitioner v. Lance Gates et ux., 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); Illinois Petitioner v. John Andreas, 528 U.S. 119, 120 S. Ct. 673, 145 L. Ed. 2d 570, (2000); United States Petitioner v. Bradley Thomas Jacobsen and Donna Marie Jacobsen, 466 U.S. 109, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1984); United

2

States Petitioner v. Alberto Leon et al., 468 U.S. 897, 104 S. Ct. 3405, 82 L.

Ed. 2d 677 (1984); United States Petitioner v. Thomas J. Hensley, 378 U.S.

108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1983); Arizona Petitioner v. Isaac

Evans, 514 U.S. 1, 115 S. Ct. 1185, 131 L. Ed. 2d 34(1995); Merle R.

Schneckloth, Superintendent California Conservation Center, Petitioner v.

Robert Clyde Bustamonte, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854

(1973); Lonnie North Appellant v. C. B. Russell et al., 427 U.S. 328, 96 S.

Ct. 2707, 49 L. Ed. 534 (1974); W. T. Stone, Warden Petitioner v. Lloyd

Charles Powell, Charles L. Wolff Jr., Warden Petitioner . David L. Rice, 428

U.S. 465, 96 S. Ct. 3037, 47 L. Ed. 2d 1067 (1976); James Zurcher, etc., et

al., Petitioners v. The Stanford Daily et al., Louis P. Bergna, District

Attorney and Craig Brown, Petitioners v. The Stanford Daily et al., 436 U.S.

547, 98 S. Ct. 1970, 56 L. Ed. 2d 525 (1978); United States Petitioner v.

Keith Crews, 445 U.S. 463, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980);

Edward H. Coolidge Jr., Petitioner v. New Hampshire, 403 U.S. 443, 91 S. t.

2022, 29 L. Ed. 2 564 (1971); United States Petitioner v. Roosevelt Hudson

Harris, 403 U.S. 573, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971); Gerald

Shadwick, Appellant v. City of Tampa, 407 U.S. 345, 92 S. Ct. 2119, 32 L.

Ed. 2d 783 (1972); Lonnie Melvin Murray v. United States, 419 U.S. 942,

95 S. Ct. 210, 42 L. Ed. 2d 166 (1974); Jim Rose, Warden, Petitioner v.

3

Noah Harrison Lundy, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379

(1982); Margaret Papachristou et al., Petitioners v. City of Jacksonville, 405

U.S. 156, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972); See also, Plaintiff's

Response to Defendant's Summary Judgement, page 5. See Exhibit –A-

attached to Plaitiff's Amended Complaint. Post-hoc showing that probable

cause existed (through routine police procedures that are unconstitutional)

does not justify warrentless search. **Johnson v. United States**, 333 U.S. 10,

68 S.Ct. 367, 92 L. Ed. 436 (1948). See Plaintiff's Motion for Summary

Judgment, page 4, 5.

WHEREFORE, Plaintiff, Tami M. Bronnenberg, THEREFORE prays

that RIMS computer system of the Park County Sheriff's Office, that Officer

Egger's, acts, policies and practices, applied and used in the violation of the

4th and 14th amendments to the Constitution of America, (false arrest and

false imprisonment of the Plaintiff), is unconstitutional granting her Motion

for Summary Judgment.

DATED: June 29, 2019.

Tami M. Bronnenberg, Pro-se

4

CERTIFICATE OF SERVICE.

I hereby certify that a copy of the forgoing reply to Defendant Officer

Egger's Response to Plaintiff's Motion for Summary Judgment was mailed

to U.S. Magistrate Judge, Kelly H. Rankin, United States District Court,

2120 Capitol Ave., Suite 2204, Cheyenne, Wyoming 82001 and to the

Defendant, Office of the Attorney General, 2320 Capitol Avenue, Cheyenne,

Wyoming 82002 on June 29 , 2019.

Tami M. Bronnenberg, Pro-se

5

# Harold WHITELEY v. WARDEN, WYOMING STATE PENITENTIARY.

- Decision
- Cites

**401 U.S. 560** (91 S.Ct. 1031, 28 L.Ed.2d 306)

Harold WHITELEY v. WARDEN, WYOMING STATE PENITENTIARY.

No. 136.

Argued: Jan. 13, 1971.

Decided: March 29, 1971.

- **opinion**, HARLAN [HTML]
- **dissent**, BLACK [HTML]

Syllabus

A sheriff, acting on a tip, made a complaint before a magistrate charging that petitioner and another individual on the date and at the place named 'did then and there unlawfully break and enter into (the described) locked * * * building,' and a warrant was issued. A police radio bulletin named and described the two persons, the type of car they were probably driving, and the amount and type of money taken. Relying on the bulletin, an officer in another county made a warrantless arrest of the suspects. The car was then searched and various incriminating items removed, which were later used at petitioner's trial, which resulted in his conviction. Petitioner filed a habeas corpus petition reiterating the challenge he had made at his arraignment and trial to the constitutionality of the use of evidence seized during a search incident to the assertedly illegal arrest. The District Court denied the petition, and the Court of Appeals affirmed. Held:

1. Petitioner's arrest violated his rights under the Fourth and Fourteenth Amendments and the evidence secured incident thereto should have been excluded from his trial. Pp. 564—569.

(a) The complaint, which did not mention that the sheriff acted on an informer's tip, and which consisted of no more than the sheriff's conclusion that the individuals named committed the offense, could not support the independent judgment of a disinterested magistrate. P. 565.

(b) The standards applicable to the factual basis for an arresting officer's probable-cause assessment are no less strict than those applicable to the magistrate's assessment. Here the arresting officer had no information to corroborate the report that the suspects had committed the crime and the fact that the warrantless arrest was based on a police radio bulletin cannot supply the element of probable cause that the officer who issued the bulletin lacked. Pp. 565—567.

2. Since, notwithstanding petitioner's constitutional challenge at each stage, respondent made no attempt to show that the magistrate had more information than was presented in the complaint, he may not attempt to do so now on remand; and the writ must issue unless the State appropriately arranges to retry the petitioner. P. 569.

416 F.2d 36, reversed and remanded.

William J. Knudsen, Jr., Laramie, Wyo., for the petitioner.

Jack Speight, Cheyenne, Wyo., for respondent.

TOP

---

Mr. Justice HARLAN delivered the opinion of the Court.

Petitioner Whiteley, in 1965, was convicted in the District Court for the Second Judicial District of the State of Wyoming on charges of breaking and entering and being an habitual criminal.[1] Both at his arraignment and at trial Whiteley challenged the constitutionality of the use of evidence seized during a search incident to an arrest which he claimed was illegal. The trial court overruled petitioner's motion to suppress, and on appeal the Supreme Court of Wyoming affirmed. Whiteley v. State, 418 P.2d 164 (1966). This proceeding commenced with a petition for habeas corpus in the United States District Court for the District of Wyoming, which was denied on November 25, 1968.[2] Whiteley v. Wyoming, 293 F.Supp. 381. On appeal, the United States Court of Appeals for the Tenth Circuit affirmed. Whiteley v. Meacham, 416 F.2d 36 (1969). We granted certiorari, limiting the writ to the issue of the constitutionality of the arrest and ensuing search and seizure. 397 U.S. 1062, 90 S.Ct. 1505, 25 L.Ed.2d 683 (1970).[3] We reverse the judgment of the Tenth Circuit for the reasons stated herein.

* The circumstances surrounding petitioner's arrest and the incidental search and seizure, as stated by the Wyoming Supreme Court, 418 P.2d 164, 165—166, are as follows:[4]

'On November 23, 1964, certain business establishments in Saratoga were broken into, including the Rustic Bar and Shively's Hardware, the offenses being investigated by the Carbon County Sheriff, (Sheriff Ogburn) who, acting on a tip, the next day signed a complaint charging defendant and another with breaking and entering the building identified as the Rustic Bar. This complaint was made before a justice of the peace at approximately 11:30 a.m. on the 24th, and a warrant issued. After the investigation, the sheriff put out a state item on the radio to pick up two suspects of the breaking and entering, defendant and another. The message went to the network at Casper and was transmitted over the State, received by the Albany County Sheriff's Office and communicated to the Laramie Police Department, the message giving names and descriptions of the two persons and advising the type of car probably being driven and the amount of money taken, including certain old coins with the dates. Late at night on November 24, a Laramie patrolman, in reliance on the information in the radio item, arrested the defendant and his companion. At the time, the patrolman had no warrant for defendant's arrest nor search warrant. The officer together with a deputy sheriff, who had come up in the meantime, searched the car and removed a number of items introduced in evidence, including tools and old coins, identified at the trial as taken from Shively's Hardware. * * *'

Sheriff Ogburn's complaint, which provided the basis for the arrest warrant issued by the justice of the peace, is as follows:

'I, C. W. Ogburn, do solemnly swear that on or about the 23 day of November, A.D. 1964, in the County of Carbon and State of Wyoming, the said Harold Whiteley and Jack Daley, defendants did then and there unlawfully break and enter a locked and sealed building (describing the location and ownership of the building).' App. 28.

A state item 881, the bulletin which Sheriff Ogburn put out on the radio and which led to petitioner's arrest and search by the Laramie patrolman, is as follows:

'P & H for B & E Saratoga, early A.M. 11—24—64. Subj. #1. Jack Daley, WMA, 38, D.O.B. 2—29—(26), 5 10 , 175, med. build, med. comp., blonde and blue. Tat. left shoulder: 'Love Me or Leave Me.' #2. Harold Whitley, WMA, 43, D.O.B. 6—22—21, 5 11 , 180, med. build, fair comp. brown eyes. Tat. on right arm 'Bird.' Poss. driving 1953 or 1954 Buick, light green bottom, dark top. Wyo. lic. 2-bal. unknown. Taken: \$281.71 in small change, numerous old coins ranging from .5¢ pieces to silver dollars, dated from 1853 to 1908. Warrant issues, will extradite. Special attention Denver. \* \* \*' App. 31.[5]

II

The decisions of this Court concerning Fourth Amendment probable-cause requirements before a warrant for either arrest or search can issue require that the judicial officer issuing such a warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant.[6] Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). In the instant case—so far as the record stipulated to by the parties reveals[7]—the sole support for the arrest warrant issued at Sheriff Ogburn's request was the complaint reproduced above.[8] That complaint consists of nothing more than the complainant's conclusion that the individuals named therein perpetrated the offense described in the complaint. The actual basis for Sheriff Ogburn's conclusion was an informer's tip, but that fact, as well as every other operative fact, is omitted from the complaint. Under the case just cited, that document alone could not support the independent judgment of a disinterested magistrate.

The State,[9] however, contends that regardless of the sufficiency of the complaint to support the arrest warrant, the Laramie police officer who actually made the arrest possessed sufficient factual information to support a finding of probable cause for arrest without a warrant. In support of this proposition, the State argues that a reviewing court should employ less stringent standards for reviewing a police officer's assessment of probable cause as a prelude to a warrantless arrest than the court would employ in reviewing a magistrate's assessment as a prelude to issuing an arrest or search warrant.[10] That proposition has been consistently rejected by this Court. United States v. Ventresca, 380 U.S., at 105—109, 85 S.Ct., at 746; Aguilar v. Texas, 378 U.S., at 110—111, 84 S.Ct., at 1511—1512; Jones v. United States, 362 U.S., at 270—271, 80 S.Ct., at 735—736. And the reason for its rejection is both fundamental and obvious: less stringent standards for reviewing the officer's discretion in effecting a warrantless arrest and search would discourage resort to the procedures for obtaining a warrant. Thus the standards applicable to the factual basis supporting the officer's probable-cause assessment at the time of the challenged arrest and search are at least as stringent as the standards applied with respect to the magistrate's assessment. See McCray v. Illinois, 386 U.S. 300, 304—305, 87 S.Ct. 1056, 1058 1059, 18 L.Ed.2d 62 (1967).

Applying those standards to the instant case, the information possessed by the Laramie police officer at the time of arrest and search consisted of: (1) the data contained in state bulletin 881, reproduced supra; (2) the knowledge, obtained by personal observation, that two men were driving a car matching the car described in the radio bulletin; (3) the knowledge, possessed by one of the arresting officers, that one of the people in the car was Jack Daley, App. 71; (4) the knowledge, acquired by personal observation, that the other individual in the car fitted the description of Whiteley contained in state bulletin 881; and (5)

the knowledge, acquired by the officer after stopping Whiteley, that he had given a false name.[11]

This Court has held that where the initial impetus for an arrest is an informer's tip, information gathered by the arresting officers can be used to sustain a finding of probable cause for an arrest that could not adequately be supported by the tip alone. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). See Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). But the additional information acquired by the arresting officers must in some sense be corroborative of the informer's tip that the arrestees committed the felony or, as in Draper itself, were in the process of committing the felony. See the opinions of the Court and that of Mr. Justice White concurring in Spinelli v. United States, supra, and p. 423, 89 S.Ct. p. 592. In the present case, the very most the additional information tended to establish is that either Sheriff Ogburn, or his informant, or both of them, knew Daley and Whiteley and the kind of car they drove; the record is devoid of any information at any stage of the proceeding from the time of the burglary to the event of the arrest and search that would support either the reliability of the informant or the informant's conclusion that these men were connected with the crime. Spinelli v. United States, supra; McCray v. Illinois, supra; Aguilar v. Texas, supra.

The State, however, offers one further argument in support of the legality of the arrest and search: the Laramie police relied on the radio bulletin in making the arrest, and not on Sheriff Ogburn's unnamed informant. Clearly, it is said, they had probable cause for believing that the passengers in the car were the men described in the bulletin, and, in acting on the bulletin, they reasonably assumed that whoever authorized the bulletin had probable cause to direct Whiteley's and Daley's arrest. To prevent arresting officers from acting on the assumption that fellow officers who call upon them to make an arrest have probable cause for believing the arrestees are prepetrators of a crime would, it is argued, unduly hamper law enforcement.

We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.

In sum, the complaint on which the warrant issued here clearly could not support a finding of probable cause by the issuing magistrate. The arresting officer was not himself possessed of any factual data tending to corroborate the informer's tip that Daley and Whiteley committed the crime.[12] Therefore, petitioner's arrest violated his constitutional rights under the Fourth and Fourteenth Amendments; the evidence secured as an incident thereto should have been excluded from his trial. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

III

There remains the question as to the proper disposition of this case. The State urges us to remand so that it will have an opportunity to develop a record which might show that the issuing magistrate had factual information additional to that presented in Sheriff Ogburn's complaint. Brief for Respondent 8—9. Yet the State concedes, as on the record it must, that at every stage in the proceedings below petitioner argued the insufficiency of the warrant as well as the lack of probable cause at the time of the arrest. Brief for Respondent 4. Knowing the basis for petitioner's constitutional claim, the State chose to try those proceedings on the record it had developed in the state courts. See n. 4, supra. Its sole explanation for this state of affairs is that 'the state has felt, based on precedent and logic, that no court would accept

the legal reasoning of petitioner.' Brief for Respondent 9. In the circumstances of this case, that justification, as we have shown, is untenable.

Pursuant to our authority under 28 U.S.C. 2106 to make such disposition of the case 'as may be just under the circumstances,' we reverse the judgment of the Tenth Circuit and remand with directions that the writ is to issue unless the State makes appropriate arrangements to retry petitioner.[13]Cf. Giordenello v. United States, 357 U.S., at 487—488, 78 S.Ct., at 1250—1251.

It is so ordered.

Reversed and remanded with directions.

TOP

---

Mr. Justice BLACK, with whom THE CHIEF JUSTICE joins, dissenting.

With all respect to my Brethren who agree to the judgment and opinion of the Court, I am constrained to say that I believe the decision here is a gross and wholly indefensible miscarriage of justice. For this reason it may well be classified as one of those calculated to make many good people believe our Court actually enjoys frustrating justice by unnecessarily turning professional criminals loose to prey upon society with impunity. Here is what this record shows:

On the night of November 23, 1964, several establishments, including a bar and hardware store were broken into at the village of Saratoga, Wyoming. Some old coins and other items were taken from the hardware store. Some people saw petitioner and his companion that night in or near Saratoga. The next morning the sheriff, who lived at Rawlins, the county seat, another village in sparsely settled Carbon County,[1] investigated the burglaries. In addition to viewing the scene of the crimes, the sheriff received a rather detailed description of the car, including a portion of the license plate number, said to have been used by the burglars. The sheriff also received a tip that persuaded him that petitioner and his companion, Jack Daley, were probably guilty of one of the burglaries. Upon the strength of this tip, coupled with his observation of the scene of the crimes and the description of the vehicle, the sheriff personally appeared before the justice of the peace in Rawlins to secure a warrant for the arrest of petitioner and his companion. After securing the warrant he authorized and sent a statewide radio police alert describing the men and their car and calling upon officers to arrest them. The night of November 24, policemen at Laramie, Wyoming, learned that petitioner's companion, Daley, was in the city. They located and stopped the car described in the alert, finding it occupied by two men matching the descriptions contained in the message. One of the officers personally recognized Jack Daley. In response to a request for identification, Harold Whiteley gave police a false name. At that point the two men were arrested and the car was searched. Old coins, tools, and other items later identified at trial as having been taken from the burglarized hardware store were found in the trunk and interior of the car.

At the trial the seized items were introduced into evidence over petitioner's objection. In addition, petitioner was identified as having been near the scene of the crime on the night of November 23.[2] Jack Daley, petitioner's companion, told the jury in vivid detail how he and Whiteley jimmied open the back door and burglarized the hardware store.[3] Petitioner took thestand and presented an alibi defense which was discredited by several witnesses including Jack Daley. Petitioner was convicted and sentenced to 10 years for burglary and concurrently to life imprisonment under Wyoming law because of his several prior

convictions. It was charged and proved that he had been convicted of three felonies and the record shows that he was 43 years of age and had already served six times in the penitentiary. The Supreme Court of Wyoming affirmed the conviction September 15, 1966, Whiteley v. State, 418 P.2d 164, holding that the Laramie officers had a right and duty to arrest the men in their vehicle because they had reasonable ground to believe the men had committed a burglary and that they had the fruits of their crime in the car, citing among other cases Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). See also Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

I think it is a distortion of the Fourth Amendment's meaning to hold that this petitioner's arrest and the seizure of the goods he had stolen were an 'unreasonable arrest' and an 'unreasonable seizure.' In deciding this question it should always be remembered that the Fourth Amendment itself does not expressly command that evidence obtained by its infraction should always be excluded from proof.

There was certainly probable cause to arrest this man. The store was burglarized. The county was a sparsely settled one in which people knew one another. Petitioner, whose previous life would appear to have earned for him the title of professional in the stealing vocation, was seen around the store with his car the very night of the burglary. Undoubtedly this longtime county sheriff (who appears still to be sheriff) was bound to know petitioner. The tip he received was so persuasive to him that in the performance of his official duty he was willing to assume all the risk incident to having petitioner arrested. It surely cannot be said that when a sheriff, with his prestige and standing, and bond against civil suit, communicates an emergency message to arrest men in cars as burglars, a policeman must stand supinely by while two people denounced as burglars go along their way. Of course these policemen had enough information from the sheriff to have probable cause to arrest petitioner.

My disagreement with the majority concerning the wisdom and constitutional necessity of a 'little trial' before a magistrate or justice of the peace prior to the issuance of a search or arrest warrant is a matter of record. See Aguilar v. Texas, 378 U.S. 108, 116, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964) (Clark, J., dissenting); Spinelli v. United States, 393 U.S. 410, 429, 89 S.Ct. 584, 595, 21 L.Ed.2d 637 (1969) (Black, J., dissenting). But even accepting those decisions, arguendo, they do not control the disposition of this case which involves the apprehension of criminals in an automobile moving away from the scene of the crime less than 24 hours after its commission. The sheriff's belief that Whiteley and Daley were guilty, even if it was only a 'suspicion' as the majority seems to label it, gave police officers proper grounds to stop petitioner's car and inquire about its passengers. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). And once the officers stopped the car and positively identified Jack Daley, they had every reason to believe that Whiteley was lying and attempting to escape detection when he reported a false name. At least at that point, if not before, the Laramie police had probable cause to arrest petitioner and Daley. With probable cause to arrest the men, they also had authority to search the car. Such a search could be justified under either of two theories. Even under Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the search of an automobile incident to the arrest of the occupants is permissible. And in this very case, the officers found a fully loaded handgun in the glove compartment. The search was also permissible under the 'movable vehicle' exception to the usual requirement for a search warrant. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). I consider it a travesty of justice to turn this man out of jail or give him a new trial six years after he was convicted.[4]

Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), does not, in my judgment, justify what the Court is doing. The trial court passed on this issue of validity of petitioner's arrest some years ago. Later he asked for relief through state post-conviction procedures on

the same ground and his claim was rejected. He has now sought relief through federal habeas corpus. After the United States District Court and the Court of Appeals rejected his unlawful-search claim bringing to 10 the number of state and federal judges who have consistently and unanimously rejected petitioner's claim, this Court reverses his judgment of conviction, although petitioner does not, of course, now allege his innocence. As I said in Kaufman v. United States, 394 U.S. 217, 231, 89 S.Ct. 1068, 1076, 22 L.Ed.2d 227 (Black, J., dissenting), the Fay v. Noia remedy should be limited as it was by its own facts, and convictions should remain final unless a petitioner seeking habeas corpus alleges that he can currently show he was innocent. There is not even a suspicion here that this hardened criminal is innocent and I would let him stay in confinement to serve his sentence.

Mr. Justice BLACKMUN agrees with much that is said by Mr. Justice BLACK and also dissents from the opinion and judgment of the Court.

CC∅ | Transformed by Public.Resource.Org

1

He was given concurrent sentences on the breaking and entering charges of one to 10 years and, in consequence of the recidivist charge, imprisonment for life.

2

Prior to commencing federal habeas corpus proceedings, Whiteley had filed a petition for post-conviction relief pursuant to the Wyoming statutes. No appeal was taken from the denial of that petition.

3

In his petition for habeas corpus, Whiteley raised several other issues which had previously been advanced in his state petition for post-conviction relief, but not in his direct appeal to the Supreme Court of Wyoming. On these other issues, both lower federal courts held that failure to appeal the denial of his state post-conviction petition constituted nonexhaustion of state remedies. Petitioner sought to raise the exhaustion issue in his present petition for certiorari, but, as noted in text, we granted the writ limited to the search and seizure issue decided by the lower federal courts.

4

At the outset of the federal habeas corpus proceeding now before us, both parties entered into the following stipulation, App. 10:

'IT IS HEREBY STIPULATED by and between the parties through their respective counsel that, pursuant to the agreement of the parties in open court on February 16, 1968, both sides will rely exclusively on the record before the trial court in the original case of the State of Wyoming v. Harold Whiteley * * * and any and all parts of the record on appeal to the State of Wyoming * * * in the hearing on the merits of this case before the (U.S. District Court).'

5

A second version of state item 881 is identical in all relevant respects except that it omits reference to the arrest warrant. See App. 37.

6

In Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), the Court held that the same probable-cause standards were applicable to federal and state warrants under the Fourth and Fourteenth Amendments. In Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the Court held the exclusionary rule was applicable to state prosecutions.

7

See n. 4, supra.

8

The dissent seems to imply that 'this record shows' that Sheriff Ogburn received the description of the car contained in the radio bulletin from someone who also informed him that he also saw the car at the scene of the crime. Post, at 570. The record wholly fails to support any such implication. Sheriff Ogburn, who testified on four separate occasions at the trial, see R. 105—112, 187—191, 310—314, 335—337. said nothing of the sort. Only one other witness, Leonard Russell Marion, testified to having given Ogburn any information about the car prior to Whiteley's arrest; Marion never testified to seeing the car near the scene of the crime. R. 317—322, 329—330. Indeed, it is quite apparent from reading Marion's testimony that his observations of Whiteley on the day of the robbery took place at his own house. R. 320—321.

More importantly, even the dissent apparently concedes that as far as the record in this case reveals, the only information Sheriff Ogburn communicated to the magistrate issuing the warrant was contained in his written complaint reproduced above. Under the cases of this Court, an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate. See Aguilar v. Texas, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511, 12 L.Ed.2d 723. A contrary rule would, of course, render the warrant requirements of the Fourth Amendment meaningless.

9

Since this is a federal habeas corpus proceeding, the State is technically not a party.

10

'The legal principles relied upon by the state throughout this entire litigated process have been based on the premise that a law enforcement officer may make a warrantless arrest if he has requisite probable cause, which can be something less than the requisite probable cause that must be presented to a judicial officer prior to the issuance of an arrest or search warrant.' Brief for Respondent 6.

11

After arresting Whiteley and Daley, the officers searched the car and discovered in the car's interior the old coins taken in one of the burglaries and described in the radio bulletin. In addition, they found burglar's tools in the trunk of the car. Of course, the discoveries of an illegal search cannot be used to validate the probable-cause judgment upon which the legality of the search depends.

12

The arrest warrant issued at about noon on November 24, 1964. See App. 53. State bulletin 881 was broadcast at 3:03 p.m. that same day. App. 31. It is apparent that Sheriff Ogburn did not himself acquire additional corroborative data possibly supporting a probable-cause arrest after securing the warrant.

13

The State makes a halfhearted attempt to argue that the introduction of the illegally seized evidence was harmless error. The evidence, of course, was damning, to say the least. See n. 10, supra. The only other evidence implicating Whiteley was his accomplice's testimony. It is clear that the error cannot be said to be harmless under applicable standards. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

Contrary to the implications in the dissenting opinion, see post, at 571, no witness at trial other than the accomplice placed Whiteley 'near the scene of the crime' on the night of the robbery.

1

The population of Carbon County according to the 1970 census is about 13,000 persons.

2

Leonard Russell Marion testified at trial that he had seen Whiteley at his home in Saratoga, a town of about 1,000 population, on the day of the robbery. Mr. Marion further testified that he observed Whiteley's car and a portion of the license plate number and gave that information to the sheriff. See R. 317—321, 329—330. The majority fails to recognize that Saratoga is a very small country town and

that strangers are most unlikely to move about unnoticed. Something obviously aroused Mr. Marion's suspicion or else he would not have reported the observation of petitioner and his car to the sheriff.

3

Daley's testimony was not uncorroborated. He testified in detail about the trip from Laramie to Saratoga where the crime was committed with stops in Medicine Bow and Elk Mountain. Ernest Hornden testified at trial that Daley and Whiteley were in the Dip Bar in Medicine Bow on the night of November 23, 1964, shortly before the burglary. Another witness, LeRoy Hansen, testified that Whiteley was in Elk Mountain on the day of the burglary, see R. 315—316.

4

The search in this case took place on November 24, 1964. Although I disagreed with Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), I have always believed that constitutional decisions should be fully retroactive in their application. See Linkletter v. Walker. 381 U.S. 618, 640, 85 S.Ct. 1731, 1743, 14 L.Ed.2d 601 (1965) (Black, J., dissenting). I am thus glad to see that the majority has apparently decided to apply constitutional decisions retroactively even when they do not affect the 'integrity of the fact-finding process,' see id., at 639, 85 S.Ct., at 1743, and will greatly burden the administration of justice, see Desist v. United States, 394 U.S. 244, 250, 89 S.Ct. 1030, 1034, 22 L.Ed.2d 248 (1969).



endicia

07180085457?

US POSTAGE AND FEES PAID
FIRST – CLASS
Jun 29 2019
Mailed from ZIP 82414
6oz First – Class Pkg Svc Zone 1

Commercial BasePrice

FIRST – CLASS PKG SVC

C001

TAMI MAE BRONNENBERG, PRO – SE
P.O. BOX 802
CODY WY 82414 – 3840

SHIP TO:
CLERK U.S. DISTRICT COURT
111 S. WOLCOTT
ROOM 121
Casper WY 82601

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 AUG -5  AM 8:51

STEPHAN HARRIS, CLERK
CASPER

TAMI MAE BRONNENBERG,

      Plaintiff,

    v.

BEAU J. EGGER, Arresting Officer,

      Defendant.

Case No. 19-CV-21-SWS

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This case comes before the Court on the following motions:

(1)     Defendant Egger's Motion to Dismiss Plaintiff's Complaint (Doc. 28), which was converted into a motion for summary judgment under Fed. R. Civ. P. 12(d) (Doc. 30). Plaintiff filed an opposition (Doc. 33), and Defendant replied (Doc. 35).

(2)     Plaintiff's Motion for Declaratory Judgment (Doc. 36), Defendant's opposition (Doc. 39), and Plaintiff's reply (Doc. 41).

(3)     Plaintiff's Motion for Summary Judgment (Doc. 38), Defendant's opposition (Doc. 40), and Plaintiff's reply (Doc. 44).

Having considered the parties' arguments, the record herein, and being otherwise fully advised, the Court finds Defendant Egger is entitled to qualified immunity in this action. Consequently, Defendant's motion for summary judgment must be granted and Plaintiff's opposing motions denied.

## BACKGROUND

Plaintiff Tami Bronnenberg proceeds pro se without the aid of a lawyer in this matter. Therefore, her "pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers," but the Court cannot "assume the role of advocate." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

After screening Ms. Bronnenberg's amended civil rights complaint (Doc. 9), the Court found she had stated a plausible claim under 42 U.S.C. § 1983 for false arrest/false imprisonment in violation of the Fourth Amendment against Defendant Egger.[1]  (Doc. 10.)   More specifically, she contends Defendant Egger, a law enforcement officer working for the City of Cody, Wyoming, at the relevant time, arrested her on January 31, 2017, on an invalid arrest warrant despite her attempts to explain to him why it was invalid and showing him a court order canceling the warrant. (Doc. 9 at pp. 3-4.)  The evidence submitted by the parties establishes that the warrant had indeed been vacated by the state district court judge, and Ms. Bronnenberg was released from detention less than an hour after being booked into the local jail. (*See* Doc. 9 at pp. 11-13; Doc. 29-2 at pp. 2-3.) The Court determines the dispositive question is whether Officer Egger is protected by qualified immunity in relation to arresting Ms. Bronnenberg.

## SUMMARY JUDGMENT AND QUALIFIED IMMUNITY

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[1]  The remainder of Ms. Bronnenberg's claims were dismissed in screening under 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim upon which relief could be granted. (Doc. 10.)

of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). "The district court must draw all reasonable inferences in favor of the nonmoving party." *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

> When a defendant asserts qualified immunity at summary judgment, the burden shifts to the *plaintiff*, who must clear two hurdles in order to defeat the defendant's motion. The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity.

*Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015) (emphasis in original) (quoting *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)). Though the Court must still view the evidence in the light most favorable to the non-moving party, the "record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 878 (10th Cir. 2014) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

## DISCUSSION

Examining the first step of the qualified-immunity analysis, Ms. Bronnenberg has not established Officer Egger violated her constitutional rights. The affidavit from Defendant Egger establishes that a facially-valid warrant for Ms. Bronnenberg's arrest existed at the time he arrested her, that he called into dispatch to confirm the validity of the arrest warrant, and that dispatch affirmed through the "RIMS Computer Aided Dispatch System" the arrest warrant was still active. (Doc. 29-2 at pp. 1-3; *see also* Doc. 29-1 at p. 2; Doc. 29-3 at pp. 1-2; Doc. 29-4.) Ms. Bronnenberg does not dispute these material facts, but essentially contends Officer Egger's actions were unconstitutional anyway. She asserts Officer Egger "was relying on" an arrest warrant as his basis for arresting Ms. Bronnenburg. (Doc. 9 at p. 3.) Attached as "Exhibit A" to her amended complaint is an "Order Vacating Warrant and Resetting Previously Scheduled Hearing," entered by the state district judge of the Fifth Judicial District of Wyoming. (Doc. 9 at p. 11.) It was entered on January 17, 2017, and it ordered "that the Warrant issued January 9, 2017 in this matter is vacated." (*Id.*) Ms. Bronnenburg alleges she showed this order to Officer Egger at the time he arrested her on January 31, 2017, to convince him not to execute the arrest warrant, but he ignored her and arrested her anyway. (Doc. 9 at pp. 3-4, 5.)

Generally, an officer executing an arrest warrant that is valid on its face enjoys absolute immunity (also known as "quasi-judicial immunity"). "Just as judges acting in their judicial capacity are absolutely immune from liability under section 1983, official[s] charged with the duty of executing a facially valid court order enjoy[] absolute immunity

from liability for damages in a suit challenging conduct prescribed by that order." *Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009) (alterations in original) (quoting *Turney v. O'Toole*, 898 F.2d 1470, 1472 (10th Cir. 1990)). And "[f]acially valid does not mean lawful. An erroneous order can be valid." *Turney*, 898 F.2d at 1473 (internal quotation marks omitted) (citing *Baker v. McCollan*, 443 U.S. 137, 143–44 (1979)). To be entitled to absolute immunity, "the judge issuing the disputed order must be immune from liability in his or her own right, the officials executing the order must act within the scope of their own jurisdiction, and the officials must only act as prescribed by the order in question." *Moss*, 559 F.3d at 1163.

The undisputed evidence presented by the parties in their competing summary judgment motions establishes the state district court judge issued the arrest warrant due to Ms. Bronnenberg's earlier failure to appear on a show cause order (Doc. 29-4), and there is no suggestion the state judge lacked this authority. Next, the undisputed evidence shows Officer Egger, a police officer for the City of Cody, Wyoming, acted within the scope of his jurisdiction as he executed what appeared to be a valid arrest warrant within the city limits of Cody, Wyoming. (Doc. 29-2 at p. 1.) Finally, the undisputed evidence demonstrates Officer Egger acted in conformity with the arrest warrant and not beyond it by arresting Ms. Bronnenberg and immediately transporting her to the local detention center. (Doc. 29-1 at p. 2.) Consequently, all requirements for absolute (or quasi-judicial) immunity are met here, and Officer Egger is immune from liability under § 1983.

The Tenth Circuit has considered similar situations on multiple occasions. For example, in *Hill v. Bogans*, 735 F.2d 391 (10th Cir. 1984), the plaintiff asserted the officer violated the plaintiff's civil rights "by failing to check the validity of the warrant when requested to do so." 735 F.2d at 393. The Tenth Circuit disagreed, saying, "Unless a warrant is facially invalid an officer has no constitutional duty to independently determine its validity." *Id.* (citing *Baker*, 443 U.S. at 145-46). The court held the police officers "acted reasonably in relying on routine police procedures [i.e., calling the police station] for establishing the existence of an outstanding warrant." *Id.*; *see also Smith v. City of Lakewood*, 83 F.3d 433 (10th Cir. 1996) (unpublished table decision) (stating that a facially-valid arrest warrant "unquestionably justified Smyth's arrest by Kuebler"); *Taylor v. Robinson*, 2016 WL 9488864, at *4 (D.N.M. Dec. 5, 2016) ("Because dispatch informed Burd that there was an active warrant for Plaintiff's arrest, the Court finds that it was reasonable for Burd to rely on this information.").

Here, Officer Egger acted reasonably when arresting Ms. Bronnenberg. He relied on routine police procedures to determine the arrest warrant's continuing validity by calling into dispatch, which checked the RIMS computer system and informed Officer Egger the arrest warrant was still active. Based on that information, Officer Egger executed the facially-valid arrest warrant. Even in the face of Ms. Bronnenberg's protests, Officer Egger's actions were constitutionally reasonable because an officer "is not required by the Fourth Amendment to obtain a copy of the warrant, research supporting documentation, or go behind the facial validity of a warrant before making the arrest." *Smyth*, 83 F.3d 433; *see also Lauer v. Dahlberg*, 717 F. Supp. 612, 614 (N.D. Ill.

1989) (determining that an officer was not required to further investigate the arrest warrant's validity even where, like alleged here, the officer was presented with "an uncertified copy of the [warrant] recall order").

It is unfortunate that the state court judge's order vacating the arrest warrant was not timely registered into the RIMS computer system. The disruption to Ms. Bronnenberg's life, though relatively brief, was significant and should not be ignored. However, it's not appropriate to make Officer Egger answer for that mistake when there's no evidence to suggest it was his doing. "Simple fairness requires that state officers 'not be called upon to answer for the legality of decisions which they are powerless to control.'" *Turney v. O'Toole*, 898 F.2d 1470, 1473 (10th Cir. 1990) (quoting *Valdez v. City & County of Denver*, 878 F.2d 1285, 1289 (10th Cir. 1989)). The undisputed evidence presented by the parties' summary judgment motions shows Officer Egger did not violate Ms. Bronnenberg's constitutional rights when he arrested her pursuant to the facially-valid warrant because he acted as a reasonable officer in doing so and is protected by absolute (quasi-judicial) immunity.

Turning now to the second prong of the qualified immunity analysis, Ms. Bronnenberg has also failed to show the alleged right was clearly established at the time of the alleged unlawful activity. It is difficult to isolate exactly what right she contends was violated by Officer Eggers. (*See* Doc. 33.) For example, she discussed the need for an arrest warrant or search warrant to be supported by probable cause (Doc. 33 at pp. 4-5), which is an accurate reflection of the Fourth Amendment. However, there's no evidence to suggest the state court judge's arrest warrant was not supported by probable

cause. (Doc. 29-4 (stating the arrest warrant was issued due to Ms. Bronnenberg's failure to appear for a prior show cause hearing).) And even if the arrest warrant did lack supporting probable cause when it was issued, that would not demand money damages against Officer Eggers for executing the facially-valid warrant. *Turney*, 898 F.2d at 1473 (officers should "not be called upon to answer for the legality of decisions which they are powerless to control").

At best, Ms. Bronnenberg relies upon general Fourth Amendment principles in alleging Officer Eggers violated her constitutional rights, but the U.S. Supreme Court demands that "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam). The Supreme Court "has repeatedly told courts ... not to define clearly established law at a high level of generality." *Id.* (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)). Ms. Bronnenberg has not set forth a clearly-established right that Officer Eggers allegedly violated. "[T]here is no clearly established law to the effect that an arrest based on execution of a court's bench warrant may constitute false arrest." *Zamora v. City of Belen*, 383 F. Supp. 2d 1315, 1338 (D.N.M. 2005). The Court cannot conclude that "every reasonable official would have understood" that Officer Egger's conduct here was unreasonable and in violation of the Fourth Amendment. *Aschcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

## CONCLUSION AND ORDER

Based on the undisputed evidence presented by the parties, Ms. Bronnenberg has not overcome either prong of the qualified immunity defense. Consequently, Officer

Eggers is entitled to qualified immunity, which protects him against liability for civil damages.

Ms. Bronnenberg's request for a declaratory judgment (*see* Doc. 9 at p. 9) must be denied because it seeks a declaration aimed at past conduct, but the "Eleventh Amendment does not permit judgments against state officers declaring that they violated federal law in the past." *Johns v. Stewart*, 57 F.3d 1544, 1553 (10th Cir. 1995). Finally, Ms. Bronnenberg's request for an injunction against any future constitutional deprivations (*see* Doc. 9 at p. 9) must also be denied because "the complaint alleged no threatened violations other those specifically charged," yet "the necessary determination [for an injunction to issue] is that there exists some cognizable danger of recurrent violation." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).

**IT IS THEREFORE ORDERED** that Defendant Egger's Motion to Dismiss Plaintiff's Complaint (Doc. 28) is **GRANTED**. Officer Egger is entitled to qualified immunity.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Declaratory Judgment (Doc. 36) and Plaintiff's Motion for Summary Judgment (Doc. 38) are **DENIED**. Final judgment in Defendants' favor and against Plaintiff shall be entered in this matter and the case will be closed.

**DATED:** July 3/⁵ᵗ, 2019.

Scott W. Skavdahl
United States District Judge



FILED

9:21 am, 8/5/19
**Stephan Harris**
**Clerk of Court**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

TAMI MAE BRONNENBERG

Plaintiff

vs                                           Case Number:  19-CV-21-SWS

BEAU J. EGGER, Arresting Officer

Defendant

---

## JUDGMENT IN A CIVIL ACTION

---

This matter comes before the Court on  Defendants' Motion to Dismiss which was converted into a motion for Summary Judgment  (ECF No. 28) and Plaintiff's Motions for Declaratory Judgment (ECF No. 36) and for Summary Judgment (ECF No. 38). Pursuant to the Order  entered August 5, 2019, incorporated by reference herein,  GRANTING Defendant's Motion for Summary Judgment and Denying Plaintiff's Motions for Declaratory Judgment and for Summary Judgment,

IT IS HEREBY ORDERED AND ADJUDGED that a Judgment be entered on behalf of the Defendants and the matter is dismissed.

Dated this 5th day of August, 2019.

Stephan Harris
Clerk of Court


By Crystal Toner
Deputy Clerk

AO 133    (Rev. 12/09)  Bill of Costs

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
| v. | ) | Case No.: |
|  | ) |  |
|  | ) |  |

## BILL OF COSTS

Judgment having been entered in the above entitled action on _____ against _____ ,

Date

the Clerk is requested to tax the following as costs:

Fees of the Clerk  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    $_____

Fees for service of summons and subpoena . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    _____

Fees for printed or electronically recorded transcripts necessarily obtained for use in the case . . . . . .    _____

Fees and disbursements for printing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    _____

Fees for witnesses *(itemize on page two)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    _____

Fees for exemplification and the costs of making copies of any materials where the copies are
necessarily obtained for use in the case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    _____

Docket fees under 28 U.S.C. 1923 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    _____

Costs as shown on Mandate of Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    _____

Compensation of court-appointed experts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    _____

Compensation of interpreters and costs of special interpretation services under 28 U.S.C. 1828  . . . . .    _____

Other costs *(please itemize)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    _____

TOTAL    $_____

*SPECIAL NOTE:*  Attach to your bill an itemization and documentation for requested costs in all categories.

### Declaration

     I declare under penalty of perjury that the foregoing costs are correct and were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed.  A copy of this bill has been served on all parties in the following manner:

    ❏   Electronic service         ❏   First class mail, postage prepaid

    ❏   Other:  _____

    s/ Attorney:  _____

        Name of Attorney:  _____

For:  _____    Date:  _____

*Name of Claiming Party*

### Taxation of Costs

Costs are taxed in the amount of  _____  and included in the judgment.

_____    By:  _____    _____

*Clerk of Court*            *Deputy Clerk*            *Date*

# UNITED STATES DISTRICT COURT

| | | | | | | |
|---|---|---|---|---|---|---|
| **Witness Fees (computation, cf. 28 U.S.C. 1821 for statutory fees)** | | | | | | |

| NAME , CITY AND STATE OF RESIDENCE | ATTENDANCE | | SUBSISTENCE | | MILEAGE | | Total Cost Each Witness |
|---|---|---|---|---|---|---|---|
| | Days | Total Cost | Days | Total Cost | Miles | Total Cost | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | **TOTAL** | | |

## NOTICE

**Section 1924, Title 28, U.S. Code (effective September 1, 1948) provides:**
"Sec. 1924. Verification of bill of costs."
    "Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed."

**See also Section 1920 of Title 28, which reads in part as follows:**
    "A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree."

**The Federal Rules of Civil Procedure contain the following provisions:**
**RULE 54(d)(1)**

Costs Other than Attorneys' Fees.

    Unless a federal statute, these rules, or a court order provides otherwise, costs — other than attorney's fees — should be allowed to the prevailing party. But costs against the United States, its officers, and its agencies may be imposed only to the extent allowed by law. The clerk may tax costs on 14 day's notice. On motion served within the next 7 days, the court may review the clerk's action.

## RULE 6

(d) Additional Time After Certain Kinds of Service.

    When a party may or must act within a specified time after service and service is made under Rule5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire under Rule 6(a).

**RULE 58(e)**

Cost or Fee Awards:

    Ordinarily, the entry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees. But if a timely motion for attorney's fees is made under Rule 54(d)(2),  the court may act before a notice of appeal has been filed and become effective to order that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Rule 59.

UNITED STATES DISTRICT COURT FOR THE 10TH CIRCUIT COURT

DISTRICT OF WYOMING

FILE NUMBER _____

FILED
U.S. DISTRICT COURT
OF WYOMING
2019 SEP 3  AM 11: 54
STEPHAN HARRIS, CLERK
CASPER

| | |
|---|---|
| TAMI M. BRONNENBERG                                    ) | |
|                                                       ) | |
|                   Plaintiff,                          ) | |
|                                                       ) | |
|        V.                                             ) | |
|                                                       ) | **NOTICE** |
| BEAU J. EGGAR, Arresting Officer; WILLIAM K.          ) | |
| STRUEMKE, Attorney; SARA L. STRUEMKE,                 ) | **OF** |
| Secretary; SERVICM LEGAL SERVICES, LLC;               ) | |
| MARLIN D. RICHARDSON, DC; BIG HORN BASIN              ) | **APPEAL** |
| CHIROPRACTIC; CITY OF CODY; PARK COUNTY               ) | |
| DETENTION CENTER; BOARD OF COUNTY                     ) | |
| COMMISSIONERS OF THE COUNTY OF PARK;                  ) | |
|                                                       ) | |
|                   Defendants.                         ) | |

---

**NOTICE** is hereby given that plaintiff, Tami M. Bronnenberg, in the above named case hereby appeal to the United States Court of Appeals for the 10th Circuit from the **JUDGMENT IN A CIVIL ACTION**, "**Order Granting Defendant's Motion for Summary Judgment**, entered in this action on August 5, 2019"; "Order on 28 U.S.C. §1915 Screening of Amended (1983 Civil Rights) Complaint." **IN PART**, **Ordered that all other claims alleged in the amended complaint are dismissed with prejudice under 28 U.S.C. §1915 (e) (2) (B) (ii),** entered in this action on

1

Case 2:19-cv-00021-SWS    Document 47    Filed 09/03/19    Page 2 of 54

February 25, 2019. (Voluntary dismissal of the appeal will not preclude a

timely appeal from a final judgment or otherwise appealable order at a later

date.) See, Order, March 27, 2019 by Elisabeth a. Shumaker, Clerk of Court

for the 10th Circuit Court of Appeals.

Dated: August _30_, 2019

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

2

UNITED STATES DISTRICT COURT FOR THE 10TH CIRCUIT COURT

DISTRICT OF WYOMING

FILE NUMBER _____

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | . |
| | ) | **MOTION FOR** |
| BEAU J. EGGAR, Arresting Officer; WILLIAM K. | ) | **PERMISSION** |
| STRUEMKE, Attorney; SARA L. STRUEMKE, | ) | **TO APPEAL** |
| Secretary; SERVICM LEGAL SERVICES, LLC; | ) | **IN FORMA** |
| MARLIN D. RICHARDSON, DC; BIG HORN BASIN | ) | **PAUPERIS** |
| CHIROPRACTIC; CITY OF CODY; PARK COUNTY | ) | |
| DETENTION CENTER; BOARD OF COUNTY | ) | |
| COMMISSIONERS OF THE COUNTY OF PARK; | ) | |
| | ) | |
| Defendants. | ) | |

Comes now the plaintiff above mentioned, Ms. Bronnenberg, pro-se, and

respectfully requests for permission to appeal in forma pauperis with

accompanying affidavit in support of motion.

Dated this 30 day of August, 2019.

Tami Mae Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

UNITED STATES DISTRICT COURT FOR THE 10TH CIRCUIT COURT

DISTRICT OF WYOMING

FILE NUMBER _____

| | |
|---|---|
| TAMI M. BRONNENBERG | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) |
| | ) |
| BEAU J. EGGAR, Arresting Officer; WILLIAM K. | ) |
| STRUEMKE, Attorney; SARA L. STRUEMKE, | ) |
| Secretary; SERVICM LEGAL SERVICES, LLC; | ) |
| MARLIN D. RICHARDSON, DC; BIG HORN BASIN | ) |
| CHIROPRACTIC; CITY OF CODY; PARK COUNTY | ) |
| DETENTION CENTER; BOARD OF COUNTY | ) |
| COMMISSIONERS OF THE COUNTY OF PARK; | ) |
| | ) |
| Defendants. | ) |

---

**AFFIDAVIT ACCOMPANYING MOTION FOR PERMISSION TO
APPEAL IN FORMA PAUPERIS.**

I swear or affirm under penalty of perjury that, because of my poverty,

I cannot prepay the docket fees of my appeal or post a bond for them. I

believe I am entitled to redress. I swear or affirm under penalty of perjury

under United States laws that my answers on this form are true and correct.

(28 U.S.C. §1746; 18 U.S.C. §1621.) Signed: _____

Dated: August 30, 2019. My issues on appeal are:

1

1. Whether it is not the federal court's duty to decide a controverted question of state law first, Siler v. Louisville & Nashville R, Co. (1909) 213 U.S. 175, 29 S.Ct. 451, 455, 53 S.Ct. 451,455, 53 L. Ed. 653; Delaware v. Van Arsdall, 475 U.S. 175, 707, 106 S.Ct. 1431, 1450, 89 L.Ed. 2d (1986); Ellis v. City of La Mesa 990 F2d 1518 (9th Cir.1993); Seals v. Quarterly County Court, 562 F2d 390, 392 (6th Cir. 1977); Johnson v. State of Wyoming Hearing Examiner's Office, 838 P. 2d 158 (Wyo. 1992).

2. Whether non-compliance with Wyoming legal decisions, ORDER VACATING WARRANT AND RESETTING PREVIOUSLY SCHEDULED HEARING, In the fifth Judicial District Court, Civil Action No. 28047, filed January 17, 2017, marked Exhibit –A- to Amended Complaint; Whiteley v. Warden of Wyoming Penitentiary, 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. ct. 1031 (1971), was sufficient to show that Bronnenberg's arrest and imprisonment was not consistent with the United States Constitution of America, Amendment 4.

3. Whether non-compliance with Wyoming legal decisions, ORDER VACATING WARRANT AND RESETTING PREVIOUSLY SCHEDULED HEARING, In the fifth Judicial District Court, Civil Action No. 28047, filed January 17, 2017, marked Exhibit –A- to Amended Complaint; Whiteley v. Warden of Wyoming Penitentiary, 401 U.S. 560, 28

2

L. Ed. 2d 306, 91 S. Ct. 1031 (1971) was sufficient to show that

Bronnenberg's arrest and imprisonment was denial of Due process of law

and the Equal Protection of the Laws pursuant to the United States

Constitution of America, Amendment 5, Amendment 14.

    4. A. Defendants: William K. Struemke, Attorney; Sara L. Struemke,

Secretary; Servicm Legal Services, LLC; Marlin D. Richardson, D.C; Big

Horn Basin Chiropractic; City of Cody; Park County Detention Center;

Board of County Commissioners of the County of Park should not be

dismissed with prejudice from the case at hand. They are equally responsible

for Federal Constitutional violations for **False Arrest/False imprisonment),**

**under the Fourth Amendment, Due Process Clause of the Fourteenth**

**Amendment of the United States Constitution, and those rights were**

**clearly established at the time.** See, Exhibits -A- through -F- attached to

the Amended 1983 Civil Rights Complaint; Order on 28 U.S.C. §1915

Screening of Amended Complaint p. 7. (". . . local attorney and local

chiropractor conspired to have Ms. Bronnenberg falsely arrested . . .") (Doc.

9 at p. 5). See, Tower v. Grover, 467 U.S. 914, 104 S. Ct. 2820, 81 L. Ed 2d

758 (1984); Polk County v. Dodson, 454 U.S. 312, 102 S. Ct. 445, 70 L. Ed.

2d 509 (1981); Dennis v. Sparks, 449 US 24 at Pp. 919-920, 101 S. Ct. 183,

66 L. Ed. 2d 185 (1980); Adickes v. Kress & Co, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed 2d 142 (1970).

B. The text and structure of Statute **28 U.S.C. §1915** is unconstitutional because it discriminates against Ms. Bronnenberg as an "indigent person", (a class of indigent people) the word indigent has been removed from **28 U.S.C. §1915**. Ms. Bronnenberg has been included with the (class of indigent prisoners). Which I believe to be discriminatory towards Ms. Bronnenberg. Depriving a "person" of his or her "liberty, (of being included with a class of criminals) . . . without due process of law." Is in violation of the United States Constitution, Amendment 5. I do believe defamation is considered to be a civil wrong. The United States District Court of Wyoming lacks jurisdiction on this issue because the Court exercised its statutory authority in an unreasonable fashion. See, **(Act of Congress providing for equal rights of citizens 28 USC §1343(3)).**

1. For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, mounts before any deductions for taxes or otherwise. Please see attached pages 54 through 58 of form 4 of the Federal Rules of Appellant Procedure.

4

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | Spouse | You | Spouse |
| Employment | $ ○ | $ NA | $ ○ | $ NA |
| Self-employment | $ ○ | $ NA | $ ○ | $ NA |
| Income from real property (such as rental income) | $ ○ | $ ○ | $ ○ | $ ○ |
| Interest and dividends | $ ○ | $ ○ | $ ○ | $ ○ |
| Gifts | $ ○ | $ ○ | $ ○ | $ ○ |
| Alimony | $ ○ | $ ○ | $ ○ | $ ○ |
| Child support | $ ○ | $ ○ | $ ○ | $ ○ |
| Retirement (such as social security, pensions, annuities, insurance) | $ ○ | $ ○ | $ ○ | $ ○ |
| Disability (such as social security, insurance payments) | $ 901 | $ ○ | $ 901 | $ ○ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ 350 | $ ○ | $ 350 | $ ○ |
| Other (specify): | $ ○ | $ ○ | $ ○ | $ ○ |
| Total monthly income: | $ | $ | $ | $ |

2. *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| NA | ——— | ——— | $ —— |
| | | | $ |
| | | | $ |

3. List your spouse's employment history for the past two years, most recent employer first. *(Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

4. How much cash do you and your spouse have? $____

Below, state any money you or your spouse have in bank accounts or in any other financial institution.

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
| Pinnacle Bank | Checking | $ 0 | $ N/A |
| | | $ | $ |
| | | $ | $ |

*If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.*

5. List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| NA | NA | Make and year: |
| | | Model: |
| | | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: | | |
| Model: | | |
| Registration #: | | |

6.   State every person, business, or organization owing you or your spouse money, and the amount owed.

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7.   State the persons who rely on you or your spouse for support.

| Name [or, if under 18, initials only] | Relationship | Age |
|---|---|---|
| A . C . W | Son | 6 |
| | | |
| | | |

8.   Estimate the average monthly expenses of you and your family. Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (include lot rented for mobile home)<br>Are real estate taxes included?    [ ] Yes [X] No<br>Is property insurance included?    [ ] Yes [X] No | $ 270 | $ |

Appellate Case: 19-8055   Case 2:19-cv-00021-SWS   Document 47   Filed 09/03/19   Page 11 of 54   Document: 010110225198   Date Filed: 09/10/2019   Form 4   Page: 356

FEDERAL RULES OF APPELLATE PROCEDURE

| | | |
|---|---|---|
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $300 | $ |
| Home maintenance (repairs and upkeep) | $ — | $ |
| Food | $100 | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $68 | $ |
| Transportation (not including motor vehicle payments) | $95 | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
|     Homeowner's or renter's: | $ | $ |
|     Life: | $31.62 | $ |
|     Health: | $ | $ |
|     Motor vehicle: | $35 | $ |
|     Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
|     Motor Vehicle: | $ | $ |
|     Credit card (name): | $ | $ |
|     Department store (name): | $ | $ |
|     Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
|     **Total monthly expenses:** | $ | $ |

9. *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

   [ ] Yes [X] No       If yes, describe on an attached sheet.

10. *Have you spent — or will you be spending — any money for expenses or attorney fees in connection with this lawsuit?* [ ] Yes [X] No

   *If yes, how much?* $ _____

11. *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.* I live on disability and have a 6 yr old I am raising. There is No money for anything other than

12. *State the city and state of your legal residence.* monthly expenses
    Cody Wyoming
    *Your daytime phone number:* (307) 899 2150

    *Your age:* 50   *Your years of schooling:* 11th grade GED , CNA license. at one time

(As amended Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 28, 2010, eff. Dec. 1, 2010; Apr. 16, 2013, eff. Dec. 1, 2013; Apr. 26, 2018, eff. Dec. 1, 2018.)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING



**FILED**

9:21 am, 8/5/19
**Stephan Harris**
**Clerk of Court**

| | |
|---|---|
| TAMI MAE BRONNENBERG | |
| Plaintiff | |
| vs | Case Number: 19-CV-21-SWS |
| BEAU J. EGGER, Arresting Officer | |
| Defendant | |

## JUDGMENT IN A CIVIL ACTION

This matter comes before the Court on Defendants' Motion to Dismiss which was converted into a motion for Summary Judgment (ECF No. 28) and Plaintiff's Motions for Declaratory Judgment (ECF No. 36) and for Summary Judgment (ECF No. 38). Pursuant to the Order entered August 5, 2019, incorporated by reference herein, GRANTING Defendant's Motion for Summary Judgment and Denying Plaintiff's Motions for Declaratory Judgment and for Summary Judgment,

IT IS HEREBY ORDERED AND ADJUDGED that a Judgment be entered on behalf of the Defendants and the matter is dismissed.

Dated this 5th day of August, 2019.

Stephan Harris
Clerk of Court

By Crystal Toner
Deputy Clerk

WY 37

Rev. 10/30/2017

### UNITED STATES DISTRICT COURT
### DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 AUG -5 AM 8: 51

STEPHAN HARRIS, CLERK
CASPER

TAMI MAE BRONNENBERG,

    Plaintiff,

v.

                    Case No. 19-CV-21-SWS

BEAU J. EGGER, Arresting Officer,

    Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This case comes before the Court on the following motions:

(1)    Defendant Egger's Motion to Dismiss Plaintiff's Complaint (Doc. 28), which was converted into a motion for summary judgment under Fed. R. Civ. P. 12(d) (Doc. 30). Plaintiff filed an opposition (Doc. 33), and Defendant replied (Doc. 35).

(2)    Plaintiff's Motion for Declaratory Judgment (Doc. 36), Defendant's opposition (Doc. 39), and Plaintiff's reply (Doc. 41).

(3)    Plaintiff's Motion for Summary Judgment (Doc. 38), Defendant's opposition (Doc. 40), and Plaintiff's reply (Doc. 44).

Having considered the parties' arguments, the record herein, and being otherwise fully advised, the Court finds Defendant Egger is entitled to qualified immunity in this action. Consequently, Defendant's motion for summary judgment must be granted and Plaintiff's opposing motions denied.

## BACKGROUND

Plaintiff Tami Bronnenberg proceeds pro se without the aid of a lawyer in this matter. Therefore, her "pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers," but the Court cannot "assume the role of advocate." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

After screening Ms. Bronnenberg's amended civil rights complaint (Doc. 9), the Court found she had stated a plausible claim under 42 U.S.C. § 1983 for false arrest/false imprisonment in violation of the Fourth Amendment against Defendant Egger.[1]  (Doc. 10.)   More specifically, she contends Defendant Egger, a law enforcement officer working for the City of Cody, Wyoming, at the relevant time, arrested her on January 31, 2017, on an invalid arrest warrant despite her attempts to explain to him why it was invalid and showing him a court order canceling the warrant.  (Doc. 9 at pp. 3-4.)  The evidence submitted by the parties establishes that the warrant had indeed been vacated by the state district court judge, and Ms. Bronnenberg was released from detention less than an hour after being booked into the local jail.  (*See* Doc. 9 at pp. 11-13; Doc. 29-2 at pp. 2-3.)  The Court determines the dispositive question is whether Officer Egger is protected by qualified immunity in relation to arresting Ms. Bronnenberg.

## SUMMARY JUDGMENT AND QUALIFIED IMMUNITY

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[1] The remainder of Ms. Bronnenberg's claims were dismissed in screening under 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim upon which relief could be granted. (Doc. 10.)

of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). "The district court must draw all reasonable inferences in favor of the nonmoving party." *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

> When a defendant asserts qualified immunity at summary judgment, the burden shifts to the *plaintiff*, who must clear two hurdles in order to defeat the defendant's motion. The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity.

*Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015) (emphasis in original) (quoting *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)). Though the Court must still view the evidence in the light most favorable to the non-moving party, the "record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 878 (10th Cir. 2014) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

## DISCUSSION

Examining the first step of the qualified-immunity analysis, Ms. Bronnenberg has not established Officer Egger violated her constitutional rights. The affidavit from Defendant Egger establishes that a facially-valid warrant for Ms. Bronnenberg's arrest existed at the time he arrested her, that he called into dispatch to confirm the validity of the arrest warrant, and that dispatch affirmed through the "RIMS Computer Aided Dispatch System" the arrest warrant was still active. (Doc. 29-2 at pp. 1-3; *see also* Doc. 29-1 at p. 2; Doc. 29-3 at pp. 1-2; Doc. 29-4.) Ms. Bronnenberg does not dispute these material facts, but essentially contends Officer Egger's actions were unconstitutional anyway. She asserts Officer Egger "was relying on" an arrest warrant as his basis for arresting Ms. Bronnenburg. (Doc. 9 at p. 3.) Attached as "Exhibit A" to her amended complaint is an "Order Vacating Warrant and Resetting Previously Scheduled Hearing," entered by the state district judge of the Fifth Judicial District of Wyoming. (Doc. 9 at p. 11.) It was entered on January 17, 2017, and it ordered "that the Warrant issued January 9, 2017 in this matter is vacated." (*Id.*) Ms. Bronnenburg alleges she showed this order to Officer Egger at the time he arrested her on January 31, 2017, to convince him not to execute the arrest warrant, but he ignored her and arrested her anyway. (Doc. 9 at pp. 3-4, 5.)

Generally, an officer executing an arrest warrant that is valid on its face enjoys absolute immunity (also known as "quasi-judicial immunity"). "Just as judges acting in their judicial capacity are absolutely immune from liability under section 1983, official[s] charged with the duty of executing a facially valid court order enjoy[] absolute immunity

from liability for damages in a suit challenging conduct prescribed by that order." *Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009) (alterations in original) (quoting *Turney v. O'Toole*, 898 F.2d 1470, 1472 (10th Cir. 1990)).  And "[f]acially valid does not mean lawful.  An erroneous order can be valid." *Turney*, 898 F.2d at 1473 (internal quotation marks omitted) (citing *Baker v. McCollan*, 443 U.S. 137, 143–44 (1979)).  To be entitled to absolute immunity, "the judge issuing the disputed order must be immune from liability in his or her own right, the officials executing the order must act within the scope of their own jurisdiction, and the officials must only act as prescribed by the order in question." *Moss*, 559 F.3d at 1163.

The undisputed evidence presented by the parties in their competing summary judgment motions establishes the state district court judge issued the arrest warrant due to Ms. Bronnenberg's earlier failure to appear on a show cause order (Doc. 29-4), and there is no suggestion the state judge lacked this authority.  Next, the undisputed evidence shows Officer Egger, a police officer for the City of Cody, Wyoming, acted within the scope of his jurisdiction as he executed what appeared to be a valid arrest warrant within the city limits of Cody, Wyoming. (Doc. 29-2 at p. 1.)  Finally, the undisputed evidence demonstrates Officer Egger acted in conformity with the arrest warrant and not beyond it by arresting Ms. Bronnenberg and immediately transporting her to the local detention center.  (Doc. 29-1 at p. 2.)  Consequently, all requirements for absolute (or quasi-judicial) immunity are met here, and Officer Egger is immune from liability under § 1983.

The Tenth Circuit has considered similar situations on multiple occasions. For example, in *Hill v. Bogans*, 735 F.2d 391 (10th Cir. 1984), the plaintiff asserted the officer violated the plaintiff's civil rights "by failing to check the validity of the warrant when requested to do so." 735 F.2d at 393. The Tenth Circuit disagreed, saying, "Unless a warrant is facially invalid an officer has no constitutional duty to independently determine its validity." *Id.* (citing *Baker*, 443 U.S. at 145-46). The court held the police officers "acted reasonably in relying on routine police procedures [i.e., calling the police station] for establishing the existence of an outstanding warrant." *Id.*; *see also Smith v. City of Lakewood*, 83 F.3d 433 (10th Cir. 1996) (unpublished table decision) (stating that a facially-valid arrest warrant "unquestionably justified Smyth's arrest by Kuebler"); *Taylor v. Robinson*, 2016 WL 9488864, at *4 (D.N.M. Dec. 5, 2016) ("Because dispatch informed Burd that there was an active warrant for Plaintiff's arrest, the Court finds that it was reasonable for Burd to rely on this information.").

Here, Officer Egger acted reasonably when arresting Ms. Bronnenberg. He relied on routine police procedures to determine the arrest warrant's continuing validity by calling into dispatch, which checked the RIMS computer system and informed Officer Egger the arrest warrant was still active. Based on that information, Officer Egger executed the facially-valid arrest warrant. Even in the face of Ms. Bronnenberg's protests, Officer Egger's actions were constitutionally reasonable because an officer "is not required by the Fourth Amendment to obtain a copy of the warrant, research supporting documentation, or go behind the facial validity of a warrant before making the arrest." *Smyth*, 83 F.3d 433; *see also Lauer v. Dahlberg*, 717 F. Supp. 612, 614 (N.D. Ill.

1989) (determining that an officer was not required to further investigate the arrest warrant's validity even where, like alleged here, the officer was presented with "an uncertified copy of the [warrant] recall order").

It is unfortunate that the state court judge's order vacating the arrest warrant was not timely registered into the RIMS computer system.   The disruption to Ms. Bronnenberg's life, though relatively brief, was significant and should not be ignored. However, it's not appropriate to make Officer Egger answer for that mistake when there's no evidence to suggest it was his doing.  "Simple fairness requires that state officers 'not be called upon to answer for the legality of decisions which they are powerless to control.'"  *Turney v. O'Toole*, 898 F.2d 1470, 1473 (10th Cir. 1990) (quoting *Valdez v. City & County of Denver*, 878 F.2d 1285, 1289 (10th Cir. 1989)).  The undisputed evidence presented by the parties' summary judgment motions shows Officer Egger did not violate Ms. Bronnenberg's constitutional rights when he arrested her pursuant to the facially-valid warrant because he acted as a reasonable officer in doing so and is protected by absolute (quasi-judicial) immunity.

Turning now to the second prong of the qualified immunity analysis, Ms. Bronnenberg has also failed to show the alleged right was clearly established at the time of the alleged unlawful activity.  It is difficult to isolate exactly what right she contends was violated by Officer Eggers.  (*See* Doc. 33.)  For example, she discussed the need for an arrest warrant or search warrant to be supported by probable cause (Doc. 33 at pp. 4-5), which is an accurate reflection of the Fourth Amendment.  However, there's no evidence to suggest the state court judge's arrest warrant was not supported by probable

cause. (Doc. 29-4 (stating the arrest warrant was issued due to Ms. Bronnenberg's failure to appear for a prior show cause hearing).) And even if the arrest warrant did lack supporting probable cause when it was issued, that would not demand money damages against Officer Eggers for executing the facially-valid warrant. *Turney*, 898 F.2d at 1473 (officers should "not be called upon to answer for the legality of decisions which they are powerless to control").

At best, Ms. Bronnenberg relies upon general Fourth Amendment principles in alleging Officer Eggers violated her constitutional rights, but the U.S. Supreme Court demands that "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam). The Supreme Court "has repeatedly told courts ... not to define clearly established law at a high level of generality." *Id.* (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)). Ms. Bronnenberg has not set forth a clearly-established right that Officer Eggers allegedly violated. "[T]here is no clearly established law to the effect that an arrest based on execution of a court's bench warrant may constitute false arrest." *Zamora v. City of Belen*, 383 F. Supp. 2d 1315, 1338 (D.N.M. 2005). The Court cannot conclude that "every reasonable official would have understood" that Officer Egger's conduct here was unreasonable and in violation of the Fourth Amendment. *Aschcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

## CONCLUSION AND ORDER

Based on the undisputed evidence presented by the parties, Ms. Bronnenberg has not overcome either prong of the qualified immunity defense. Consequently, Officer

Eggers is entitled to qualified immunity, which protects him against liability for civil damages.

Ms. Bronnenberg's request for a declaratory judgment (*see* Doc. 9 at p. 9) must be denied because it seeks a declaration aimed at past conduct, but the "Eleventh Amendment does not permit judgments against state officers declaring that they violated federal law in the past." *Johns v. Stewart*, 57 F.3d 1544, 1553 (10th Cir. 1995). Finally, Ms. Bronnenberg's request for an injunction against any future constitutional deprivations (*see* Doc. 9 at p. 9) must also be denied because "the complaint alleged no threatened violations other those specifically charged," yet "the necessary determination [for an injunction to issue] is that there exists some cognizable danger of recurrent violation." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).

**IT IS THEREFORE ORDERED** that Defendant Egger's Motion to Dismiss Plaintiff's Complaint (Doc. 28) is **GRANTED**. Officer Egger is entitled to qualified immunity.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Declaratory Judgment (Doc. 36) and Plaintiff's Motion for Summary Judgment (Doc. 38) are **DENIED**. Final judgment in Defendants' favor and against Plaintiff shall be entered in this matter and the case will be closed.

**DATED:** July 31st, 2019.

Scott W. Skavdahl
United States District Judge

FILED
United States Court of Appeals
Tenth Circuit

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**March 27, 2019**

Elisabeth A. Shumaker
Clerk of Court

TAMI MAE BRONNENBERG,

Plaintiff - Appellant,

v.

BEAU J. EGGAR, arresting officer, et al.,

Defendants - Appellees.

No. 19-8026
(D.C. No. 2:19-CV-00021-SWS)
(D. Wyo.)

## ORDER

This matter is before the court on its own initiative following the opening of the appeal and this court's review of the district court's docket. This court has identified a potential jurisdictional defect and is considering whether to summarily dismiss this appeal. 10th Cir. R. 27.3(B). Briefing on the merits is suspended pending further order of the court. *See* 10th Cir. R. 27.3(C).

Pro se appellant Tami Mae Bronnenberg seeks to appeal the district court's February 25, 2019 *Order on 28 U.S.C. § 1915 Screening of Amended Complaint.* [ECF No. 10]. Although that order dismissed with prejudice the majority of Ms. Bronnenberg's claims, it also held she had "state[d] a plausible claim upon which relief can be granted against Defendant Beau J. Eggar in his individual/personal capacity for false arrest/false imprisonment in violation of the Fourth Amendment." [*Id.* at 11]. Mr. Eggar has accepted

service of the amended complaint, and the Fourth Amendment claim against him for false

arrest/false imprisonment remains pending before the district court.

Accordingly, it appears this court lacks jurisdiction over this appeal. *See* 28 U.S.C.

§ 1291; *see also United States v. Nixon*, 418 U.S. 683, 690-92 (1974) ("The finality

requirement of 28 U.S.C. § 1291 embodies a strong congressional policy against

piecemeal reviews, and against obstructing or impeding an ongoing judicial proceeding

by interlocutory appeals."); *Albright v. Unum Life Ins. Co.*, 59 F.3d 1089, 1092 (10th Cir.

1995) ("Under § 1291, we have jurisdiction only over 'final' decisions of the district

court—that is, those decisions that leave nothing for the court to do but execute

judgment." (citation and internal quotation marks omitted)).

On or before April 16, 2019, Ms. Bronnenberg shall file a written response to this

order, addressing any basis in law for this court to exercise jurisdiction over this appeal.

In the alternative, Ms. Bronnenberg may either: (1) voluntarily dismiss this appeal, *see*

Fed. R. App. P. 42(b); or (2) elect not to file a response to this show cause order, in which

case the court will dismiss her appeal without further notice, *see* 10th Cir. R. 42.1.

Voluntary dismissal of the appeal will not preclude a timely appeal from a final judgment

or otherwise appealable order at a later date.

Entered for the Court
ELISABETH A. SHUMAKER, Clerk

by: Lisa A. Lee
    Counsel to the Clerk

2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 FEB 25  AM 8: 38

STEPHAN HARRIS, CLERK
CASPER

TAMI MAE BRONNENBERG,

    Plaintiff,

v.

                              Case No. 19-CV-21-SWS

BEAU J. EGGAR, Arresting Officer; WILLIAM K.
STRUEMKE, Attorney; SARA L. STRUEMKE,
Secretary; SERVICM LEGAL SERVICES, LLC;
MARLIN D. RICHARDSON, DC; BIG HORN BASIN
CHIROPRACTIC; CITY OF CODY; PARK COUNTY
DETENTION CENTER; BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF PARK;

    Defendants.

---

## ORDER ON 28 U.S.C. § 1915 SCREENING OF AMENDED COMPLAINT

---

    This matter comes before the Court on Ms. Bronnenberg's *pro se* Amended 1983

Civil Rights Complaint Pursuant to 42 USCS §1983 (Doc. 9), filed on February 14, 2019.

Because Ms. Bronnenberg seeks to proceed *in forma pauperis* in this action without the

prepayment of fees (Doc. 2), the litigation process generally begins with the Court

screening her amended complaint under 28 U.S.C. § 1915. *See Buchheit v. Green*, 705

F.3d 1157, 1161 (10th Cir. 2012) (noting that prompt screening, even for cases involving

non-prisoners, "may be a good thing and conserve the resources of defendants forced to

respond to baseless lawsuits"). Ms. Bronnenberg's original civil rights complaint was

dismissed without prejudice upon initial screening for failure to state a plausible claim

upon which relief could be granted. (Doc. 5.) She then sought and received leave to file this amended complaint (Docs. 6, 7), which the Court now screens.

## LAW

Section 1915(e)(2)(B) requires a district court to dismiss the case whenever the court determines the action "fails to state a claim on which relief may be granted or seeks monetary relief against a defendant who is immune from such relief." *See Merryfield v. Jordan*, 584 F.3d 923, 926 (10th Cir. 2009). For § 1915 screening purposes, the Court accepts the Plaintiff's allegations as true and construes all reasonable inferences drawn from those allegations in the light most favorable to the Plaintiff. *See Kay v. Bemis*, 500 F.3d 1214, 1217-18 (10th Cir. 2007).

## DISCUSSION

The underlying basis for Ms. Bronnenburg's amended civil rights complaint seems to be an allegation that Defendant Beau Eggar[1], a law enforcement officer at the relevant time, arrested her on January 31, 2017, on an invalid arrest warrant despite her attempts to explain to him why it was invalid. (Doc. 9 at pp. 3-4.) It appears she was released from detention less than an hour after being booked, ostensibly because the arrest warrant had indeed been canceled. (*Id.*) As for the other defendants, she alleges generally that they are somehow also responsible for her arrest and they conspired together to wrongfully arrest her.

1. **Ms. Bronnenburg has stated a plausible § 1983 claim for false arrest/false imprisonment under the Fourth Amendment against Defendant Beau Egger.**

---

[1] Ms. Bronnenburg also spells this defendant's name as "Egger" in her amended complaint.

Officer Eggar "was relying on" an arrest warrant as his basis for arresting Ms.

Bronnenburg. (Doc. 9 at p. 3.) Attached as "Exhibit A" to her amended complaint is an

"Order Vacating Warrant and Resetting Previously Scheduled Hearing," entered by the

state district judge of the Fifth Judicial District of Wyoming. (Doc. 9 at p. 11.) It was

entered on January 17, 2017, and it ordered "that the Warrant issued January 9, 2017 in

this matter is vacated." (*Id.*) Ms. Bronnenburg alleges she showed this order to Officer

Eggar at the time he arrested her on January 31, 2017, to convince him not to execute the

arrest warrant, but he ignored her and arrested her anyway. (Doc. 9 at pp. 3-4, 5.)

Nowhere in her amended complaint does Ms. Bronnenburg suggest the arrest warrant on

which Officer Eggar relied was somehow invalid on its face (*see generally* Doc. 9), but

its facial validity can be reasonably questioned at this point, particularly considering that

the order vacating the warrant had been filed two weeks prior to Ms. Bronnenburg's

arrest.

Generally, an officer executing an arrest warrant that is valid on its face enjoys

absolute immunity (also known as "quasi-judicial immunity"). "Just as judges acting in

their judicial capacity are absolutely immune from liability under section 1983, official[s]

charged with the duty of executing a facially valid court order enjoy[] absolute immunity

from liability for damages in a suit challenging conduct prescribed by that order." *Moss*

*v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009) (alterations in original) (quoting *Turney v.*

*O'Toole*, 898 F.2d 1470, 1472 (10th Cir. 1990)). However, to be entitled to this absolute

immunity, "the judge issuing the disputed order must be immune from liability in his or

her own right, the officials executing the order must act within the scope of their own

jurisdiction, and the officials must only act as prescribed by the order in question." *Id.* The amended complaint does not suggest whether these absolute-immunity requirements are or are not met. But construing Ms. Bronnenburg's alleges as true and making all reasonable inferences in her favor, as the Court must do at this preliminary stage, the Court finds a plausible claim of false arrest/false imprisonment in violation of the Fourth Amendment has been stated in the amended complaint, and the question remains whether Officer Eggar is entitled to absolute immunity from that claim.

2.   **Ms. Bronnenburg has not stated any other plausible § 1983 claims against Officer Eggar or against any other defendant.**

Ms. Bronnenburg's "Cause of Action" section in her amended complaint attempts to assert several other claims against Officer Eggar and the other defendants, but those allegations do not create viable claims under 42 U.S.C. § 1983 for several reasons.

First, there is no due process claim stated in connection with her false arrest/false imprisonment because there is no allegation that legal process was ever instituted against Ms. Bronnenburg. Indeed, her amended complaint suggests she was released about an hour after booking and nothing more ever came of it. (Doc. 9 at pp. 3-4.) Thus, there is no due process violation stated in her amended complaint. *See Mondragon v. Thompson,* 519 F.3d 1078, 1083 (10th Cir. 2008) (explaining that a false arrest/false imprisonment claim under the Fourth Amendment accrues during "[t]he period of time between an unlawful arrest and the institution of legal process," whereas a due process claim under the Fourteenth Amendment accrues during "[t]he period of time between the institution of [legal] process and its favorable termination").

Second, as to her claims of Wyoming Constitution violations, 42 U.S.C. § 1983 "applies to federal constitutional violations and not to state constitutional violations." *Herrera v. Santa Fe Public Schools*, 41 F. Supp. 3d 1027, 1081 n.123 (D.N.M. 2014); *see also Davis v. Reynolds*, 890 F.2d 1105, 1109 n.3 (10th Cir. 1989) (describing a claim grounded in the state constitution as a state law claim) (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1983)); *Brock v. Herbert*, 2012 WL 1029355, at *2 (D. Utah Mar. 26, 2012) (unpublished) (describing alleged violations of the Utah Constitution as "exclusively state law claims"). To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the U.S. Constitution or federal law, *West v. Atkins*, 487 U.S. 42, 48 (1988); an alleged violation of state law does not amount to a § 1983 claim. However, Ms. Bronnenburg relies on § 1983 as the basis for asserting all her claims, even naming her complaint "Amended 1983 Civil Rights Complaint Pursuant to 42 USCS §1983." (Doc. 9.) Section 1983 does not afford Ms. Bronnenburg the right to bring state law claims in federal court. This principle also precludes her claims alleging the defendants violated state criminal statutes and state rules of criminal procedure.

Third, as to her claims alleging violations of federal criminal statutes (such as kidnapping and conspiracy to kidnap in violation of 18 U.S.C. § 1201), "a plaintiff may not recover civil damages for an alleged violation of a criminal statute." *Shaw v. Niece*, 727 F.2d 947, 949 (10th Cir. 1984). Criminal statutes "do not provide for a private civil cause of action." *Henry v. Albuquerque Police Dep't*, 49 F. App'x 272, 273 (10th Cir. 2002) (unpublished) (stating that 18 U.S.C. §§ 241 and 242 do not create a private civil cause of action); *see also Diamond v. Charles*, 476 U.S. 54, 64-65 (1986) (holding that

private citizens cannot compel enforcement of criminal law); *Andrews v. Heaton*, 483 F.3d 1070, 1076 (10th Cir. 2007) ("criminal statutes that do not provide for a private right of action [] are [] not enforceable through a civil action"). Ms. Bronnenburg's claims that the defendants violated certain criminal statutes are not viable causes of action in this civil lawsuit.

Fourth, her claims alleging the defendants violated the Federal Rules of Criminal Procedure are also incognizable because "rules governing procedure in the federal courts do not give rise to private causes of action." *Good v. Khosrowshahi*, 296 F. App'x 676, 680 (10th Cir. 2008) (unpublished); *see also Duncan v. Jackson Energy Auth.*, No. 1:15-CV-1238-JDB-EGB, 2016 WL 4079033, at *2 (W.D. Tenn. June 28, 2016) (unpublished), *report and recommendation adopted*, No. 15-1238, 2016 WL 4074482 (W.D. Tenn. July 29, 2016) (unpublished) (stating that "[n]either the Federal Rules of Civil Procedure nor the Federal Rules of Criminal Procedure provides" a plaintiff with a private cause of action against a defendant); *Heiken v. Meeks*, No. 2:17-CV-304-WKW, 2018 WL 1163467, at *3 (M.D. Ala. Feb. 12, 2018) (unpublished), *report and recommendation adopted*, No. 2:17-CV-304-WKW, 2018 WL 1157550 (M.D. Ala. Mar. 5, 2018) (unpublished) (holding that a state's rules of criminal procedure "do not create a private right of action for violations of the rules"). Ms. Bronnenburg's claims that the defendants violated certain rules of criminal procedure are not viable causes of action in this civil lawsuit.

Fifth, as to all defendants except Officer Eggar, Ms. Bronnenburg's claims of a mass conspiracy to kidnap or falsely arrest her fail to state a plausible claim upon which

relief can be granted.  Under the U.S. Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), federal pleading "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Gee v. Pacheco*, 627 F.3d 1178, 1184 (10th Cir. 2010) (internal quotation marks omitted).  "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  "In § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities.  Therefore it is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249–50 (10th Cir. 2008) (emphasis in original) (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1970-71 n.10 (2007)).  Ms. Bronnenburg's amended complaint, however, entirely fails to set forth any factual allegations in support of her claims against the remaining defendants.  Ms. Bronnenburg's bald assertions, *e.g.*, that a local attorney and a local chiropractor conspired to have Ms. Bronnenburg falsely arrested so they could hold her "for collections (ransom)" (Doc. 9 at p. 5), are untethered to any supporting factual allegations and constitute no more than speculation and conjecture, which fails to state a plausible claim on which relief can be granted.  "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989); *see also Fuller v. Davis*, 594 F. App'x 935, 939 (10th Cir. 2014)

(unpublished) (affirming the trial court's dismissal of a § 1983 claim of conspiracy because the "plaintiff's conjecture that [a defendant] conspired with other defendants to create an unenforceable no-contact order is too speculative and conclusory" to state a plausible claim for relief). Indeed, most of Ms. Bronnenburg's allegations against the remaining defendants consist of assertions that the defendants have certain duties, *e.g.*, that the local attorney is bound by Wyoming's attorney oath, but never actually alleges those duties were breached (let alone how they were breached). (*See* Doc. 9 at pp. 6-8.) A cause of action unsupported by factual allegations must be dismissed for failure to state a claim on which relief may be granted.

Sixth, concerning the § 1983 claims against the governmental entities (here, the City of Cody, the Park County Detention Center, and the Park County Board of County Commissioners), Ms. Bronnenburg has not identified any policy, custom, or practice as the driving force behind the alleged constitutional violation. Section 1983 does not allow governmental entities to be held vicariously liable for the unlawful acts of their employees under *respondeat superior* principles. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978). That is, they cannot be liable solely because they employed a liable employee. Instead, governmental entities may only be liable under § 1983 for their own unconstitutional conduct, specifically where constitutional deprivation is inflicted pursuant to the governmental entity's policy, custom, or practice. *Monell*, at 690–91, 694. "Locating a policy ensures that a municipality [or other governmental entity] is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those

Page 8 of 12

of the municipality." *Board of County Commissioners of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403–04 (1997).

Here, Ms. Bronnenburg did not identify any policy from the Park County Detention Center or the Board of County Commissioners, let alone a policy that caused her alleged constitutional deprivation. (*See* Doc. 9 at p. 8.) As to the City of Cody, Ms. Bronnenburg identified a city policy that prohibits its employees from discriminating against or harassing others. (Doc. 9 at p. 7.) She did not explain how this policy caused her alleged constitutional deprivation. (*See id.*) In fact, it seems she has asserted the defendants *violated* this policy and their policy violation led to her alleged constitutional deprivation. (*See id.*) This is no basis for municipal liability under § 1983, though. As noted above, the City of Cody cannot be held liable under § 1983 for the illegal conduct of its employees unless the city caused such illegal conduct through a city policy, custom, or practice. Ms. Bronnenburg's allegation here is that one or more city employees caused her alleged constitutional violation because they failed to follow the city's non-discrimination/non-harassment policy, but this is the exact opposite of the municipal liability allowed under § 1983.

Seventh and finally, Ms. Bronnenburg sued each defendant "Individually, Personally, City AND County Officially" (sic). (Doc. 9 at pp. 1-3 (emphasis in original).) It is reasonable to construe this language as Ms. Bronnenburg's attempt to sue the defendants in both their individual and official capacities. However, official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)

(quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n.55 (1978)). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." *Id.* at 166 (internal citation omitted). Because the Court determined above that Ms. Bronnenburg failed to state plausible claims against the governmental entities, the official-capacity claims must be dismissed along with those governmental-entity claims because they are one and the same.

**3.**   **All claims except for false arrest/false imprisonment against Defendant Eggar are dismissed with prejudice because further amendment would be futile.**

When dismissing *pro se* claims for failure to state a plausible claim upon which relief can be granted, "the district court should allow a plaintiff an opportunity to cure technical errors or otherwise amend the complaint when doing so would yield a meritorious claim." *Curley v. Perry*, 246 F.3d 1278, 1284 (10th Cir. 2001). "Pro se litigants are to be given reasonable opportunity to remedy the defects in their pleadings." *Hall v. Bellmon*, 935 F.2d 1106, 1110 n.3 (10th Cir. 1991).

The Court dismisses with prejudice all claims except the false arrest/false imprisonment claim against Defendant Eggar because Ms. Bronnenburg was previously provided an opportunity to amend her complaint to state plausible claims for relief. (*See* Doc. 5 (dismissing without prejudice the original complaint); Doc. 7 (granting request for leave to amend the original complaint).) Ms. Bronnenburg was provided the opportunity to cure the deficiencies in her original complaint and did so with regard to her false

arrest/false imprisonment claim under the Fourth Amendment against Defendant Eggar. She has not cured her other pleading deficiencies, though, and after two bites at the same apple, the Court finds her repeated failures to plausibly state her other claims do not warrant additional amendment. Consequently, the Court concludes allowing further amendment would be futile.

## ORDER

**IT IS THEREFORE ORDERED** that the amended complaint (Doc. 9) states a plausible claim upon which relief can be granted against Defendant Beau J. Eggar in his individual/personal capacity for false arrest/false imprisonment in violation of the Fourth Amendment.

**IT IS FURTHER ORDERED** that the Clerk of Court shall serve Defendant Beau J. Eggar, in his individual/personal capacity, as follows:

1. The Clerk shall send Defendant Eggar a copy of the complaint, a notice of lawsuit, and a copy of this Order on 28 U.S.C. § 1915 Screening of Amended Complaint, and the Clerk shall request Defendant Eggar to waive service of a summons in the manner set forth in Fed. R. Civ. P. 4(d); and

2. If Defendant Eggar fails to return a waiver of service within thirty (30) days from the date on which the request for waiver was sent, the Clerk of Court shall issue a summons for Defendant Eggar and shall deliver the summons (along with a copy of the complaint and this Order) to the United States Marshal for service on Defendant Eggar pursuant to Fed. R. Civ. P. 4(c)(3).

**IT IS FURTHER ORDERED** that Defendant Eggar shall serve an answer within twenty-one (21) days of being served the summons and complaint, or, if service of the summons is timely waived under Fed. R. Civ. P. 4(d), then within sixty (60) days after the date when the request for waiver was sent.

**IT IS FURTHER ORDERED** that all other claims alleged in the amended complaint are **dismissed with prejudice** under 28 U.S.C. § 1915(e)(2)(B)(ii).

**IT IS FURTHER ORDERED** that Ms. Bronnenburg's Application to Proceed in District Court Without Prepaying Fees or Costs (Doc. 2) is **granted** under 28 U.S.C. § (a). However, "like any *ifp* litigant, [Ms. Bronnenburg] remains liable for the full amount of the filing fee." *Brown v. Eppler*, 725 F.3d 1221, 1231 (10th Cir. 2013); *see also Robbins v. Switzer*, 104 F.3d 895, 898 (7th Cir. 1997) ("[A]ll § 1915(a) does for any litigant is excuse the pre-payment of fees. Unsuccessful litigants are liable for fees and costs and must pay when they are able.").

**IT IS FINALLY ORDERED** that Ms. Bronnenburg's "Motion to Reconsideration" (Doc. 8) is **denied as moot** because the Court has herein screened anew her amended complaint.

**DATED:** February 25th, 2019.

Scott W. Skavdahl
United States District Judge

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 MAR 12  AM 11: 42

STEPHAN HARRIS, CLERK
CASPER

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| TAMI M. BRONNENBERG<br><br>Plaintiff,<br><br>v.<br><br>BEAU J. EGGAR, Arresting Officer; WILLIAM K. STRUEMKE, Attorney; SARA L. STRUEMKE, Secretary; SERVICM LEGAL SERVICES, LLC; MARLIN D. RICHARDSON, DC; BIG HORN BASIN CHIROPRACTIC; CITY OF CODY; PARK COUNTY DETENTION CENTER; BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF PARK;<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 19-CV-021-S<br><br><br>AMENDED<br>1983 CIVIL RIGHT<br>COMPLAINT PURSUANT<br>TO 42 USCS §1983 |

### OBJECTION.

Comes now the plaintiff above mentioned, Ms. Bronnenberg, pro-se, and

respectfully objects, pursuant to **Federal Rules of Civil Procedure, Rule 12 (a) (1) (C)**;

**Federal Rules of Evidence, Rules 103 (a) (1); 402**, in part, to the Order on 28

U.S.C.§1915 Screening of Amended Complaint as follows:

Ms. Bronnenberg is not a prisoner within the meaning of the Prison Litigation

Reform Act of 1995 (PLRA), see 28 U.S.C. §1915(h). See also, Merryfield v. Jordan, 584

F.3d 923 (10th Cir. 2009). The screening requirement of 28 U.S.C. §1915A (a) applies

only to prisoner complaints against government officials. "It simply does not require

district courts to review the merits of every claim that comes before them in an IFP (in

1

forma pauperis status) motion, and **we decline to read in such an extensive duty absent statutory language to that effect.**" See Buchheit v. Green, 705 F3d 1157 at 1161 (10th Cir. 2012). We think an affidavit is sufficient which states that one cannot because of his poverty 'pay or give security for the costs * * * and still be able to provide' himself and dependents 'with the necessities of life.' To say that no persons are entitled to the statute's benefits until they have sworn to contribute to payment of costs, the last dollar they have or can get, and thus make themselves and their dependents wholly destitute, would be to construe the statute in a way that would throw its beneficiaries into the category of public charges. **Adkins v. E. L du Pont De Nemours & Co.** 335 U.S. 331 at 339, 69S. Ct.85, 93 L. Ed. 43 **(1948)**. "A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991); see also, e.g. Ledbetter v. City of Topeka, 318 F.3d 1183, 1187 (10th Cir. 2003).

**Federal Rule of Civil Procedure, Rule 8(a) (2)** provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Derived from Conley v. Gibson: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his (her) claim which would entitle him (her) to relief." 355 U.S. 41, 45-46, 78 S. Ct. 99, 21 L.Ed.2d 80 (1957) (emphasis added); see e.g. Kikumura v. Osagie, 461 F.3d 1269, 1294 (10th Cir. 2006).

The new formulation is less then pellucid referring to the "Conflicting signals" calling the opinion "confusing" The opinion seeks to find a middle ground between "heightened fact pleading," which is expressly rejected, Twombly,127 S. Ct. at 1974; see also id. At 1964 (a complaint "does not need detailed factual allegations"). The most difficult question in interpreting Twombly is what the Court means by "plausibility" See Robbins v. Oklahoma, 519 F.3 1242 at 1247 (10th Cir. 2008).

2

This short essay examines the seemingly contradictory definitions and associations of the word "plausibility" which the Supreme Court unexpectedly elevated to a key gate keeping role for all of federal civil litigation in its rulings altering the pleading standard in Twombly and Iqbal, [Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868, 2009 U.S. Lexis 3472 (2009). Justices, judges and commentators have not focused on what "plausibility" means, for some good reasons; it carries with it connotations of the "reasonable" and "fair" but also "superficial," "often specious" and "pretext." I can offer only a plausibility defense of the seemingly contradictory meanings of this word deployed to regulate allegations in federal complaints, for which the transparency of its vice is, for better and for worse, its main virtue. By Garrett, Brandon L., Applause for the Plausible **February 14, 2014**). University of Pennsylvania Law Review Online, **2014**; Virginia Public Law and Legal Theory Research Paper No. 2014-17. Available at SSRN: https://ssrn.com/abstract-2395912

"A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Twombly at 1965 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed.2d 90 (1974). See, Robbins v. Oklahoma, 519 F.3d 1242 at 1247 (10th Cir. 2008).

**"Plausibility" is ambiguous, open to more than one interpretation; having a double meaning.** All defendants, above mentioned, violated Ms. Bronnenberg's constitutional rights (False Arrest/False imprisonment), under the Forth, Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, and those rights were clearly established at the time.

The Supreme Court in **Dunaway v. New York**, 442 U.S. 200 at 216, 99 S. Ct. 224, 860 L. Ed. 2d 824 **(1979)** stated, "We accordingly hold that the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation."

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." This provision binds the state and its officers, including local police. See, **Wolf v. Colorado**, 338 U.S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 **(1949)**. The Fourth Amendment requires that

3

warrants issue "upon probable cause, supported by Oath or affirmation." The significance

of the oath requirement is **"that someone must take the responsibility for the facts**

**alleged, giving rise to the probable cause for the issuance of a warrant."** United

States ex rel. Pugh v. Pate, 401 F.2d 6 (7th Cir. 1968); See also Frazier v. Roberts, 441

F.2d 1224 (8th Cir. 1971). To effect an arrest there must be actual or constructive seizure

or detention of the person arrested, or his voluntary submission to custody, and the

restraint must be under real or pretended legal authority. Neilson v. State, 599 P.2d 1326,

1979 Wyo. LEXIS 447 (Wyo. 1979), **cert. denied,** 444 U.S. 1079, 100 S. Ct. 1031, 62 L.

Ed. 2d 763, 1980 U.S. LEXIS 755 (U.S. 1980). Where the claim is that the police have

improperly searched or seized something, the claimant must have had a legitimate

expectation of privacy as to that thing. Factors to be considered in making this

determination include: (1) the precautions taken in order to maintain one's privacy; (2)

the likely intent of the drafters of the United States and Wyoming constitutions; (3) the

property rights the claimant possessed in the invaded area; and (4) the legitimacy of the

individual's possession of or presence in the property which was searched or seized.

Parkhurst v. State, 628 P.2d 1369, 1981 Wyo. LEXIS 347 (Wyo.), **cert. denied,** 454 U.S.

899, 102 S. Ct. 402, 70 L. Ed. 2d 216, 1981 U.S. LEXIS 3986 (U.S. 1981). **42 U.S.C. §**

**1983,** which provides that every "person" who, under color of any statute, ordinance,

regulation, custom, or usage of any State subjects, or "causes to be subjected," any person

to the deprivation of any federally protected rights, privileges, or immunities shall be

civilly liable to the injured party.

Parties can sue a municipality that has violated their constitutional rights "under

color of any statute, ordinance, regulation, custom, or usage." 42 U.S.C. § 1983 **(2015);**

4

see also **Monell**, 436 U.S. at 690 (holding that municipalities are "persons" for purposes of § 1983). A governmental entity, such as the Mansfield I.S.D., can be sued and subjected to monetary damages and injunctive relief under 42 U.S.C. § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right. Board of the Cty. Comm'rs of Bryan Cty, v. Brown, 520 U.S. 397, 403 (1997); **Monell**, 436 U. S. at 694. See, **Bailey v. Mansfield Independent School District; Dr. Jim Vaszauskas; and Dr. Kimberly Cantu, Civil Action No. 3:18-CV-1161-L.**, United States District Court, N.D. Texas, Dallas Division. **January 10, 2019.**

**Monell v. Department of Social Services of the city of New Your et al.**, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 **(1978) Held:** 2. Local governing bodies (and local officials sued in their official capacities) can, therefore, be sued directly under § 1983 for monetary, declaratory, and injunctive relief in those situations where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy. In addition, local governments, like every other § 1983 "person," may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such custom has not received formal approval through the government's official decision making channels. **Pp. 436 U.S. 690-691.** 4. (c) In addition, municipalities cannot have arranged their affairs on an assumption that they can violate constitutional rights for an indefinite period; accordingly, municipalities have no reliance interest that would support an absolute immunity. **Pp. 436 U.S. 699-700.** 5. Local governments sued under § 1983 cannot be entitled to an absolute immunity, lest today's decision "be drained of meaning," Scheuer

5

v. Rhodes, 416 U.S. 232, 416 U.S. 248. **P. 436 U.S. 701. Owen v. City of**

**Independence,** 445 U.S. 622 **(1980)** Held: A municipality has no immunity from liability

under § 1983 flowing from its constitutional violations, and may not assert the good faith

of its officers as a defense to such liability. **Pp. 445 U.S.635-658.** Since a municipality

has no "discretion" to violate the Federal Constitution. **Pp.445 U.S. 644-650.**

The Supreme Court, in **Hafer v. Melo, et al.,** 502 U.S. 21, 112 S.Ct. 358, 116

L.Ed.2d 301 **(1991).** Justice O'Conner, held that: (1) state officers may be personally

liable for damages under § 1983 based upon actions taken in their official capacities; (2)

officers' potential liability is not limited to acts under color of state law that are outside

their authority or not essential to operation of state government, but also extends to acts

within their authority and necessary to performance of governmental functions; and (3)

Eleventh Amendment does not erect barrier against suits to impose individual and

personal liability on state officers under § 1983. Because the real party in interest in an

official-capacity suit is the governmental entity and not the named official, "the entity's

'policy or custom' must have played a part in the violation of federal law." *** Personal-

capacity suits, seek to impose individual liability upon a government officer for actions

taken under color of state law. Thus, "on the merits, to establish personal liability in a §

1983 action, it is enough to show that the official, acting under color of state law, caused

the deprivation of a federal right." Id., at 166, 105 S.Ct., at 3105. While the plaintiff in a

personal-capacity suit need not establish a connection to governmental "policy or

custom," **Id., 502 U.S. at 25.** ("A state official in his or her official capacity, when sued

for injunctive relief, would be a person under § 1983 because 'official-capacity actions

for prospective relief are not treated as actions against the State'") (quoting Graham, 473

6

U.S., at 167, n. 14, 105 S.Ct., at 3106, n. 14). **Id., 502 U.S. at 27.** Congress enacted §

1983 " 'to enforce provisions of the Fourteenth Amendment against those who carry a

badge of authority of a State and represent it in some capacity, whether they act in

accordance with their authority or misuse it.'" Scheuer v. Rhodes, 416 U.S. 232, 243, 94

S. Ct. 1683, 1689, 40 L.Ed.2d 90 (1974) (quoting Monroe v. Pape, supra, 365 U.S., at

171-172, 81 S.Ct.., at 475-476). **Id., 502 U.S. at 28.** "Since Ex parte Young, 209 U.S.

123 28 S.Ct. 441, 52 L.Ed. 714 (1908)," we said, "it has been settled that the Eleventh

Amendment provides no shield for a state official confronted by a claim that he had

deprived another of a federal right under the color of state law." Scheuer, 416 U.S., at

237, 94 S.Ct., at 1687. While the doctrine of Ex parte Young does not apply where a

plaintiff seeks damages from the public treasury, damages awards against individual

defendants in federal courts "are a permissible remedy in some circumstances

notwithstanding the fact that they hold public office." 416 U.S., at 238, 94 S.Ct., at 1687.

That is, the Eleventh Amendment does not erect a barrier against suits to impose

"individual and personal liability" on state officials under § 1983. Ibid. **Id., 502 U.S. at**

**30, 31.** We hold that state officials, sued in their individual capacities, are "persons"

within the meaning of § 1983. The Eleventh Amendment does not bar such suits, nor are

state officers absolutely immune from personal liability under § 1983 solely by virtue of

the "official" nature of their acts. **Id., 502 U.S. at 31.**

    Marlin D. Richardson; Big Horn Basin Chiropractic,  made a contract or

agreement to hiring William K. Struemke, Attorney; Servicm Legal Services, LLC, to use

the judicial process to make a collection from Ms. Bronnenberg. See, **Amended 1983**

**Civil Rights Complaint Exhibit –A-,** (Caption of the Order Vacating Warrant And

7

Resetting Previously Scheduled Hearing) which crossed the line and violated Federal Constitutional Rights, (False Arrest/False imprisonment), under the Forth, Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, and those rights were clearly established at the time. And violated Park County Policy Manual, (July 1, 2017) Chapter 4, page 4-1, which states in part, ***. Park County is an equal opportunity employer: Pursuant to Title VI of the Civil Rights Act of 1964 Park County prohibits discrimination. And City of Cody, Personnel and Policy Manual, Section 3. See, Amended 1983 Civil Rights Complaint C. Cause of Action, a) Count 1, Paragraph 10, Page 7.

Officer Beau Egger used City and County Property, his patrol car and the Park County Detention Center as City and County jail and administrative office facilities to violate Federal Constitutional Rights, (False Arrest/False imprisonment), under the Forth, Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, and those rights were clearly established at the time. I believe there is a contract or agreement between the City of Cody and Park County to jointly establish and operate, police protection agency facilities and jail and administrative office facilities or any combination thereof. See, W.S. 18-2-108). See, Amended 1983 Civil Rights Complaint, C. Cause of Action, Paragraph 12, Page 8. Officer Egger used a two weeks old Vacated Warrant drafted by William K. Struemke, Attorney, Servicm Legal Services, LLC, to violate Federal Constitutional Rights, (False Arrest/False imprisonment), under the Forth, Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, and those rights were clearly established at the time, instead of giving

8

notice of the vacated order to Officer Beau Egger or the City or County Law

Enforcement Center. **See, Exhibit –A-,** lower left hand side where it states Copies to:

William K. Struemke.

"**A lawyer shall not: (a) unlawfully obstruct \*\*\* or conceal a document \*\*\*".
See, Rules of Professional Conduct, Rule 3.4 (a). It is professional misconduct for a
lawyer to: (a)** violate or attempt to violate the Rules of Professional Conduct; knowingly
assist or induce another to do so, or do so through the acts of another.**(b)** commit a
criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as
a lawyer in other respects; **(c)** engage in conduct involving dishonesty, fraud, deceit or
misrepresentation; **(d)** engage in conduct that is prejudicial to the administration of
justice; **(e)** state or imply an ability to influence improperly a government agency or
official or achieve results by means that violate the Rules of Professional Conduct or
other law; **Id., Rule 8.4.**

**Federal Rules of Civil Procedure, Rule 17 (b)** CAPACITY TO SUE OR BE
SUED. Capacity to sue or be sued is determined as follows: (1) for an individual who is
not acting in a representative capacity, by the law of the individual's domicile; (2) for a
corporation, by the law under which it was organized; and (3) for all other parties, by the
law of the state where the court is located, except that: (A) a partnership or other
unincorporated association with no such capacity under that state's law may sue or be
sued in its common name to enforce a substantive right existing under the United States
Constitution or laws; and (B) 28 U.S.C. §§754 and 959(a) govern the capacity of a
receiver appointed by a United States court to sue or be sued in a United States court.

**Federal Rules of Evidence, Rules 301** provides, for **presumptions in civil cases
only.** A presumption imposes on the party against whom it is directed the burden of going

forward with evidence to rebut or meet the presumption. F.R.E., Rule 302 provides, "a

presumption respecting a fact which is an element of a claim or defense as to which state

law provides the rule of decision is determined in accordance with state law." The **Eric v.**

**Thompson doctrine,** 304 U.S. 64 **(1938)** of applying state law where it provides a rule of

decision applies to presumptions. However, only where the issue or claim "has its source

in state law" (Maternity Yours, Inc v. Your Maternity Shop, Inc., 234 F.2d 538 **(1956).**

F.R.E., Rule 501 provides that, "in a civil case, state law governs privilege regarding

a claim or defense for which state law supplies the rule of decision." "**These rules shall**

9

be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and **promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." See, Federal Rules of Evidence, Rule 102.** The relevant question, to be answered under state law, is whether a particular official is a policy maker to whom the local government has delegated policy-decision making authority.

"This court has the same right, and can, if it deem it proper, decide the local questions only, and omit to decide the federal questions, or decide them adversely to the party claiming their benefit. Horner v. United States, 143 U.S. 570, 576, 36 S. L. ed. 266, 268, 12 Sup. Ct. Rep. 522; Fallbrook Irrig. Dist. v. Bradley, 164 U.S. 112, 154, 41 S. L. ed. 369, 387, 17 Sup. Ct. Rep. 56; Penn Mut. L. Ins. Co. v. Austin, 168 U.S. 685, 694, 42 S. L. ed. 626, 630, 18 Sup. Ct. Rep. 223; Burton v. United States, 196 U.S. 283, 295, 49 S. L. ed. 482, 485, 25 Sup. Ct. Rep. 243; Williamson v. United States, 207 U.S. 425, 52 L. ed. 278, 28 Sup. Ct. Rep. 163; People's Sav. Bank v. Layman, 134 Fed. 635; Michigan R. Tax Cases, 138 Fed. 223." **See, Siler v. Louisville & N. R. CO.** (1909) 213 U.S. 175, at 191.

## CONCLUSION.

The claims against the other defendants mentioned above should not be dismissed with prejudice under 28 U.S.C. §1915(e) (2) (B) (ii).

DATED this 9th day of March 2019.

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

## CERTIFICATE OF SERVICE.

I, Tami M. Bronnenberg, Pro-se, swear and certify that I mailed this true and correct original copy of the above Objection for the Court, (a copy for Ms. Bronnenberg's stamped copy with a pre-paid stamped self addressed envelope to be mailed to her), pursuant to **Federal Rules of Civil Procedure, Rule 12 (a) (1) (C); Federal Rules of Evidence, Rules 103 (a) (1); 402** to the United States District Court Clerk's Office, 111 S. Wolcott, Room 121, Casper, Wyoming 82601 on this day of March 9th, 2019.

Tami M. Bronnenberg, Pro-Se

10

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 FEB 28  AM 9:00

STEPHAN HARRIS, CLERK
CASPER

TAMI MAE BRONNENBERG,

    Plaintiff,

    v.

BEAU J. EGGAR, Arresting Officer; WILLIAM K.
STRUEMKE, Attorney; SARA L. STRUEMKE,
Secretary; SERVICM LEGAL SERVICES, LLC;
MARLIN D. RICHARDSON, DC; BIG HORN BASIN
CHIROPRACTIC; CITY OF CODY; PARK COUNTY
DETENTION CENTER; BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF PARK;

    Defendants.

Case No. 19-CV-21-SWS

---

## ORDER DENYING MOTION FOR APPOINTMENT OF COUNSEL

---

This matter comes before the Court on the Plaintiff's Motion for Appointment of Counsel (Doc. 3).

"There is no constitutional right to appointed counsel in a civil case." *Durre v. Dempsey*, 869 F.2d 543, 547 (10th Cir. 1989). The United States Code, however, permits the Court to "request an attorney to represent" an indigent party in a civil case where appropriate. 28 U.S.C. § 1915(e)(1). Section 1915(e)(1) does not create any right to counsel, and it does not allow the Court to "appoint" counsel because it "merely empowers a court to *request* an attorney to represent a litigant proceeding *in forma pauperis*." *Mallard v. U.S. Dist. Ct. S. Dist. Iowa*, 490 U.S. 296, 301-02 (1989) (emphasis in original) (addressing former § 1915(d), which is the predecessor to current §

1915(e)(1)); *see also Amin v. Voigtsberger*, 560 F. App'x 780, 786 (10th Cir. 2014) (unpublished) ("Under 28 U.S.C. § 1915(e)(1), the district court lacked authority to appoint an attorney.... Instead, the court could simply request an attorney to take the case.").

Plaintiff was previously permitted to proceed *in forma pauperis* in this matter. The Tenth Circuit has "directed district courts to evaluate, in connection with a request to appoint counsel under § 1915, the merits of a [plaintiff's] claims, the nature and complexity of the factual and legal issues, and the [plaintiff's] ability to investigate the facts and present his claims." *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1115 (10th Cir. 2004)

There are no unusual or exceptional circumstances that would warrant the appointment of counsel for Plaintiff in this case. *See Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995). Specifically, the Court finds that the instant matter is not so factually or legally complex as to demand a request for counsel. The totality of the circumstances here do not support requesting an attorney to represent Plaintiff.

**IT IS THEREFORE ORDERED** that the Plaintiff's Motion for Appointment of Counsel (Doc. 3) is **DENIED.**

DATED: February 27ᵗʰ, 2019.

Scott W. Skavdahl
United States District Judge

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414
(307) 899-2150

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TAMI M. BRONNENBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 19-CV-021-S |
| | ) | |
| BEAU J. EGGAR, Arresting Officer; WILLIAM K. | ) | |
| STRUEMKE, Attorney; SARA L. STRUEMKE, | ) | |
| Secretary; SERVICM LEGAL SERVICES, LLC; | ) | |
| MARLIN D. RICHARDSON, DC; BIG HORN BASIN | ) | **AMENDED** |
| CHIROPRACTIC; CITY OF CODY; PARK COUNTY | ) | 1983 CIVIL RIGHT |
| DETENTION CENTER; BOARD OF COUNTY | ) | COMPLAINT PURSUANT |
| COMMISSIONERS OF THE COUNTY OF PARK; | ) | TO 42 USCS §1983 |
| | ) | |
| Defendants. | ) | |

## OBJECTION.

Comes now the plaintiff above mentioned, Ms. Bronnenberg, pro-se, and

respectfully objects, pursuant to **Federal Rules of Civil Procedure, Rule 12 (a) (1) (C);**

**Federal Rules of Evidence, Rules 103 (a) (1); 402.**

28 U.S.C. §1915, Proceedings in forma pauperis, provides in part, **(b)** any court

of the United States may authorize the commencement, prosecution or defense of any

suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees

or security therefor, by a person who submits an affidavit that includes a statement of all

assets ***.

(c) Upon the filing of an affidavit in accordance with *** subsection (b), the court may direct payment by the United States of the expenses of (1) printing the record on appeal in any civil or criminal case, if such printing is required by the appellate court; (2) preparing a transcript of proceedings before a United States magistrate judge in any civil or criminal case, if such transcript is required by the district court, in the case of proceedings conducted under section 636 (b) of this title or under section 3401 (b) of title 18, United States Code; and (3) printing the record on appeal if such printing is required by the appellate court, in the case of proceedings conducted pursuant to section 636 (c) of this title. Such expenses shall be paid when authorized by the Director of the Administrative Office of the United States Courts.

(d) The officers of the court shall issue and serve all process, and perform all duties in such cases. Witnesses shall attend as in other cases, and the same remedies shall be available as are provided for by law in other cases. (e) (1) the court may request an attorney to represent any person unable to afford counsel.

[See, 42 U.S.C. 2000a-3 (a) (appoint; complainant seeking injunction under civil rights laws). These federal statutes empowering courts to assign or appoint counsel were all passed well after 1915 attained its present broad coverage. See Act of Aug. 10, 1956, Pub. L. 1028, 827, 70A Stat. 46, 10 U.S.C. 827; Pub. L. 88-455, 78 Stat. 552 (1964), 18 U.S.C. 3006A; Pub. L. 91-452, 84 Stat. 934 (1970), 18 U.S.C. 3503(c); Pub. L. 95-144, 91 Stat. 1218 (1977), 18 U.S.C. 4109; Pub. L. 95-608, 92 Stat. 3071 (1978), 25 U.S.C. 1912 (b); Pub. L. 88-352, 78 Stat. 241 (1964), 42 U.S.C. 1971 (f); Pub. L. 88-352, 78 Stat. 244 (1964), 42 U.S.C. 2000 a-3 (a); Pub. L. 88-352, 78 Stat. 259 (1964), 42 U.S.C. 2000e-5 (f) (1); Pub. L. 89-793, 80 Stat. 1445 (1966), 42 U.S.C. 3413 (1). See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 306, 307 (1989). Footnote 7.]

(h) As used in this section, the term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.

Interpretation of a statute must begin with the statute's language E. g., United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989); Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985); Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 300, 301 **(1989).**

Ms. Bronnenberg is not a prisoner within the meaning of the Prison Litigation Reform Act of 1995 (PLRA), see 28 U.S.C. §1915 (h). See also, Merryfield v. Jordan, 584 F.3d 923 (10th Cir. 2009). The screening requirement of 28 U.S.C. §1915A (a) applies only to prisoner complaints against government officials. "It simply does not require district courts to review the merits of every claim that comes before them in an IFP (in forma pauperis status) motion, and **we decline to read in such an extensive duty absent statutory language to that effect."** See Buchheit v. Green, 705 F3d 1157 at 1161 (10th Cir. 2012). We think an affidavit is sufficient which states that one cannot because of his poverty 'pay or give security for the costs * * * and still be able to provide' himself and dependents 'with the necessities of life.' To say that no persons are entitled to the statute's benefits until they have sworn to contribute to payment of costs, the last dollar they have or can get, and thus make themselves and their dependents wholly destitute, would be to construe the statute in a way that would throw its beneficiaries into the category of public charges. Adkins v. E. I. du Pont De Nemours & Co. 335 U.S. 331 at 339 (1948).

Report of the House Judiciary Committee states that the bill containing 1915(d) was designed to enable persons unable to afford legal representation to avail themselves of the courts, as "[m]any humane and enlightened States" that had similar laws allowed

them to do. H. R. Rep. No. 1079, 52d Cong., 1st Sess., 2 (1892). See, Mallard v. U.S.

Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 302 (1989).

Some state statutes providing assignment or appointment of counsel are Ark. Stat. 1053 (1884) (assign); Ill. Rev. Stat., ch. 26, 3 (1845) (assign); Ind. Rev. Stat., Vol. 2, pt. 2, ch. 1, Art. 2, 15 (1852) (assign); Ky. Stat. 884 (1915) (Act of May 27, 1892) (assign); Mo. Rev. Stat. 2918 (1889) (assign); N. J. Gen. Stat., Vol. 2, Practice 369, p. 2598 (1896) (enacted 1799) (assign); 1876 N. Y. Laws, ch. 448, Art. 3, 460 (assign); 1869 N.C. Pub. Laws, ch. 96, 2 (assign); Tenn. Code 3980 (1858) (appoint and assign); Tex. Rev. Stat., Art. 1125 (1879) (enacted 1846) (appoint); Va. Code Ann. 3538 (1904) (appeared in 1849 Code) (assign); W. Va. Code, ch. 138, 1 (1891) (assign). Cf. N. Mex. Comp. Laws 2289 (1884) (judge may appoint attorney to represent Territory if Territory's attorneys are unable to attend by reason of sickness or inability); Nev. Comp. Laws 3126 (1900) (court may appoint attorney to appear on behalf of absent defendant in certain contract actions). See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 303 (1989).

28 U.S.C. 1915 (a), as originally drafted it apparently applied only to suits

commenced by an indigent person. Act of July 20, 1892, ch. 209, 1, 27 Stat. 252. ***

And the floor debate in the House speaks only of poor persons suing as plaintiffs. See 23

Cong. Rec. 5199 (1892).  See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at

306 (1989). Footnote 5.

These federal statutes empowering courts to assign or appoint counsel were all passed well after 1915 attained its present broad coverage. See Act of Aug. 10, 1956, Pub. L. 1028, 827, 70A Stat. 46, 10 U.S.C. 827; Pub. L. 88-455, 78 Stat. 552 (1964), 18 U.S.C. 3006A; Pub. L. 91-452, 84 Stat. 934 (1970), 18 U.S.C. 3503(c); Pub. L. 95-144, 91 Stat. 1218 (1977), 18 U.S.C. 4109; Pub. L. 95-608, 92 Stat. 3071 (1978), 25 U.S.C. 1912(b); Pub. L. 88-352, 78 Stat. 241 (1964), 42 U.S.C. 1971(f); Pub. L. 88-352, 78 Stat. 244 (1964), 42 U.S.C. 2000a-3(a); Pub. L. 88-352, 78 Stat. 259 (1964), 42 U.S.C. 2000e-5(f)(1); Pub. L. 89-793, 80 Stat. 1445 (1966), 42 U.S.C. 3413(1). See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 307 (1989). Footnote 7.

The fact that a court's power to require a lawyer to render assistance to the indigent is firmly rooted in the authority to define the terms and conditions upon which members are admitted to the bar, Frazier v. Heebe, 482 U.S. 641 (1987); United States v. Hvass, 355 U.S. 570 (1958), 3 and to exercise "those powers necessary to protect the functioning of its own processes." Young v. United States ex rel. Vuitton et Fils S. A., 481 U.S. 787, 821 (1987) (SCALIA, J., concurring in judgment). Cf. Sparks v. Parker, 368 So.2d 528 (Ala.) (rejecting constitutional challenges to compelled representation of indigent defendants), appeal dism'd, 444 U.S. 803 (1979). The lawyer's duty to provide professional assistance to the poor is part of the ancient traditions of the bar long

recognized by this Court and the courts of the several States. *** "Attorneys are officers of the court, and are bound to render service when required by such an appointment." Powell v. Alabama, 287 U.S. 45, 73 (1932). *** Congress intended to "open the United States courts" to impoverished litigants and "to keep pace" with the laws of these "[m]any humane and enlightened States." H. R. Rep. No. 1079, 52d Cong., 1st Sess., 1-2 (1892). *** To be faithful to the congressional design of ensuring the poor litigant equal justice whether the suit is prosecuted in federal or state court, the statute should be construed to require counsel to serve, absent good reason, when requested to do so by the court. See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 312, 313-315 (**dissenting**) (1989).

"An Act providing when plaintiff may sue as a poor person and when counsel shall be assigned by the court." Ch. 209, 27 Stat. 252. Every contemporary decision uses the word "assign" to describe the judge's authority to secure counsel for parties under 1915(d). See Boyle v. Great Northern R. Co., 63 F. 539 (CC Wash. 1894); Whelan v. Manhattan R. Co., 86 F. 219, 220-221 (CC SDNY 1898); Brinkley v. Louisville & N. R. Co., 95 F. 345, 353 (CC WD Tenn. 1899); Phillips v. Louisville & N. R. Co., 153 F. 795 (CC ND Ala. 1907), aff'd, 164 F. 1022 (CA5 1908); United States ex rel. Randolph v. Ross, 298 F. 64 (CA6 1924). It is evident that the drafters of this statute understood these terms to impose similar obligations and simply assumed that members of our profession would perform their assigned tasks when requested to do so by the court. See, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 312, 316 (**dissenting**) (1989).

Because plaintiff is preceding pro se, this court will liberally construe her pleadings. **Cf.**, Haines V. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 595, 30 L. Ed.2d 652 **(1972)**. Durre v. Dempsey, 869 F.2d 543 at 545 **(10th Cir. 1989)**. Pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers. **Cf.**, Haines, 404 U.S. at 520, 92S. Ct. at 595. Durre v. Dempsey, 869 F.2d 543 at 547 (10th Cir. 1989); Hall v. Bellmon, 935 F.2d 1106, 1110 **(10th Cir. 1991)**; see also, e.g. Ledbetter v. City of Topeka, 318 F.3d 1183, 1187 **(10th Cir. 2003)**.

We have previously directed district courts to evaluate, in connection with a request to appoint counsel under § 1915, *** the nature and complexity of the factual and legal issues. Rucks v. Boergermann, 57 F.3d 978 at 979 (10th Cir. 1995); see also, Macline v. Freake, 650 F.2d 885, 887-89 (7th Cir.1981). **Cf.**, Hill V. SmithKline Beecham Corp., 393 F.3d 1111, at 1115 (10th Cir. 2004). In order to be liable pursuant to

5

§ 1983, a defendant must have personally participated in the alleged deprivation. Meade v. Grubbs, 841 F. 2d 1512 at 1527-58 (10th Cir. 1988); Durre v. Dempsey, 869 F.2d 543 at 548 (10th Cir. 1989). See, Amended 1983 Civil Rights Complaint Exhibits –A- thru –F.

I believe the statute has become unconstitutional by removing "indigent person" from the statute in violation of the Equal Protection Clause and Due Process Clause of the 14th Amendment see Buchheit v. Green, Supra, 705 F3d 1157 at 1161 (10th Cir. 2012). "**We decline to read in such an extensive duty absent statutory language to that effect.**" Report of the House Judiciary Committee states that the bill containing 1915(d) was designed to enable persons unable to afford legal representation to avail themselves of the courts, as "[m]any humane and enlightened States" that had similar laws allowed them to do. H. R. Rep. No. 1079, 52d Cong., 1st Sess., 2 (1892). See, **Supra**, Mallard v. U.S. Dist. Ct. S. Dist. Iowa, 490 U.S. 296, at 302 **(1989)**.

## CONCLUSION.

Plaintiff's Motion for Appointment of Counsel should not be dismissed.

DATED this *12* th day of March 2019.

Tami M. Bronnenberg, Pro-se
P.O. Box 802
Cody, Wyoming 82414

## CERTIFICATE OF SERVICE.

I, Tami M. Bronnenberg, Pro-se, swear and certify that I mailed this true and correct original copy of the above Objection for the Court, (a copy for Ms. Bronnenberg's stamped copy with a pre-paid stamped self addressed envelope to be mailed to her), pursuant to **Federal Rules of Civil Procedure, Rule 12 (a) (1) (C); Federal Rules of Evidence, Rules 103 (a) (1); 402** to the United States District Court Clerk's Office, 111 S. Wolcott, Room 121, Casper, Wyoming 82601 on this day of March *12* th, 2019.

Tami M. Bronnenberg, Pro-Se

6

Tami M. Bronnenberg
P.O. Box 802
Cody, Wyo. 82414

U.S. District Court Clerk's Office
111 S. Wolcott, Room 121
Casper, Wy. 82___

KTTN $-GOLD
P. BOTTOM



TAMI BRONNENBERG
(307) 899-2150
PO BOX 802
CODY WY 82414

SHIP ATTN  CLERK OF COURT
TO: (307) 232-2620
U.S. DISTRICT COURT CLERK S OFFICE
RM 121
111 S WOLCOTT ST
CASPER  WY 82601-2534

2 LBS          1 OF 1
SHP WT: 2 LBS
DATE: 30 AUG 2019

WY 826 9-01

UPS GROUND
TRACKING #: 1Z V83 823 03 0495 2354

BILLING: P-P